IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS,
DALLAS DIVISION

ABEL REVILL OCHOA,                         §
                                           §
            Petitioner,                    §
                                           §
                                           §
      -v-                                  §      NO.  3:09-cv-02277-K
                                           §
                                           §
                                           §
RICK THALER,                               §
Director, Texas Department of Criminal     §
Justice, Correctional Institutions Division §      CAPITAL CASE
                                           §
            Respondent.                    §

PETITION FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY

## I. Introduction

This is Abel Revill Ochoa's first federal petition for a writ of habeas corpus challenging the constitutionality of his conviction and death sentence.  Mr. Ochoa was convicted and sentenced to death for the shooting deaths of his wife, Cecilia Ochoa, and his daughter, Crystal Ochoa.  Mr. Ochoa's trial counsel did not begin work on a mitigation investigation until after general voir dire and only five days before individual jury selection was to begin.  This circumstance affected every aspect of the trial representation.  It dramatically limited the ability of the defense to conduct a meaningful voir dire.  It impacted the defense at guilt-innocence, particularly because counsel failed to preserve important evidence.  Finally, it affected the defense's ability to present witnesses at punishment.  The lack of preparation not only affected the presentation of a defense, it also impacted the manner in which counsel preserved issues for further review.  The representation that Mr. Ochoa received was not only inadequate at trial; his appellate attorney failed to raise a number of important

and meritorious issues for appeal.  When these issues are viewed individually or in combination, it is clear that Mr. Ochoa did not receive a fair trial.  He is entitled to relief.

## II.  Jurisdiction

This Court has subject matter jurisdiction of this case under 28 U.S.C. § 2241(d).  Mr. Ochoa was indicted for the offense of capital murder in the 194th District Court of Dallas County, Texas, which is in the Northern District of Texas.  Mr. Ochoa is in the custody of the Texas Department of Criminal Justice in accordance with this judgment and death sentence.  Under 28 U.S.C. § 2244(d)(1), a petition filed on or before August 19, 2010, is timely.

## III.  Procedural History

### A.  Trial and Direct Appeal

Mr. Ochoa was indicted for capital murder in Dallas County, Texas, in connection with the August 4, 2002, shooting deaths of Cecilia Ochoa and Crystal Ochoa.  *1C. 2.*[1]  Mr. Ochoa's trial commenced on April 14, 2003, and the jury returned a verdict finding him guilty of capital murder on April 15, 2003.  *33R. 1; 34R. 95.*  On April 23, 2010, the jury answered the two special issues affirmatively, and the trial court sentenced Mr. Ochoa to death accordingly.  *39R. 108-09.*

---

[1]      In this petition, the official trial transcript of the trial shall be referred to as "R." followed by the page number.  The clerk's record shall be referred to as "C" followed by the page number.  For both the trial transcript and the clerk's record, the volume number shall precede the references.  The state habeas record shall be referred to as "SHR." followed by the page number. All other documents shall be referred to by title followed by citing reference, if any, and page number.  The supplemental state habeas record shall be referred to as "SSHR." followed by the page number.

On direct appeal, the Texas Court of Criminal Appeals affirmed Mr. Ochoa's conviction and death sentence. *Ochoa v. State*, No. AP-74,663 (Tex.Crim.App. January 26, 2005). Mr. Ochoa did not file a Petition for Writ of Certiorari in the United States Supreme Court. Therefore, his direct appeal process concluded and his conviction became final on April 26, 2005. *See Nix v. Secretary, Dept. of Corr.*, 393 F.3d 1235, 1236-37 (11th Cir. 2004).

**B.  The State Habeas Proceedings**

Mr. Ochoa, by and through appointed counsel C. Wayne Huff, timely filed a petition for writ of habeas corpus in state court on February 11, 2005, raising a number of claims. *SHR. 2-55.* On February 21, 2005, Mr. Ochoa, acting *pro se*, timely filed a supplemental petition raising additional claims. *SHR. 158-62.* On March 19, 2007, Mr. Ochoa, again acting *pro se*, filed another supplemental petition raising additional claims. *SSHR. 2-13.* This petition was forwarded to the Court of Criminal Appeals on April 25, 2007, in accordance with Article 11.071, § 5(b), as a successor habeas application. *SSHR. 15-16.* The state habeas court signed findings of fact and conclusions of law recommending that relief be denied on May 7, 2009. *SHR. 345-416.* On August 19, 2009, the Texas Court of Criminal Appeals denied Mr. Ochoa's writ application. *Ex parte Ochoa*, Nos. WR-67,495-1 & WR-67,495-2 (Tex.Crim.App., August 19, 2009). The court also dismissed the second supplemental *pro se* writ application because it "fail[ed] to meet the dictates of Article 11.071, § 5." *Id*. at 2. The AEDPA one-year statute of limitations began to run on this date. Therefore, a petition for writ of habeas corpus is timely if it is filed in on or before August 19, 2010.

3

## IV.  Statement of Facts

**A.      Evidence in the guilt-innocence phase of the trial**

Mr. Ochoa did not contest his guilt during the guilt-innocence phase of trial; instead, he started setting up an explanation of his actions that led to the deaths of five family members.  He more fully elaborated on this explanation in the punishment phase.  In essence, the evidence presented throughout trial showed that Mr. Ochoa developed a cocaine addiction, which started about two years before the murders and escalated in intensity as time passed.  He abruptly quit using cocaine about 10 days prior to the murders, but the cravings built in intensity until he could not handle it anymore.

On Sunday, August 4, 2002, he went with his family to church services and then to lunch.  On the way home, Mr. Ochoa, whose body craved cocaine, asked his wife for money to purchase cocaine in order to stem the cravings.  She relented and gave Mr. Ochoa money to purchase a small amount of cocaine.  However, she insisted on accompanying him to purchase it and that he use it at the house.  When they got home, Mr. Ochoa went into the back yard and smoked the cocaine.  He walked back into the house.  By this time, Cecilia's sisters Jackie and Alma had come over to visit.  Cecilia, Alma, Jackie, his father-in-law Bartolo, and his two children Crystal and Anahi were sitting in the living room.  Mr. Ochoa walked by them.  Cecilia followed him into the bedroom and asked him why he was rude to her sisters, and he told her that he did not want them to see him under the influence of cocaine.  Cecilia returned to the living room.

About 20 minutes later, Mr. Ochoa walked into the living room with his 9mm Ruger pistol and started shooting everyone there.  He shot Bartolo, Alma, Cecilia, and Jackie.  Jackie was holding Anahi, and a bullet pierced Anahi, traveled through her body, and then entered Jackie's body.  When Mr. Ochoa ran out of bullets, he returned to the bedroom and put another clip into the gun.  Alma

4

was able to escape into the front yard, but Mr. Ochoa ran Crystal down and shot her four times.  He then got his wife's ATM card from her purse and then drove their Toyota 4Runner to a nearby shopping center.  The police apprehended him shortly thereafter as he was driving away from the shopping center.

Alma, who was the sole survivor, testified first.  On August 4, 2002, Alma went over to her mother's house to visit.  *33R. 22.*  Her sister, Jackie was there.  *Id.*  They went shopping, and when they returned, Jackie called Cecilia to see if they could come by for a visit.  *33R. 23.*  They went to Cecilia's house around 4:00 or 4:30 p.m.  *Id.*  Her father, Bartolo, was living with Cecilia and Mr. Ochoa after having a leg amputated as a result of complications with diabetes.  *33R. 24.*  Cecilia, Bartolo, and the two girls were there when Alma and Jackie arrived, and they sat in the living room and visited.  *33R. 23-26.*  Jackie was holding Anahi, and Crystal was playing in the floor.  *33R. 26.*  They visited for about 30 minutes, and then Mr. Ochoa came in from the backyard.  *Id.*  He passed through the living room and headed to his bedroom.  *33R. 26-27.*  Alma testified that she said "Hi" to Mr. Ochoa, but he did not respond to her.  *33R. 27.*  Cecilia followed Mr. Ochoa into the bedroom, and Alma could hear them talking, though she could not hear what they were saying.  *Id.*  After about three minutes, Cecilia joined everyone in the living room again.  *Id.*  She brought in an album of Crystal at school, and they looked through it.  *33R. 27-28.*

Alma testified that Mr. Ochoa stayed in the bedroom for about 20 minutes.  *33R. 28, 31.*  Alma looked up and saw Mr. Ochoa in the corner "with the gun and shooting my dad."  *33R. 31.*  Alma said that Mr. Ochoa shot Bartolo two times.  *33R. 32.*  She described the expression on his face as being "very mean, very angry," like he was mad.  *Id.*  Mr. Ochoa turned the gun on Alma and shot her twice.  *33R. 33.*  She fell to the floor in pain, and she could hear "[a] lot of shooting."  *Id.*  She did not see Mr. Ochoa shoot her other family members because she stayed on the floor.

5

*33R. 33-34.*  When the shooting stopped, she saw him going back down the hallway.  *33R. 34.*  She looked over and saw Jackie reach for the phone, but then Jackie fell back and her eyes "went blank white."  *33R. 34-35.*  Alma struggled to get up, and she unbolted the front door in order to escape. *33R. 35-36.*  However, she did not notice where Crystal was.  *33R. 36.*  Alma ran out of the house to seek help.  *33R. 36-37.*  A lady across the street called the police, and Alma could recall telling the police that her brother-in-law shot everyone.  *33R. 38-39.*  Alma was in the hospital for three months, and she did not learn that her family members had died until she was discharged.  *33R. 40-41.*

Officer Abel Lopez responded to the shooting call around 6:19 p.m.  *33R. 46.*  He estimated that the original dispatch went out around 6:10 to 6:15 p.m.  *33R. 49.*  Because he could speak Spanish, he went over to check on Alma.  *33R. 46-47.*  Alma was only speaking Spanish at the time, so the officers needed someone to talk to her.  *Id*.  He noticed that she had at least three, possibly four, gunshot wounds.  *33R. 46-47.*  Alma told Officer Lopez that her brother-in-law had shot her. *33R. 48.*

Officer Sergio Perez also responded to the scene, and he testified about what he saw when he went into the house.  *33R. 55, 65-66.*  He noticed the bodies of Bartolo, Cecilia, Jackie, and Anahi in the living room.  *33R. 65-69.*  He also saw the gun sitting on the coffee table.  *33R. 67.*  Officer Perez and another officer walked through the house to check for other victims and to ensure that the perpetrator was not there.  *33R. 70-71.*  He saw an empty gun magazine (clip) laying on the carpet in the master bedroom.  *33R. 71.*  As they came back to the front of the house, the officers saw Crystal laying in the kitchen.  *33R. 72-73.*  When the paramedics arrived, Officer Perez, along with officer Tami Yanez, stood by and made sure no one moved the gun.  *33R. 75, 86.*  Officer Perez testified that the gun was cocked and ready to fire.  *Id*.  On cross-examination, he admitted that he

6

did not notice any narcotics or narcotics paraphernalia as he and the other officer looked through the house. *33R. 78.*

Inez Colton was the neighbor who first assisted Alma after she escaped from the house. *33R. 88-89.* Colton testified that she watched Alma run out of the house, and as she was running, Colton could hear popping sounds, like firecrackers, going off. *33R. 88-89.* She noticed that Alma was holding her side, and at that point Colton realized that Alma was injured, so she called 911. *33R. 90.* She ran back into the house to get a towel to hold on Alma's wounds, and when she returned, she saw Mr. Ochoa get in Cecilia's car and drive away. *33R. 89-92.* She gave a description of the vehicle to the police. *33R. 92.* On cross-examination, Colton testified that she knew the Ochoa's, and she was not aware of any marital difficulties between them. *33R. 94-95.* They appeared to be a happy couple to her. *33R. 95.* As a matter of fact, when she first saw Alma run out of the house, she thought it was Cecilia and that she and Mr. Ochoa were horsing around like they usually did. *33R. 88-89, 95.*

Officer Jason Cox heard the dispatch about the shooting. *33R. 98.* A description of the suspect's vehicle was given, and he saw a light-colored Toyota 4Runner that fit the description pulling into the Wynnewood Shopping Center. *Id.* He and his partner decided to pull the vehicle over to check it out. *Id.* The car pulled over without problem, which made Officer Cox believe that he did not have the suspect. *33R. 100.* He asked for Mr. Ochoa's ID, and according to Cox, Mr. Ochoa pulled out his wallet, went through it, and then produced his driver's license. *33R. 100, 107.* Cox described Mr. Ochoa's demeanor as calm and cooperative. *33R. 101, 110.* Cox noticed that the address on the license was the same as the reported shooting, so he pulled Mr. Ochoa out of the car and arrested him. *Id.*

7

Officer Cox handcuffed Mr. Ochoa and read him the *Miranda* warnings. *33R. 104-05.* Cox knew that there was a firearm involved, and he explained that he was concerned that Mr. Ochoa "may have thrown the gun out of a window of the vehicle," so he asked Mr. Ochoa where the gun was. *33R. 105-06.* Mr. Ochoa told Cox that the gun was at his house on a table, which was true. *33R. 106, 127.* According to Cox, Mr. Ochoa then said that he was tired of his life and could not handle the stress anymore. *33R. 106, 127-28, 131.* These statements were made around 6:30 p.m., which would have been about 20 minutes after the shootings. *33R. 106, 127-28, 131.* Cox took Mr. Ochoa to the Physical Evidence Section of the Dallas Police Department, where he was fingerprinted and tested for gunshot residue, and then he transported him to the Crimes Against Persons Section. *33R. 106-07.* Cox did not think that Mr. Ochoa had any slurred speech or any other indications of intoxication when he first encountered him. *33R. 108, 110, 129.* While they were sitting at the Physical Evidence Section, Mr. Ochoa asked Cox how his children were. *33R. 108, 128.* He asked whether his baby was okay. *Id.* Then, as they were heading to the Crimes Against Persons Section, Mr. Ochoa said that he could not believe he did it. *33R. 108, 128, 131.*

Upon arresting Mr. Ochoa, Officer Cox retrieved a glass pipe, some brillo pad, and an empty baggie from Mr. Ochoa's shirt pocket. *33R. 109, 130.* He recognized this as paraphernalia that is typically used to smoke crack cocaine. *33R. 109.* The brillo appeared new to him, but he did not recall whether the end of the pipe was discolored. *33R. 130.* He did not see anything in it, however. *Id.* He placed the items in his pants pocket until he went off duty, at which time he placed them into a plastic drug bag and put them into his locker; the next day, he checked the bag with the items into the evidence room as "found property." *33R. 109, 118-22.* By the time Cox delivered the evidence to the property room, he knew that Mr. Ochoa was being charged with capital murder. *33R. 109-10, 131.* He was not aware of the exact contents of the statement Mr. Ochoa provided to the detective,

8

so he was unsure whether he knew that Mr. Ochoa admitted to having smoked cocaine just prior to the murders. *33R. 114-16.* The detective did not give him any direct instructions about what to do with the evidence. *33R. 115.* Instead, the detective told him to do whatever he wanted to with it. *33R. 116.* Cox took it upon himself to log it in as found property. *33R. 116-17, 124.* He insisted that if he thought there was drug residue on the items, he would have logged them in differently. *33R. 133.* Cox admitted that the detective in charge of the investigation had the ultimate responsibility for the preservation of evidence. *33R. 123-24.* He only learned a week before trial that the evidence had been destroyed and that the police department had a policy to destroy unclaimed found property after 60 days. *33R. 124-25, 132.* Cox was not aware of any other drug paraphernalia found during any searches of Mr. Ochoa's residence or car. *33R. 126-27.*

Roosevelt Holiday, a detective in the Crime Scene Unit, photographed the house and collected the evidence as he went through it. *33R. 135-37.* He saw the gun on the coffee table and the empty clip in the bedroom. *33R. 138, 140, 151-52.* Two other detectives assisted him in processing the scene. *33R. 155.* None of these detectives were directed to photograph or collect the drug paraphernalia evidence that Officer Cox seized from Mr. Ochoa. *33R. 155-56, 169-70.* In fact, Holiday could not recall being told about this evidence. *33R. 169.* Holiday admitted that he and the other detectives searched the entire house, as well as the backyard, and they did not find any evidence of drugs or drug paraphernalia. *33R. 156-58.*

Dan Lusty was the detective in charge of the investigation in this case. *34R. 32-33.* He learned that officers were transporting Mr. Ochoa to the Physical Evidence Section, so he headed there. *34R. 33-34.* The officers briefed Detective Lusty, and then Lusty informed Mr. Ochoa who he was and what he would be doing. *34R. 34.* Lusty knew that Cox had already read Mr. Ochoa the *Miranda* warnings, but Lusty wanted to make sure that Mr. Ochoa understood his rights, so he went

9

over them with Mr. Ochoa again.  *34R. 35-37, 53.*  Lusty got Mr. Ochoa to sign a consent to search

form so the other officers could search the house, and then Lusty informed Mr. Ochoa what the

police were investigating and asked if Mr. Ochoa would be willing to accompany him to his office

downtown.  *34R. 34-35.*  Mr. Ochoa agreed.  *34R. 35.*  Lusty described Mr. Ochoa's demeanor when

he first met him at the Physical Evidence Section:

> He was very quiet.  Any questions you would ask him, he responded.  I
> remember at – at the Physical Evidence Section if he understood what day it was and
> he said, Yes, it's Sunday.  Anything I asked him, he responded.  He was articulate.
> He was aware.  He was – he seemed to be sad, upset, but quiet.  He cooperated as far
> as any questions I would ask him.

*34R. 38.*  Lusty testified that his speech was clear and that he appeared alert.  *34R. 38, 58.*

Lusty met with Mr. Ochoa at his office about 10 minutes later after the officers brought him

over, which was about 8:30 p.m. or so.  *34R. 39.*  Lusty described how he initially took Mr. Ochoa's

statement by typing out on a Palm Pilot device.  *34R. 39-40.*  Lusty said he talked to Mr. Ochoa for

about an hour and a half to two hours, getting general information from him as well as information

about the incident.  *34R. 40, 49-50.*  Then they started putting the statement down on paper, and Mr.

Ochoa signed it around 11:15 p.m.  *Id.*  Lusty showed Mr. Ochoa the first draft of the statement, and

Mr. Ochoa indicated that his name was spelled wrong and he wanted it corrected.  *34R. 40.*  Lusty

made the correction and printed out another statement.  *34R. 40-41.*  Mr. Ochoa read over it, and

then Lusty read it aloud "to make sure that he understood the following narrative, this was his

story."  *34R. 41.*  Mr. Ochoa informed Lusty that he did not want to change anything, and then Lusty

pulled in a witness to observe Mr. Ochoa sign the statement.  *34R. 41-42.*

In the statement, Mr. Ochoa said that he lived at 2327 Salerno with his wife and two

daughters.  *34R. 45.*  His father-in-law also lived with them.  *Id.*  He had a drug problem for about

two years, and he had recently spent time in a drug rehab house.  *Id.*  Before he went into rehab, he

had been using cocaine about once every three to four days.  *Id*.  After rehab, he was using once every seven to ten days.  *Id*.  That morning, Mr. Ochoa and his wife and two daughters went to church around 2:00 p.m.  *Id*.  After church, he asked his wife for $10 to buy some cocaine.  *Id*.  At first she refused, but then she agreed.  *Id*.  After buying the cocaine, he returned to his house with his family, and then he went into the backyard to smoke it.  *Id*.  While he was doing this, his two sisters-in-law came over.  *Id*.  After he smoked the cocaine, Mr. Ochoa went to his bedroom and lay down on the bed.  *Id*.  The television was on, but he was not paying any attention to it.  *Id*.  While he lay there, his body started wanting more cocaine, but he knew if he asked his wife for money, she would say no.  *34R. 45-46*.  He knew they would argue like they had in the past.  *34R. 46*.  Mr. Ochoa said he got up and retrieved his gun from the closet, which he knew was already loaded, and he walked into the living room, where he shot everyone there until he ran out of bullets.  *Id*.  He did not remember who he shot first, but he recalled returning to his bedroom and grabbing the other clip.  *Id*.  He went back into the living room, where he saw his daughter, Crystal.  *Id*.  Crystal started running away, and Mr. Ochoa pursued her and shot her.  *Id*.  After shooting everyone, Mr. Ochoa went back to the bedroom, got his wife's purse out, and took her ATM card.  *Id*.  He then drove to the Wynnewood Shopping Center to use an ATM, but he did not know the code.  *Id*.

After Mr. Ochoa signed the statement, he was taken to the jail, and Detective Lusty had no more contact with him.  *34R. 42, 47*.  On cross-examination, Lusty admitted that the interview, which lasted nearly three hours, was not audio taped or videotaped.  *34R. 50*.  He took handwritten notes during the two hour initial interrogation, but he destroyed these after he typed up the statement on his Palm Pilot.  *34R. 51*.  He also destroyed the first draft of the statement.  *34R. 52*.  So there was no record of everything that was said during the two hours before Lusty started writing out the statement.  *Id*.  Lusty also admitted that Mr. Ochoa gave him a small plastic baggie when he was in

the interview room, but Lusty did not preserve this evidence either. *34R. 55-56.* He thought he may have handed it to officer Cox. *34R. 56.* Lusty thought Cox may have told him about seizing other drug related evidence, but Lusty did not recall what they talked about. *34R. 56-57.* He knew that Cox had placed it in the property room as found property. *34R. 57.*

After the medical examiners testified about the cause and manner of death, the State rested, and the defense put on no evidence; therefore, the evidence was closed. *34R. 83.* The jury quickly returned a guilty verdict. *34R. 95.*

### B.      Evidence in the penalty phase of the trial

Alma Alvizo testified again at the punishment hearing. She said she was closest to Cecilia of all her sisters. *35R. 58, 94.* Alma explained that Cecilia had a son, Jonathan, from another man prior to meeting Mr. Ochoa. *35R. 59.* Cecilia kept this fact a secret from Mr. Ochoa, and Mr. Ochoa did not find out about him until they had been married for five years. *35R. 59-60.* During this time, Cecila's mother, Maria Alvarado, was raising Jonathan, and the Alvizo family told Mr. Ochoa that Jonathan was the son of Freddie Alvizo, Cecilia's brother who had died. *35R. 59.* When Mr. Ochoa found out the truth about Jonathan, he was deeply hurt, and he moved out. *35R. 73-74.* He and Cecilia were separated for about eight months. *35R. 64.* During this time, Cecilia recorded a telephone conversation between herself and Mr. Ochoa. *35R. 60-64; State's Exhibits 140-42.* From the context of the conversation, it was apparent that Cecilia had been to visit a lawyer (in order to determine her rights) and she was seeking child support payments from Mr. Ochoa. *State's Exhibit 142.* Mr. Ochoa was not only upset about the betrayal of being lied to about Jonathan for so many years, he was also upset about the impending legal actions Cecilia was proposing. *Id.* When Mr. Ochoa threatened to end the marriage, something that Cecilia apparently did not want, Cecilia threatened Mr. Ochoa that she would keep Mr. Ochoa's daughter away from him and that

12

he should make no inquiries about her. *Id*. At this point, Mr. Ochoa made an oblique reference to shooting Cecilia. *Id*.

Alma's testimony about this incident added considerably to the context of the tape itself. The unmistakable impression that Alma imparted about the situation was that Cecilia did not make the tape in anticipation of a divorce or custody battle as one would deduce from listing to the tape; instead, she made it because she was afraid of Mr. Ochoa. *35R. 60, 64*. Specifically, Alma stated, "She told me that she was going to record it and that she was afraid of him, that if something might happen to her, that I would know that she had that recording." *35R. 64*. She knew that Cecilia was worried about Mr. Ochoa, which evidently is something she learned from Cecilia herself. *35R. 60*. Alma was there when Cecilia made the tape, and she heard Mr. Ochoa threaten to shoot her. *35R. 60*. Eventually, Mr. Ochoa went back to Cecilia, but according to Alma, Mr. Ochoa became more mean and aggressive with his wife. *35R. 60, 64*. The issue of her lying about Jonathan was a frequent source of marital problems for the couple throughout the years. *35R. 64*. He would not allow her to visit with her sisters as often, because he did not trust her anymore. *35R. 65*. Alma said this was a persistent pattern up to the time Mr. Ochoa shot Cecilia. *Id*. Though Alma never saw Mr. Ochoa hit, strike, or slap Cecilia, she witnessed one incident in which Mr. Ochoa forcibly grabbed Cecilia's arm and pulled her towards him. *35R. 66, 69-70*. She also was aware of incidents, other than those on the recorded conversation, when Mr. Ochoa called Cecilia a bitch and a whore. *35R. 87-88*.

On cross-examination, Alma testified that Cecilia's mother told Mr. Ochoa about Jonathan, and Mr. Ochoa was extremely hurt when he heard the news, primarily because of the elaborate deception that Cecilia and her family concocted during these years. *35R. 71-73*. He separated from Cecilia, but then went back to her. *35R. 74*. Alma believed they were a happy couple until Mr.

13

Ochoa found out about Jonathan; after that, she doubted they remained happy together. *35R. 78-79.* Mr. Ochoa left Cecilia one other time for three months in 2000. *35R. 74.* Alma knew that Mr. Ochoa bought the gun for protection after he and Cecilia bought the house on Salerno. *35R. 75-76.* Cecilia was fully aware of the gun, and Mr. Ochoa never took it out and displayed it at any time prior to the shootings. *35R. 76.* Other than the taped conversation and the incident in which Mr. Ochoa grabbed Cecilia's arm, Alma agreed that Mr. Ochoa had never hit, slapped, or threatened Cecilia. *35R. 78.* Alma elaborated on what happened during the arm grabbing incident. *35R. 77-78.* Cecilia's sister, Angelica, was going through marital difficulties with her husband, Victor Faz. *Id.* Cecilia, Alma, and Jackie went to talk to Angelica about the situation, and at one point during the conversation, Cecilia did not like what she heard and got up to leave. *Id.* Mr. Ochoa grabbed her arm. *Id.* Alma agreed that Mr. Ochoa did not improperly discipline Crystal, and she never saw him act rough with her. *35R. 76.*

On redirect, the State probed Alma further about Mr. Ochoa's marriage to Cecilia, and the trial court allowed additional evidence that Alma learned from Cecilia in over objection based on the defense cross-examination. Alma admitted that she never saw Mr. Ochoa slap or hit Cecilia, but she saw suspicious bruises on Cecilia. *35R. 89.* Cecilia never blamed Mr. Ochoa for the bruises, but Alma had her suspicions, which were based on circumstances she learned other than from the taped conversation. *35R. 89.* She knew that Mr. Ochoa had been violent towards Cecilia. *35R. 89-90.* About three weeks before the murders, Cecilia told Alma that Mr. Ochoa had held the gun to her head. *35R. 90.* She told Alma that if anything ever happened to her, then it was Mr. Ochoa who did it. *Id.* Alma saw that Cecilia was scared and upset. *Id.* Though Alma never saw Mr. Ochoa mistreat his daughters, she did not believe he was particularly close to them. *35R. 92-93.*

The State rested after Alma finished testifying.

14

The defense presented considerable testimony during punishment. Mr. Ochoa's father, Abel Ochoa, Sr., testified. He had three sons, Gabriel, Mr. Ochoa, and Javier. *35R. 102.* Two daughters died in childbirth or in infancy. *35R. 102-03, 105.* Abel, Sr., was from Nombre de Dios Durango, Mexico, which was a small village near Torreon, Chihuahua, Mexico. *35R. 103.* He was the oldest of eight children, and he met his wife, Belen, there. *Id.* He did not know much about her family, but he had been married to her for 33 years. *35R. 104.* He had a fourth grade education, and his family was very poor. *Id.* He worked in agriculture in Mexico, planting chilies, tomatoes, and corn. *Id.* There was never enough money, and sometimes the family did not have enough to eat. *35R. 106.* For about three years, he was in the military, and he patrolled the mountain regions looking for drug traffickers while Belen took care of the children. *35R. 107.* He believed the family situation was fine, though they were poor. *35R. 106-07.*

When Abel, Sr., discharged from the military, money was scarce, so he left for the United States to find work. *35R. 108.* He did not remember when he immigrated to the United States, but he estimated he was about about 27 years old. *35R. 105-06.* Gabriel and Mr. Ochoa were young children, and they stayed behind with Belen in Mexico. *35R. 108.* For the next 14 months or so, he worked on a dairy farm and harvested watermelons in Oklahoma and Texas trying to raise money to bring his family to the United States. *35R. 108-09.* Mr. Ochoa was two years old when his mother brought him to Texas. *35R. 109-10.* The family continued to live in poverty, and there were days when Abel, Sr., earned as little as $3 a day. *35R. 110.* The family's situation improved when Abel, Sr., obtained a job at a dairy, where he worked for the next 11 years. *Id.* But when his boss died, he had to move the family somewhere else. *35R. 111.* He could not remember how old Mr. Ochoa was when the family was uprooted this time. *Id.* Abel, Sr., loosely described moving his family around, working at intermittent jobs, until they finally settled in Dallas. *Id.* He recalled that

15

they lived in four different places before moving to Dallas.  *Id*.  During this time, he only recalled being unemployed for about a week, and he agreed that they moved to Dallas to find a better life.  *35R. 111-12.*  Abel, Sr., was not able to provide much detail about his children's education, but he testified that Gabriel and Javier did not graduate from high school, and Mr. Ochoa was the only son to obtain a high school diploma.  *35R. 112-13.*

Abel, Sr., denied that he was an alcoholic, though he admitted that he was a heavy drinker for about five years.  *35R. 113.*  He also admitted that he committed violence in the house, most of which was directed at Belen.  *Id*.  He described it as follows:  "One time I would hit them.  Sometimes I would offend them verbally.  That's it."  *35R. 114.*  He admitted that he physically abused Mr. Ochoa, but "[n]ot a lot."  *Id*.  He beat Mr. Ochoa with a belt and sometimes with a stick or a branch.  *35R. 114-15.*  He admitted that his behavior was not a form of discipline but was a product of his drunkenness.  *35R. 115, 129.*  He took his rage out on Mr. Ochoa.  *Id*.  On cross-examination, he estimated that Mr. Ochoa was around nine years old when this happened.  *35R. 128.*  Abel, Sr., attributed his behavior to the Hispanic culture.  *35R. 113.*  Abel, Sr., had three DWI convictions, and he stopped drinking after a bad accident in which a passenger was seriously injured.  *35R. 115-16.*  This convinced him to stop drinking.  *35R. 116.*  Abel, Sr., testified that one of his brothers, who also lived in the United States, had a drinking problem, and he was aware that there was a history of alcoholism on Belen's side of the family.  *Id*.

Abel, Sr., testified about Mr. Ochoa's marriage to Cecilia.  He could tell that the young couple was in love, and as Abel, Sr., grew to know Cecilia, he treated her like his own daughter.  *35R. 116-17.*  He was very happy to have a granddaughter.  *35R. 117.*  Abel, Sr., did not know the truth about Jonathan either, but on the day Mr. Ochoa found out, he called Abel, Sr., to come get him.  *35R. 117-18.*  They called the police to meet them at Mr. Ochoa's house, because Mr. Ochoa

16

knew that Cecilia would not want him to leave and he did not want there to be an ugly scene. *35R. 119-20.* Abel, Sr., took Mr. Ochoa over to his house to get his belongings and then helped him move into an apartment. *Id*.

Abel, Sr., did not know that his son had become addicted to crack cocaine, and he first found out about it about a month before the shootings. *35R. 119-20.* Cecilia came over to his house and told Abel, Sr., and Belen about the problem, and Abel, Sr., went back to Mr. Ochoa's house to confront him about it. *35R. 120-21, 127.* When he arrived, Mr. Ochoa was high on cocaine. *35R. 120, 127.* Mr. Ochoa later checked into a Christian based rescue house to fight his addiction. *35R. 121-22.* Abel, Sr., did not understand why Mr. Ochoa did what he did. *35R. 126.*

Gabriel Ochoa testified about his family and Mr. Ochoa. Gabriel was married and had two children. *35R. 132.* He lived outside Dallas, and his parents lived with him. *Id*. He owned a construction business. *35R. 133.* He went through the 11th grade and later obtained his GED. *35R. 135-36.* Mr. Ochoa was the only sibling to have graduated from high school. *35R. 136.*

Gabriel immigrated to the United States with his mother and Mr. Ochoa when he was six years old. *35R. 133-34.* He could not really remember much about his childhood in Mexico, but he remembered what life was like when the family relocated in Texas. *35R. 134.* Gabriel testified briefly that his father was a recovering alcoholic, but when he was drunk, he would beat his wife and sons "[w]ith reason or without reason." *Id*. The family did not have much money, and Gabriel recalled times when his father was without work for up to six months at a time. *Id*. Sometimes, he and his brothers, Mr. Ochoa and Javier, picked up cans and pecans, which they would sell to raise money for the family. *35R. 134-35.* Gabriel believed that Mr. Ochoa was 14 or 15 years old when this occurred. *35R. 135.* Gabriel recalled that the family moved three or four times because there was no work for his father. *35R. 137.*

17

Gabriel did not know much about the situation with Jonathan, but he knew that Mr. Ochoa was hurt by it. *35R. 137-38.* Mr. Ochoa mostly kept his feelings about it to himself. *Id.* Gabriel never saw Mr. Ochoa abuse, hit, or slap Cecilia. *35R. 138.* He was constantly around them, and after Crystal was born, he visited with them every day. *Id.* Belen took care of Crystal during the day so Cecilia could work. *35R. 139.* Gabriel considered Cecilia to be part of the family and loved her like a sister. *35R. 139, 144.* Gabriel recalled one instance in which Cecilia did something that should have upset his brother. *35R. 148-49.* They were at a party, and Mr. Ochoa's brother, Javier, handed him a glass of wine. *Id.* When Cecilia saw this, she slapped the glass out of Mr. Ochoa's hand. *Id.* Instead of becoming angry about it, Mr. Ochoa just laughed. *Id.*

Gabriel found out about Mr. Ochoa's crack addiction only a few months before the shootings. *35R. 139, 145.* Cecilia told Belen, who told the rest of the family. *Id.* Cecilia was worried about her husband and wanted him to quit this habit. *35R. 145.* Gabriel knew that his brother's use was getting worse, growing from using twice a week to nearly daily usage. *35R. 151-52.* He could also tell when his brother was high. *35R. 142, 145-46.* Gabriel talked to his brother about his addiction problem, and he urged him to seek counseling. *35R. 139-40.* Mr. Ochoa checked into a church-based rehab program, and Gabriel helped the family make ends meet while Mr. Ochoa was in the program. *35R. 140-42.* Gabriel did not think that he had a drinking problem, but he had quit drinking. *35R. 140-41.* He talked to his brother about how he was able to quit and advised him to do the same. *35R. 141.* Gabriel believed that Mr. Ochoa tried to quit and that he wanted to. *Id.* After Mr. Ochoa lost his job, Gabriel hired him as part of his construction business. *35R. 141-42.* In the week leading up to the shootings, Mr. Ochoa was at home taking care of the baby. *35R. 142-43.* He had quit using cocaine cold turkey. *35R. 146-47.* Cecilia was working

18

during the day.  *35R. 143.*  Gabriel would call and check up on Mr. Ochoa to see how he was doing. *Id*.

Gabriel believed that Mr. Ochoa loved Cecilia and his two daughters.  *35R. 143-44.*  Mr. Ochoa was very close to his daughters and would attend church with them on Sundays.  *35R. 144.* The entire family was devastated when this happened, and Gabriel did not understand the reason for it.  *Id*.

Javier testified later in the trial, relating much of the same information Gabriel and Abel, Sr., did.  Javier was four years younger than Mr. Ochoa, and unlike his brothers, he was born in the United States.  *36R. 158-59.*  He acknowledged that his father was an alcoholic and would beat his wife and children.  *36R. 159.*  Javier recalled, "He would come home sometimes drunk and he would beat on my mom and I couldn't, you know, help her because I was young at the time."  *Id*.  Gabriel and Mr. Ochoa tried to stop their father as well, but they were too young to do much about it.  *36R. 160.*  Sometimes, his father would come home drunk and slap his mother and sometimes he would not do this.  *Id*.  Javier believed he was around six years old when this happened, and it persisted for two to five years.  *36R. 159-60.*

The family was poor and moved a number of times.  *36R. 161-62.*  Javier recalled that the first move happened when he was nine or 10 years old.  *36R. 161.*  They had been living in Purdon, Texas, where his father worked at a dairy.  *36R. 161-63.*  They lived in a house provided by the farmer, but when he died, Abel, Sr., lost his job and the house.  *36R. 162.*  The family moved to Dallas to live with an uncle and then to Purdon, Texas.  *36R. 161-62, 164.*  During this time, Abel, Sr., was mostly unemployed for about a year, and Belen did not work.  *36R. 162.*  When they lived in Purdon, the Ochoa brothers picked up cans and pecans to help raise money for the family.  *36R. 163-64.*  Abel, Sr., eventually found work at a bedding company, but he lost this job after becoming

19

injured in an accident. *36R. 161, 165.* He was disabled for five or six months, but he continued to draw a check. *36R. 165.* While Abel, Sr., worked for the bedding company, the family stayed in Purdon, which Javier described as a small town with dirt roads. *36R. 164-65.* The family next moved to Midlothian, where both Abel, Sr., and Belen worked double shifts in a dairy. *36R. 166.* After a couple of years, the family moved to Dallas, and Abel, Sr., found work on road crews. *36R. 167.*

Javier only recently found out about his brother's drug use. *36R. 168, 177.* He had experience with drugs and alcohol and had been able to overcome them, so he encouraged his brother to seek God's help to quit. *36R. 169-71, 175-76, 181.* Javier testified that it was not obvious when Mr. Ochoa was high. *36R. 178.* Javier worked for his brother, Gabriel, in his construction business during the summer of 2002 when Gabriel brought Mr. Ochoa in as an employee. *36R. 168, 171.* One day, Mr. Ochoa showed up to work looking nervous, and he informed Javier that he had to run an errand. *36R. 171.* He never came back, which led Javier to believe that he was still using drugs. *Id.* Javier did not know where Mr. Ochoa got money to buy drugs; he assumed he used his paycheck. *36R. 171-72.*

Javier never saw Mr. Ochoa behave violently toward Cecilia. *36R. 172.* He knew about the incident with Jonathan, but Javier did not talk to Mr. Ochoa about it. *36R. 180.* Like Gabriel, he witnessed the incident in which Cecilia knocked the drink out of Mr. Ochoa's hands. *36R. 172-73.* Javier thought Mr. Ochoa would respond with anger, but he just laughed it off and left with Cecilia. *36R. 173.* Javier thought Mr. Ochoa loved his wife and children, and he was shocked by what happened. *Id.*

Bessie McClendon lived across the street from Mr. Ochoa and Cecilia, and over the years, she grew very close to Cecilia. *37R. 132-33.* During and after the Ochoa's first separation in 1997,

20

after Mr. Ochoa first learned about Jonathan, Cecilia started confiding in McClendon more and more, including personal and private matters, and they visited almost daily. *37R. 135-36.* McClendon tried to testify about what she learned about Cecilia's relationship with Mr. Ochoa, but after the trial court sustained the State's hearsay objections, she was limited to expressing her belief that Mr. Ochoa and Cecilia had a close, loving relationship. *37R. 133.* They were a normal, caring couple and outwardly appeared affectionate to one another. *37R. 134.* McClendon never noticed any bruises on Cecilia, and she never saw Mr. Ochoa abuse his wife in any way. *37R. 136.*

McClendon testified that Mr. Ochoa was very helpful and friendly to everyone in the neighborhood. *37R. 137-38.* Once, a tree fell down in an elderly neighbor's yard, and Mr. Ochoa helped cut it up and haul it away. *37R. 137.* He helped McClendon out a number of times with her car and her house. *37R. 138-40.* Mr. Ochoa never wanted anything in return for his help. *37R. 139.* She was very happy to have a neighbor like Mr. Ochoa. *37R. 140.* McClendon saw Mr. Ochoa playing with his children in the yard, and he was very proud when Anahi was born. *37R. 134, 141.* He carried her around and showed her affection. *37R. 141.* He played with Crystal and taught her how to ride a bicycle. *37R. 141-42.* McClendon also saw Mr. Ochoa with Jonathan, and he treated him like his own son. *37R. 142-43.*

McClendon was shocked by the shootings. *37R. 144-45.* In the six years she had known him, she had never seen him do anything violent. *37R. 145.* She was saddened by the loss of Cecilia, but she still believed that Mr. Ochoa was a good, kind man who had proven himself valuable to the community. *37R. 145-46.* She did not believe he would do this unless something was wrong with him. *37R. 146.* McClendon did not believe that Mr. Ochoa was jealous of Cecilia in any way. *37R. 147.* In fact, Cecilia had never told her anything in confidence that indicated that she was afraid of Mr. Ochoa. *37R. 149.*

21

Jerry Heath was another neighbor who knew the Ochoas.  About two years before the trial, a big oak tree had fallen in an elderly lady's yard.  *36R. 110.*  Heath woke up early and was trying to clean it up by himself, but all he had were a pair of hedge clippers and a hand saw.  *36R. 111.*  A short while later, Mr. Ochoa came to help, bringing a chain saw.  *36R. 111-12.*  They worked from 8:00 in the morning until around 6:00 that evening clearing up the mess, and after they finished, Mr. Ochoa refused to be paid for his work.  *36R. 112.*  Heath offered Mr. Ochoa a beer, but he refused that as well.  *36R. 113.*  Heath never saw Mr. Ochoa smoke or drink.  *Id.*  Heath was shocked to learn that Mr. Ochoa did this.  *36R. 116.*  He did not believe in his wildest dreams that he would ever do anything like it.  *Id.*  Heath knew Mr. Ochoa as a hard-working man who kept his house up.  *Id.*  He had a beautiful family.  *Id.*

Several of Mr. Ochoa's co-workers testified.  Mike Barrera worked at International Mill Service (IMS) with Mr. Ochoa.  *36R. 119-21.*  Later, IMS was bought out by Heckett, and Barrera and Mr. Ochoa stayed on as employees.  *36R. 122.*  IMS, and later Heckett, ran a steel recycling business, and Mr. Ochoa and Barrera were heavy equipment operators.  *36R. 120-22.*  Barrera believed that Mr. Ochoa was a good, hard worker.  *36R. 123-24.*  During all the years he worked with Mr. Ochoa, he had never seen Mr. Ochoa fight with anyone or talk inappropriately.  *36R. 124.*  He was also familiar with Mr. Ochoa's family life, and he never saw Mr. Ochoa mistreat his wife.  *36R. 125.*  In fact, he knew Mr. Ochoa as a very happy person, who was always laughing and joking with people around him, and he thought of Mr. Ochoa as just a normal guy.  *36R. 129.*  He was shocked to learn that Mr. Ochoa did this.  *Id.*  Corbet Grimes was a shift supervisor at IMS, though he was not Mr. Ochoa's direct supervisor.  *37R. 91, 101.*  Mr. Ochoa was a good employee who always did his job; in fact, Grimes considered him one of the better employees at IMS.  *37R. 92-93.*  Mr. Ochoa was out going and got along with everyone.  *37R. 93.*  He had very few accidents, which

indicated to Grimes that he paid attention to what he was doing. *Id*. During the last four or five months of Mr. Ochoa's employment, Grimes noticed a change in Mr. Ochoa. *37R. 94*. He did not hang around with his coworkers as much, and he was not the same easy going person. *Id*. Toward the end of his employment, Mr. Ochoa had an accident with a pallet carrier in which he turned it over. *37R. 96-97*. When Grimes arrived on the scene, he saw Mr. Ochoa sitting close by, and a Bible was on the ground near him. *37R. 97*. Grimes never saw Mr. Ochoa do drugs on the job, however. *37R. 98, 100*. Mr. Ochoa never acted up or got intoxicated as far as Mr. Grimes knew. *Id*. The day that Mr. Ochoa left Heckett, he just parked his machine and walked off. *37R. 101*. He was shocked to hear about the shootings. *37R. 99*.

Ronald Pirkle was the custodian of records at the Dallas jail. *36R. 133*. He testified that the jail records reflected that Mr. Ochoa had no disciplinary problems in the least during his time at the jail, other than refusing his dinner tray twice. *36R. 150-52*. He had been housed in a single-man, maximum security cell because of the nature of the charges and not because of his behavior. *36R. 140-41, 151*. S.O. Woods, a prison classification expert called by the defense, testified that he had reviewed Mr. Ochoa's jail records, offense reports, and other documentation related to this case, and he believed that Mr. Ochoa would be classified as a G3 or G4 inmate if given a life sentence. *37R. 27, 57*. He would be assigned to a high security unit and would be housed in a two-man cell. *37R. 27, 39-40, 57*. He would have some degree of movement within the prison unit, but it would be restricted because of his classification. *37R. 41, 44-45, 57, 66*. The prison unit would also restrict his prison job details. *37R. 49*. He could improve his classification with good behavior. *37R. 45-46*. Woods extensively testified about what life would be like for Mr. Ochoa in prison. *37R. 29-49*. Based on Mr. Ochoa's age, his lack of prior criminal history (which meant he lacked street savvy), and his good behavior in jail while awaiting trial, Woods believed that Mr. Ochoa would adapt well

23

in prison and would pose a minimal risk. *37R. 46-47, 58-59, 71*. Woods admitted, however, that he did not know about Mr. Ochoa's brain damage from cocaine use. *37R. 71*. But he opined that Mr. Ochoa's ability to obtain cocaine in prison would be very limited, so he apparently did not change his opinion based on this new information. *37R. 60-65, 82*.

Victor Faz, Mr. Ochoa's brother-in-law (through marriage to Cecilia's sister Angelica), was very familiar with Mr. Ochoa and Cecilia, their marriage, and their family. *37R. 160-61*. He married Angelica before Mr. Ochoa met Cecilia, and he and Cecilia had a very close relationship, one in which Cecilia would confide in him. *37R. 161-62*. Faz was a very religious man, and though he did not go to the same church as Cecilia and Mr. Ochoa, he believed that Cecilia followed his guidance and trusted him as she would an older brother. *37R. 162, 164-65, 171*. She would tell him the secrets of her heart. *Id*. He believed that Cecilia and Mr. Ochoa loved one another and were happy. *37R. 161*. Mr. Ochoa was a good father and gave his children proper attention. *Id*. Mr. Ochoa took in Cecilia's father after he had his foot amputated when it became apparent that Faz and Angelica would be unable to take care of him. *37R. 163-64*. Furthermore, Faz believed that Mr. Ochoa treated Jonathan like his own son. *37R. 165*.

Faz did not learn about Mr. Ochoa's drug use until about a year before the shootings, and he tried to help him with it. *37R. 166-67*. Cecilia is the one who approached him seeking help, and they talked about getting Mr. Ochoa into a Christian-based drug rehabilitation center. *37R. 167-68, 175-76*. Faz approached Mr. Ochoa about it, and Mr. Ochoa agreed to go. *37R. 168*. Faz believed that Mr. Ochoa was serious about wanting to kick his habit. *Id*. However, Mr. Ochoa did not finish the rehabilitation program. *Id*. Nevertheless, Faz knew that Mr. Ochoa was ashamed of his drug habit. *37R. 172*. After Mr. Ochoa lost his job with Heckett, Faz offered him a job in his business,

24

and Mr. Ochoa proved himself to be a hard worker.  *37R. 168-70.*  In fact, Faz wanted to make him a business partner.  *37R. 169.*

Faz did not believe that Cecilia was abused.  *37R. 171-73.*  Cecilia was prone to recording phone conversations, and she had recorded a conversation with her mother once and had shown it to Faz.  *37R. 171-72.*  Faz believed that Cecilia would have told him if Mr. Ochoa were abusing her. *37R. 173.*  Faz believed that friends influenced Mr. Ochoa to try cocaine and, once cocaine took control of him, he was unable to control himself.  *37R. 166, 174.*  If it had not been for cocaine, this would never have happened.  *37R. 174.*

Herbierto Lopez was the director of Casa de Rescate, a Christian-based rehabilitation center located in West Dallas, that Mr. Ochoa entered.  *37R. 103-05.*  It was affiliated with a Pentecostal church.  *37R. 108.*  Lopez described the center:  It could hold up to 30 people at a time, and participants were expected to attend church seven days a week, fast three days a week, work, and pray.  *37R. 106-08.*  Lopez was an ex-drug addict, and he was able to quit drugs by faith in God, and he expected residents of the center to do the same.  *37R. 105.*  Residents raised money for the center by selling candy and tamales door to door during the day, and they attended church services at night. *37R. 104, 105-08.*  Lopez handled all the counseling duties, something he asserted he attended school to do, but the center did not staff any counselors or psychologists.  *37R. 106.*  Mr. Ochoa stayed at the center for about two or three months.  *37R. 108-09.*  He talked to Lopez about his drug addiction and his marriage, but he left the center too soon.  *37R. 108-10.*  Mr. Ochoa believed he needed to work to support his family, so he left, which Lopez believed was his mistake.  *37R. 112.*

Rodolpho Ojeda was a deacon at the Pentecostal church that was affiliated with the rescue center.  *37R. 113-15.*  He knew that Mr. Ochoa was a resident at the center, and he would see Mr. Ochoa at the services.  *37R. 115-16.*  Like Lopez, Ojeda was a recovering drug addict and alcoholic,

and he found deliverance from his addictions through faith.  *37R. 116.*  Ojeda saw Mr. Ochoa at church services on August 4, 2002, the day of the shootings.  *37R. 117.*  Mr. Ochoa came to the altar during the services seeking a miracle or anointment.  *37R. 118.*  After Mr. Ochoa's arrest, he visited Mr. Ochoa at the jail.  *37R. 122.*  Mr. Ochoa cried when he saw Ojeda, and Mr. Ochoa talked with him about the incident.  *37R. 122-23.*  Ojeda believed that Mr. Ochoa had repented.  *37R. 123.*  Ojeda visited again about two weeks later, and when he approached the cell, he saw Mr. Ochoa praying.  *37R. 125.*

Mr. Ochoa testified.  He was born in Durango, Mexico, and he was two or three years old when his family moved to Texas.  *38R. 6.*  He did not remember much about Mexico or the early years in Texas.  *Id.*  His first memories were living in Waller, Texas, when his family lived in the farm house and his father worked at the dairy.  *38R. 6-7.*  They lived there for about 10 years until he was around 12 years old.  *Id.*  When he started kindergarten, he could not speak English, but during the year he learned little by little.  *38R. 8.*  While the family lived in Waller, Abel, Sr., drank heavily, and he would abuse his wife and the children.  *38R. 8-9.*  He would come home drunk and beat on Belen, and Mr. Ochoa and his brothers would try to stop him.  *Id.*  Mr. Ochoa said this upset him greatly, and the memory of it still upset him.  *Id.*  When Abel, Sr., lost his job in Waller, the family went through a very tough year–first moving to Dallas to live with an uncle and then moving to Purdon, where Abel, Sr., was unable to find steady work.  *38R. 9-10.*  The family lived in Purdon for about two to two and a half years, and Mr. Ochoa recalled picking up cans and pecans to help the family with money.  *38R. 10.*  Mr. Ochoa also lost a year of school during this time, but he was able to make it up when the family finally got settled in.  *38R. 10-11.*  By this time, Abel, Sr., had quit drinking, but the family remained very poor.  *38R. 11.*  Abel, Sr., became a legal resident, so his employment opportunities improved, and he was able to find work at a bedding company in

26

Corsicana. *38R. 11-12.* During this time, Mr. Ochoa continued his schooling, and he made mostly B's and C's. *38R. 12-15.* Abel, Sr., moved to Midlothian next, and he and Belen worked double shifts at a dairy. *38R. 13-14.* The work was hard, and the pay was meager. *Id.* Finally, the family settled in Dallas, where Mr. Ochoa graduated from high school at Sunset in Oak Cliff. *38R. 15-16.* Abel, Sr., made decent money working for a paving company. *38R. 15.*

Mr. Ochoa graduated from Sunset High School in 1991. *38R. 16.* During his senior year and after graduation, Mr. Ochoa worked as a busboy at Luby's cafeteria. *38R. 16-17.* He started working for IMS on August 24, 1991. *38R. 19.* After a 90 day probationary period, he was hired permanently and given a raise. *Id.* In 1999, Heckett bought IMS and laid off 20 percent of the workforce, but Mr. Ochoa was retained. *38R. 19-20.* Mr. Ochoa started work as a torch operator, but he was eventually promoted to heavy equipment operator and was trained accordingly. *38R. 21-22.* Other than an accident in 1994, he had a good safety record, and received frequent promotions over the years. *38R. 22, 32-33.*

In November 1991, Mr. Ochoa met Cecilia at a dance club, and he asked her to dance. *38R. 23-24.* He noticed her beautiful hair, and the two hit it off immediately. *38R. 24.* After dating for a while, they moved in with Mr. Ochoa's grandmother. *38R. 24-25.* Cecilia became pregnant, but because the couple had not discussed marriage and because they believed they could not financially afford a child at that time, particularly given their living arrangements, they decided to terminate the pregnancy. *38R. 26-27.* The couple moved into several apartments over the next year or so, and in 1993, Mr. Ochoa decided to propose to her. *38R. 29-30.* They were married in a civil ceremony, and afterwards they informed their families. *38R. 30-31.* Mr. Ochoa's family was happy for him, but Mr. Ochoa did not know how Cecilia went about telling her family about it. *38R. 31-32.* Crystal was born in 1994, and Mr. Ochoa was very proud to be a father. *38R. 33.* He recalled her going to

27

school; she was a very happy child.  *38R. 34.*  Cecilia started working at Head Start of Greater Dallas after Crystal was born, and Belen took care of Crystal during the days.  *38R. 34-37.*  Cecilia worked because she wanted to, and Mr. Ochoa was happy for her.  *38R. 36-37.*  Some of his family thought it was strange that his wife would work when he had a good job, but Mr. Ochoa supported her decision, and he would take her flowers and teddy bears to work.  *38R. 35-37.*

In December 1995, while he and Cecilia were still living in an apartment, Mr. Ochoa bought the gun.  *38R. 37-38.*  He explained that he bought it for home protection, and he showed Cecilia how to use it.  *38R. 39-40.*  Around mid 1996, Mr. Ochoa and Cecilia purchased the house on Salerno.  *38R. 42-43.*  Mr. Ochoa was 23 years old, and he was very proud to share in the American dream of home-ownership at such a young age.  *Id.*  Prior to 1997, Mr. Ochoa believed that he and Cecilia were very happy; they both continued to work and to live on Salerno with Crystal.  *38R. 46.*  There were two incidents in which he and Cecilia argued, and the exchanges became heated enough that he ended up slapping her; however, they quickly made up, and she forgave him.  *38R. 46-47, 149, 173-74.*  They talked about their abusive family lives growing up, and they agreed that they did not want that for themselves.  *38R. 47.*  Also, Mr. Ochoa talked about the time that he grabbed Cecilia by the arm.  *38R. 169.*  He and Cecilia were talking to Angelica and Jackie about Angelica's marital difficulties, and Cecilia became angry during the conversation and got up to leave.  *Id.*  Mr. Ochoa grabbed her by the arm to explain what was being said and to tell her not to leave without the children.  *Id.*  Other than these incidents, life was happy.

In 1997, Mr. Ochoa learned that his wife had deceived him about her past.  When Mr. Ochoa met Cecilia, her mother Maria was raising a child, Jonathan, and Cecilia, along with the rest of her family, told Mr. Ochoa that Jonathan was Freddie Alviso's son.  *38R. 47-48.*  Freddie had died previously, and Mr. Ochoa thought that Jonathan was an orphan child.  *Id.*  One day, Cecilia and her

28

mother were arguing, and Maria told Mr. Ochoa that Jonathan was really Cecilia's child.  *38R. 49,*
*150-51.*  Mr. Ochoa did not believe Maria, but she insisted she could prove it; so they went over to
Maria's house, and she showed, Mr. Ochoa the birth certificate.  *Id.*  Mr. Ochoa was deeply hurt that
he had been deceived in this way, and he ran from the house.  *38R. 49-51.*  He called his father to
pick him up, and they called the police to go over to Mr. Ochoa's house while he retrieved some of
his belongings.  *38R. 52-53.*  Mr. Ochoa explained that Cecilia did not want him to leave, and Mr.
Ochoa did not want her to cause a scene.  *38R. 53.*  Mr. Ochoa moved into an apartment.  *38R. 53-*
*54.*  The separation lasted for about six months, but during this time, Mr. Ochoa saw Cecilia and
Crystal regularly.  *38R. 54-55.*  Cecilia visited with a lawyer to learn about her rights and to secure
child support from Mr. Ochoa.  *38R. 55.*  This upset him, and it was after learning that Cecilia was
pursuing legal remedies that the phone conversation that Cecilia taped occurred.  *Id.*  Mr. Ochoa
agreed that he and Cecilia had a heated argument during the course of the conversation, and he said
many things that he regretted.  *38R. 57, 152.*  He did not recall threatening Cecilia, and he would not
have believed it until he heard the tape.  *38R. 58, 152.*  Mr. Ochoa ended up going back with
Cecilia–he apologized for leaving her, and he forgave her for deceiving him about Jonathan.  *38R.*
*56, 58-59, 154.*  Mr. Ochoa consistently denied that he harbored a grudge or was still angry about
Cecilia's deception over Jonathan and their brief separation, all of which happened in 1997, and that
it had nothing do to with his actions on August 4, 2002.  *38R. 148-49, 159-60, 173.*

 After Mr. Ochoa moved home, life resumed as before, and Mr. Ochoa stated that his love
for Cecilia did not fail "one bit."  *38R. 58, 156-57.*  He cared for Jonathan as before, and he never
blamed him for the deception and the temporary breakup of his marriage.  *38R. 50-51, 58-59.*  In
1999, Mr. Ochoa separated from Cecilia again for about three months, moving into an apartment
as before, but this time, Mr. Ochoa needed some time to himself.  *38R. 61-62, 154-55.*  It had

nothing to do with Jonathan and Cecilia's prior deception; instead, it was a personal matter to him. *38R. 62-63, 154-55.* Again, he returned home and resumed his life with Cecilia. *Id.* Also, in 1999, Mr. Ochoa became a U.S. citizen. *38R. 64.* Mr. Ochoa was not one to drink to excess, though he admitted that he drank during his first separation, and he tried powdered cocaine once, but when he lived with Cecilia, he stayed sober. *38R. 65.* Other than smoking marijuana once or twice, which was after he started abusing crack cocaine, he had not tried other psychedelic drugs, like LSD and psilocybin. *38R. 67.* Therefore, his problems with cocaine began when he moved back in with Cecilia the second time.

Mr. Ochoa thought his first experiment with crack cocaine was in January 2000, but he was not sure of the exact date, and it could have been in late-1999. *38R. 65-66.* Mr. Ochoa was hanging out with some of his friends from work. *38R. 68.* They had rented a hotel room, and the rest of the men there were smoking crack. *Id.* At first, Mr. Ochoa refused to try it, but later he relented. *Id.* He had been drinking some, and he explained that the effect he felt from the cocaine was that it took whatever intoxication feeling he had away. *38R. 69-70.* Mr. Ochoa only tried one hit. *Id.* The next week, the men gathered in another hotel room, and Mr. Ochoa wanted to see how the cocaine would feel without the effect of alcohol; so this time, he tried more than one hit. *38R. 71-72.* He said it made him feel good. *38R. 72.* The third time Mr. Ochoa tried crack, he was by himself. *Id.* Mr. Ochoa started using crack a couple of times a week. *38R. 72-73.* He used his own money to pay for it, which was easy at first because he smoked very little and only intermittently, and he typically did it while driving around or he would rent a hotel room. *38R. 73-74.*

His cocaine use progressed over the course of the year. *38R. 160-61.* He continued to use it several times a week and would rent hotel rooms, but then he started using it at home. *38R. 74-75.* His daughter, Crystal, saw him smoking it once, and when Cecilia found out, she was angry with

him.  *38R. 75-77*.  Mr. Ochoa started out buying $10 to $20 at a time, but his usage increased over

the course of the year to $60 to $80 at a time.  *38R. 77, 165*.  Mr. Ochoa explained that his craving

for the drug was not something that was in his head; instead, it was his body that needed it, and he

compared it to hunger.  *38R. 77-78*.  "Then sometimes I would, you know, use that within a few

hours and then sometimes I would – you know, my body would still have the urge or need more,

and, you know, I'd go – I'd go get more sometimes."  *38R. 77*.  At first, he was able to pay for the

drugs from money he carried in his wallet, but as his use increased, he was unable to keep up, and

he started using money from his and Cecilia's checking account.  *38R. 78-79*.  Eventually, this was

not enough, and Mr. Ochoa started taking out loans at small, local finance places.  *38R. 82-83*.

Because he had a steady job and good credit, obtaining a loan was easy for him.  *Id*.  Furthermore,

if he refinanced the loans by extending the credit line and adding to the loan, he could delay making

payments on them.  *Id*.  He used three or four of these places to obtain money for his increasing

needs for cocaine.  *Id*.  By the end of 2001, Mr. Ochoa was easily spending $100 to $300 per week

on cocaine and was using it three to four times a week.  *38R. 86, 165-66*.

     With the need for more and more money to buy cocaine came the need to conceal his activity

from Cecilia, but eventually this became impossible.  *38R. 79-80, 145*.  In order to keep him from

spending all the family's money, she took away his checkbook and ATM card, which he freely gave

to her.  *38R. 79-80*.  She even changed the PIN on her ATM card.  *38R. 80*.  But with easy credit,

he was able to continue financing his habit for the time being.  On October 7, 2001, Cecilia gave

birth to Anahi, but Mr. Ochoa had virtually no memory of her birth because he was high on cocaine.

*38R. 80-81, 84-85*.  In the same month, Mr. Ochoa became sick with a bad cough and a fever, which

he attributed to his cocaine use.  *38R. 85-86*.  Mr. Ochoa was unable to seek medical help during this

time, because he knew that he would be subjected to a drug screening, and he did not want to fail

31

it and lose his job. *38R. 85-88.* Once, Mr. Ochoa injured his thumb at work, but he did not seek treatment right away. *38R. 87-88.* When he could not put off going to the doctor anymore, he talked an uncle into providing him with a urine sample so he could pass the drug screening test. *38R. 87-88, 146.* Up to this point, Mr. Ochoa did not use cocaine at work, but his body started craving the drug more and more. In March 2002, Mr. Ochoa started taking cocaine at work. *38R. 88-89.* He explained that he needed to take it at work just to calm his body down. *Id.* Mr. Ochoa knew that his problem was out of control after two things happened. First, Cecilia started crying, telling him that she was married to a drug addict. *38R. 90.* He promised to quit, and though he was sincere about it, it proved impossible for him. *Id.* The second incident happened one day when he just pulled his piece of equipment over and walked off his job. *38R. 91.* He went to buy more crack. *Id.* The next day, Cecilia confronted him, and he dropped to his knees and confessed to her that he could not stop by himself. *38R. 91-92, 163-64.*

Mr. Ochoa's brothers had also confronted him about his cocaine use, and Mr. Ochoa agreed to enter the rescue house. *38R. 92-93.* Gabriel loaned Mr. Ochoa $2,000 to pay off his loans so Mr. Ochoa could focus on recover and not have to worry about Cecilia having this debt hanging over her head. *38R. 94-95.* Faz then took Mr. Ochoa to the rescue house. *38R. 95.* At the rescue house, there were no drug counselors, psychologists, or 12 step programs; instead, he sold candy during the day and went to church at night. *38R. 96-97.* Mr. Ochoa stayed there for about two months, but he was not consistent. He would make excuses to leave in order to use cocaine. *38R. 98-100, 146.* Mr. Ochoa left the center twice, and on the third occasion, he never came back. *38R. 99.* Mr. Ochoa started working for Faz, but by this time he had returned to cocaine use. *38R. 100-02.* Some days, Faz would come by to pick Mr. Ochoa up, but Mr. Ochoa would not come out of the house. *38R. 102.* Mr. Ochoa started borrowing money again in order to finance his cocaine purchases. *38R. 104.*

32

Mr. Ochoa left Faz's employ and started working for Gabriel. *38R. 104-05.* As with Faz, Mr. Ochoa continued to use cocaine and some days would not work. *Id.* He explained that he would drop his children off in the morning and then purchase some cocaine on the way to work. *38R. 105.* After Mr. Ochoa had maxed out his credit at the finance places, he received an offer for a line of credit through the mail. *38R. 107.* He and Cecilia decided to take out the loan to pay off the finance places. *Id.* Cecilia was supposed to go with him to do this, but one day at work, he left early, took out the loan, and then purchased cocaine and used it at a hotel. *Id.* He spent about $200. *Id.* When he got home, he gave Cecilia the rest of the money, and she paid off the other debts. *38R. 107-08.*

This happened on July 25, 2002, and this was the last time he did cocaine until August 4, 2002. *38R. 108-09.* Cecilia took away the money and disabled his truck so he could not drive. *38R. 108-10, 162-63.* Mr. Ochoa stayed home for the next 10 days looking after Anahi. *Id.* He was determined to quit, and at first, the cravings were manageable. *38R. 111.* But as the week wore on, his body craved the drug. *Id.* Mr. Ochoa described the events of August 4. He went with his family to church, and then they went to eat at a restaurant. *38R. 113-14, 175-76.* When they got in the car to leave, Mr. Ochoa asked Cecilia for $10 for some cocaine, but she refused. *38R. 115.* He explained that he had been clean for 10 days, and a small amount would help relieve his body's cravings. *Id.* She relented, and they went to a "dope" house to buy crack. *38R. 116.* Afterwards, they returned home, and Mr. Ochoa went into the back yard to smoke the cocaine. *38R. 116-17.* He took two or three hits until all the cocaine was gone. *38R. 118, 176.* Mr. Ochoa felt a rush unlike other times. *38R. 119.* He explained, "My head was brushing, going in circles, going crazy." *Id.* He was perspiring and his heart was racing. *Id.* He felt as if his cheeks were puffed up, and he thought he may have been breathing heavy. *Id.* He could not tell what he was thinking, however. *Id.* He walked back into the house, where he saw his wife and children with Cecilia's sisters, who

33

had come by for a visit, and Bartolo. *38R. 120.* Mr. Ochoa walked by them and headed for the bedroom. *Id.* He thought he may have said "Hi" to them, but he was not sure. *Id.*

From this point forward, Mr. Ochoa guessed at what he did because he did not have a clear memory of everything. He was not 100 percent sure what happened, and he could not recall any of his thoughts. *38R. 121.* His head was spinning. *Id.* He thought he turned on the television and lay on the bed. *38R. 120, 177.* Mr. Ochoa recalled that Cecilia came into the bedroom and scolded him for being rude. *38R. 122, 177-78.* When asked how that made him feel, he responded: "What did I feel? I don't know. I don't know if I felt anything after that. I just remember responding to her." *Id.* He told Cecilia that he felt that his face was messed up and he did not want her sisters to see him that way. *Id.* Mr. Ochoa had read his statement many times since giving it to Detective Lusty, but he had no clear recollection of everything that was said in the statement or even of the process of giving it to Lusty. *38R. 122-23.* Mr. Ochoa did not remember the events that followed after Cecilia left the room, but he could remember hearing many gunshots. *38R. 122, 81.* He did not remember getting the gun, loading it, going into the living room, and shooting his family. *38R. 123-24, 179-80.* He recalled going back to the bedroom and reloading the gun, and he recalled shooting Crystal. *38R. 124, 181-82.* He did not recall chasing her, and he did not recall what he was thinking as he did these terrible things. *38R. 124-25, 182-83.* He could remember shooting Crystal two times, but it was apparent to him that he had shot her four times at least. *38R. 138, 182-83.* He loved his family, all of them, and he was not angry with them. *38R. 125, 174.* He simply did not know why he did what he did, and he could think of nothing anyone had done to him to provoke such a reaction. *38R. 125, 135, 162.* Mr. Ochoa recalled getting Cecilia's purse out and digging through it for her ATM card. *38R. 125-26.* He recalled getting into her 4Runner and driving to the Wynnewood Shopping Center. *38R. 126.* He tried to get money from the ATM machine, but he

34

was not able to get anything.  *38R. 126-27.*  Mr. Ochoa did not know if Cecilia had money in her

purse or if he even looked.  *38R. 128.*  After he was arrested, Mr. Ochoa recalled telling Office Cox

that the gun was on the coffee table at his house.  *38R. 129.*  He had a clear recollection of leaving

it there.  *Id.*

   Mr. Ochoa was not clear about everything that happened after his arrest.  He did not recall

telling Cox that he could not handle the stress and that he was tired of his life.  *38R. 170-71.*  He was

not calling Cox a liar; he just did not remember it.  *Id.*  He somewhat recalled talking to Lusty, but

he did not remember most everything about the interrogation or what he said.  *38R. 133, 148, 186.*

He did not think that Lusty was crooked or that he was out to get him, but he believed that during

the course of nearly three hours, Lusty provided him information that allowed him to assemble what

happened.  For example, Lusty asked if he remembered shooting Crystal.  *38R. 137.*  Also, Mr.

Ochoa believed his past experience with his family and his own house allowed him to reassemble

or reconstruct what happened, even though he had no clear memory of everything that happened in

his house.  For instance, he knew the gun was always loaded, so it made sense that he said in his

statement that the gun was loaded.  *38R. 139.*  He knew that everyone was sitting in the living room

because he recalled seeing them there when he walked in from the backyard, so it made sense that

he would tell Lusty that he went into the living room and shot everyone there.  *38R. 140.*  He knew

how his body reacted when it craved cocaine, and he knew that seeking more money would lead to

an argument because that is what happened to him in the past.  *38R. 144, 172-73, 178.*  He admitted

that Cecilia gave him a problem about his drug use.  *38R. 144-45, 163-64.*  He had resorted to taking

money out of her purse once or twice, and when she caught him, she asked if this was how bad

things had become.  *38R. 163-64, 166.*  But money was not a consistent source of confrontation

between them because he could fall back on the loans.  *38R. 163-64.*  Mr. Ochoa, however, denied

that he ever held a gun to Cecilia's head a few weeks before the shootings; he had no recollection of that ever happening.  *38R. 168-69, 173, 187.*

Mr. Ochoa recalled talking to Gabriel the next day when he was in jail.  *38R. 133-34.*  He asked how his daughters were, and Gabriel told him that they were dead.  *Id*.  He recalled shooting Crystal, but he did not know she was dead until Gabriel told him.  *38R. 175.*  He knew from talking to Lusty that he had shot his family members.  *Id*.  He continued to hear gunshots in his head.  *38R. 175, 186.*

The defense called several expert witnesses to talk about Mr. Ochoa's brain damage and addiction to crack cocaine, and how these things affected his behavior.  Dr. Theodore Simon was a nuclear medicine physician, and he had read the results of a PET scan performed on Mr. Ochoa on April 4, 2003.  *36R. 41-42.*  Dr. Simon determined that Mr. Ochoa had brain damage, and this damage was consistent with extensive cocaine abuse.  *36R. 46-47, 49.*  There were five areas of damage revealed in the images:  (1) "salt and pepper" spots of damage throughout the cerebral cortex; (2) decreased activity in the left frontal lobe; (3) damage to the right parietal lobes, which indicated they were not functioning properly; (4) increased activity on the left portion of the basal ganglia in the amygdala region; and (5) damage to the medial part of the temporal lobes.  *36R. 44-46.*  Dr. Simon agreed that functionally, these portions of the brain were dead.  *36R. 45-46.*

Dr. Edgar Nace was a psychiatrist with extensive experience in treating addiction.  *36R. 52-53.*  He was a clinical professor of psychiatry at the University of Texas Southwestern Medical School.  He had a subspecialty in addictions and substance abuse disorders, which had been a focus of his practice for more than 30 years.  He was the director of the Turtle Creek Manor, a substance abuse treatment center; he had been the director of other substance abuse treatment centers.  He worked in the Army at Walter Reed Institute of Research on substance abuse issues.  *Id*.  He had

36

written articles on substance abuse and its effects. *36R. 53*. Dr. Nace explained the effects of cocaine on a person. "Crack cocaine is a highly purified form of cocaine, just about completely pure cocaine. No other kind of chemicals mixed in with it." *36R. 53-54*. Smoking provided the quickest way to get the full effect of the drug to the brain, which can happen within eight to 10 seconds of smoking it. *36R. 54*. A user will feel high, excited, and euphoric, and a person using cocaine will have an intense feeling and will want to "return trying to repeat it time after time." *Id*. Crack use will also produce adverse side-effects, such as irritability, excitability, and agitation. *Id*. It has a powerful effect on the brain, more so than nicotine, and a person addicted to it will feel a compulsion to keep using it even with the best of intentions not to return to it. *36R. 54-55*.

Cocaine works by blocking dopamine transporters in the brain, which results in a full shot of dopamine hitting receptive synapses in the brain, which in turn stimulates the brain excessively. *36R. 55-56*. The high created by cocaine is only short-lived, so the person using it has a strong desire to repeat the effect. *36R. 56-57*. However, repeated use will leave the addict exhausted and washed out. *36R. 57*. Therefore, it is common for a person to use crack for days in a row and pull back from it for several days. *Id*. But then the craving for the high will come back, and the addict will seek out more cocaine. *Id*. Another effect of repeated cocaine use is that a person will build up a tolerance to the drug, and it will take more and more of it to produce the same effect. *Id*. If a person stops using cocaine for an extended period, the tolerance will fade, and when the addict returns to cocaine, he or she will start fresh. *Id*. Finally, Dr. Nace described a more insidious effect of cocaine use, which he called sensitization, in which the person's brain is altered:

> But the problem is as one has used cocaine over an extended period of time, another change occurs in the brain which is called sensitization. The brain gets sensitized to even smaller amounts of the cocaine for certain effects. Not the high, per se, but the harmful effects will come about more readily, more easily. Things like constricting the blood vessels, producing psychotic symptoms. Those types of dangerous effects

37

will occur more easily, and we don't have the tolerance to them that we have – would be kind of the high or the euphoria.

*36R. 57-58.*  Thus, extended use of cocaine can change the physiology of the brain in such a way that the harmful behaviors associated with cocaine use can be produced with minimal amounts of the drug.

Dr. Nace believed that the brain scans, which showed brain damage consistent with constricted blood vessels, and the process of sensitization explained why Mr. Ochoa committed this brutal crime:

> He had not used cocaine for 10 days prior to August the 4th, and this was a Sunday.  Went to church with his family, and at some point after church he – he had been struggling with the desire for cocaine for days, and asked his wife could he just get $10 worth.  She eventually relented, gave him $10.  She kept all the money because he knew that, and she knew that if he had money, then the temptation to buy cocaine would be there which is common in the case with people caught up in this.  So he didn't keep any money.  Anyway, she gave him $10.  He bought the crack cocaine.  And she said, You have to smoke it outside.  Okay?  So he smoked it outside.  I think it was around 5:30 or so, walked back into the house to the bedroom, then his wife came in the bedroom and said, You didn't say hello to my sisters, and said – he said, Well, I don't – I don't want them to see me like this.  And he had described that his – he felt his face was puffy and felt he looked funny from smoking the cocaine so she left the room and then shortly thereafter – and he doesn't have memory for a good bit of this – got the gun that was in the house, and the shootings took place after that.

> And what he recalled was hearing gunshots in his head, and then after he left the house and got in this truck, he felt some – something – knew something had gone wrong and he should return home.  What he could recall, shooting one daughter, couldn't recall whether people were exactly what – how it happened.  And he was in a – a cocaine-induced delirium, delirious state produced by the cocaine where there was a serious change in brain functioning.

*36R. 58-59.*  Dr. Nace explained that a cocaine induced delirium is a medically recognized condition and is described in the DSM-IV.  *36R. 59-60.*  It is a "very serious mental state provoked by different things," particularly cocaine.  *36R. 60.*  It disrupts a person's level of consciousness to the

point that the person is not aware of what he or she is doing or of the environment around them.  *Id.*

A person in a delirium can get excited, irritable, and aggressive.  *Id.*  He continued:

> Their thinking processes change at the same time.  Typically, they won't have good
> memory for parts of what's going on or what has happened.  They will also have
> perceptual disturbances.  For example, in his case, he was hearing gunshots for –
> going off in his head, the noise of the gunshot for days and had some other sort of
> flashes going through his mind which he couldn't quite understand.  Delirium
> typically does not last very long, at least not a cocaine delirium.

*Id.*  Dr. Nace believed that Mr. Ochoa was suffering from a delirium brought on by the use of

cocaine shortly before the murders.  *36R. .*  Mr. Ochoa had abstained from cocaine for 10 days,

which triggered the sensitization process, and when he used cocaine that day, he slipped into a

psychotic state.  *36R. .*  Mr. Ochoa's brain damage supported Dr. Nace's opinion because it rendered

Mr. Ochoa more susceptible to a delirium:

> The frontal – there was a left frontal lobe damage, and the frontal lobes are the part
> of the brain that helps us control ourselves, keeps us from not, you know, acting out
> on our impulses and are very important for kind of normal behavioral functioning.
> The brain being damaged – a damaged brain is more susceptible to a state of
> delirium, so I think the fact there – from his history of his cocaine use, there was
> indications that he was, from a clinical point of view, showing increasing neurologic
> and kind of brain effects from the cocaine.
>
> He had blackouts at times.  Sometimes – three or four times his wife told
> him, You can't even talk right.  This is when he was using cocaine.  He couldn't
> speak clearly.  He had one episode where his head fell to the side, and that might
> have represented sort of like a small stroke taking place.  Felt his upper body sagging
> sometimes after he had used cocaine.  And so the damaged brain is more vulnerable,
> more susceptible to a psychotic or delirious – delirious-like state which is almost
> pretty similar to a psychotic state.

*36R. 63-64.*

> Dr. Nace did not believe that Mr. Ochoa would pose a future danger in prison.  *36R. 61-63.*

He explained:

> What happened on August 4th was the result of his cocaine addiction and triggering
> brain events beyond his control.  And he has no history of being a danger to society.

39

> Prior to that he had a good work record for the most part, at least prior to his addiction. He was not – he didn't have a criminal history. He wasn't presenting a danger to anybody, and there is no reason to think he would, if he's not addicted to cocaine.

*36R. 61.* Dr. Nace agreed that literature supported the hypothesis that addiction was genetically linked, and he believed it relevant that members of Mr. Ochoa's family showed signs of alcoholism and addiction. *36R. 64-65.* Mr. Ochoa was deeply remorseful for what he had done and was astonished that he could do such a thing. *36R. 66.* Mr. Ochoa had been abusing cocaine for two and a half years at the time of the murders, but he had no prior criminal history or incidences of violent behavior. *36R. 78, 97-98.* When asked about the slapping incidents and the 1997 phone conversation, Dr. Nace agreed that this may have mattered to a point, but he disagreed that it demonstrated Mr. Ochoa would pose a future threat. *36R. 79-80, 94.* "Of course it matters – it matters up to a point. It doesn't affect my opinion in any way whatsoever because he was not motivated out of anger towards his wife or anyone else in the family." *36R. 81.* The prior incidents raised by the State happened long before the murders, and Mr. Ochoa had reconciled with Cecilia and had another child with her. *36R. 82-85.* Furthermore, these incidents happened before Mr. Ochoa started taking cocaine, and they were not cocaine induced. *Id.* Thus, the threats in 1997 and prior incidences had no relevance to what happened on August 4 because on the latter occasion, Mr. Ochoa was intoxicated and in a delirium. *36R. 81.* In other words, five people did not die because Cecilia had lied to Mr. Ochoa and he happened to find out about it five years prior to the murders. *36R. 102.*

Dr. Nace did not believe Mr. Ochoa's brain damage would lead to a conclusion that Mr. Ochoa would be dangerous in prison. Mr. Ochoa had no problems while in jail up to that point, and his prior actions were cocaine related. He stated: "Well, his dangerousness was expressed under

the influence of cocaine.  And I'm not aware of any criminal acts.  There's no record of that or any other real danger absent cocaine experience." *36R. 87.*  He concluded that "no one would assume" that frontal lobe damage would make Mr. Ochoa dangerous in prison. *Id.*  Instead, Mr. Ochoa had a compromise, and this made him more susceptible to a delirium when he used cocaine. *36R. 87-88.* "[H]e had that, and then he had this use of crack cocaine one more time and it threw him out of his mind." *36R. 88.*

Dr. Nace believed that Mr. Ochoa could be experiencing a delirium and still be able to engage in seemingly "purposeful"behavior. *36R. 73-74, 96-97.*  Dr. Nace explained that a person can be in a delirium and still engage in purposeful behavior, such as happens when a patient jumps out of a window to escape from a hospital. *36R. 73.*  He did not think it improbable that Mr. Ochoa was experiencing a delirium when he murdered his family and then was, as the police described, calm, coherent, and respectful when the officers arrested him a short time later.  *36R. 66.*  He explained:  "This is a very short-lived delirious episode because the crack gets in quickly and then is – you know, the whole experience doesn't last very long, so that's compatible." *36R. 66.* Mr. Ochoa reported that the cocaine on this occasion hit him harder than he ever remembered. *36R. 70.* Dr. Nace did not think it inconsistent with a delirium that Mr. Ochoa did not recall much about the shootings or the time shortly afterwards, but then was in a calm and relaxed state later when the police arrested and interrogated him. *36R. 69-70, 75.* To Dr. Nace, a delirium best explained what happened, so much so that he called it the only logical conclusion, and he disagreed with the State that Mr. Ochoa acted out of anger. *36R. 71-72.*  Dr. Nace believed that Mr. Ochoa's emotional state was one of agitation and frenzy, rather than anger and frustration. *36R. 72, 101.*  He disagreed that Mr. Ochoa was lying on his bed "brooding;" instead, he did not know what sort of emotional state

41

he was in. *36R. 71-72, 81, 98-99.* "He wasn't able to formulate any thoughts." *36R. 99.* In other words, there was no rational or logical thought process going on. *36R. 101.*

With respect to Mr. Ochoa's statement, Dr. Nace believed that Mr. Ochoa could have supplied facts through his experience and through suggestion. *36R. 81.* Mr. Ochoa could have been subject to the power of suggestion, even if the detective asked simple questions about the incident. *38R. 14-15.* Furthermore, Mr. Ochoa was familiar with his house and the situation just prior to slipping into a delirium. *38R. 15-17.* For example, Mr. Ochoa would know that asking for more money would lead to an argument because it had done so in the past. *36R. 81; 38R. 27.* Dr. Nace believed that Mr. Ochoa could have reconstructed many details during the nearly three hour interrogation. *38R. 27.* Furthermore, Dr. Nace did not believe that Mr. Ochoa was malingering; instead, Mr. Ochoa was being honest with him (even brutally so), and Dr. Nace believed his conclusions were supported by the extrinsic evidence, including Mr. Ochoa's statement. *36R. 93, 99, 104; 38R. 26, 28.*

The State called Dr. Richard Coons in rebuttal. Dr. Coons was a forensic psychiatrist with "extensive" experience in evaluating people for court cases, such as competency in criminal cases and for civil commitment purposes. *38R. 215-18.* In 1972, he ran the drug and alcohol program at Fort Sam Houston in San Antonio for two years. *38R. 215-16.* Dr. Coons reviewed the file, evaluated Mr. Ochoa for a couple of hours on April 3, 2003, and listened to testimony at trial. *38R. 220-22.* He evaluated Mr. Ochoa for competency and talked to him about the "major aspect[s]" of this case. *38R. 222.* He described taking seven pages of notes. *Id.* Dr. Coons opined that Mr. Ochoa was not in a cocaine induced delirium and he would pose a future danger.

With respect to the cocaine induced delirium, Dr. Coons testified "every time I've seen it, it's basically been dose related." *38R. 223, 247.* Mr. Ochoa took a relatively low dose of cocaine

on August 4, and based on this, Dr. Coons concluded that it was "quite unlikely" to have produced a delirium. *38R. 224.* He referred to the $10 rock of cocaine Mr. Ochoa smoked that day as a "spit in the ocean" compared to what he was used to taking. *38R. 223.* Furthermore, Mr. Ochoa was able to describe considerable details about his thought process to Detective Lusty. *38R. 224-27.* He explained:

> All of those things reflect a perception of what happened, a recollection of what happened, and all of those things notate against this being a delirium. That's why I don't think it's a delirium. I think it's a matter of anger. I think he was extremely frustrated with his situation. He was married – he had a difficult relationship with his wife, partly because he was continuing to use cocaine and not being a husband and father. And – and partly because of this Jonathan problem that he had never gotten over.

*38R. 226-27.* Dr. Coons believed that the Jonathan situation was at the root of it and was always on Mr. Ochoa's mind. *38R. 227-28.* Cocaine only exacerbated the problem. *Id.* Thus, according to Dr. Coons, Mr. Ochoa was not in a delirium. *38R. 245-46.* Mr. Ochoa simply was not able to deal with his anger. *38R. 228.* Dr. Coons explained that people in a delirium are aimless and out of it; so he disagreed in certain respects that a person in a delirium can act purposefully. *38R. 230.* Mr. Ochoa's behavior on August 4 was "goal oriented." *38R. 230-31.* Mr. Ochoa had been manipulative and he had run out of tricks. *38R. 232, 234.* He did not have a job, he had a nagging wife, he was failing as a father, and he did not have any money. *38R. 234.* "And he's extremely frustrated and cablooey." *Id.* Dr. Coons believe that anger best explained what happened. *Id.*

Dr. Coons believed that Mr. Ochoa would be a future danger. He described the factor that he used to evaluate risk of violence: (1) history of past violence; (2) the person's attitude towards violence, such as whether the person feels it is okay to use violence to get what he or she wants; (3) whether the person has a conscience, which according to Dr. Coons was related to remorse and empathy; (4) the society the person would be in; and (5) the presence of brain damage. *38R. 235-37.*

43

With respect to prison and brain damage, these easily pointed to future danger in Mr. Ochoa's case. *38R. 237-38.* Mr. Ochoa's frontal lobe damage would reduce his ability to control his impulses, and prison is inherently violent ("a crazy little place"); so Mr. Ochoa's mere presence there would place him at risk of being subjected to it and, therefore, having to react to it. *38R. 237-39.* Apparently, Dr. Coons believed that reacting to violence is synonymous with being violent even if one acted in self-defense. Mr. Ochoa's good behavior in jail simply did not count for Dr. Coons. *38R. 238.* He explained that anyone who acted up in jail while awaiting a capital murder charge would be a "nitwit." *Id.* Mr. Ochoa had exhibited manipulative behavior in the past that was contrary to the interest of others; so his conscience was not sufficient in Dr. Coons's opinion. *38R. 236.*

Dr. Nace testified again in response to Dr. Coons's testimony. Dr. Nace believed that Dr. Coons was flat-out wrong about delirium being only dose-related. He reiterated what he said before about sensitization:

> Sensitization refers to a process in the brain where after sufficient chronic exposure to certain drugs, the brain is prone to react more quickly with smaller dose. For example, with cocaine if one has had a seizure related to cocaine use, a small amount of cocaine again, even smaller than whatever induced the initial seizure, can trigger subsequent seizures. And that applies also to other brain disturbances related to the use of cocaine, including the onset of a delirium or other – or other possible psychotic symptoms.

> Also, the issue of blood vessel constriction which was saw on – probably caused the brain damage that we saw on the PET scan last week, that's another sensitization issue. It does not take as much drug to produce these physiological brain problems.

*39R. 11-12.* Dr. Nace did not agree that a $10 rock of cocaine would be unable to produce a delirium when Mr. Ochoa had been taking eight to 10 times that much previously. *38R. 12.*

With respect to future dangerousness, Dr. Nace did not believe the several incidents in which Mr. Ochoa slapped his wife constituted a "history of violence." *38R. 13.* He stated, "I don't agree

44

that Mr. Ochoa has a history of violence absent the brain catastrophe that occurred on August 4th."

*Id*.  There simply was not a pattern of violence in his life.  *Id*.  Dr. Nace talked extensively about the

physiological effect of cocaine on Mr. Ochoa's brain:

> Well, what is happening is the cocaine, as I tried to explain the other day, is – produces an excessive release of this brain chemical dopamine.  That's the one we're most concerned about out.  Squeezes it out of this cell and then the dopamine under non-cocaine situations, some will be drawn back in and saved.  But when there is cocaine present, all that dopamine that is released goes across the brain and stimulates other cells so the person is getting an abnormal brain reaction from that.
>
> Eventually these brain cells get exhausted.  They've squeezed out as much dopamine as is available, and then the person has a crash from cocaine as it's called.  They become tired.  They become depressed and so on.  And once the – once there is less dopamine around, these other cells that are receiving the dopamine recognize that, and they tend to grow additional receptor sites, because it's like trying to catch a fish.  If you throw in three or four lines instead of just one, you have a better chance of catching a fish.
>
> So these cells are trying to get dopamine, so they grow more sites where dopamine can land.  Then if a person gets back to cocaine, as Mr. Ochoa did 10 days after having been off of it, July 25th to August 4th, his brain is sensitized because he exhausted the dopamine.  The brain compensated by trying to build more receptor sites, and then sure enough, along comes another dose of cocaine, squeezes out that dopamine, and is received with greater impact.
>
> Now, you combine that with the fact that he already had brain damage from his two and a half years of cocaine use, he was a setup for this catastrophe, this brain catastrophe and this tragedy.  And that's the essence of my testimony.

*38R. 18-19*.  With respect to whether Mr. Ochoa had a conscience, Dr. Nace testified that he "did

not see a pattern of behavior over the course of his life that would suggest otherwise."  *38R. 19*.

Any detriments in his conscience was attributed to cocaine addiction.  *Id*.  But even with the

addiction, he was not involved in criminal behavior, such as theft or robbery, in order to support his

habit, and he was conscientious enough to support his family or to attempt to continue to do so even

after his addiction started to take over.  *Id*.

Dr. Nace reiterated that Mr. Ohcoa's actions were not anger-based or the product of frustration. *38R. 20.* In response to the State's assertions whether the murders could be consistent with anger, Dr. Nace responded: "But if you're saying is that an explanation or consistent with what happened on August the 4th, I don't think you're appreciating the nature of what was going on in his brain at that time." *38R. 32.* Mr. Ochoa did not present as an angry person, either chronically or immediately at the time of the evaluation. *Id*. The Jonathan matter had receded into the past, and Mr. Ochoa and Cecilia had moved beyond it. *38R. 20-21.* Finally, brain damage alone would not tell the whole story about whether Mr. Ochoa would pose a future danger in prison. *38R. 21-23.* It only made him more susceptible to insults, such as cocaine use; it did not make him dangerous *per se. 38R. 21-22.* Dr. Nace disagreed that Mr. Ochoa's good behavior in jail was as irrelevant as Dr. Coons made it out to be. Dr. Nace did not believe that someone could simply override a supposedly-dangerous brain condition and behave when he had to, simply to succumb to it later in prison. *38R. 22-23.* Dr. Nace disagreed that Mr. Ochoa was a trickster or manipulator. He voluntarily relinquished his money, checkbook, ATM card, and car to Cecilia and he tried to quit cocaine. *38R. 23-24.* Dr. Nace did not think it was even a close call that Mr. Ochoa was experiencing a delirium when he murdered his family. *38R. 24.* "No, it wasn't a close call. The criteria that we have for delirium were apparent from his behavior and the experience as described." *Id*.

## V.  Evidence in Support of the Petition

This Petition for Writ of Habeas Corpus is supported by the following evidence, all of which is attached to the petition and is incorporated in it as if fully set forth:

1.      Exhibit A................................ Affidavit of Tena Francis (dated August 18, 2010)

2.      Exhibit B. ...................................... Affidavit of Tena Francis (dated April 5, 2003)

3.      Exhibit C.. .................................................................. Affidavit of Abel Ochoa, Sr.

4.      Exhibit D. .......................................................... Affidavit of Belen Revilla Ochoa

5.      Exhibit E. ...................................................................... Affidavit of Gabriel Ochoa

6.      Exhibit F. ......................................................................... Affidavit of Javier Ochoa

7.      Exhibit G. ................................................................. Affidavit of Margarito Revilla

8.      Exhibit H. .......................................................... Affidavit of Anita Zarate Revilla

9.      Exhibit I. .......................................................................... Affidavit of Juan Revilla

10.     Exhibit J. ................................................................... Affidavit of Teodoro Revilla

11.     Exhibit K. .................................................. Spanish Declaration of Abel Ochoa, Sr.

12.     Exhibit L. .......................................... Spanish Declaration of Belen Revilla Ochoa

13.     Exhibit M. .............................................. Spanish Declaration of Margarito Revilla

14.     Exhibit N. ...................................................... Spanish Declaration of Juan Revilla

15.     Exhibit O. .................................................. Spanish Declaration of Teodoro Revilla

16.     Exhibit P. ................................................................ Transcript of Examining Trial

## VI.  Summary of the Claims

A.      Mr. Ochoa received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution when his trial attorneys failed to investigate and to present significant mitigation evidence at the punishment hearing.

B.      Mr. Ochoa received ineffective assistance of counsel during the *voir dire* of his capital murder trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

C.     Mr. Ochoa's trial counsel were rendered ineffective during the *voir dire* of his capital murder trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

D.     Because Mr. Ochoa was deprived of the right to an adequate *voir dire*, his right to be tried by a fair and impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution was denied.

E.     Mr. Ochoa received ineffective assistance of counsel on appeal because his appellate attorney failed to raise the *voir dire* issues on appeal.

F.     Mr. Ochoa's right to confront and cross-examine witnesses as guaranteed by the Confrontation Clause of the Sixth Amendment was violated when the trial court allowed testimonial evidence before the jury.

G.     Mr. Ochoa received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution when his trial counsel failed to make proper and timely objections to the State's use of testimonial statements contrary to the Confrontation Clause of the Sixth Amendment to the United States Constitution.

H.     The trial court's exclusion of important rebuttal evidence denied Mr. Ochoa the right to present a fair defense contrary to the Sixth and Fourteenth Amendments to the United States Constitution.

I.     Mr. Ochoa received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution when his trial counsel failed to make proper and timely objections to the trial court's ruling excluding important rebuttal evidence.

J.     Mr. Ochoa was deprived of his right to due process of law under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution by the State's presentation of unreliable psychiatric rebuttal testimony by Dr. Richard Coons.

K.     Mr. Ochoa was deprived of his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution because of his appellate counsel's failure to present the issue concerning the trial court's erroneous admission of Dr. Coons's unconstitutionally unreliable testimony on direct appeal.

L.     Because Mr. Ochoa was shackled during the punishment phase of his capital murder trial, his right to due process under the Fourteenth Amendment to the United States Constitution was denied.

48

M.     Mr. Ochoa received ineffective assistance of counsel during the punishment phase of his capital murder trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution when his trial counsel failed to object to the trial court's decision to place Mr. Ochoa in shackles.

N.     The evidence is legally insufficient to support the jury's answer to the first special issue finding that Mr. Ochoa would constitute a continuing threat to society.

O.     Mr. Ochoa was deprived of rights to due process and to a fair trial when the State destroyed material and exculpatory evidence.

P.     Mr. Ochoa received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution when his trial counsel failed to preserve evidence in the State's possession or make a timely objection or motion for such preservation.

Q.     Mr. Ochoa received ineffective assistance of appellate counsel when his direct appeal counsel failed to raise the issue concerning the State's unconstitutional destruction of evidence on direct appeal.

R.     Mr. Ochoa's death sentence should be set aside because the Texas mitigation special issue given in his case failed to assign a burden of proof in violation of Applicant's rights to due process under the Fourteenth Amendment and to reliability of the death sentence and freedom from arbitrariness and capriciousness in capital sentencing as guaranteed by the Eighth Amendment..

S.     Mr. Ochoa's death sentence should be set aside because the Texas mitigation special issue given in his case failed to adequately define what is meant by mitigation or mitigating evidence and the terms used created a reasonable possibility that the jury would construe mitigating evidence narrowly such that it would not give full consideration and effect to all of Applicant's mitigating evidence in violation of the Eighth Amendment to the United States Constitution.

T.     Mr. Ochoa received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution when his trial counsel failed to object properly and timely to the mitigation special issue and when his direct appeal counsel failed to raise these issues on direct appeal.

U.     Mr. Ochoa right as guaranteed by the Sixth Amendment of the United States Constitution to be tried by a jury selected from a jury panel representing a fair cross-section of the community was violated.

### VII.  Antiterrorism and Effective Death Penalty Act of 1996

Because this case is filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), its provisions apply and govern this petition and the issues raised in it.  *See generally Lindh v. Murphy*, 521 U.S. 320, 326 (1997) ("The statute reveals Congress's intent to apply the amendments to chapter 153 only to such cases as were filed after the statute's enactment (except where chapter 154 otherwise makes select provisions of chapter 153 applicable to pending cases.").  Generally speaking, under AEDPA, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  This provision is a limitation on the relief a federal habeas court may grant.  The deferential requirement of § 2254(d) only applies to state claims that were adjudicated *on the merits*.  "When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied.  A federal court must then resolve the claim without the deference AEDPA otherwise requires."  *Panetti v. Quarterman*, 127 S. Ct. 2842, 2858 (2007).

The Supreme Court has explained the independent meaning of the "contrary to" and "unreasonable application" clauses:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams* that an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694 (2002) (citations omitted) (citing *Williams v. Taylor*, 529 U.S. 362 (2000)).  When a state court's factual determinations are challenged, an application for writ of habeas corpus may not be granted unless the adjudication of the claim by the state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  State court factual determinations are presumed to be correct, and the applicant has the burden to rebut the presumption of correctness "by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

## VIII.  Claims for Relief

### A.  Ineffective Assistance of Counsel at Punishment

Mr. Ochoa received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution when his trial attorneys failed to investigate and to present significant mitigation evidence at the punishment hearing.

### 1.    Factual Background

Mr. Ochoa was represented at trial by Stephen Miller and Michael Byck.  They were appointed on August 8, 2002.  *1C. 14.*  However, they did not begin any meaningful mitigation investigation until February 12, 2003, when the trial court signed an order appointing Tena Francis as the mitigation investigator.  *1C. 138, 213.*  By this time, the court had already conducted general

*voir dire* and individual *voir dire* was set to begin on February 17, 2003. *3R. 1; 4R. 1.* Trial started on April 14, 2003. *33R. 1.* The jury returned a guilty verdict on April 15, 2003. *34R. 95.* Punishment began on April 16, 2003, and the State rested its case on punishment the same day. *35R. 1, 95.* Therefore, Francis had a mere five days before individual jury selection began and just over 60 days before the defense started presentation of its case in punishment.

Trial counsel first contacted Francis sometime in November 2002; however, they did not meet with her or provide her with any meaningful information about the case until late-January 2003. *Affidavit of Tena Francis (dated August 18, 2010)*, p. 1-2. During the intervening months, Francis expressed frustration about the lack of movement in getting her appointed, and she was concerned about being able to complete a mitigation investigation by the time trial started. *Id.* at 2-3. She attempted to meet with Byck in November, but he did not want to meet until December. *Id.* On December 2, Byck faxed some rudimentary documents about the case, which included the indictment, an affidavit of probable cause, an offense report, and Mr. Ochoa's statement, to Francis. *Id.* She also received a transcript of the examining trial. *Id.* On January 28, 2003, Francis finally met Byck at his office. *Id.* at 3. Byck informed Francis that he hired a fact investigator, David Kinney, but that he did not want Kinney to do too much because he did not trust him. *Id.* He indicated that he hired Kinney out of pity because his wife had recently died. *Id.* Byck assured Francis that he would get her appointed to the case. *Id.* Francis asked Byck whether he could obtain a continuance, but he informed her that in Dallas County, once a case is scheduled for trial, it goes. *Id.* Francis informed Byck that he could have the crack pipe tested to see if Mr. Ochoa had smoked more than just cocaine that day, and he assured her he would file a motion seeking testing. *Id.* After her meeting with Byck, Francis went to the Dallas County Clerk's office and looked through the file.

She saw no defense motions in the file at all, except a request for payment.  Finally, Francis met with Mr. Ochoa at the jail for the first time.  As of this date, she had not been appointed.

Francis was concerned about the lack of time she would have to develop a mitigation case in time, and based on her discussions with trial counsel, she believed that they did not have a good grasp of the relevance of mitigation in a capital case and the time it would take to prepare a complete mitigation investigation for trial.  *Affidavit of Tena Francis (dated August 8, 2010)*, p. 3-4.  On February 3, 2003, she met with Miller's secretary and learned that trial counsel were preparing an array of pretrial motions for filing but that the motions did not include her appointment.  *Id.* at 4. Francis requested that a message be relayed to Miller that the trial team needed to file a motion to have her appointed so she could begin work.  *Id.*  Francis met with both trial counsel on February 10, and she expressed her concern regarding the need to test the crack pipe.  *Id.*  Trial counsel asked Francis to call Kinney and press him to get the report on his investigation finished.  *Id.*  On February 12, 2003, the trial court signed an order appointing Francis as mitigation investigator.  *Id.*  At this time, she had conducted very little work on the case, and other than talking to Mr. Ochoa, she had conducted no investigative work into Mr. Ochoa's life and social history.  *Id.*  In her affidavit, Francis explains in great detail what is required to conduct a proper mitigation investigation and why an early start is absolutely necessary.  *Id.* at 4-7.

Francis's ability to interact with trial counsel and to talk to Mr. Ochoa further was hampered by the fact that counsel and Mr. Ochoa were in court every day for voir dire.  *Affidavit of Tena Francis (dated August 18, 2010)*, p. 4.  She often had to resort to emails in order to communicate with them.  *Id.*  Shortly after her appointment by the court, Francis began the laborious task of securing documents related to Mr. Ochoa's life, which included school records, work history records, medical records, credit reports and financial records, and so forth.  *Id.* at 5.  When Francis

53

finally met with Kinney, she mentioned that the crack pipe should be tested.  *Id*. at 4.  He agreed.

Kinney told Francis about the interviews he had conducted to date, which only included a number

of interviews with neighbors.  *Id*.  When Francis met Mr. Ochoa's parents for the first time, she

found that her ability to interview them was hampered by a language barrier because they spoke

mostly Spanish.  *Id*.  Later, Francis sought assistance with this from Abe Wilson, an interpreter at

the public defender's office, to accompany her on the interviews.  *Id*. at .  Nevertheless, Francis

believed ability to interview witnesses in this case, most of whom spoke limited English, was greatly

hindered.  *Id*.  It became a much more laborious task having to work through a translator, and she

was concerned that she was not able to spend adequate time with each witness, develop the sort of

trust necessary with this type of investigation, and gather the information each witness knew with

accuracy.  *Id*.

On March 18, 2003, Kinny provided a report of his interviews of Mr. Ochoa's neighbors.

*Affidavit of Tena Francis (dated August 18, 2010)*, p. 7.  The next day, Francis prepared an initial

report concerning the status of her investigation.  *Id*.  As she did in her initial meeting with counsel,

she again urged them to seek a continuance because she did not believe she would be able to prepare

a thorough punishment phase investigation by April 14, 2003.  *Id*.  She believed more time was

essential and a matter of effective representation.  *Id*.  Francis continued the process of locating and

interviewing witnesses.  *Id*. at 10.  On March 23, Francis met with trial counsel.  *Id*. at 7.  The

defense had received a motion from the State concerning additional extraneous unadjudicated

offenses, namely that Mr. Ochoa had held a gun to Cecilia's head a few weeks prior to the murders.

*Id*. at 8.  Francis believed that the aggravating facts that the State was raising this close to trial

required investigation and were additional reasons for needing a continuance.  *Id*.  Francis also

learned that Byck had hired Dr. Nace, and that tests were being performed on Mr. Ochoa at Parkland Hospital.  *Id*.  Francis did not know anything about Dr. Nace and had no prior contact with him.  *Id*.

On March 31, Francis emailed Miller and informed him of her difficulty in talking with Mr. Ochoa about the case because he was returned to the jail very late each evening.  *Affidavit of Tena Francis (dated August 18, 2010)*, p. 8.  She wanted to know if arrangements could be made to interview him at the courthouse during breaks in the voir dire.  *Id*. at 9.  On April 2, Francis was able to meet with Mr. Ochoa at the court house.  *Id*.  The next day, Francis, along with Philip Wischkaemper, a capital assistance attorney, discussed the need for a continuance once again with trial counsel.  *Id*.  She and Wischkaemper urged them to seek one in order to allow her to complete her investigations.  *Id*.  The late notice of additional aggravating evidence from the State also concerned them, and they believed it provided additional reason for a continuance.  *Id*.  Byck informed Francis that there would be no continuance in Dallas County, and Francis came away from the conversation believing that trial counsel was unwilling to even make the attempt or do something as rudimentary as make a record.  *Id*.

On April 4, 2003, Abel underwent a PET scan, and the defense received a report three days later.  *Affidavit of Tena Francis (dated August 18, 2010)*, p. 9.  Francis started preparing a detailed affidavit for the defense to use in support of a motion for continuance.  *Id*. at 9-10.  In this affidavit, Francis set out her investigations during the previous 51 days and detailed what remained to be done and why additional time was needed.  *Id*.; *Affidavit of Tena Francis (dated August 5, 2003)*.  It is readily apparent from the affidavit that Francis had much left to do with the mitigation investigation, and she was concerned that she would not be able to finish the investigation by the time trial started or provide the trial counsel with any meaningful assistance in time for them to make use of it.  *Id*.  Trial counsel eventually, and reluctantly, filed the motion for continuance, which the court heard

55

a week before trial was to begin. *31R. 2-6.* Jury selection had concluded at this point. Counsel added one reason for needing the extension, which was the recent death of an officer that had evidence relevant to chain of custody issues, and asked for 60 additional days to prepare. *Id*. Needless to say, the trial court denied the motion. *Id*. Francis continued investigating witnesses and receiving records through the guilt-innocence phase of trial. *Affidavit of Tena Francis (dated August 18, 2010)*, p. 10. She was unable to provide the experts with sufficient information in a timely manner, particularly Dr. Nace, because she was still investigating these matters at the time the experts conducted their examinations. *Id*.

In the week leading up to trial, Francis struggled to obtain Mr. Ochoa's jail records. *Affidavit of Tena Francis (dated August 18, 2010)*, p. 10. She was not able to obtain them until April 11, 2003. *Id*. She continued interviewing witnesses, and she received more records that she had requested. *Id*. Trial counsel asked Francis to prepare a condensed version of the social history report, which would be a synopsis that summarized her findings. *Id*. On April 14, Francis prepared a list of potential defense witnesses, and she made recommendations to the order they should testify so the mitigation story flowed and would be easy to follow. *Id*. However, presentation of witnesses, and consequently Mr. Ochoa's life history, did not follow an orderly plan, partly because the trial court forced the defense to take witnesses out of order. *Id*. But more importantly, trial counsel were unprepared to present witness testimony, and the witnesses themselves were unprepared to testify. *Id*.

Abel Ochoa, Sr., provided an affidavit in support of this petition. He was born in a town called Nombre de Dios in Durango, Mexico. *Affidavit of Abel Ochoa, Sr.*, p. 1. Presently, he lives with Belen at his Gabriel's house. *Id*. He understands some English, but he prefers to speak Spanish. *Id*.

56

He was his mother's oldest son, who had eight children by different fathers. *Affidavit of Abel Ochoa, Sr.*, p. 1. His father died when he was three years old, and his maternal grandparents raised him. *Id*. His mother was a bartender. *Id*. He lived in an agrarian society, and he did not go hungry. *Id*. He had no education, and he had to learn to read by reading comic books and the Bible. *Id*. The first time Abel, Sr., saw Belen, he knew he would marry her. *Id*. They were married on her family's *rancho* in Segundo Molino, which was a very rural part of Mexico. *Id*. He brought her to live with him in Nombre de Dios. *Id*. They had five children together. Their first child, a daughter named Patricia, died from an unknown illness when she was about a year old. *Id*. Gabriel was second, and he was their oldest son. *Id*. Mr. Ochoa was the middle son. *Id*. Another daughter was stillborn, and they did not name her. *Id*. Finally, Javier was their last child. *Id*. Abel, Sr., worked for farmers in Nombre de Dios to support his family. *Id*. They had a meager existence. *Id*. When there was no work for him in Nombre de Dios, Abel, Sr., joined the Mexican Army, and he was stationed in the mountains, where he went on patrol. *Id*. It was dangerous work, and he would walk for miles and miles through the mountains on patrol and be gone for days at a time. *Id*. After he was discharged from of the military, Abel, Sr., returned to Nombre de Dios, but there still was no work for him, and he could not support his family. *Id*. at 2. When Mr. Ochoa was about a year old, Abel, Sr., left his family in Mexico and came to Texas to find work. *Id*. He worked for a year and a half on farms and building fences trying to raise enough money to bring his family to the United States. *Id*. When he found work on a dairy, he sent for his family to join him. *Id*. They settled in Waller, Texas. *Id*.

Abel, Sr., explained that life in Mexico in a rural pueblo like Nombre de Dios is very different than in the United States. *Affidavit of Abel Ochoa, Sr.*, p. 2. He learned that a man is in charge of the house, and the wife is expected to wait on her husband, who is the provider. *Id*. He

also learned that the proper way to teach children is by slapping them.  *Id*.  His grandfather slapped Abel, Sr., when he did not do as expected, and Abel, Sr., could recall his grandfather picking him up by the hair.  *Id*.  Abel, Sr., recalled collecting firewood, cultivating land, and planting crops, and he would a beating if he did his chores incorrectly.  *Id*.  He would cry from the beatings, but he was more hurt that his grandfather was mad at him.  *Id*.  He preferred a beating to the disapproval.  *Id*.

Abel, Sr., brought what he learned to his marriage, and he beat Belen and his sons with impunity.  *Affidavit of Abel Ochoa, Sr.*, p. 2.  While the family lived in Waller, between 1978 and 1986, he worked at two shifts at a dairy, and when he got home, he expected everything to be the way he expected it to be.  *Id*. at 2-3.  He rarely slept, and he drank excessively, never shaved, and smoked marijuana.  *Id*. at 3.  Abel, Sr., explained that he drank about 20 beers a day as well as a strong drink called *mescal* every day.  *Id*.  His boss was friends with the Sheriff; so if Abel, Sr., was arrested for drunken driving or public intoxication, the police would take him in, and he would be released the next day.  *Id*.  This happened four times.  *Id*.  If he felt that Belen or one of the boys needed a good beating, he would deliver one.  *Id*.  This did not bother him one bit because he believed himself entitled to behave this way–he heated the house, he put food on the table–so he figured, "why not."  *Id*.  He beat his children with a piece of wood or his belt.  *Id*.  He would also slap them around.  *Id*.  He was very hard on his family in those days.  *Id*.  He spoke to his sons and his wife in a vulgar manner and called them pigs.  *Id*.  He called them the worst things you can imagine.  *Id*.  He beat Belen with his fists and would drag her by the hair, and she often had bruises and black eyes.  *Id*.  The beatings mostly occurred when Abel, Sr., was drunk, but he also behaved this way sometimes when he was sober.  *Id*.  If he was in a bad mood after work, he just expected his family to take it.  *Id*.  Belen's brothers would come to Waller to check on Belen on the boys, but

Belen refused to leave Abel, Sr.  *Id.*  He was her husband and was from the same place as him and knew this was a normal way of life.  *Id.*

When Abel, Sr., was 29 years old, he was involved in a terrible car accident in which his passenger was badly hurt.  *Affidavit of Abel Ochoa, Sr.*, p. 3.  He was taken to the jail rather than the hospital, and when he woke up the next day, he was in terrible pain.  *Id.*  Belen encouraged him to see a doctor, and this incident caused Abel, Sr., to see what a terrible husband and father he had become.  *Id.* at 4.  He prayed to God to help him change, and when the pain went away, Abel, Sr., decided to change his life.  *Id.*  However, the change was not immediate, and it took several years for Abel, Sr., to quit drinking and beating his family.  *Id.*  Over time, he became a decent husband to Belen and a decent father to his sons.  *Id.*  Looking back, he realized how terrible his treatment of his family had been, but he confessed that at the time, he did not think there was anything wrong with his behavior.  *Id.*  He thought it was a normal way to act.  *Id.*

Abel, Sr., described Mr. Ochoa.  *Affidavit of Abel Ochoa, Sr.* p. 4.  Abel was different from Gabriel and Javier; he was a hard worker, a good student, and always set a good example.  *Id.*  Gabriel and Javier chased women and drank, which was not Mr. Ochoa's way.  *Id.*  Mr. Ochoa was very quiet and never had many girlfriends.  *Id.*  He married his first real girlfriend, Cecilia.  *Id.*  Abel, Sr., explained that Mr. Ochoa always worked hard to provide for his wife and family.  *Id.*  Abel, Sr., saw how Cecilia treated Mr. Ochoa.  *Id.*  He witnessed the incident at the party in which Cecilia knocked the drink out of Mr. Ochoa's hand, and Abel, Sr., asked Mr. Ochoa why he allowed Cecilia to treat him that way.  *Id.*  Mr. Ochoa replied that it was better than fighting with her.  *Id.*  Abel, Sr., told his son that wife should not boss him around like that.  *Id.*  Abel, Sr., also described the time that Mr. Ochoa first found out about Jonathan.  *Id.* at 4-5.  Mr. Ochoa called his father to come pick him up, and they had to call the police to meet them at Mr. Ochoa's house.  *Id.* at 5.

Abel, Sr., explained that Cecilia would not let Mr. Ochoa go, and an officer had to go into the house to keep Cecilia quiet.  *Id*.

Abel, Sr., was distraught learning that his son was addicted to drugs.  *Affidavit of Abel Ochoa, Sr.*, p. 5.  He tried to get Mr. Ochoa to enter a treatment program, but Mr. Ochoa told him that he could not leave until Cecilia came home.  *Id*.  Abel, Sr., thought Mr. Ochoa would enter the program on Monday, but over the weekend, Abel, Sr., lost half his family.  *Id*.

Abel, Sr., explained that an English-speaking investigator talked to him twice before the trial, and his son, Gabriel interpreted for her.  *Affidavit of Abel Ochoa, Sr.*, p. 6.  It was very difficult for Abel, Sr., to communicate to her what he was going through because of the language barrier.  *Id*.  He felt he could only answer her questions and could not explain what he was going through inside.  *Id*.  He felt that he had so much to say, but he was unable to convey it to her or the defense team.  *Id*.  He felt helpless.  *Id*.  He met with defense counsel the first time at trial, and they never spoke to him until the day he testified.  *Id*.  They told him not to say anything but to only answer their questions.  *Id*.  He had no idea what they would ask him.  *Id*.  The entire experience was very hard on him.  *Id*.

Belen Revilla Ochoa is Mr. Ochoa's mother, and she has provided an affidavit in support of this petition.  She was born on a rural *rancho* called Segundo Molina in Durango, Mexico, which was a small village that had no roads.  *Affidavit of Belen Revilla Ochoa*, p. 1.  There were only trails into and out of the village, which led to other *ranchos* and pueblos.  *Id*.  The next proper pueblo was Nombre de Dios.  *Id*.  Belen has two sisters, who live in Mexico, and five brothers, who live in Dallas and Mesquite, Texas.  *Id*.  She only went to school through the second grade, and she could not read or write.  *Id*.  Her family lived off the land, and she began working at a very young age.  *Id*.  Ten people lived in a two room house, and there was no running water or electricity.  *Id*.  The

60

bathroom was outside. *Id*. Abel, Sr., courted her, and he took her to his *rancho* in Nombre de Dios. *Id*. Two days later, he asked her father for her hand in marriage. *Id*. They were married on her family's *rancho*, and she moved to Nombre de Dios with Abel, Sr. *Id*. They had three sons, all of whom survived, and two daughters, both of whom died. *Id*. at 1-2. Their first child, Patricia died when she was 18 months old from an unknown illness. *Id*. at 2. She had diarrhea, vomiting, and a high fever, and there was no way to get her to a doctor. *Id*.

Gabriel was born in 1970 in Mexico, and Mr. Ochoa, their second son, was born in 1973 on a Mexican military base. *Affidavit of Belen Revilla Ochoa*, p. 2. Belen became pregnant with a fourth child, a girl, but she was not strong enough to have her. *Id*. There were no doctors in Nombre de Dios, and she went to a nurse. *Id*. The baby was stillborn. *Id*. Javier was born in 1977 in Dallas. *Id*. Life was very hard in Nombre de Dios; the family was very poor, and they lived off the land. *Id*. Nombre de Dios had three land owners then, and Abel, Sr., worked for them, and he would make about 80 cents a day, and some weeks he only worked one or two days. *Id*. Abel, Sr., joined the military to support his family, where he could earn about $20 per month. *Id*. He moved his family to a mountain military base called Los Charcos, where they lived amongst the Huicholes and Tepehuanos Indians of Durango. *Id*. As in Segundo Molina, they lived in a small dwelling with no running water or electricity. *Id*. They had to bathe in a bucket, and they had no refrigerator. *Id*. Belen would cut firewood, and she cooked the food for the family in a brake drum with a metal pipe attached to it to let out the smoke. *Id*. Apparently, this is where Mr. Ochoa was born. Abel, Sr., was a foot soldier and would leave on missions for days at a time in the mountains. *Id*. Belen and the young boys stayed behind. *Id*. Winters were very hard, and it would get so cold, that everything would turn to ice. *Id*. Belen had to break the ice with a hammer to get water. *Id*. She bundled Gabriel and Mr. Ochoa in every piece of clothing she had to keep them warm. *Id*. She could only

see their eyes.  *Id*.  The last year and a half that Abel, Sr., was in the military, the family lived in a barracks in Durango, but the store on the base was very expensive, so the family could not afford clothes or food.  *Id*. at 3.

After Abel, Sr., was discharged from the military, the family moved back to Nombre de Dios, where they lived for about another year.  *Affidavit of Belen Revilla Ochoa*, p. 3.  Again, there was not enough work, so Abel, Sr., left for the United States.  *Id*.  Belen and the boys crossed into Texas at Acuna, Coahuila, but Abel, Sr., had come to Mexico to look for them.  *Id*.  He had to pay a coyote $300 to get him back into the United States.  *Id*.  At first, the family moved around, but they settled in Waller, where they lived for about 11 years.  *Id*.  Abel, Sr., started drinking heavily, and this is when the beatings began.  *Id*.  Belen explained that Abel, Sr., would beat her and the boys when he was drunk and sometimes when he was sober.  *Id*.  He slapped Belen around and dragged her by the hair.  *Id*.  There would be no reason for it other than he was in a bad mood.  *Id*.  He beat his sons with is hand or a wooden pallet, and he would slap them over any small provocation.  *Id*.  Everything made him mad in those days.  *Id*.  Belen felt there was nothing she could do about it because her husband was tired.  *Id*.  Plus, Belen was used to this sort of behavior because she grew up with it in her family in Segundo Molina.  *Id*.  She knew that Abel, Sr.'s grandfather beat his grandmother as well.  *Id*.  It was a way of life.

Belen worried about Abel, Sr., because he worked hard and drank to excess when he was not at work.  *Affidavit of Belen Ochoa*, p. 4.  He two worked to shifts each day–from noon to 5 p.m., and then from midnight to 5 a.m.–at the dairy.  *Id*. at 3-4.  Between his shifts, he would go out drinking, and sometimes he stayed out with his friends and would not get enough sleep.  *Id*. at 4.  If he was too drunk to go to work at night, Belen would wake up at 4:00 in the morning and milk the cows so he would not lose his job.  *Id*.  She would stay awake when he was out, and she worried more about

62

him being out drinking than she did about the beating she received when he was around. *Id*. There was nothing she could do when Abel, Sr., beat Gabriel, Mr. Ochoa, and Javier, except wait until he got tired and went to bed. *Id*.

Mr. Ochoa was very different than his brothers. *Affidavit of Belen Revilla Ochoa*, p. 4. Gabriel and Javier helped their father with the farm work, and Mr. Ochoa stayed at home with Belen and helped her around the house. *Id*. Mr. Ochoa kept things to himself, and he was quiet and stayed with Belen all the time. *Id*. He helped with the cooking and household chores. *Id*. Whereas, Gabriel would stand up to his father, Mr. Ochoa never talked back to him. *Id*. Abel, Sr., changed when the family moved to Dallas, and he stopped drinking and abusing his family. *Id*.

Belen was very happy when Mr. Ochoa married Cecilia. *Affidavit of Belen Revilla Ochoa*, p. 4. He provided a good life for his wife and two daughters. *Id*. Belen did not understand why Cecilia wanted to work, but she told Belen she did it because she wanted to. *Id*. Belen believed that she and Abel, Sr., learned about Mr. Ochoa's drug problem too late, and they were powerless to do anything about it. *Id*. Belen did not go to funerals for her grandchildren out of respect for the Alvizo family, but it was a very hard time for her. *Id*. She had lost her family too, and she could not eat or drink for days. *Id*.

Before trial, the defense investigator spoke to Abel, Sr., and Belen twice. *Affidavit of Belen Revilla Ochoa*, p. 5. The first time, Gabriel had to interpret for the investigator. *Id*. Belen was never asked to testify, and Mr. Ochoa's attorneys never spoke to her. *Id*. Had she been asked, she would have willingly testified. *Id*. Belen believed that Mr. Ochoa had to bear responsibility for what he did, but she knew him too well, and she believed he was not in his "right five senses." *Id*. Belen knew that the defense attorneys told her family not to say anything unless asked. *Id*. She did not learn until after the trial was over that Mr. Ochoa had been sentenced to death. *Id*. Mr. Ochoa

63

was taken away, and she had no idea that she would never be able to touch him again until he was already gone.  *Id*.

Gabriel Ochoa was born in Mexico on September 30, 1970.  *Affidavit of Gabriel Ochoa*, p. 1.  He is Mr. Ochoa's older brother, and he testified at trial.  *Id*.  Javier is their younger brother.  *Id*. He lives with his wife and children, along with his parents, in Ferris, Texas.  *Id*.  Gabriel had two sisters who died.  *Id*.  He knew that his youngest sister who was stillborn died because his mother was not eating enough and was too weak.  *Id*.  Belen always worked hard, washing clothes by hand and working the land.  *Id*.  Gabriel recalled seeing her work this way when she was pregnant.  *Id*. When the family lived in Mexico, it was impossible to see a doctor, because doctors were too far away, and they could not afford one even if they could get there.  *Id*.  When Gabriel was a boy, he recalled getting very sick and coughing up blood.  *Id*.  Belen was able to get him to a doctor, and she paid him with chickens and corn.  *Id*.  Abel, Sr., worked very hard on farms in Mexico, and he was in the military for a few years.  *Id*.

Gabriel explained that life was real hard growing up.  *Affidavit of Gabriel Ochoa*, p. 1.  Abel, Sr., abused Belen and the boys, and Gabriel, being the oldest, was very frustrated because he could not do anything about it.  *Id*.  Abel, Sr., was always mad, and he humiliated everyone in the family by calling them terrible names all the time.  *Id*. at 1-2.  Any small matter could set him off, and he would go after Belen, Gabriel, or his brothers.  *Id*. at 2.  It was worse when he was drinking.  *Id*. Gabriel believed that his father was watching them, waiting for them to do something wrong so he could get angry with them.  *Id*.  If one of the boys said anything wrong to Abel, Sr., he would punch them in the nose.  *Id*.  He would beat Belen and pull her around by the hair.  *Id*.  Gabriel made a promise to himself as a child that he would stand up to his father and try to protect the others.  *Id*. Because of this, he would fight with his father.  *Id*.  He would get between his father and whoever

he was abusing, and then Gabriel would be beaten as well.  *Id*.  Gabriel explained that the attitude

that Abel, Sr., exhibited was known as "machismo;" he had considerable pride, but Gabriel thought

it was strange that his father thought he was doing the right thing when it was so obviously wrong.

*Id*.  Gabriel stated that his father beat him until he was around 17 or 18 years old.  *Id*.  When Javier

was around 14 years old, Abel, Sr., chased him with a wooden post, and Javier ran home bleeding

from the nose.  *Id*.  Not only was there abuse, but there was the poverty.  The Ochoa family was very

poor.  *Affidavit of Gabriel Ochoa*, p. 1.  Gabriel did not remember ever being hungry, but he recalled

that life was very limited for them.  *Id*.  To him, every dollar earned was a dollar saved, and they

took the cheap route with everything.  *Id*.  Gabriel did not have hard feelings for his father over the

abuse, because his father was able to change eventually.  *Id*.  Today, Gabriel respects his father and

calls him chief.  *Id*.

Gabriel explained that Mr. Ochoa was not like him and his brother, Javier.  *Affidavit of

Gabriel Ochoa*, p. 3.  Mr. Ochoa was quiet and stayed home taking care of his mother.  *Id*.  Gabriel

and Javier ran around doing the things that boys do.  *Id*.  Gabriel would follow him to work at the

dairy, and if Abel, Sr., was not in a bad mood, he would let Gabriel stay and help.  *Id*.  If he was in

a bad mood, he would slap Gabriel until he ran away.  *Id*.  But Gabriel always followed his father

around, and sometimes, Abel, Sr., would take him into the bars with him.  *Id*.  The bartenders were

used to seeing him, and Gabriel had a regular (cheeseburger and a coke) at one bar and another

regular at another bar.  *Id*.  Abel, Sr., told Belen that he could be with any woman he wanted, but

Gabriel never saw him with another woman.  *Id*.  Sometimes he would get drunk and dance with

another woman, which bothered Belen.  *Id*.  Sometimes, Abel, Sr., would come home too drunk and

could not make it to his night shift at the dairy, so Belen and Gabriel would work all night milking

cows so Abel, Sr., would not get fired.  *Id*.  Mr. Ochoa, on the other hand, never wanted to be with

his father when he was young.  *Id*.  He stayed inside, and he never stood up to his father no matter how bad Abel, Sr., treated him.  *Id*.  Mr. Ochoa did well in school, and Gabriel thought he was perfect growing up.  *Id*.

Mr. Ochoa married his first girlfriend.  *Affidavit of Gabriel Ochoa*, p. 4.  Cecilia wanted a perfect life, and Mr. Ochoa did everything to provide it for her.  *Id*.  Mr. Ochoa remained passive and quiet, even if Cecilia humiliated him in front of his family.  *Id*.  Gabriel recalled one time when they were watching television, and Cecilia became so upset with him that she slapped him.  *Id*.  The only thing that affected Mr. Ochoa about Cecilia was her deception about Jonathan, which was very hard for him.  *Id*.

Gabriel recalled that Mr. Ochoa called him the day after his arrest and told him that he had been arrested for drugs.  *Affidavit of Gabriel Ochoa*, p. 4.  He did not understand why the police were telling him that he had killed his wife.  *Id*.  Gabriel told him it was true, and Mr. Ochoa started to cry very hard.  *Id*.  He asked about his children, and Gabriel told him that he had killed them also. *Id*.  Mr. Ochoa cried uncontrollably, and Gabriel had to get off the phone.  *Id*.  Mr. Ochoa tried to commit suicide in jail by hanging himself, and he kept hitting his head hard against the wall.  *Id*.

Gabriel never met the defense attorneys before trial, and he met them for the first time in court.  *Affidavit of Gabriel Ochoa*, p. 4.  Gabriel wanted to talk about his brother, but they told him only to answer the questions he was asked.  *Id*. at 5.  He was very frustrated that they wanted him to testify in Spanish, because he was more comfortable talking in English.  *Id*.  But the attorneys wanted his testimony to be in Spanish so the Alvizos could understand him.  *Id*.  He believed that having to testify through an interpreter affected his ability to convey what he knew to the jury.  *Id*. Gabriel believed that had he been interviewed at length by the defense investigator, he could have revealed more about his family and Mr. Ochoa.  *Id*.

Javier Ochoa also provided an affidavit, and described the physical abuse he endured as a child.  Abel, Sr., abused Belen and told her repeatedly that he was seeing other women.  *Affidavit of Javier Ochoa*, p. 1.  He hit her and dragged her around by the hair.  *Id.*  He was more abusive when he was drunk, but even if he was sober, he would slap Belen and the boys around.  *Id.*  When Javier was a baby, Abel, Sr., was hitting Belen, and Javier started crying.  *Id.*  Abel, Sr., kicked him about three feet across the floor.  *Id.*  Javier said that his father could drink heavily–up to 25 beers at a time easy.  *Id.*  When Javier was around eight or nine, his father quit drinking, but he continued abusing his family for a couple more years.  *Id.*  Javier estimated that Mr. Ochoa was around 14 or 15 years old when his father stopped abusing him.  *Id.* at 2.  Javier knew that his father had been abused as a child, and his maternal grandmother, who worked in a bar, used to sleep with men when Abel, Sr. was close by.  *Id.*  Abel, Sr., could hear their moans.  *Id.*  Addiction ran deep on his father's side of the family.  *Id.*  Javier's uncle almost died of alcoholism, and another uncle was shot in a bar fight.  *Id.*  Abel, Sr., was never close to his siblings, whom he described as lazy.  *Id.*

Like Gabriel, Javier agreed that Mr. Ochoa was different than he and his brother.  *Affidavit of Javier Ochoa*, p. 2.  Mr. Ochoa was quiet all the time, and Javier believed that his brother had to have been affected by everything they went through.  *Id.*  Javier thought Mr. Ochoa's relationship with Cecilia was strange, but he would do everything for her.  *Id.*  Mr. Ochoa fell for her.  *Id.*  Javier used to abuse drugs, particularly inhalants.  *Id.* at 3.  He knew that Mr. Ochoa needed treatment, but Cecilia took him to a safe place where people prayed for him.  *Id.* at 2.

Javier never met trial counsel until after the trial started, and he had only met with the investigator once.  *Affidavit of Javier Ochoa*, p. 3.  Javier was confused by the whole process, and he got the impression that the lawyers thought that his family was mad at Mr. Ochoa.  *Id.*  This was not the case, but they thought something had to be wrong with his mind, because they knew he

67

would not hurt a fly.  *Id.*  Javier believed this would never have happened if not for the drugs.  *Id.*  Javier would have willingly provided testimony beyond that which he provided at trial.  *Id.*

Margarito Revilla was Mr. Ochoa's maternal uncle.  *Affidavit of Margarito Revilla*, p. 1.  He was Belen's older brother, and he was raised in rural Segundo Molina in Durango, Mexico.  *Id.*  He immigrated to the United States, and currently lives in Dallas with his wife.  *Id.*  Growing up, Margarito and Belen lived in one room house that had a kitchen, but the bathrooms were outside.  *Id.*  There was no running water or electricity, and they had to use Kerosene lamps for lighting.  *Id.*  The nearest town was Nombre de Dios.  *Id.*  Segundo Molina did not have roads leading into or out of it, and inhabitants had to walk everywhere.  *Id.*  As a result, it was nearly impossible to get to a doctor in an emergency.  *Id.*  They lived off the land and butchered their own livestock.  *Id.*  Margarito's father was an alcoholic and drank and smoked heavily every day.  *Id.*  He drank a hard liquor, *Mescal*, which was made from the maguey plant; it was strong like Tequila, but smelled more like lighter fluid.  *Id.*  Margarito's father spit up blood every day and eventually died from alcoholism.  *Id.*  He was abusive to their mother all the time, and when Margarito was 16 years old, he had to tackle his father to stop him from beating up his mother.  *Id.* at 2.  Abuse like this was a part of life in rural Mexico.

Belen worked hard, but she only had a second grade education.  *Affidavit of Margarito Revilla*, p. 2.  Margarito's parents were not educated either.  *Id.*  The nearest school was too far away, and it would take the children too long to walk there, and, as well, it was dangerous.  *Id.*  The younger children, particularly the boys, were able to go to school, however.  *Id.*  Their brother, Teodoro, is a teacher in Durango, Mexico.  *Id.*  Magarito knew Abel, Sr., when they were young, and he used to call him Abelito.  *Id.*  Abel, Sr., courted Belen, and they were married on the *rancho*

68

in Segundo Molina.  *Id*.  When Abel, Sr., entered the military, Belen and the boys lived in the barracks.  *Id*.  When he discharged from the military, he took his family to the United States.  *Id*.

When Abel, Sr., and his family settled in Waller, he started drinking heavily and abusing Belen and the children.  *Affidavit of Margarito Revilla*, p. 2.  Margarito knew about this.  *Id*.  Abel, Sr., believed he could get away with anything because his boss was friends with the local Sheriff. *Id*.  Margarito described Abel, Sr., as a "machista," and because of this self-proclaimed status, he would drink heavily and was hard on his family.  *Id*.  Belen and the boys could not defend themselves, and the boys grew afraid of their father.  *Id*. at 3.  Belen and Gabriel would wake up at 4:00 a.m. and milk the cows at the dairy when Abel, Sr., became too drunk.  *Id*.  Belen would call Margarito when Abel, Sr., beat her bad, and Margarito and another brother would come to Waller to check on her.  *Id*.  When they talked to Belen, she always told them she wanted to stay with Abel, Sr.  *Id*.  Margarito believed the decade of severe abuse affected the children:  Gabriel seemed depressed, and Mr. Ochoa was always too quiet.  *Id*.  Abel, Sr., exercised extreme control over his children, so much so, that he could rule them with his eyes.  *Id*.

Margarito believed that Mr. Ochoa was different from Gabriel and Javier.  *Affidavit of Margarito Revilla*, p. 3.  Whenever Margarito would visit his sister, he noticed that Mr. Ochoa would be doing household chores, such as washing dishes, while Gabriel and Javier were running around.  *Id*.  Margarito believed that Mr. Ochoa was always peaceful, punctual, calm, and noble. *Id*.  He married his first girlfriend.  *Id*. Mr. Ochoa started working at a young age and, like his mother, always worked very hard.  *Id*.

Anita, Margarito's wife, explained that Mr. Ochoa had been a great person since he was a small child.  *Affidavit of Anita Zarate Revilla*, p. 1.  He was very much like Belen–very reserved. *Id*.  Also, he was like Belen in another, darker way–both had been terrorized and traumatized by

Abel, Sr.  *Id*.  They were scared of him, and Anita knew it took its toll on Mr. Ochoa.  *Id*.  She explained:  "Abel was the most affected.  It was obvious because he was always very quiet.  He never said anything."  *Id*.  He never talked back or questioned anything anyone asked him to do.  *Id*.  Anita thought he was very timid because she never saw him play with the other children.  *Id*.  Belen always had Mr. Ochoa by her side inside, and Anita thought that Belen was protecting him from Abel, Sr.  *Id*.  Anita could tell Mr. Ochoa was very proud of his daughters.  *Id*.  She attended the trial, sitting with Belen, but she did not understand anything that was going on, and the attorneys never talked to them or explained anything.  *Id*.  She found the experience heartbreaking.  *Id*.  Belen did not know that her son had been sentenced to death until after he had been taken away.  *Id*. at 2.  Anita did not believe that the interpreter used at trial was interpreting everything correctly, and she could tell that Gabriel was uncomfortable testifying in Spanish.  *Id*.  She was very fluent in both languages, but the trial counsel never asked her for her help or advice.  *Id*.  Anita was surprised that more of the family did not testify at the trial, and she was especially surprised the Belen, Mr. Ochoa's own mother, did not testify.  *Id*.

No one from the defense team contacted Margarito or Anita before trial, and they would have willingly testified.  *Affidavit of Margarito Revilla*, p. 4; *Affidavit of Anita Zarate Revilla*, p. 2.

Juan Revilla, another of Belen's brothers, described growing up in Segundo Molina.  *Affidavit of Juan Revilla*, p. 1.  He was one of ten siblings–Margarito, Paula, Belen, Maria Isabelle, Pedro, Conchita, Juan, Martin, and Teodoro.  *Id*.  Their father was a farmer, and they lived off the land.  *Id*.  They were poor and worked hard for whatever food they had.  *Id*.  They would sell corn and pigs for money.  *Id*.  Two of Juan's sisters–Maria and Conchita–died as children.  *Id*.  The only way in or out of Segundo Molina was on foot, unless you rode a horse or a donkey.  *Id*.  The nearest store was in Nombre de Dios, and the nearest school was a five mile walk.  *Id*.  When Juan was nine

70

years old, Segundo Molina got its first school, and by this time Belen was a teenager and had hardly attended any school.  *Id*.  She could barely spell her name.  *Id*.  Once after Belen had married Abel, Sr., she became very ill and she grew very thin and cold with fever.  *Id*.  She almost died.  *Id*.  When Juan immigrated to the United States, he lived with Abel, Sr., and Belen for about seven months. *Id*.  At this time, Abel, Sr., was not drinking heavily, and Juan did not see him hit his sister.  *Id*. at 2.  But Abel, Sr., began drinking heavier in later years and started abusing his family.  *Id*.  Juan and Margarito would check up on Belen when things got really bad.  *Id*.  However, she would never leave her husband.  *Id*.

Juan explained that Belen is a very humble person, and she would do anything to preserve her marriage, no matter how badly Abel, Sr., treated her.  *Affidavit of Juan Revilla*, p. 2.  Abel, Sr., physically and psychologically abused Belen and the boys.  *Id*.  Abel, Sr., would beat Mr. Ochoa with a belt.  *Id*.  Juan recalled what Mr. Ochoa was like as a child.  *Id*.  He thought that Mr. Ochoa was much like his mother–quiet, humble, and respectful.  *Id*.  Mr. Ochoa always worked hard and from a young age.  *Id*.  He wanted to have a nice home for his wife and sons.  *Id*.  It shocked Juan when he learned that Mr. Ochoa had stopped working.  *Id*.  Juan believed it was very hard for his family, particularly Belen, to stay away from the funerals.  *Id*. at 3.

The trial attorneys never approached Juan about this case or asked him to testify.  *Affidavit of Juan Revilla*, p. 3.

Teodoro Revilla had been a teacher in Durango, Mexico, for 20 years.  *Affidavit of Teodoro Revilla*, p. 1.  He visited his family in the United States every year, and he would work with Margarito when he visited.  *Id*.  Teodoro also explained how hard life was growing up in Segundo Molina.  *Id*.  They were poor and lived off the land, and there were no doctors close by.  *Id*.  Teodoro stated that their mother would faint–just drop to the ground–and then recover and continue doing

71

whatever she had been doing.  *Id*.  Their father was an alcoholic and abused his wife and children.

*Id*.  Teodoro explained that in Mexico, there are men that treat their wives and children like servants,

and their father was this way.  *Id*.  Belen was very proud of Mr. Ochoa because he was a responsible

and hard working person.  *Id*. at 2.  Teodoro was shocked to learn what happened because it was out

of character for Mr. Ochoa, who always loved his wife and daughters so much.  *Id*.  Teodoro

believed that something had to have been wrong with Mr. Ochoa's mind that day–that he was not

in his right five senses–because he was not capable of doing something like this.  *Id*.  Teodoro, like

the rest of the Revilla side of the family, had not been contacted or interviewed by the defense team.

*Id*.  He would have willingly came from Mexico to testify.  *Id*.

    2.    *Strickland v. Washington*:  The Basic Standard for Ineffective Assistance of Counsel.

The standard for assessing a claim of ineffective assistance of counsel is the familiar two-

prong test promulgated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687

(1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id*.  It is clear that the mandates of the Sixth Amendment are not satisfied simply because "a person

who happens to be a lawyer is present at trial alongside the accused."  *Id*. at 685.  Instead, the Court

centered its elaboration of this standard in the due process guarantee of a fair trial–one in which

"evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues

defined in advance of the proceeding." *Id*. at 684-85.  In so doing, the Court noted:  "In giving meaning to the requirement, however, we must take its purpose–to ensure a fair trial–as the guide. The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686.  Therefore, as the Court made abundantly clear in *Strickland*, any interpretation or application of the two-part test must be viewed in light of the overarching principle of fairness.  And at the very least this means that the result of the proceeding must be unreliable precisely because it was reached in an unjust, unfair, or arbitrary manner as a result of trial counsel's actions or omissions.

> 3.  Mr. Ochoa's trial counsel performed deficiently when they waited until after jury selection had begun to begin any meaningful mitigation investigation in this case; by that time, it was too late to conduct the exhaustive and extensive investigations required in time to formulate a defense strategy and execute it at all stages of trial, from *voir dire*, through guilt innocence, and leading ultimately to punishment.

When alleging that an attorney rendered deficient performance, a defendant must demonstrate that the attorney's performance "fell below an objective standard of reasonableness," which, as the Court noted, means "reasonableness under prevailing professional norms." *Strickland v. Washington*, 466 U.S. at 687-88.  An inquiry into counsel's performance must be highly deferential, and a court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id*. at 689.  As a result, and because of the need to protect counsel's independence and to ensure there remains considerable latitude for counsel to make the necessary tactical decisions that might arise during the representation, a court must indulge a strong presumption that counsel's conduct was within the "wide range of reasonable professional assistance" and was based upon sound trial strategy. *Id*. at 688-89.  The determination must be made

73

on a case-by-case basis, and the reviewing court must "determine whether, *in light of all the circumstances*, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id*. at 690 (emphasis added).  Of course, the overarching policy of fairness must be ever-present in the review process, and the court must inquire whether counsel functioned in such a way, particularly as articulated in prevailing professional norms, as to make the "adversarial testing process work in the particular case." *Id*. at 688-90.

Whether trial counsels' purported trial strategy is reasonable under this standard is based in large part on whether the investigation underlying the decision making process was itself reasonable. *Strickland v. Washington*, 466 U.S. at 690-91.  Importantly, the Sixth Amendment imposes a duty upon trial counsel to investigate the case.  As the Court explained:

> [S]trategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.  *In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary*.

*Id*. (emphasis added).  Thus, strategy presupposes the existence of an adequate investigation.  *See Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003); *Johnson v. Bagley*, 544 F.3d 592, 603 (6th Cir. 2008).  *See also Lewis v. Dretke*, 355 F.3d 364, 368 (5th Cir. 2003); *Turpin v. Dobbs*, 142 F.3d 1383, 1388-89 (11th Cir. 1998); *Austin v. Bell*, 126 F.3d 843, 848-49 (6th Cir. 1997).  Of course, it is clear that an attorney's duty to investigate must be based on prevailing professional norms and does not simply evaporate because a client has requested that no investigation be done or demanded that the investigation be limited or conducted in a certain way or because the client or the family may be less than cooperative or forthcoming.  *See Rompilla v. Beard*, 545 U.S. 374, 377 (2005); *Stankewitz v. Woodford*, 365 F.3d 706, 721-22 (9th Cir. 2004); *Hamblin v. Mitchell*, 354 F.3d 482, 492 (6th Cir.

74

2003).  *See also Johnson*, 544 F.3d at 603 ("Uncooperative defendants and family members, however, do not shield a mitigation investigation (even under AEDPA's deferential standards) if the attorneys failed to utilize other available sources that would have undermined and contradicted information received.").

Since *Strickland*, the Court addressed ineffective assistance of counsel claims, particularly as they relate to the failure to investigate mitigating evidence in a capital case, in three number of cases.  In *Williams (Terry) v. Taylor*, 529 U.S. 362 (2000), the Court recognized that the defendant had a constitutionally protected right to "provide the jury with the mitigating evidence that his trial attorney either failed to discover or failed to offer."  *Id*. at 393.  The Court noted that trial counsel "failed to conduct an investigation that would have uncovered extensive records graphically describing [the defendant's] nightmarish childhood," and that this failure "clearly demonstrate[d] that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background."  *Id*. at 395-96 (citing 1 ABA STANDARDS FOR CRIMINAL JUSTICE Standard 4-4.1, commentary, pp. 4-55 ($2^d$ ed. 1980)).  The Court further held that the lack of investigation and the failure to present the evidence could not be justified as a tactical decision.  *Id*. at 396.  In other words, counsel could not formulate a reasonable trial strategy with respect to punishment because there was an inadequate investigation.

Next, in *Wiggins v. Smith*, 539 U.S. 510 (2003), the Court again addressed a failure of trial counsel to investigate extensive mitigation evidence concerning the defendant's background and life history.  *Id*. at 522-23.  As in *Williams*, the Court cited the ABA Standards for Criminal Justice as compelling guides to prevailing professional norms and to what is reasonable.  *Id*. at 522, 524-25. In *Wiggins*, trial counsel knew some of the defendant's background; however, they apparently decided to focus on retrying guilt at sentencing to minimize the defendant's participation in the

75

murder rather than focus on mitigation. *Id*. at 515. Nevertheless, counsel promised in the opening statement to present mitigation evidence to the jury, but failed to carry through with the promise. *Id*. at 515-16, 526. The Court held that counsels' decision to forego further investigation into mitigation was not reasonable under prevailing professional norms as enumerated in the ABA Standards. *Id*. at 524-26. Also, the Court held that the information that counsel had concerning the defendant's background (which the Court described as rudimentary, gathered from a few sources), rather than giving counsel reason to limit the investigation and to forego presenting evidence to the jury, should have prompted further investigation. *Id*. at 524-25, 527-28. Along these lines, the Court held: "In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id*. at 527. Based on this evidence, the Court held that counsels' decision not to present the extensive mitigation evidence available was not strategic because it was not based on a reasonable investigation. *Id*. at 534.

Finally, in *Rompilla v. Beard*, 545 U.S. 374 (2005), the Court found that defense counsel were deficient for not making a reasonable effort to investigate easily available evidence that they knew the State intended to use as part of its aggravation case at punishment. *Id*. at 383-90. Specifically, the Court held that "even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." *Id*. at 377. Thus, the Court started its analysis with statements about defense counsel's duty to make reasonable efforts to investigate the State's punishment case. Importantly, however, trial counsel conducted a considerable investigation for mitigating evidence, which included interviews with not only the

defendant, but also his family members (both sources indicated that the defendant had an unexceptional background), review of certain records, and interviews with three mental health experts. *Id*. at 381-82. These sources turned up little in the way of mitigation, and Rompilla's counsel decided to advance a residual doubt theory during the punishment phase. *Id*. at 386.

Notwithstanding this facially "strategic" decision, the Court found Rompilla's counsel deficient under the *Strickland* standard because they failed to review a case file concerning a prior crime that the State had informed the defense that it intended to use in aggravation during sentencing, and this file was both readily available and contained extensive mitigation leads and evidence. *Rompilla v. Beard*, 545 U.S. at 383-90. The Court noted that reasonable efforts would include at the least an attempt to learn what the State knew about the prior crime, any mitigation evidence available that the State would probably downplay, and any details that the State would try to emphasize. *Id*. at 385-86. As it had in *Wiggins* and *Williams,* the Court resorted to the ABA Standards for guidance into what is reasonable in finding counsels' performance deficient. *Id*. at 387. So even in light of a fairly extensive mitigation investigation, strategy can nevertheless be considered unreasonable if counsel fails to conduct all reasonable investigations called for in the circumstances of the case.

Most recently, in *Porter v. McCollum*, ___ U.S. ___, 130 S. Ct. 447 (2009), the Court addressed a situation in which trial counsel failed to investigate extensive mitigation evidence concerning the defendant's history of growing up in an abusive family, his heroic military service in the Korean War, trauma he suffered from as a result of this service, his long-term struggles with substance abuse, and his impaired mental health and mental capacity. *Id*. at 449-51. "It is unquestioned that under the prevailing professional norms at the time of Porter's trial, counsel had an 'obligation to conduct a thorough investigation of the defendant's background.'" *Id*. at 452-53

(quoting *Williams (Terry) v. Taylor*, 529 U.S. at 396). The Court found that, even though counsel had a month to prepare for trial, he did not take the first step of interviewing witnesses or obtaining records. *Id*. at 453. Furthermore, as in *Wiggins*, counsel did not follow up on important leads, particularly indications set forth in a competency evaluation that important mitigating evidence existed "of which he should have been aware." *Id*. Counsel explained that his client was "fatalistic and uncooperative," but the Court held that this did not excuse counsel's duty to investigate: "Porter may have been fatalistic or uncooperative, but that does not obviate the need for defense counsel to conduct *some* sort of mitigation investigation." *Id*. (emphasis in original) (citing *Rompilla v. Beard*, 545 U.S. at 381-82).

From *Strickland* to *Rompilla*, the Court has repeatedly invoked the ABA Standards for guidance in determining whether attorney actions or omissions are reasonable.[2] Similarly, other federal courts have found the ABA Standards persuasive. *Canaan v. McBride*, 395 F.3d 376, 384-85 (7th Cir. 2005); *Hamblin v. Mitchell*, 354 F.3d at 486-88; *Pickens v. Lockhart*, 714 F.2d 1455, 1460-61 (8th Cir. 1983). The ABA Standards are instructive in this case. With respect to the duty to investigate, the ABA Standards provide:

> Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to *facts relevant to the merits of* the case and *the penalty* in the event of conviction. The investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to defense counsel of facts constituting guilt or the accused's stated desire to plead guilty.

---

[2]    In *Bobby v. Van Hook*, ___ U.S. ___, 130 S. Ct. 13 (2009), the Court noted that "[r]estatements of professional standards . . . can be useful as 'guides' to what reasonableness entails," but the Court cautioned that the ABA Standards, and particularly the ABA Guidelines governing capital representation which were promulgated in 2003, are not "inexorable commands" and do not necessarily define or limit the scope of the Sixth Amendment inquiry into deficient performance of trial counsel. *Id*. at 16-17.

STANDARDS FOR CRIMINAL JUSTICE: PROSECUTION FUNCTION AND DEFENSE FUNCTION, Standard 4-4.1 (3$^d$ ed. 1993) (emphasis added) [hereinafter ABA STANDARDS].   Furthermore, during punishment, counsel should present "any ground which will assist in reaching a proper disposition favorable to the accused."  ABA STANDARDS, Standard 4-8.1.  With respect to mental impairments and mental health and its effect on punishment, the Standards provide:  "Evidence of mental illness or mental retardation should be considered as a possible mitigating factor in sentencing a convicted offender."  ABA CRIMINAL JUSTICE MENTAL HEALTH STANDARDS, Standard 7-9.3 (1989).  *See generally Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (describing belief long held by American society "'that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse'") (quoting *California v. Brown*, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring)).

As in *Williams*, *Wiggins*, and *Rompilla*, the ABA Guidelines for death penalty representation are instructive.[3]  They provide:

> A.   Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty.
>
> * * *
>
> 2.   The investigation regarding penalty should be conducted regardless of any statement by the client that evidence bearing upon penalty is not to be collected or presented.

_____

[3]   The ABA Death Penalty Guidelines were adopted in February 2003, which is the same time as voir dire started in this case.  They are a clear reflection of the contemporaneous standards of practice at the time.  Needless to say, trial counsel in this case should not have required exhaustive guidelines in 2002 to remind them to start investigating this case at the earliest possible time, and they were reminded of this by Tena Frances as early as November 2002.

ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.7, p. 76 (2003) [hereinafter ABA Death Penalty Guidelines].  The Guidelines are instructive about presenting evidence once it is obtained:

> F.    In deciding which witnesses and evidence to prepare concerning penalty, the areas counsel should consider include the following:
>
> 1.    *Witnesses familiar with any evidence relating to the client's life and development*, from conception to the time of sentencing, that would be explanatory of the offense(s) for which the client is being sentenced, would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death;
>
> 2.    Expert and lay witnesses along with supporting documentation (*e.g.*, school records, military records) to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense(s); to give a favorable opinion as to the client's capacity for rehabilitation, or adaptation to prison; to explain possible treatment programs; or otherwise support a sentence less than death; and/or to rebut or explain evidence presented by the prosecutor;
>
> * * *
>
> L.    Counsel at every stage of the case should take advantage of *all appropriate opportunities to argue why death is not suitable punishment for their particular client*.

ABA Death Penalty Guidelines, Guideline 10.11, pp. 104-06 (emphasis added).  Along these lines, the commentaries continue:

> [D]efense counsel must both rebut the prosecution's case in favor of the death penalty and *affirmatively present the best possible case in favor of a sentence other than death*.
>
> If the defendant has any prior criminal history, the prosecution can be expected to attempt to offer it in support of a death sentence.  Defense counsel accordingly must comprehensively investigate–together with the defense investigator, a mitigation specialist, and other members of the defense team–the defendant's behavior and the circumstances of the conviction.  Only then can counsel

protect the accused's Fourteenth Amendment right to deny or rebut factual allegations made by the prosecution in support of a death sentence, and the client's Eighth Amendment right not to be sentenced to death based on prior convictions obtained in violation of his constitutional rights.

If uncharged prior misconduct is arguably admissible, defense counsel must assume that the prosecution will attempt to introduce it, and accordingly must thoroughly investigate it as an integral part of preparing for the penalty phase.

Along with preparing to counter the prosecution's case for the death penalty, *defense counsel must develop an affirmative case for sparing the defendant's life. A capital defendant has an unqualified right to present any facet of his character, background, or record that might call for a sentence less than death*. The Eighth Amendment right to offer mitigating evidence does nothing to fulfill its purpose unless it is understood to presuppose that the defense lawyer will *unearth, develop, present and insist on the consideration of those* "*compassionate or mitigating factors stemming from the diverse frailties of humankind*." Nor will the presentation be persuasive unless it (a) is consistent with that made by the defense at the guilt phase and (b) *links the client's behavior to the evidence offered in mitigation*.

Finally, trial counsel, like counsel throughout the process, *must raise every legal claim* that may ultimately prove meritorious, lest default doctrines later bar its assertion.

ABA DEATH PENALTY GUIDELINES, commentary to Guideline 1.1, pp. 7-8 (emphasis added).

The ABA Guidelines are clear that a mitigation investigation must start at the earliest available opportunity and should never be delayed. Guideline 10.4 directs that "[a]s soon as possible after designation, lead counsel should assemble a defense team," which should include "at least one mitigation specialist." ABA DEATH PENALTY GUIDELINES, Guideline 10.4.C. Similarly, the Commentary to Guideline 1.1 dictates that ""[i]nvestigation and planning for both phases [of the capital trial] must begin immediately upon counsel's entry into the case." *Id.* at Guideline 1.1, Commentary. *See also* ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, Guideline 11.4.1.A, 11.8.3.A (1989). Indeed, the importance of a timely, competent mitigation investigation has been recognized as so crucial that the ABA has enacted an additional set of guidelines exclusively dedicated to mitigation. ABA SUPPLEMENTARY

GUIDELINES FOR THE MITIGATION FUNCTION OF DEFENSE TEAMS IN DEATH PENALTY CASES (2008), Guideline 10.4.A ("It is the duty of counsel to lead the team in conducting an exhaustive investigation into the life history of the client.  It is therefore incumbent upon the defense to interview all relevant persons and obtain all relevant records and document that enable the defense to develop and implement an effective defense strategy.").[4]

In this case, counsel were deficient primarily because they waited until the trial was underway–general voir dire had happened and they were only five days from starting individual voir dire–to start any meaningful mitigation investigation.  As demonstrated in subsequent, but related issues, this greatly affected trial counsel's ability and effectiveness at voir dire.  They simply were not prepared to select a capital jury going in, and they certainly only had at best a rudimentary understanding of the mitigation case that would be developed during voir dire.  Additionally, they were engaged every day in the laborious and taxing process of selecting a jury (up to 12 hours or more a day), and from this, it should be obvious that they did not have the time to prepare a punishment case at the same time.  This became apparent at trial when they started putting on the defense witnesses because they had spent hardly any time, if any at all, preparing these witnesses to testify.  Undoubtedly, this affected the presentation of testimony at trial, primarily because the witnesses were not prepared to testify and counsel were not prepared to examine them.

Though counsel were able to present a mitigation case to the jury, much remained in the investigation to do.  Francis explained that much of the documentation that she believed necessary for a full investigation was not collected.  Document collection is an necessary part of any

---

[4]        Though these supplementary guidelines were adopted in 2008, well after Mr. Ochoa's trial, it is clear that as a 2003, well-established standards of practice dictated an early start to the mitigation investigation because of its central, if not pivotal role in the entire defense.

investigation, and it typically is the first order of business.  But more importantly, the process of document collection is something that is largely beyond the investigator's control, because she must rely upon document custodians to gather them and provide them.  The information in the documents, such as school and medical records, guide and inform the witness interviews.  In this case, Francis was hampered by critical constraints imposed upon her because she had very limited time to put a mitigation investigation together.  She had to interview witnesses even though the process of document collection was in its earliest stages.  She had to conduct truncated interviews with witnesses, and she was unable to spend the time needed to develop a relationship of trust with the witnesses so they would open up about information that is very private and often painful to relate to a complete stranger.  And because of this, she was unable to prepare these witnesses, particularly, Mr. Ochoa's family, to testify about these matters in open court.  Instead, she got what she could, and Mr. Ochoa's family were thrown into the daunting and invariably frightening aspect of testifying with virtually no preparation.

Based on this, it should not be surprising that Mr. Ochoa's family provided minimal testimony about what life was like in Mexico, their immigration to Texas, and the alcoholism and family abuse that was not only part of their society but that was a very real part of their lives once they settled in Texas.  This was a family torn apart and grieving over the tragic death of their family members, and in spite of this grief, they were expected to open up fully.  Belen, Mr. Ochoa's mother, was so grief stricken that she was unable to talk about her son and his life.  Francis was unable to

spend any time with Belen outside the presence of Abel, Sr., or Gabriel, who interpreted during the first interview.  In the two brief interviews in which Belen was present, she was unable to open up to Francis, and Francis had no time to follow up with her.  Belen was not being uncooperative;

instead, she wanted to cooperate and to help her son in any way she could. With time and proper interviews, she would have told the defense team what she knew about her son and her family. As a result of the woefully inadequate investigation, which is a direct result of the limited time placed upon Francis to conduct this enormous task, Belen did not testify at Mr. Ochoa's trial. This is no small matter in a death penalty case as a matter of course, but in this case, Belen and Mr. Ochoa were very much alike, and the jury should have been allowed to hear from her. She had important information to relate to them, but she was effectively forced into silence because trial counsel delayed their start on the investigation. And she sat through the trial, befuddled and confused, because no one on the defense explained anything to her or asked her anything at all, and once the jury sentenced Mr. Ochoa to death, she did not know what happened or even that she would never touch her son again.

Counsel were also deficient in not seeking more time to prepare for this case. They were admonished repeatedly by Francis, as early as November 2002, but no later than January 2003, that a mitigation investigation, done properly, would take far more time than remained before the trial setting. They knew that they would have no meaningful information about the case before jury selection began. They knew what would be required to obtain this information. And, yet, they did nothing until prodded into action. By the time the trial court heard the motion for continuance, which contained Francis's plea for adequate time, a jury had been empaneled and was waiting to be sworn in. It should not be surprising at that point that the trial court denied the motion. But a timely motion, filed as early as November 2002 should have been granted, because slightly more than six months (the time between indictment and beginning of jury selection) is insufficient time to prepare for a case of this magnitude. Counsel should have known this, and they should have given their investigator every reasonable opportunity to do her job.

It is readily apparent that counsel in this case performed deficiently in waiting until the eleventh hour to begin any meaningful investigation.

    4.      Mr. Ochoa was prejudiced by his trial counsel's deficient performance such that had the additional mitigation evidence been presented at trial, there is a reasonable probability that at least one jury would have voted for life.

With respect to prejudice, *Strickland* effectively established a case-by-case, totality of the evidence review process for determining prejudice, which the Court elaborated upon in *Williams*, *Wiggins*, and *Rompilla*. In *Williams*, the Court held that a state court failed to "evaluate the totality of the available mitigation evidence–both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." *Williams (Terry) v. Taylor*, 529 U.S. at 397-98. The Court criticized the state court for failing to consider the additional evidence elicited during the post-conviction proceedings as part of its totality of the evidence review. *Id*. at 397-98. "Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case. The Virginia Supreme Court did not entertain that possibility. It thus failed to accord *appropriate weight* to the body of mitigation evidence available to trial counsel." *Id*. at 398 (emphasis added). According to the Court, this evidence "might well have influenced the jury's appraisal of [the defendant's] moral culpability." *Id*. at 398.

In *Wiggins v. Smith*, the Court again addressed the totality of the evidence aspect of the prejudice analysis. 539 U.S. at 534-38. The Court held that "[i]n assessing prejudice, we reweigh the evidence in aggravation against the totality of the available mitigation evidence." *Id*. at 534. In finding prejudice as part of its reweighing process, the Court stated as follows:

    We further find that had the jury been confronted with this considerable mitigating evidence, there is a reasonable probability that it would have returned with a different sentence. In reaching this conclusion, we need not, as the dissent suggests,

make the state-law evidentiary findings that would have been at issue at sentencing. Rather, we evaluate the totality of the evidence–"both that adduced at trial, *and the evidence adduced in the habeas proceeding[s]*."

*Id*. at 536 (internal citations omitted and emphasis in original) (quoting *Willaims (Terry) v. Taylor*, 529 U.S. at 397-98). It is clear, at least in *Willams* and *Wiggins* that a reviewing court must address all of the evidence, from all sources available to it, in determining whether prejudice is established.

In *Rompilla v. Beard*, the Court reiterated that *Strickland* requires that reviewing courts must consider all of the evidence in determining whether prejudice is shown, and after addressing mitigation evidence that the jury never heard, the Court added:

> [A]lthough we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, *that is not the test*. It goes without saying that the undiscovered "mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [Rompilla's] culpability," and the likelihood of a different result if the evidence had gone in is "sufficient to undermine confidence in the outcome" actually reached at sentencing.

545 U.S. at 393 (internal citations omitted and emphasis added) (quoting *Wiggins v. Smith*, 539 U.S. at 538; *Williams (Terry) v. Taylor*, 529 U.S. at 398; and *Strickland v. Washington*, 466 U.S. at 694).

Recently, in *Sears v. Upton*, ___ U.S. ___, 130 S. Ct. 3259 (2010), the Court further clarified the prejudice standard and ultimately held that the prejudice inquiry is independent from the deficient performance prong. The prejudice inquiry does not focus on the reasonableness of the mitigation theory actually presented at trial; instead, what is required is a probing analysis into whether the deficiencies in counsel's performance prejudiced the defense. *Id*. at 3265. "[M]ore to the point, that a theory might be reasonable, in the abstract, does not obviate the need to analyze whether counsel's failure to conduct an adequate mitigation investigation before arriving at this particular theory prejudiced [the defendant]." *Id*. The Court plainly held, contrary to the state court in that case, that it had never "limited the prejudice inquiry under *Strickland* to cases in which there

86

was only 'little or no mitigation evidence presented.'" *Id*. at 3265-66 (quoting state court opinion).

The Court continued:

> We certainly have never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant.  To the contrary, we have consistently explained that the *Strickland* inquiry requires precisely the type of probing and fact-specific analysis that the state trial court failed to undertake below.

*Id*. at 3266 (emphasis in original).  Importantly, the Court made clear that the reweighing standard required for such a probing prejudice inquiry "will necessarily require a court to 'speculate' as to the effect of the new evidence–regardless of how much or how little mitigation evidence was presented during the initial penalty phase." *Id*. 3266-67.  In all circumstances, a court considering prejudice under *Strickland* must undertake this process.  *Id*. at 3267.

In this case, the State presented virtually no independent aggravating evidence other than the facts of the case itself.  And going into jury selection, the State knew that this was a weakness in its case.  Mr. Ochoa had virtually no history of violence prior to committing this crime.  On the other side of the equation, Mr. Ochoa's defense counsel presented considerable mitigation evidence of Mr. Ochoa's drug addiction and brain damage, and through expert testimony, linked these factors to his behavior to explain what went wrong with an otherwise peaceable and humble man.  But what was lacking in the case was the background that may have explained Mr. Ochoa's fateful choice to try cocaine or placed it in the overall context of Mr. Ochoa's life.  There was little evidence presented, other than a few lines of testimony from Abel, Sr., Gabriel, and Javier, as well was some testimony from Mr. Ochoa himself, about his father's alcoholism and abuse Mr. Ochoa and the rest of the family endured during his most important formative years.  These witnesses, as well as others in the family, could have presented much fuller and more compelling portraits of what life was like growing up in the Ochoa home.  This would have included what life was like in Mexico, where Mr.

87

Ochoa was born in a primitive military barracks in the mountains.  The jury could have seen harsh conditions and destitution of his beginnings, and how these conditions continued once the family moved to the United States.  Added to this was the misery of what Abel, Sr., became to his family for more than 10 years.

Though the jury heard some of this evidence, it surely did not hear all of it.  Given the weaknesses in the State's case in aggravation and the mitigation evidence the jury actually did hear, it would not have taken much to tip the scale such that there would be a reasonable probability that at least one juror would have returned with a life sentence.  Had counsel started the investigation early enough, they could have more fully developed their mitigation case, which would have included detailed testimony about what Mr. Ochoa's life was like growing up.  The deficiencies in waiting until the last minute and having to scramble all the way down to the wire to get everything put together in time to present it to the jury, with the attendant consequence that many of the fact witnesses simply were not prepared to testify and counsel were not prepared to examine them, undoubtedly resulted in this vital aspect of the case being presented in a truncated form.  Additionally, the rush to get everything done likely affected the presentation of the drug addiction and brain damage evidence that the jury heard.  In particular, there was no evidence linking this evidence to Mr. Ochoa's life history in any meaningful manner.

Trial counsel were deficient in investigating mitigation evidence and clearly deviated from professional norms.  These deficiencies resulted in prejudice to Mr. Ochoa.  As a result, Mr. Ochoa is entitled to a new sentencing hearing.

B. *Voir Dire* Issues

Mr. Ochoa received ineffective assistance of counsel during the *voir dire* of his capital murder trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

Mr. Ochoa's trial counsel were rendered ineffective during the *voir dire* of his capital murder trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

Because Mr. Ochoa was deprived of the right to an adequate *voir dire*, his right to be tried by a fair and impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution was denied.

Mr. Ochoa received ineffective assistance of counsel on appeal because his appellate attorney failed to raise the *voir dire* issues on appeal.

1.      Mr. Ochoa's Right to Be Tried by a Fair and Impartial Jury Encompassed the Right to an Adequate *Voir Dire*.

Mr. Ochoa was entitled to have his case heard by a fair and impartial jury.  UNITED SSTATESCONSTITUTION, AMEND. I; *see also In re Oliver*, 333 U.S. 257 (1948).  A fair trial in a fair tribunal is a basic requirement of due process.  *In re Murchison*, 349 U.S. 133, 136 (1955).  Due process alone requires that, if a jury is to hear the defendant's case, the jury must stand impartial and indifferent.  *Turner v. Louisiana*, 379 U.S. 466, 472 (1965).  Central to the "guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (citing *Dennis v. United States*, 339 U.S. 162, 171-72 (1950); *Morford v. United States*, 339 U.S. 258, 259 (1950)).

*Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored.  Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosalez-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion).  The Fifth Circuit has recognized that "[a]ll veniremen are

potentially biased.  The process of *voir dire* is designed to cull from the venire persons who demonstrate that they cannot be fair to *either* side.  Clearly, the extremes must be eliminated–*i.e.*, those who, in spite of the evidence, would automatically vote to convict or impose the death penalty or automatically vote to acquit or impose a life sentence." *Smith v. Balkcom*, 660 F.2d 573, 578 (1981) (emphasis in original), *modified*, 671 F.2d 858, *cert. denied*, 459 U.S. 882 (1982).  The Supreme Court has been clear that conducting an adequate *voir dire* is among the duties of effective trial counsel:  "As with any other trial situation where an adversary wishes to exclude a juror because of bias, then, it is the adversary seeking exclusion who must demonstrate, *through questioning*, that the potential juror lacks impartiality."  *Wainwright v. Witt*, 469 U.S. 412, 423 (1985) (citation omitted; emphasis added).

As the foregoing makes clear, counsel's duties in this regard include ensuring that jurors are not seated who would automatically impose the death penalty upon a finding of guilt.  *See Morgan v. Illinois*, 504 U.S. at 733-34 ("Were *voir dire* not available to lay bare the foundation of petitioner's challenge for cause against those prospective jurors who would *always* impose death following conviction, his right not to be tried by such jurors would be rendered as nugatory and meaningless as the State's right, in the absence of questioning to strike those who would *never* do so.") (emphasis in original).  Counsel's responsibilities, however, do not end there.  Trial counsel is also obliged to ensure that the jury will give fair consideration to the defense's mitigation evidence.  *Id*. at 739 ("Any juror to whom mitigating factors are likewise irrelevant should be disqualified for cause, for that juror has formed an opinion concerning the merits of the case without basis in the evidence developed at trial.").

    2.    Mr. Ochoa Was Deprived of the Right to an Adequate *Voir Dire* Because Counsel Failed to Question the Venire Members about Their Ability to Give Meaningful Consideration to the Defense Mitigation Evidence.

Mr. Ochoa's trial counsel failed in their duty to conduct an adequate *voir dire*.  Because the State's case in chief at punishment was brief and consisted primarily of evidence related to the charged offense, the bulk of the punishment phase evidence was presented by the defense.  Indeed, in the instant case, there is an important indication that trial counsel were aware of the importance of asking pointed questions of the venire members about mitigation evidence.  On February 11, 2003, counsel filed a motion seeking to question the venire members about their ability to consider the following types of mitigation evidence:

1.   A capital defendant's relative youth at the time of the crime;
2.   The fact that a capital defendant was intoxicated at the time of the crime;
3.   The fact that a capital defendant suffers from a medically-diagnosed form of mental or emotional illness;
4.   The fact that a capital defendant is mentally retarded or suffers brain damage;
5.   The fact that a capital defendant was abused or neglected as a child;
6.   The fact that a capital defendant has exhibited positive character traits, such as having engaged in acts of kindness towards family members;
7.   Any residual or lingering doubts a juror might harbor concerning the defendant's guilt;
8.   Any acceptance of responsibility or remorse on the part of the Defendant;
9.   Any other relevant mitigating factor that would tend to militate in favor of a life sentence rather than a death sentence.

*1C. 274-77* (Motion to Question Veniremen Regarding Mitigating Evidence).  Counsel's motion was granted prior to the beginning of individual *voir dire*.  *4R. 10-11*.

Despite requesting and receiving permission to do so, counsel failed to implement the sound–and constitutionally required–strategy of propounding specific mitigation questions to the venire members.  During *voir dire*, counsel failed to make a searching inquiry of the venire members who were ultimately seated on the jury as to whether they could give meaningful consideration to the defense's mitigation case, including evidence of a debilitating cocaine addiction and the drug's affect on Mr. Ochoa's brain.  Indeed, in conducting the *voir dire* of eight of the twelve jurors seated in Mr. Ochoa's case, trial counsel utterly failed to ask any questions about the venire members'

ability to fairly and impartially consider the mitigation evidence the defense would present.  *See 7 R. 61-82* (defense *voir dire* of juror Kellye Bailes devoid of questions about relevant mitigating evidence); *9 R. 39-56* (defense *voir dire* of juror John Rudkin; same); *9 R. 94-110* (defense *voir dire* of juror Leann Zeek; same); *10 R. 54-71* (defense *voir dire* of juror Gregory Kessler; same); *22 R. 63-88* (defense *voir dire* of juror Lynette Cavazos; same); *23 R. 46-69* (defense *voir dire* of juror Byron Willis; same); *25 R. 69-88* (defense *voir dire* of juror Gene Bounds; same); *28 R. 184-213* (defense *voir dire* of juror Chad Murphy; same).

The remaining jurors were asked only cursory questions about drug use.  *See 13 R. 58-87* (defense *voir dire* of juror Nancy Martin included only brief questioning about drug use); *15 R. 138-61* (defense *voir dire* of juror Rachel Worley; same); *18 R. 115-37* (defense *voir dire* of juror Albert Crabtree; same); *27 R. 53-76* (defense *voir dire* of juror David Berg; same).

This poor performance is not terribly surprising, as a review of counsel's trial records makes clear that counsel did not yet know what their mitigation evidence would be when *voir dire* took place.  Individual *voir dire* began in Mr. Ochoa's case on February 17, 2003.  Though lead counsel was appointed to represent Mr. Ochoa on August 8, 2002, counsel did not file a motion requesting appointment of a mitigation specialist until February 12, 2003–a mere five days before individual *voir dire* began.  *1C. 138* (Defendant's First Motion for Continuance); *1C. 213* (Sealed *Ex Parte* Funding Motion for Mitigation Specialist).[5]  Counsel did not file a motion seeking appointment of Dr. Nace until March 12, 2003–after nearly a month of individual *voir dire* had taken place.  *1C. 114*.[6]  Finally, counsel did not file a motion seeking funds for completion of an M.R.I. and P.E.T.

---

[5]     The motion for appointment of a mitigation specialist was granted the same day.  *1C. 228*.

[6]     This motion was likewise granted the same day.  *1 C. 117-18*.

92

scan until April 1, 2003.  *1 C. 121*.  The court granted the motion the day it was filed, and the requested imaging took place on April 4, 2003—the day that individual *voir dire* was completed. *1C. 122-23*.

As this time line makes clear, the evidence that would form the backbone of the defense's mitigation case was not only incomplete when individual *voir dire* began, but the mitigation investigation was still in its preliminary stages when *voir dire* was completed.  Indeed, as late as April 7, 2003, the day that pretrial hearings began, counsel acknowledged in a motion to continue that the "vital" mitigation investigation had not yet been completed.  *1C. 138-50*.  There is no question that the blame for this delay rests squarely on counsel's shoulders.  As detailed in the affidavit of Mitigation Specialist Tena Francis that accompanied the motion for continuance, she had done everything in her power to conduct as thorough a mitigation investigation as possible in the fifty-one days since her appointment.  *Id.* at 144-50.  Given that *voir dire* was occurring simultaneously, however, not even the most herculean of efforts could have resulted in completion of the investigation and incorporation of the defense punishment strategy into the defense's *voir dire*.

3.      Mr. Ochoa Was Deprived of the Right to an Adequate *Voir Dire* Because Counsel Either Were Not Allowed to Question the Venire Members about Their Ability to Be Fair in a Case Involving Five Victims; or They Failed to Make an Adequate and Timely Request, Motion, or Objection on the Record; or They Simply Failed to Ask Proper Questions.  In any Event, Counsel were Ineffective.

a.      *The Trial Court Rendered Counsel Ineffective.*  Mr. Ochoa's attorneys were rendered ineffective by the trial court's erroneous ruling that barred them from asking venire members if they could be fair and impartial in a case in which six people were shot, five of whom died as a result, and which included two children.  The indictment in Mr. Ochoa's case charged him with the shooting deaths of only two of his five victims.  *1C. 2.*  During *voir dire*, the venire members were presented with a copy of the indictment, but were not informed that the State would present evidence that five people were actually shot, including two children, one of whom was only nine months old. *See, e.g.*, *7R. 33-34* (asking juror Kellye Bailes whether she "think[s] she can be open-minded to the [future dangerousness] special issue . . . or would you think that anybody that's capable of murdering two people is automatically going to be a future danger").

The grave effects of this omission became clear on April 1, 2003–three days before jury selection was completed–when a hearing on jury misconduct was necessitated.  *See 27R. 116-26.* Venire member Lori Polk, who was previously seated as a juror, *see 22R. 93-163*, called the court and reported that subsequent to her selection, she had a conversation in which a friend guessed that she was sitting as a juror in the case where "that[ ] guy [ ] shot his whole family."  *Id.* at 121.  That comment triggered Ms. Polk's recollection of news reports she had seen and heard at the time of the offense.  *Id.*  Ms. Polk reported that, now that she was aware of the facts involved, she could not be a fair juror in Mr. Ochoa's case.  *Id.*  After the trial court excused Ms. Polk, the defense made the following oral motion:

Your Honor, the Defense would respectfully urge a motion to bring in the other ten members of the jury and give them the truth and inform them that this is the case involving five homicides that happened at the same time.

Your Honor, we're not talking about extraneous offenses; we're talking about five homicides that were committed together that are part and parcel of the same offense that cannot be separated; they are all *res gestae* of each other.  And, Your Honor, it is obvious from the effect it's had on Ms. Polk that it would also have effect on other members of our jury if they only knew the truth.

Your Honor, prior to the commencement of these proceedings we asked the Court to be able to inform the jury that we are involved in five homicides involving the two children.

The reason why we asked that, Your Honor, was not because they were extraneous offenses or they would prolong the jury selection; although, it would make the jury selection more difficult.

The problem is, Your Honor, is that all of these cases are together.  It's not like Mr. Ochoa committed the murder of two individuals named in the indictment and then as other offenses unrelated, unconnected, removed in space and time from the instant offenses he committed other offenses that could be brought up on either guilt or innocence or punishment.

Here we are dealing with essentially one single transaction in which five lives were taken.

Your Honor, we have had over and over again the problem of jurors saying we cannot be fair or we are going to have difficulty being fair if multiple murders were committed.

We have had other jurors who have said we're going to have a difficulty being fair if children were murdered.

Now, we have operated under the best we could under the rulings of this Court in not specifically informing them of the exact nature of this case but trying to approach the areas of their sensitivity.

We would submit, Your Honor, that we were ineffective in doing that with this juror; and we would submit that we would likewise be ineffective in doing that with the other jurors.  We would ask the Court for the following: (a) to bring the remaining jurors who we have selected in, tell them the truth, ask them if they can be fair in a situation like that.

I believe Article 1, Section 10, 13 and 19 of the Texas Constitution as well as the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution require fundamental fairness, due process of law, and the ability for the defendant's attorneys to intelligently inquire a venireman regarding their prejudices, not on a speculative state of facts but on essentially the facts that we have here in this courtroom.

We would ask that these jurors be brought in and requestioned regarding the true facts of this offense.

In the alternative we would ask that the entire jury panel be struck and that we be allowed to commence a new *voir dire* with a new general venire or special venire panel with the ability to inform the jurors of the true facts and nature of the offense. Otherwise, Your Honor, we would respectfully submit we are precluded from asking these jurors if they have any kind of perceived notions[7] about the defendant's guilt or the appropriate punishment in a case like this when they really don't remember it.

But once cued I would respectfully submit, Your Honor, that each and every one of these jurors might have a very strong opinion that amounted to a prejudice that would deny our defendant a fair trial. And for the grounds cited herein and the reasons cited as specifically demonstrated to this Court by the last juror's memory being cued, we would ask the Court for relief.

*Id.* at 122-25. In response to this lengthy, well-reasoned argument from counsel, the trial court denied the motion summarily, saying only, "That will be denied." *Id.* at 125.

The trial court's ruling on this score was erroneous and rendered counsel unable to conduct *voir dire* effectively. *See Strickland v. Washington*, 466 U.S. at 686 (citing *Geders v. United States*, 425 U.S. 80 (1976) (bar on attorney-client consultation during overnight recess); *Herring v. New York*, 422 U.S. 853 (1975) (bar on summation at bench trial); *Brooks v. Tennessee*, 406 U.S. 605 (1972) (requirement that defendant be first defense witness); and *Ferguson v. Georgia*, 365 U.S. 570 (1961) (bar on direct examination of defendant)). As counsel argued in their oral motion, the ruling impermissibly restrained counsel in two respects: first, without giving the venire members sufficient

---

[7] Presumably "perceived notions" is an error in the reporter's record and should read "preconceived notions."

96

information about the case, questions as to whether the venire members had been exposed to media reports about the offense were largely meaningless. Second, counsel were incapable of effectively questioning the venire members as to whether they could fairly consider the special issues despite having rendered a guilty verdict when they were barred from informing the venire members that the case involved five victims. The questions posed to the venire members about their ability to be fair in a case involving two victims were insufficient. A capital case involving the shooting of five of the defendant's family members, two of whom were children, is a different order of magnitude from one involving the deaths of only two victims. As the Supreme Court has recognized, pointed questions are necessary to ferret out juror bias. *See Morgan v. Illinois*, 504 U.S. at 734-35. Deprived of the right to ask such questions, counsel were ineffective.

       *b.*    *Counsel's Failure to Make Adequate and Timely Request, Motion, or Objection.* In counsel's oral motion, reference was made to a prior motion to question the jurors about their ability to be fair in a case involving five victims, which counsel stated had been denied. *27R. 123* ("Your Honor, prior to the commencement of these proceedings we asked the Court to be able to inform the jury that we are involved in five homicides involving the two children."); *id.* at 124 ("Now, we have operated under the best we could under the rulings of this Court in not specifically informing them of the exact nature of this case but trying to approach the areas of their sensitivity."). Evidently this was also an oral motion, as a written motion on this score is not included in the clerk's record. This oral motion is not, however, transcribed in the reporter's record, nor is the court's ruling. Counsel's failure to ensure that both were included in the record was ineffective. *See, e.g.*, *Harmon v. Quarterman*, 2008 U.S. Dist. LEXIS 55838, *29-30 (S.D. Tex. 2008).

       Alternatively, this Court may accept trial counsel's account of the prior ruling, despite counsel's failure to ensure that this exchange was recorded. In the absence of a timely and proper

objection, counsel's statements to the trial court were properly before it as evidence. *See White v. State*, 982 S.W.2d 642, 645, 646 (Tex.App.–Texarkana 1998, no pet.) (concluding unsworn statements of counsel may be offered to explain why peremptory challenges were exercised); *Peterson v. State*, 961 S.W.2d 308, 311 (Tex.App.–Hous. [1st Dist.] 1997, pet. ref'd) (counsel's unsworn statements considered by court without objection were properly considered as evidence); Tex. R. Evid. 801(e)(2)(A), ( C ) & (D) (recognizing as non-hearsay statements made by an individual's personal representative).

What is not reflected, however, in counsels' reference to their prior request was when it was made, what particular questions they desired to ask, whether they objected to the trial court's refusal to allow the questioning, the basis of the objections (with reference to constitutional provisions and how the trial court's ruling violated those provisions), and whether the trial court ruled on the objections. As the Texas Court of Criminal Appeals has held:

> To preserve error for appellate review, a party must make a timely and specific objection or motion at trial, and there must be an adverse ruling by the trial court. Failure to preserve error at trial forfeits the later assertion of that error on appeal. In fact, *almost all error–even constitutional error–may be forfeited if the appellant failed to object.* We have consistently held that the failure to object in a timely and specific manner during trial forfeits complaints about the admissibility of evidence. This is true even though the error may concern a constitutional right of the defendant.

*Fuller v. State*, 253 S.W.3d 220, 232 (Tex.Crim.App. 2008) (internal footnotes and citations omitted) (emphasis added). Ostensibly, under these circumstances, counsel failed to preserve the issue for review. Nevertheless, counsel were ineffective, regardless of whether they failed to secure a proper record or they simply failed to act.

    *c.*    *Failure to Ask Proper Questions to Expose Juror Bias.* Counsel's failures in conducting an adequate *voir dire* were objectively unreasonable. This is evident first from the ample

case law cited above that clearly establishes *voir dire* as a constitutionally essential tool in uncovering juror bias, of which counsel should have been aware.   Second, the prevailing professional norms at the time of Mr. Ochoa's trial make clear that "[c]ounsel should devote substantial time to determining the makeup of the venire, preparing a case-specific set of voir dire questions, planning a strategy for voir dire, and choosing a jury most favorable to the theories of mitigation that will be presented."  ABA DEATH PENALTY GUIDELINES, commentary to Guideline 10.10.2(B).

The ineffectiveness of counsel's performance during *voir dire* is painfully apparent in comparison to the State's.  Clearly cognizant of the vital importance of questioning venire members about the punishment case that would actually be presented to this jury, the prosecutors consistently asked jurors whether, for instance, they would require evidence of prior crimes to answer the special issue concerning future dangerousness affirmatively.  *See, e.g.*, *9R. 23-24* (State *voir dire* of juror John Rudkin).  At the conclusion of the punishment hearing, the State reminded the jurors of the responses it received during *voir dire*.  In its punishment phase closing arguments, the State made clear that its strategy was to accept only those venire members whose answers to the State's pointed *voir dire* questions indicated that they would be favorable to the State's punishment case:

> We further asked you two things, *and depending on how you answered these questions is whether or not we as the State were going to accept you as a juror*.  We understood you were qualified and you could give each side a fair shake, the wait and see approach, but there were two particular questions we asked you about specifically knowing what the facts of the case were going to be.  One of those was—the was one was do you believe—would we have to show you any prior violent acts, or do you believe you can impose the death penalty based on the severity of the facts—based solely on the offense itself?

*39 R. 40* (emphasis added).  Defense counsel, in contrast, utterly failed to fulfill their obligation to formulate and implement a comprehensive strategy for *voir dire*.

4.     Mr. Ochoa was Prejudiced by His Trial Counsels' Deficient Performance During *Voir Dire*.

Mr. Ochoa was prejudiced by the clear deficiencies in his counsels' failures to ask proper questions about mitigation evidence and the circumstances of the offense to find out whether the jurors selected would be fair and impartial.  The State exploited the fact that Mr. Ochoa was deprived of the opportunity to learn whether these jurors could be fair and impartial in a case involving five victims, repeatedly arguing during their punishment closings that they should sentence Mr. Ochoa to death based on the number of victims.  *See, e.g.*, *39 R. 40* ("Could you ever have imagined a more egregious offense than the massacre of five family members?"); *id.* at 98 ("Anybody capable of slaughtering this many people is certainly going to be a continuing danger."); *id.* at 101 ("You know, is he not violent?  This many dead people, his own flesh and blood, what he's done.").  Moreover, in the absence of effective questioning from the defense on the mitigation case, the State succeeded in empanelling a jury that was not willing to fairly and impartially consider the mitigating evidence.  *See, e.g.*, *39 R. 40-41, 46, 52-53*.

Indeed, the *voir dire* conducted by Mr. Ochoa's trial counsel was so woefully inadequate that prejudice should be presumed.  Such a presumption is appropriate because counsel's deficiencies resulted in a process so defective that this Court can have no confidence that a fair, impartial jury was seated in Mr. Ochoa's case.  In *Morgan v. Illinois*, for instance, the Supreme Court vacated the death sentence and remanded the case based solely on the "inadequacy of *voir dire*" without further inquiry into whether the jurors seated were, in fact, biased.  504 U.S. at 739.  Similarly, in the context of challenges to the fairness and impartiality of juries seated in the midst of extensive, inflammatory pretrial publicity, courts have long held that a presumption of prejudice may be

appropriate.  *See, e.g., Estes v. Texas*, 381 U.S. 532, 543-44 (1965); *Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir. 1980).

The same logic applies here.  As noted above, there is definitive evidence that at least one of the jurors, Lori Polk, who was selected through this inadequate *voir dire*, in fact was biased against Mr. Ochoa.  *27 R. 116-26*.  There is also important evidence that the State believed that, in the absence of effective questioning from the defense on the mitigation case, it had succeeded in empanelling a jury that was not willing to fairly and impartially consider the mitigating evidence of Mr. Ochoa's drug addiction and its impact on his behavior, but that they would instead view such evidence as aggravating only.  *See, e.g., 39 R. 40-41, 46, 52-53*.  These facts, in light of the inadequacies of the defense *voir dire* and the fact that the trial court denied the defense an opportunity to inform the prospective jurors of the true facts of the case, undermine all faith that the jurors who heard Mr. Ochoa's case were fair and impartial.

But even if prejudiced is not presumed under these circumstances, the focus of the prejudice inquiry should not be on the ultimate outcome.  Rather, the defect at issue here is a systemic one because it affected the selection of the ultimate factfinder that would decide the special issues.  The flaw inherent in the questioning that actually happened, coupled with the facts that a biased juror was actually selected as a result and that the State believed the jury would disregard the main mitigating thrust of Mr. Ochoa's case, should undermine confidence that a fair and impartial jury was actually impaneled.

5. Because Mr. Ochoa was Deprived of the Right to an Adequate *Voir Dire*, His Right to be Tried by a Fair and Impartial Jury Under the Sixth and Fourteenth Amendments to the United States Constitution was Denied.

As set forth above, the right to be tried by a fair and impartial jury encompasses the right to an adequate *voir dire*.  *See, e.g., In re Oliver*, 333 U.S. 257 (1948); *In re Murchison*, 349 U.S. 133,

136 (1955); *Turner v. Louisiana*, 379 U.S. 466, 472 (1965); *Morgan v. Illinois*, 504 U.S. 719, 729 (1992); *Rosalez-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion) ("*Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.").

As detailed above, the trial court erroneously held that Mr. Ochoa could not inquire into the venire members' ability to be fair and impartial in a case involving five shooting victims, two of whom were children. *See 27R. 116-26*. Because the questions posed to the venire members about their ability to be fair in a case involving two victims were insufficient, *see Morgan v. Illinois*, 504 U.S. at 734-35 (recognizing the need for pointed questions to draw out juror bias), Mr. Ochoa's right to be tried by a fair and impartial jury was violated.

6.    Mr. Ochoa was Deprived of the Effective Assistance of Appellate Counsel, in Violation of the Sixth and Fourteenth Amendments to the United States Constitution.

Every criminal defendant has a right to effective assistance of counsel on his first direct appeal as a matter of right. *Evitts v. Lucey*, 469 U.S. 387 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984). The standard applicable to such claims is the same two-pronged *Strickland* standard of deficient performance and prejudice governing claims of ineffectiveness of trial counsel. *Evitts*, 469 U.S. at 387. Counsel's role on direct appeal is "that of an expert professional whose assistance is necessary in a legal system governed by complex rules and procedures for the defendant to obtain a decision at all–much less a favorable decision–on the merits of the case." *Id*. at 394. Thus, appellate counsel must make "a conscientious examination" of the record to identify *all* of the potential issues for an appeal, thoroughly research every colorable claim, and make a reasonable

102

professional judgment about which points to raise.  *Anders v. California*, 386 U.S. 738, 744 (1967). To do so, appellate counsel must have a firm command of the facts of the case as well as governing law before they can render reasonably effective assistance of counsel.

In this case, appellate counsel's inexcusable failure to raise a point of error that had a reasonable probability of success is sufficient to make the showing of deficient performance. *Duhamel v. Collins*, 955 F.2d 962, 966–67 (5th Cir. 1993).  Mr. Ochoa's appellate counsel failed to raise the issues of trial counsel's ineffective performance during *voir dire* or the independent violation under the Sixth and Fourteenth Amendments of Mr. Ochoa's right to an adequate *voir dire*. These failures were unreasonable under the prevailing professional norms, and there is a reasonable probability that, but for appellate counsel's errors, Mr. Ochoa's death sentence would have been reversed on direct appeal.  *See Id.* at 966.  *See also Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991).  Because there is a reasonable probability that Mr. Ochoa would have prevailed on these claims had they been timely presented to the Court of Criminal Appeals in his direct appeal brief, Mr. Ochoa is entitled to a new direct appeal process.

### C.  Confrontation Clause Violations

Mr. Ochoa's right to confront and cross-examine witnesses as guaranteed by the Confrontation Clause of the Sixth Amendment was violated when the trial court allowed testimonial evidence before the jury.

Mr. Ochoa received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution when his trial counsel failed to make proper and timely objections to the State's use of testimonial statements contrary to the Confrontation Clause of the Sixth Amendment to the United States Constitution.

1.      The Basic Facts Underlying the Claim

At punishment, the State played a taped phone conversation between Mr. Ochoa and Cecilia that happened in 1997.  In the tape itself, Cecilia made a statement asking why Mr. Ochoa would want to shoot her.  Furthermore, from the context of the entire conversation, it was apparent that Mr. Ochoa was angry with Cecilia because she had visited a lawyer and was initiating legal proceedings against him.  However, Alma's testimony about the situation added considerably to this context. The unmistakable impression that she imparted to the jury was that Cecilia did not make the tape in anticipation of a divorce or custody battle; instead, she made it because she was afraid of Mr. Ochoa. *35R. 60, 64.*  Specifically, Alma stated, "She told me that she was going to record it and that she was afraid of him, that if something might happen to her, that I would know that she had that recording." *35R. 64.*  She testified that Cecilia was worried about Mr. Ochoa and what he might do to her, which she must have learned from Cecilia herself. *35R. 60.*

After the defense's cross-examination of Alma, the State probed further about Mr. Ochoa's marriage to Cecilia, and the trial court allowed over objection additional evidence that Alma had learned from conversations with Cecilia.  Alma admitted that she never saw Mr. Ochoa slap or hit Cecilia, but she saw suspicious bruises on Cecilia. *35R. 89.*  Cecilia never blamed Mr. Ochoa for the bruises, but Alma had her suspicions, which were based on circumstances she learned other than

104

from the taped conversation.  *35R. 89.*  Specifically, she knew that Mr. Ochoa had been violent

towards Cecilia on another occasion.  *35R. 89-90.*  About three weeks before the murders, Cecilia

told Alma that Mr. Ochoa had held the gun to her head.  *35R. 90.*  She told Alma that if anything

ever happened to her, then it was Mr. Ochoa who did it.  *Id.*  Alma saw that Cecilia was scared and

upset. *Id.*

>   2.   Cecilia's statements various statements on the tape and to Alma Alvizo were
>   testimonial, and Alma's testimony about what Cecilia told her on these occasions
>   violated Mr. Ochoa's right to confront and cross-examine the declarant in violation
>   of the Confrontation Clause of the Sixth Amendment to the United States
>   Constitution.

The Confrontation Clause requires that out-of-court testimonial statements be excluded

unless the declarant either testifies at trial or is unavailable and the defendant had a prior opportunity

to cross-examine the witness.  Application of this basic rule, set forth by the Supreme Court of the

United States in *Crawford v. Washington*, 541 U.S. 36 (2004), is simple and straightforward.  But

application has been complicated in lower courts since *Crawford* was decided through the

deployment of "a potpourri of analytic arguments," but the Court in the recent decision in *Melendez-

Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009), swept away most, if not all, these various devices

rendering application of the *Crawford* rule once again simple and straightforward.  *Id.* at 2532-42.

The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the

right . . . to be confronted with the witnesses against him . . . ."  U.S. Const. amend VI.  The right

to confront witnesses is a fundamental right, essential to the operation of the American judicial

system and indispensable to the truth-finding function served by that system.  *Lee v. Illinois*, 476

U.S. 530, 540 (1986) (quoting *Pointer v. Texas*, 380 U.S. 400, 405 (1965)).  In *Pointer*, the Court

stated:  "There are few subjects, perhaps, upon which this Court and other courts have been more

nearly unanimous than in their expressions of belief that the right of confrontation and cross-

examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer*, 380 U.S. at 405. Also, abrogation of a defendant's right to cross-examine witnesses constitutes a denial of due process under the Fourteenth Amendment. *Pointer*, 380 U.S. at 405 (quoting *In re Oliver*, 333 U.S. 257, 273 (1948), and *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965)). The central concern of confrontation is to ensure the reliability of evidence by subjecting it to rigorous testing in an adversarial proceeding before the trier of fact. *Lilly v. Virginia*, 527 U.S. 116, 123-24 (1999) (plurality opinion) (quoting *Maryland v. Craig*, 497 U.S. 836, 845 (1990)). Confrontation has two principal features–first, the right to cross-examine witnesses and, second, the right to physical, face-to-face confrontation. *Ohio v. Roberts*, 448 U.S. 56, 63 (1980), *abrogated on other grounds in Crawford v. Washington*, 541 U.S. 36 (2004); *Mendez*, 56 S.W.3d at 886.

Prior to *Crawford*, to avoid a confrontation problem, hearsay either had to fall within a firmly rooted hearsay exception or had to contain particularized guarantees of trustworthiness. *Ohio v. Roberts*, 448 U.S at 66. Thus, a court could avoid the dictates of the Confrontation Clause requiring in-court testimony from witnesses if it determined the out-of-court statement was sufficiently reliable. In *Crawford*, however, the Court effectively eliminated this two-part reliability test, holding instead that the Confrontation Clause's concern with reliability is a procedural, rather than a substantive, guarantee. *Crawford v. Washington*, 541 U.S. at 61. In its place, the Court adopted a *per se* test: The Confrontation Clause bars the admission of testimonial statements from a non-testifying witness, unless that witness is unavailable and the defendant has been afforded a prior opportunity to cross-examine the witness. *Id.* at 59.

In *Crawford*, the Court extensively analyzed the language of the Confrontation Clause and its historical underpinnings, tracing its origins to England and ancient common law and tracking it

106

forward to its colonial and early statehood understandings, and based on this analysis, the Court

concluded that the history supported two inferences. *Crawford v. Washington*, 541 U.S. at 50.

"First, the principal evil at which the Confrontation Clause was directed was the civil-law mode of

criminal procedure, and particularly its use of *ex parte* examinations as evidence against the

accused." *Id*. The Court rejected the proposition that the clause only applied to "in-court testimony"

because it would eviscerate the clause's power to "prevent even the most flagrant inquisitorial

practices." *Id*. at 50-51. The Court then looked to the text of the clause and concluded that it

applied to "witnesses" who "bear testimony" against an accused. *Id*. at 51. "The constitutional text,

like the history underlying the common-law right of confrontation, thus reflects an *especially acute*

*concern* with a specific type of out-of-court statement." *Id*. (emphasis added). The Court

characterized this specific type of statement as a "testimonial" statement.

However, the Court declined to provide any sort of tight definition for the term. *Id*. at 68.

It nevertheless provided some guidance:

> Various formulations of this core class of "testimonial" statements exist: [a]
> "*ex parte* in-court testimony or its functional equivalent–that is, material such as
> affidavits, custodial examinations, prior testimony that the defendant was unable to
> cross-examine, or similar pretrial statements that declarants would reasonably expect
> to be used "prosecutorially," . . . [b] "extrajudicial statements . . . contained in
> formalized testimonial materials, such as affidavits, depositions, prior testimony, or
> confessions," . . . [c] "statements that were *made under circumstances* which would
> lead an *objective witness reasonably to believe that the statement would be available*
> *for use at a later trial*." . . . These formulations all share a *common nucleus* and then
> define the Clause's coverage at *various levels of abstraction* around it. Regardless
> of the precise articulation, some statements qualify under any definition–for
> example, *ex parte* testimony at a preliminary hearing.

*Id*. at 51-52 (citations omitted and emphasis added). The Court held that statements, like the one

before it in the instant case, "taken by police officers in the course of interrogations are also

testimonial *even under a narrow standard*." *Id*. at (emphasis added). In such situations, the

presence of an oath or a "sworn" statement was not dispositive, and the Court took great pains to

explain that it was referring to "interrogation" not in its technical, legal sense, but rather in its

colloquial sense. *Id*. at 53 & n.4. Toward the end of the opinion, the Court, after refusing to "spell

out a comprehensive definition," stated "[w]hatever else the term covers, it applies *at a minimum*

to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police

interrogations." *Id*. at 68 (emphasis added). However, it is clear from a comprehensive reading of

the *Crawford* opinion that this minimum coverage statement does not define entirely the outer limits

of the Confrontation Clause.

The second inference that the Court gleaned from the history underlying the clause defined

the test that the Court ultimately adopted. The Court noted "that the Framers would not have

allowed admission of testimonial statements of a witness who did not appear at trial unless he was

unavailable to testify, and the defendant had had a prior opportunity for cross-examination."

*Crawford v. Washington*, 541 U.S. at 53-54. The Court rejected any open ended exceptions, such

as the one provided in *Roberts* through reliability weighing and testing, and in effect created a *per*

*se* rule applicable to testimonial statements. *Id*. at 54. Based on this conclusion, the Court rejected

the *Roberts* test and held:

> Where testimonial statements are involved, we do not think the Framers
> meant to leave the Sixth Amendment's protection to the vagaries of the rules of
> evidence, much less to amorphous notions of "reliability." . . . To be sure, the
> Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather
> than a substantive guarantee. It commands, not that evidence be reliable, but that
> reliability be assessed in a particular manner: by testing in the crucible of cross-
> examination. The Clause thus reflects a judgment, not only about the desirability of
> reliable evidence (a point on which there could be little dissent), but about how
> reliability can best be determined.

*Id*. at 61. Thus, the *Crawford* rule holds that, with respect to testimonial statements in which the

declarant is absent from trial, the Confrontation Clause requires what the common law required:

(1) the unavailability of the declarant, and (2) a prior opportunity for the defendant to have cross-examined the declarant.  *Id*. at 59, 61-62, 68.  Unless these preconditions are satisfied, any proffered, but nevertheless offending, statement is constitutionally barred from use at trial.

The Court took up the task of defining testimonial statements again in *Davis v. Washington*, 547 U.S. 813 (2006), and like *Crawford*, the Court limited the import of its decision to the circumstances presented in the cases before it and refused to comprehensively define the term "testimonial."  *Id*. at 822.  The Court addressed the circumstances in which initial police involvement in a criminal investigation, whether through a 911 operator or through an officer responding to a crime scene, can generate testimonial statements that are inadmissible in a later trial unless the declarant testifies.  *Id*. at 817-19.  The Court looked to the underlying circumstances in which the statements were made in making the determination whether they were testimonial:

> Without attempting to produce an exhaustive classification of all conceivable statements–or even all conceivable statements in response to police interrogation–as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows:  Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.  They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id*. at 822.  Thus, *Davis* developed a "primary purpose" test in which a court must evaluate whether the primary purpose of the police interrogation is to meet an ongoing emergency in which the declarant is describing events happening in the present or whether it is to establish past events in which the declarant is asked to describe what happened with a view to a future prosecution.

Again, as in *Crawford*, the Court took "interrogation" to have a broad meaning.  *Davis v. Washington*, 547 U.S. at 822.  Likewise, the Court focused on police interrogations because the statements fit within this understanding.  *Id*. at 822 n.1.  But the Court did not limit the

Confrontation Clause or the definition of testimonial statements to responses to police interrogations:

> This is not to imply, however, that statements made in the absence of any interrogation are necessarily nontestimonial. The Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation. . . .  And of course even when interrogation exists, *it is in the final analysis the declarant's statements*, not the interrogator's questions, *that the Confrontation Clause requires us to evaluate*.

*Id*. (emphasis added).  Viewed in this manner, *Davis* was concerned with a particular issue under the Confrontation Clause and, like *Crawford*, did not represent the last word concerning the meaning and scope of the clause.  There are situations and circumstances that can arise that do not fit nicely within *Davis*'s primary purpose test, which ostensibly could happen whenever there is a lack of interrogation as noted by the *Davis* Court, but nevertheless present testimonial hearsay within the various formulations set forth in *Crawford*.  Thus understood, *Davis* was a particularized application of *Crawford* and did not limit its scope or application.

The Court made this abundantly clear in *Melendez-Diaz*.  In that case, the defendant was arrested for cocaine possession, and the police sent the substance seized during the arrest to a crime lab for analysis.  129 U.S. at 2530.  During trial, the State presented three certificates of analysis in which the lab analysts verified the results of their tests, and through these affidavits, the State was able to establish the fact that the substance was cocaine and the net weight of the substance, both of which were elements in the State's case against the defendant.  *Id*. at 2531.  After discussing the basic rule laid out in *Crawford* and setting forth the various core formulations of testimonial statements, the Court held, "There is little doubt that the documents at issue in this case fall within the 'core class of testimonial statements' thus described." *Id*. at 2531-32.  First, the certificates were affidavits, which were the equivalent of a solemn declaration or affirmation made for the purpose

of proving a fact.  *Id*. at 2532.  Second, the certificates were prepared at the request of the police; thus, they were made under circumstances that would lead an objective witness reasonably to believe that the statements thus made would be used at a later trial.  *Id*.  The Court concluded:

> In short, under our decision in *Crawford* the analysts' affidavits were testimonial statements, and the analysts were "witnesses" for purposes of the Sixth Amendment. Absent a showing that the analysts were unavailable to testify at trial *and* that the petitioner had a prior opportunity to cross-examine them, petitioner was entitled to "'be confronted with'" the analysts at trial.

*Id*. (quoting *Crawford v. Washington*, 541 U.S. at 54) (emphasis in original).

In this case, it is clear, in light of Alma's testimony at least, that Cecilia recorded the conversation with Mr. Ochoa because she was afraid of him, and she wanted to preserve evidence in case anything ever happened to her.  This is the crux of Alma's testimony regarding the tape. Though Cecilia's statements were not made to police officers and were not the product of interrogation, the evidence shows that she made them under circumstances that should have led a reasonable person to believe they could, and would, be used in a future legal proceeding.  This was Cecilia's expressed intent according to Alma.

With respect to the gun to the head incident, Cecilia again told Alma about the incident in case anything ever happened to her, ostensibly so her family and law enforcement would know what happened to her.   Again, these are statements made under circumstances that would lead an objective witness reasonably to believe they would be used in a later trial.

The doctrine of forfeiture does not undercut the fact that Mr. Ochoa's rights under the Confrontation Clause were violated.  In *Giles v. California*, 128 S. Ct. 2678 (2008), the Supreme Court clarified the scope of the Confrontation Clause when the State seeks to admit prior statements made by the decedent.  The Court identified two exceptions to the Confrontation Clause, both of which are rooted in the common law at the time of the nation's founding:  statements made by a

111

declarant who is on the brink of death and cognizant of her fate, and those made by a witness whom the defendant purposely keeps away from the trial, through murder or other means. *Id.* at 2683. In discussing the second exception, dubbed forfeiture by wrongdoing, the Court found that the common law "exception applied only when the defendant engaged in conduct *designed* to prevent the witness from testifying." *Id.* (emphasis in original). The Court likewise noted that since the founding, the exception has not taken root in the common law "outside the context of deliberate witness tampering," *id.* at 2687, and catalogued numerous cases in which unconfronted, testimonial statements by murder victims were excluded in the absence of evidence that the defendant killed the victim with the express purpose of keeping her from testifying. Accordingly, the Court held that the common law forfeiture rule–whereby a defendant forfeits his confrontation rights only if he harms the witness specifically to prevent her from testifying–is mandated by the Sixth Amendment. *Id.* at 2688, 2693.

The majority opinion, moreover, explicitly rejected the dissenting Justices' suggestion that the forfeiture doctrine should be expanded in the domestic violence context. Acknowledging that domestic violence is a serious offense, the majority nevertheless eschewed the notion of "one Confrontation Clause (the one the Framers adopted and *Crawford* described) for all other crimes, but a special, improvised, Confrontation Clause for those crimes that are frequently directed against women." *Id.* at 2693. The majority did, however, allow that acts of domestic violence are often carried out with the purpose of "dissuad[ing] a victim from resorting to outside help." *Id.* The Court went on to note that in such a situation, "[w]here . . . an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and stop her from reporting abuse to the authorities or cooperating with a criminal prosecution"; accordingly, the victim's prior statements would be admissible under the forfeiture by wrongdoing doctrine. *Id.*

The facts in the instant case do not fit this scenario. There is absolutely no evidence that Mr. Ochoa murdered his wife to prevent her from reporting abuse or from cooperating with law enforcement in pending criminal proceedings. Mr. Ochoa therefore did not forfeit his right to confrontation under the Sixth Amendment.

Mr. Ochoa's rights to cross-examine and confront witnesses against him as guaranteed by the Confrontation Clause of the Sixth Amendment to the United States Constitution were violated under the circumstances presented in this case. He was also harmed as a result of the jury hearing this evidence. It affected his substantial rights, primarily because the State had a weak case on future dangerousness. Mr. Ochoa had no prior criminal history or history of violence beyond the facts of the crime itself. Alma provided the only independent evidence the jury heard, and her testimony about what Cecilia told her, particularly that she was afraid of Mr. Ochoa, was a central feature of her overall testimony.

3.      Mr. Ochoa's trial counsel were ineffective when they failed to object to Alma Alvizo's testimony based on the Confrontation Clause and, instead, limited their objections to state hearsay law.

Trial counsel objected to the statements; however, they only lodged hearsay and speculation objections, and thus apparently forfeited the issue for review. *35R. 22-27, 61, 89-90.* Stephen Miller provided an affidavit to the State, which is attached to the State's response to the state application for writ of habeas corpus. *1C. 262-63.* In it, Miller explains that he did not recall any reason for not making a Confrontation Clause objection. *Id.* He posited, however, that the Supreme Court had not yet decided the *Crawford* case setting out the testimonial framework. *Id.* Therefore, "at the time I probably did not believe the Confrontation Clause presented a viable option for excluding the evidence." *Id.* However, Miller overlooked the fact that the Confrontation Clause did not spring into being with *Crawford.* Instead, the Supreme Court had construed the clause for more

113

than 20 years under *Roberts*, which provided several exceptions to the rigors of the Confrontation

Clause so long as the statements were subject to a firmly rooted hearsay exception or bore

particularized guarantees of trustworthiness.  Counsel should have known that an objection was

available, and because counsel desired to exclude the statements, they should have asserted every

reason for exclusion.  Furthermore, Mr. Ochoa was prejudiced by his counsels' failure to make an

appropriate objection because Alma's testimony that Cecilia was afraid of Mr. Ochoa between 1997

to 2002 undoubtedly had a significant affect on the jury, particularly when the State had little other

independent evidence in support of the future dangerousness special issue other than the evidence

Alma provided.

### D.  Right to Present a Full and Fair Defense

The trial court's exclusion of important rebuttal evidence denied Mr. Ochoa the right
to present a fair defense contrary to the Sixth and Fourteenth Amendments to the
United States Constitution.

Mr. Ochoa received ineffective assistance of counsel in violation of the Sixth and
Fourteenth Amendments to the United States Constitution when his trial counsel
failed to make proper and timely objections to the trial court's ruling excluding
important rebuttal evidence.

1.      Background

During the presentation of defense witnesses, the defense attempted to present rebuttal

evidence to Alma Alvizo's testimony that Mr. Ochoa was abusive towards Cecilia and that he had

grown more aggressive with her after finding out the truth about Jonathan.  McClendon knew

Cecilia very well, and Cecilia had confided many things in her.  However, the defense was unable

to present evidence that would have countered Alma's assertions because of the trial court's rulings

that this evidence was hearsay.  *37R. 133, 143.*  In fact McClendon knew that Cecilia and her

mother, Maria, had a very troubled relationship, and that Maria had compelled Cecilia to conceal

the fact she had a child out of wedlock, to give him up to Maria, and portray him as her nephew rather than her son. This secret created an internal tension with Cecilia and her marriage with Mr. Ochoa. Ultimately, Maria exposed the secret she had at first enforced, and this hurt both Mr. Ochoa and Cecilia deeply. During her separation, Cecilia wanted nothing more than to be reunited with Mr. Ochoa, and she was very happy when he returned to her. Cecilia would tell McClendon stories about how romantic and caring Mr. Ochoa was. They would play together on the floor with Crystal. Crystal explained to McClendon that she loved Mr. Ochoa and how her husband made her feel. She never said anything or acted in anyway that would have led McClendon to believe that Cecilia was afraid of Mr. Ochoa.

Victor Faz also had a close relationship with Cecilia. Before Faz began testifying, the defense sought leave to question him more liberally, given the fact that the State had been allowed to ask "state of mind" questions of Alma. *37R. 154-58.* The court informed counsel that there would be no exceptions to the hearsay rule. *Id.* If asked, Faz would have adamantly denied that Mr. Ochoa had ever been violent with Cecilia.

2.    Discussion

In *Chambers v. Mississippi*, 410 U.S. 284 (1973), the Supreme Court held, "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Id.* at 302. The Court was persuaded that the state's interest in developing rules to govern the admission or exclusion of evidence was outweighed in this case because the defendant's evidence bore persuasive indicia of trustworthiness and was crucial to the defendant's overall defense. *Id.* The Court found that the exclusion of defensive evidence violated the defendant's rights to due process, to confrontation, and to compulsory process. *Id.* at 294. *See also Taylor v. Illinois*, 484 U.S. 400, 408-09 (1988) (quoting *United States v. Nixon*, 418 U.S. 683 (1974), and *Washington v. Texas*, 388 U.S.

14 (1967)).  The Court stated, "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." *Chambers*, 410 U.S. at 302.  In *Rock v. Arkansas*, 483 U.S. 44 (1987), the Court extensively analyzed when State evidentiary rules must accommodate a defendant's constitutional right to present a defense.  *Id.* at 53-57.  The Court stated, "when a state rule of evidence conflicts with the right to present witnesses, the rule may 'not be applied mechanistically to defeat the ends of justice,' but must meet the fundamental standards of due process." *Id.* at 55 (quoting *Chambers*, 410 U.S. at 302).  *See also id.* at 62; *Green v. Georgia*, 442 U.S. 95, 97 (1979).  Most recently, in *Sears v. Upton*, the Court noted that "reliable hearsay evidence that is relevant to a capital defendant's mitigation defense should not be excluded by rote application of a state hearsay rule."  130 S. Ct. at 3263, n.6.

In this case, the trial court excluded important evidence that would have rebutted Alma's assertions that Mr. Ochoa abused his wife.  McClendon and Faz testified that they were very close to Cecilia and that she confided in them and trusted them.  The close, trusting relationship between the parties suggests that the evidence is reliable.  Also, there is another aspect of the relationship between Cecilia, on the one hand, and McClendon and Faz, on the other.  Both McClendon and Faz were not only very close to Cecilia, they did not have any particular ties to Mr. Ochoa, other than through Cecilia and the Alvizo family, that would create an inference that they would want to shade the truth in any way in Mr. Ochoa's favor.  In fact, neither had an incentive to do so.  The proposed testimony was reliable and should have been admitted.  Its exclusion violated Mr. Ochoa's rights to due process.

Mr. Ochoa's trial counsel asked for "consideration" in presenting hearsay evidence.  However, counsel did not object to the trial court's exclusion of this evidence or make an appropriate proffer of the evidence.  Therefore, any error for the due process violation was waived.

116

Mr. Ochoa's trial counsel were deficient for not making the proper and timely objections and securing a proper ruling from the trial court. Furthermore, Mr. Ochoa was prejudiced as a result.

### E.  State's Unconstitutional Use of Unreliable Expert Evidence

Mr. Ochoa was deprived of his right to due process of law under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution by the State's presentation of unreliable psychiatric rebuttal testimony by Dr. Richard Coons.

Mr. Ochoa was deprived of his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution because of his appellate counsel's failure to present the issue concerning the trial court's erroneous admission of Dr. Coons's unconstitutionally unreliable testimony on direct appeal.

1.      Facts in Support of Claim

As discussed throughout this petition, the State presented a minimal punishment case in the case at bar. The State presented the facts that Mr. Ochoa had, in addition to the decedents on which guilt was based, Cecilia and Crystal, Mr. Ochoa had also shot and killed in the same episode his sister-in-law, Jacqueline Saleh, his father-in-law, Bartolo Alvizo,  his daughter, Anahi Ochoa, and injured his sister-in-law, Alma Alvizo.  In addition to this evidence, Alma testified that Mr. Ochoa and his wife had experienced two periods of marital difficulties resulting in temporary separation–the first in 1997, and the second in 1999.  Alma sponsored an audio tape, State's Exhibit 141, of a conversation between Mr. Ochoa and Cecilia in 1997 in which Mr. Ochoa made a threatening comment to Cecilia.  As demonstrated, however, Alma put this entire conversation into a new context.  Furthermore, Alma testified about a single incident in which she observed Mr. Ochoa grab Cecilia's hand and pull her to himself.  She had never observed Mr. Ochoa be violent against his wife at any other time than this incident.  Finally, Alma testified that Mr. Ochoa held a gun to Cecilia's head weeks before the murders.

117

Mr. Ochoa presented evidence in mitigation against the death penalty. His father, Abel Ochoa, Sr., and two brothers testified briefly about family circumstances growing up, which included some evidence that Abel, Sr., was an alcoholic and had been physically abusive to his wife. The family had also experienced difficult financial times during several periods. Several of Mr. Ochoa's co-workers testified about his good work ethic and apparent good character at work. Mr. Ochoa himself testified about his marital relationship, its periodic difficulties, and also about his cocaine addiction which had arisen during the two years preceding the offense and attempts to overcome his problems. Finally, the defense presented evidence that Mr. Ochoa had brain damage, likely related to his cocaine abuse.

The defense presented testimony by a clinical and forensic psychologist, Dr. Edgar Nace, who specialized in addiction and substance abuse. The evidence reflected that Dr. Nace was well-qualified in addiction issues. Dr. Nace explained that Mr. Ochoa's violent outburst was likely the result of a cocaine induced delirium from his cocaine use immediately prior to the shootings. *36R. 58-60.* Dr. Nace further observed that PET scans and reports of brain damage to Mr. Ochoa's frontal lobes likely played a roll in the offense because the damaged portion of his brain played a role in regulating impulsive activity. This damage would render Mr. Ochoa more susceptible to a delirium state. *36R. 63.* Dr. Nace believed Petitioner was unlikely to present a continuing danger to society. He concluded that the offense had been attributable and triggered by Mr. Ochoa's cocaine addiction, something that would not be a problem in the absence of his addiction. Dr. Nace also observed that Mr. Ochoa's good work record and lack of a criminal record were mitigated against a conclusion of likely future dangerousness. *36R. 61.*

118

In rebuttal to Dr. Nace, the State presented testimony by Dr. Richard Coons, a clinical and forensic psychiatrist based in Austin, Texas, but who has a state-wide practice of testifying on the future dangerousness issue in capital murder prosecutions, primarily for the State.  *36R. 215-65.*

Prior to trial, Mr. Ochoa filed a Motion to Exclude and Memorandum in Opposition to the Testimony of Dr. Richard E. Coons.  *1C. 124-38.*  In the body of the motion, Mr. Ochoa contended that "Dr. Coons [sic] testimony is so lacking in reliability as to amount to a violation of due process . . ." *1C. 124.*  Prior to Dr. Coons's testimony the trial court conducted a voir dire hearing outside the jury's presence pursuant to Texas Rule of Evidence 705.  Dr. Coons related his professional experience in drug addiction and substance abuse:  he "trained in a training program with substance abuse" and "ran a drug and alcohol program for a couple of years at Fort Sam Houston in San Antonio." *38R. 191.*  He also "had a lot of private patients who have drug and alcohol problems" as well as "evaluated quite a number of people in jail systems with those problems." *38R. 191.*  Dr. Coons stated that he disagreed with Dr. Nace that Mr. Ochoa had committed the offense as a result of a cocaine-induced delirium for the following reasons:  (1) Mr. Ochoa had remembered the details of the offense too well, (2) he had exhibited goal-oriented behavior during the offense, and (3) he had used too small of an amount of cocaine in comparison to prior amounts he had used. *38R. 192-93.*

With respect to future dangerousness, Dr. Coons explained briefly the factors he analyzed in making a risk-assessment:  (1) the individual's history of violence; (2) their "attitude" toward violence (*e.g.*, is he "willing to use violence in terms of threat or actual violence to get [his] way?"); (3) whether the individual has a "conscience" to help him control his behavior; (4) the location where the individual would reside; (5) and whether the individual had brain injury resulting in "decreased control." *38R. 196-97.*  Applying these factors to the present case, Dr. Coons explained

119

that Mr. Ochoa had a history of being violent with his wife, which included in essence that he had

a history of "killing a bunch of people," he had made "some threats" against his wife, and he had

used his "superior strength to get his way with his wife . . . like puling her purse away from her and

slapping her and so forth, those things." *38R. 195.*  Dr. Coons believed that as a result of Mr.

Ochoa's frontal lobe injuries, he had "less control than he would have had in the past." *38R. 195-96.*

Dr. Coons explained that Mr. Ochoa would be more likely to commit violence because, as a result

of his conviction for this offense, he would "be in a confrontational violent society and there will

be plenty of opportunity to . . . be involved in violent activities." *38R. 196.*

Although Mr. Ochoa issued a subpoena duces tecum, Defense Exhibit 23, to Dr. Coons for

the materials on which he based his methodology to render opinions on future dangerousness, Dr.

Coons disregarded the subpoena.[8] *38R. 199.*  He admitted he had not brought any of the requested

---

[8]  The Defense's subpoena specifically requested:

(1) "any research or studies that support, as reliable, the scientific theory and/or technique" that Coons would rely on formulating his opinion;

(2) "any literature that supports or rejects the underlying scientific theory" that Coons would utilize to formulate his opinion;

(3) "the potential and actual rates of error in the technique" that Coons utilized;

(4) "any research, studies or literature that support, as reliable or legitimate, a psychiatrists long-term clinical prediction as to the probability that a person will commit criminal acts if violence in the future either in a prison society or free-world society";

(5) "the names of each person, charged with a capital crime, who [Coons] testified will commit future acts of violence;

(6) "any study, performed by or in the possession of [Coons] of the disciplinary records of the people against whom [Coons had testified would commit future acts of violence]";

(7) "a list of any interviews, research or studies that [Coons] conducted while working in the field" of rendering opinions on future dangerousness;

(8) "any statistical research that [Coons] has performed in the field in which he is to express an opinion . . ."

items relating to his methodology in opining whether an individual would likely constitute a future danger. *38R. 197-202.* Dr. Coons admitted that he did not keep a list of the individuals against whom he testified on the issue of future dangerousness. *38R. 201-02.* He also admitted that his testimony was going to be based upon his two years experience as a drug and alcohol clinic director while in the army in 1972-74 and his experience with private patients and the "thousands" of inmates he had "seen" in jail who had drug and alcohol problems. *38R. 202.*

Addressing his specific testimony in this case, Dr. Coons explained that he would rely upon portions of his clinical interview of Mr. Ochoa, specifically his marital problems with Cecilia and his discussion of the offense. *38R. 204.* Dr. Coons did not specifically discuss with Mr. Ochoa about his "conscience," but he believed it "wasn't enough to keep him from this slaughter of various family members" and had not impelled him to seek "serious drug counseling and treatment." *38R. 204.*

Dr. Coons explained that he believed his opinions to be "scientifically reliable" because "most of it is common knowledge within our area, that is . . . very generally accepted." *38R. 205.* This included the fact of brain damage, a person's violence in the past, the person's attitude about it" and conditions under which they will be and "so forth." He contended that these factors were "very commonsense things that we use in assessing people all the time." *Id.*

Addressing the specific legal terms in the context of the future dangerousness punishment issue, Dr. Coons identified "probability" as more likely than not, but with respect to "criminal acts of violence" Dr. Coons utilized a broad definition of "acts that would be criminally actionable in law" but would not define how broadly he would construe it and whether it would include non-violent conduct. *38R. 206.* When pressed for scientific literature which would support his methodology, Dr. Coons insisted that the literature did support his opinion but could not "quote it

specifically." *38R. 208.* Dr. Coons could not provide a potential rate of error to his methodology, but merely stated that "if a person has a frontal lobe injury . . . they may well have behavioral dyscontrol." *Id.* He explained: "[T]hese risk factors . . . are commonly used by psychiatrists in assessing future dangerousness. The – these are such commonly known things that I just didn't bother to go into the research to look for it." *Id*.

Dr. Coons could not state with certainty the number of times he had testified that an individual would constitute a continuing threat to society, but estimated between 30 and 40. *38R. 209-10.* He estimated, but could not give a number of the times he had testified that an individual would not constitute a continuing threat, but that it was "probably" more than five times. *38R. 209-10.* He had never followed up on his evaluation by specifically determining whether the individuals he had predicted to be continuing threats had actually committed subsequent violent acts while incarcerated. *38R. 212-13.*

At the conclusion of the hearing, Mr. Ochoa renewed his motion to exclude Dr. Coons's testimony, based in part on Dr. Coons's disobedience of the subpoena duces tecum. *38R. 213-14.* The trial court denied the motion and permitted Dr. Coons to testify. *Id.*

Dr. Coons subsequently testified in the rebuttal at the punishment state of Mr. Ochoa's trial. He explained before the jury that he had "seen thousands" of substance abusers as part of his practice. *38R. 218.* He also stated offhandedly that in his forensic practice he has seen "thousands of people who have committed assaults or murder or whatever, violent crimes." *Id.*

Dr. Coons disagreed that the offense was attributable to a substance induced delirium because in his experience, such deliriums were "dose related" and he believed the amount of cocaine used by Mr. Ochoa prior to the offense had been insufficient to result in a delirium. *38R. 223-24.* Dr. Coons also believed that Petitioner's recollection of the events in the aftermath of the

offense, and his "goal oriented" behavior during the offense was inconsistent with a delirium.  *38R.*
*225-27, 231.*  Rather, Dr. Coons attributed the offense to a "matter of anger" over Mr. Ochoa's
family circumstances.  *38R. 228.*

Turning to the issue of "risk assessment" Dr. Coons explained that "risk assessments are a
very common thing [psychiatrists] do.  He explained to the jury his methodology was based on the
following considerations:

1.    The person's  history of violence – "if somebody has killed *a few* others, you way,
      Well, we better pay attention."  (emphasis added)

2.    The persons' "attitude of violence" – "Is violence okay.  Do they have a history of
      threatening people or hurting people or using violence to get their own way?  You
      know, by superior size or force or weapon or whatever, is violence okay with them.

3.    Whether the person has a "conscience" – "that part of our psychology that makes us
      feel bad if we do the wrong thing. . . .  [i]f you find a history of a person repeatedly
      doing things against he interests of someone else, you think, Well, they certainly
      don't have a conscience that would cover that.   . . . [I]n this case, for example, . . .
      [Petitioner's] conscience wasn't strong enough to help him control his behavior."

4.    The "society" that the person is going to be in – "if it's a person who's going to be
      in a violent society such as the penitentiary, then your index of concern goes up."

5.    The "brain damage issue" – "this is the kind of injuries [sic] . . . that lower a person's
      self control, their judgment, their ability to control their behavior . . ."

*38R. 236-37.*

Based on these factors, Dr. Coons opined that Mr. Ochoa would likely commit future acts
of violence in prison.  *38R. 238-40.*  Dr. Coons concluded Mr. Ochoa had a history and positive

attitude toward violence because "one time he grabbed his wife's purse away from her" and he "slapped her . . . a couple of times." *38R. 238.* Dr. Coons regarded this as a "reasonably powerful history of violence." *Id.* Dr. Coons also faulted Mr. Ochoa for failing to seek "some anger management help" or "perhaps pharmacologic help with behavioral control." *Id.* He marginalized Mr. Ochoa's good behavior in jail, explaining that an individual awaiting trial for capital murder would likely behave himself (although he did not reconcile this with his concerns over *lack of control* due to brain damage).

Following punishment deliberations, the jury returned an affirmative answer to the future dangerousness punishment issue and a negative answer to the mitigation punishment issue, and the trial court assessed a death sentence accordingly.

2.      Argument and Authorities

Through the presentation of Dr. Coon's rebuttal testimony, testimony which is devoid of objectively and scientifically reliable methodology essential to the accurate determination of whether a given capital defendant reasonably poses a real likelihood of committing future acts of violence,   the State has deprived Mr. Ochoa of his right against being sentenced to death on unreliable or misleading testimony in the sentencing phase of a capital trial under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.  In the alternative, Petitioner has been deprived of his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution as a result of appellate counsel's failure to pursue a challenge to the admission of Dr. Coon's rebuttal testimony, either on a constitutional, or state law basis, on direct appeal.

Under either theory of relief, Mr. Ochoa has been prejudiced by the erroneous admission of Dr. Coons's testimony at trial.  Because of the critically misleading nature of Dr. Coons's testimony,

measured against the otherwise minimal evidence that Mr. Ochoa would continue to commit acts of violence while incarcerated, the record will show upon further development that the admission of Dr. Coons's rebuttal testimony had a substantive and injurious effect upon the jurors' consideration of the future dangerousness punishment issue, or that there is a reasonable probability that had the issue been raised as a claim on direct appeal, that Mr. Ochoa would have prevailed on appeal.

a.    <u>The Due Process Claim.</u>

The Eighth Amendment imposes heightened standards of reliability in the determination of whether death is the appropriate punishment. *Deck v. Missouri*, 544 U.S. 622, 632 (2005); *Woodson v. North Carolina,* 428 U.S. 280, 305 (1976) ("there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."); *Mills v. Maryland*, 486 U.S. 367, 383 - 384 (1988) ("Evolving standards of societal decency have imposed a correspondingly high requirement of reliability on the determination that death is the appropriate penalty in a particular case."); *California v. Brown*, 479 U.S. 538, 543 (1987) (instruction focusing jurors sentencing decision on evidence in record rather than sympathy fostered need for reliability in death sentencing decision); *Caldwell v. Mississippi*, 472 U.S. 320, 330 (1985). In a capital sentencing proceeding "'the interests of the defendant [are] . . . protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment." *Bullington v. Missouri*, 451 U.S. 430, 441 (1981) (quoting *Addington v. Texas,* 441 U.S. 418, 423-424 (1979)).

The Eighth Amendment right to Due Process of Law is patently denied when the jury is permitted to consider evidence in aggravation of the death penalty which is "materially inaccurate" or misleading. *Johnson v. Mississippi*, 486 U.S. 578, 590 (1998); *Zant v. Stephens*, 462 U.S. 862,

887 nn.27, 28 (1983). Similarly, the right to due process is itself implicated where the sentencer's

decision relies at least in part on "misinformation of constitutional magnitude." *United States v.*

*Tucker*, 404 U.S. 443, 447-449 (1972) (sentence must be set aside if the trial court relied at least in

part on "misinformation of constitutional magnitude"). A sentence which is "base[ed] on

assumptions . . . which [are] materially untrue . . . whether caused by carelessness or design, is

inconsistent with due process of law . . ." *Townsend v. Burke*, 334 U.S. 736, 740 - 741 (1948).

> i.   The admission of unscientific evidence, evidence which will not
> satisfy the threshold requirements of *Daubert v. Merrell Dow
> Pharmaceuticals*, is insufficiently reliable to be admitted in the
> sentencing phase of a capital murder trial in light of controlling due
> process principles.

The issue in the context presented here is whether, particularly given the Eight Amendment's

requirement of heightened reliability to the sentencing decision in a capital case, Dr. Coons's

particular methodology satisfied even minimal standards of reliability. Plainly stated, the answer

is "no."

At least one court which has addressed the issue has concluded that the field of "risk

assessment" for criminal recidivism must itself satisfy basic standards for reliability enunciated

within *Daubert v. Merrell-Dow Pharmaceuticals*, 509 U.S. 579 (1993). in order to be admissible.

*See United States v. Thomas*, CCB-03-0150 (D. Md., Jan 31, 2006). In *Thomas*, the District Court

for Maryland excluded the testimony of an FBI behaviorist on the basis that the scientific principles

on which the expert's risk assessment testimony was insufficiently reliable under the guidelines

established in *Daubert*. *Thomas*, slip op. at 54-62. In particular, the Court excluded the

behavioralist's testimony based on the absence of reliable methodology. *Id.*, slip op. at 54.

Applying *Daubert*'s criteria for demonstrating reliability the district court observed that the

behavioralist, while claiming that his methodology was reliable and accepted in the relevant

communities (like Dr. Coons), had failed, beyond his own *ipse dixit* to establish such reliability to his predictions: there was no specific testimony that the particular methodology had *or could be* tested for validation, *id*. at 55, there was no testimony that the particular methodology had been subject to peer review and analysis, *id*. at 58, there was not testimony concerning the error rate of his technique, *id*, or that there were any objective standards to control the methodology. *Id*. at 60.

In evaluating the admissibilty of risk assessment evidence the district court observed that the psychiatric and psychological communities have long rejected the accuracy of long-term risk assessment testimony:

> although the law recognizes the relevance and admissibility of psychiatric evaluation and opinion for the purpose of assessing future dangerousness, the use of such evidence has long been criticized as lacking reliability. See, e.g., Bruce J. Ennis & Thomas R. Litwack, Psychiatry & the Presumption of Expertise: Flipping Coins in the Courtroom, 62 CAL. L. REV. 693, 695-96 (1974). See also, Eugenia T. La Fontaine, A Dangerous Preoccupation With Future Danger: Why Expert Predictions of Future Dangerousness in Capital Cases are Unconstitutional, 44 B.C. L. REV. 207, 241 (2002). In 1974, the American Psychiatric Association Task Force on Clinical Aspects of the Violent Individual, for example, took the position that "neither psychiatrists nor anyone else have demonstrated an ability to predict future violence or dangerousness." American Psychiatric Association, Task Force on Clinical Aspects of the Violent Individual, Report No. 8, 20 (1974). In 1990, the American Psychological Association Task Force on the Role of Psychology in the Criminal Justice System concluded that "the validity of psychological predictions of violent behavior . . . is extremely poor, so poor that one could oppose their use on the strictly empirical grounds that psychologists are not professionally competent to make such judgments." American Psychological Association, Report of the Task Force on the Role of Psychology in the Criminal Justice System, 73 AMERICAN PSYCHOLOGIST 1099 (1990).

*Thomas*, slip op. at 31-32.

In *United States v. Sampson*, 335 F. Supp. 2d 166 (D. Mass. 2004), the United States District Court for Massachusetts addressed the unreliability of future dangerousness evidence proffered by psychiatric experts, particularly in light of the standards for reliability of scientific testimony established by the Supreme Court's *Daubert* decision. *Id*. at 218-21. The district court observed

that such testimony, even if permissible under *Barefoot v. Estelle*, 463 U.S. 880 (1983), would likely have been excluded by the Court under *Daubert* or the statutory requirements of the federal death penalty statute.

While the Supreme Court in *Barefoot* held that future dangerousness testimony by an expert was admissible, the Court appeared to do so largely on the basis that such evidence was relevant to the statutory punishment issue. *See Barefoot v. Estelle*, 463 U.S. at 896-98. Little discussion is given to the issue of reliability (only that reliability which may be left to the juries and rules of evidence.)[9] *Id.* at 898-99. Whether *Barefoot* is currently viable, or is not an idiosyncratic case resting on shaky grounds is an open question.

Plainly, *Barefoot* with its cursory review of the constitutional reliability issue is irreconcilable on this matter with *Daubert* and its subsequent cases, *General Electric Co., v. Joiner*, 522 U.S. 136 (1997), and *Kumho Tires Co. Ltd. v. Carmichael*, 526 U.S. 137 (1999), all of which compel the trial court to perform a gate keeping function on *reliability* of any expert testimony. These latter cases are simply inconsistent with *Barefoot*. It is incongruous to conclude that the Supreme Court would accept a lower evidentiary standard for aggravating evidence under the Eighth Amendment than it would accept for an evidentiary standard under Fed.R.Evid. 702.

Further, it is notable that *Barefoot* is out-of-step with controlling Fifth and Eighth Amendment precedent set out in cases like *United States v. Tucker*, *Townsend v. Burke*, *Zant v. Stephens*, and ultimately *Johnson v. Mississippi*. *Barefoot* does not address or distinguish *Tucker*

---

[9]    Indeed, it is reasonable to conclude, based on the Court's passing reference to the Federal Rules of Evidence, *Barefoot*, 463 U.S. at 904, and its statement that excluding expert testimony on future dangerousness "is somewhat like asking . . . to disinvent the wheel," *id*. at 896, and that members of the psychiatric community disagree with the American Psychiatric Association's general position of the issue, *id*. at 899, that *Barefoot*'s holding on the admissibility of evidence is implicitly based upon the "general acceptance" rule announced in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). If this is so, then it has been plainly overruled by *Daubert*.

or *Townsend*.  *Barefoot v. Estelle*, 463 U.S. at 883 - 906.  Nor does *Barefoot* address whether it violates the Eighth Amendment principles to permit the jury to consider a psychiatric expert's opinion "evidence that has been revealed to be materially inaccurate." *Johnson v. Mississippi*, 486 U.S. at 590.

> ii.   Mr. Ochoa would seek to show through factual development, culminating in an evidentiary hearing that Dr. Richard Coons' purported methodology in assessing future dangerousness are unsound and scientifically unsupported, and for that reason cannot satisfy the requirements of *Daubert*, hence, do not guarantee sufficient probable accuracy under the Eighth Amendment.

Mr. Ochoa would show in an evidentiary hearing that Dr. Coon's purported methodology in assessing future dangerousness in the context of capital sentencing does not meet the standard for reliability under *Daubert*, and for that reason his testimony on future dangerousness in the context of a capital sentencing hearing is "materially inaccurate" to the point of violating his right to due process.

Dr. Coons's methodology on the subject of future dangerousness was constitutionally inadequate in the present case, and as a general matter across criminal defendants is constitutionally inadequate for the following reasons:

> 1.   Whether Coon's methodology can be, or has been tested:   Petitioner would show that despite repeated cross-examination of Coons on this issue, Coons is unable to demonstrate that his particular methodology, including the specific factors on which he relies to assess future dangerousness, has never been independently tested, despite repeated challenges to that methodology both before and after Mr. Ochoa's case: evidence will indicate that Dr. Coons maintains a deliberate ignorance over the accuracy of his particular methodology.

2.      <u>Whether Dr. Coons's methodology has been subjected to peer review</u>:  As reflected in the hearing in this case, and as Mr. Ochoa would seek to show, Dr. Coons has never published his methodology in assessing future dangerousness in capital cases, and for this reason, his particular methodology has never been subjected to peer review.

3.      <u>Whether Dr. Coons is aware of the potential rate of error to his methodology</u>: Dr. Coons unabashedly admitted during the voir dire that he did not know of his potential rate of error.  Mr. Ochoa would seek to show in an evidentiary hearing that Dr. Coons has been continuously pressed upon this matter in subsequent capital cases in which he has testified and at no time has Dr. Coons attempted to learn of the error rate in his methodology.  Dr. Coons remains deliberately ignorant of his fact

4.      <u>Whether there are any standards which exist to control the operation of Dr. Coons's methodology</u>:   Although materials responsive to this question were among those subject to a subpoena in the present case, as the record makes clear, Dr. Coons ignored the subpoena.  While Dr. Coons has claimed that there are materials that address the standards to evaluate future dangerousness, Mr. Ochoa would show that this explanation is either outright false, or, at best, misleading.  Mr. Ochoa would seek to obtain this information from Dr. Coons in an evidentiary hearing

5.      <u>Whether Coon's particular methodology has achieved a general acceptance within the relevant community</u>: Again, while Dr. Coons had claimed that the psychiatric community in general accepts the premise of assessing future dangerousness, he has never produced materials which demonstrate this, much less materials which

specifically endorse his methodology.  Dr. Coons is a voluntary member of both the American Psychiatric Association and the American Academy of Psychiatry and the Law; as of the filing of this writ application Mr. Ochoa is attempting to obtain the position statements of these organizations upon the issue of risk assessment *in the context of capital sentencing proceedings*.[10]

Mr. Ochoa would further show in an evidentiary hearing that in  sentencing trials in which Dr. Coons has testified, both before and after this trial, demonstrates that Dr. Coons's methodology alternates between defendants and is specifically tailored in a manner to produce a result-oriented opinion, either against a finding of future dangerousness, when he has been retained by the defense, or in favor of a finding of future dangerousness, when he testifies for the State.  Also, Mr. Ochoa would show that in these cases, the factors that Dr. uses to evaluate future dangerousness are not static but are tailored based on convenience, rather than methodology.   The following is an incomplete list of capital cases in which Dr. Coons has provided testimony on the future dangerousness issue, and which will demonstrate the flexible and non-scientific basis of Dr. Coons's purported methodology:

1.    *State of Texas v. Christian Olson* – Brazos County (2009)

2.    *State of Texas v. Billy Wayne Coble* – McLennan County (2008)

3.    *State of Texas v. Guy Len Allen* – Travis County (2004)

4.    *State of Texas v. Brian Jeffrey* – Travis County (2001)

5.    *State of Texas  v. Brittany Holberg* – Randall County (1998)

---

[10]    Petitioner would proffer to this Court that the American Psychiatric Association has not withdrawn from the position it adopted in *Barefoot* that psychiatrists are not qualified to render long-term predictions of future danger in the context of capital sentencing proceedings, and for that reason should not do so.

6.      *State of Texas v. Ramio Ibarro* – McLennan County (1997)

7.      *State of Texas v. Michael Moore* - Coryell County (1994)

8.      *State of Texas v. Joe Lee Guy* – Hale County (1994)

9.      *State of Texas v. David Powell* – Travis County (1991)

10.     *State of Texas v. Ted Cole* – Tom Green County (1988)

11.     *State of Texas v. David Battaglia* – Dallas County (2002)

12.     *State of Texas v. James Collier* – Wichita County (1996)

13.     *State of Texas v. Charles Hood* – Collin County (1990)

14.     *State of Texas v. Kenneth Allen McDuff* – Travis County

15.     *State of Texas v. Paul DeVoe*  – Travis County (2008)

16.     *State of Texas v. Charles Smith* – Pecos County

17.     *State of Texas v. Ker'Sean Olajuwa Ramey,* – Jackson County

18.     *State of Texas v. Noah Espada* – Bexar County (2005)

19.     *State of Texas v. George Rivas* – Dallas County

20.     *United States v. Brandon Bernard* – Western District of Texas - Waco Division

Petitioner would also seek to show that Dr. Coons's opinion differs on the ultimate outcome depending upon who has retained him, even when the defendants are materially indistinguishable.

iii.    The erroneous admission of Dr. Coons's unscientific evidence was prejudicial because it likely influenced the jurors in their evaluation of an otherwise weak future dangerousness case.

Mr. Ochoa would further show following evidentiary development in live hearing that the admission of Dr. Coons's testimony was prejudicial to Mr. Ochoa's sentencing hearing in that the erroneous admission of Dr. Coons's opinion testimony, in the guise of the measured and scientific opinion of a mental health professional likely had a substantial and injurious effect upon at least one

132

of the jurors, who otherwise would likely have harbored doubts in the face of the relative weakness of the State's evidence in support of a finding of future dangerousness. The State's punishment case was relatively weak. While it is true that the offense itself consisted of the deaths of several individuals in the course of a single criminal episode and that this fact in itself is significant, the homicides did not occur within the context of an evolving pattern of increasingly severe criminal conduct, but occurred out of the blue and in a manner uncharacteristic of Mr. Ochoa's life. Mr. Ochoa had no history of criminal conduct and up to the recent past, had been successfully employed and had a relatively happy marriage. Although there were suggestions of marital discord at periods of time during Mr. Ochoa's relationship with his wife, the State produced little more than innuendo on this point. And while it is true that Mr. Ochoa presented evidence that he had been dealing with a cocaine addiction for the preceding two years, such evidence at this point in time is widely recognized by society to be a medical, as opposed to a moral, issue. The jury had little rational basis to conclude from the evidence before it that Mr. Ochoa posed a realistic likelihood of repeating his violent behavior in prison should he be assessed a life sentence.

The erroneous admission of Dr. Coons's testimony provided the justification to reach an affirmative verdict on future dangerousness that was otherwise just not objectively supported by the evidence in the record, and Dr. Coons' medical pedigree providing unwarranted support for this conclusion. *See Flores v. Johnson*, 210 F.3d 456, 465-66 (5th Cir. 2000) (Garza, J., concurring) ("the problem here . . . is . . . the fact that the opinion is introduced by one whose title and education . . . gives him significant credibility in the eyes of the jury as one whose opinion comes with the imprimatur of scientific fact."). In the absence of such opinion, a court would be hard pressed to uphold the jury's verdict on future dangerousness in light of all the evidence which was presented at the sentencing phase of trial.

133

iv.     Contingent and Alternative Basis for Relief – in the event of waiver or other procedural default, such default is excused through ineffective assistance of counsel by trial counsel.

The factual basis for Mr. Ochoa's claim would not have been apparent at the time of Mr. Ochoa's trial since the constitutional basis of this claim is contingent upon a review of Dr. Coons's methodology across several cases both proceeding and following his testimony in the present case; it is, in fact, Dr. Coons's consistent failure to subject his own methodology to the requirements of *Daubert*, particularly given repeated legal challenges to his testimony, which assists in demonstrating the arbitrary and unscientific aspect of his methodology.

Nonetheless, should this Court conclude that Mr. Ochoa has waived this claim at trial through procedural default attributable to trial counsel, either through inadequate objection under the contemporaneous objection rule or other procedural deficiency, then Mr. Ochoa would show that any such waiver was the result of constitutionally inadequate counsel and that such deficient conduct on the part of counsel has prejudiced him through waiver of this meritorious claim. *See Murray v. Carrier*, 477 U.S. 478, 488-89 (1986); *Coleman v. Thompson*, 501 U.S. 722, 754 (1991).  Mr. Ochoa would show that trial counsel has a professional obligation to familiarize himself with both the law and facts applicable to an offense through conducting a reasonably thorough pre-trial investigation. *Friedman v. United States*, 588 F.2d 1010, 1016-17 (5th Cir. 1979).  For this reason, it follows from counsel's professional obligation to investigate the legal and factual basis of a case, that counsel must adopt and exercise a reasonable strategy to meaningfully challenge the State's case.  It also follows that as part of counsel's obligation to subject the State's case to meaningful adversarial challenge, counsel is obliged not to waive potentially meritorious grounds for appeal.

*See e.g.*, *Davis v. Secretary For the Dept. of Corrections*, 341 F.3d 1310, 1314 (11th Cir. 2003) (counsel was ineffective for failing to preserve *Batson* error following objection); *Flores v. Demskie*,

134

215 F.3d 293, 303-04 (2[d] Cir. 2000) (waiver of state rule requiring reversal for failure to timely present witness statement following initial objection); *Morales v. State*, 217 S.W.3d 731, 736 (Tex. App.–El Paso 2007) (counsel was ineffective failure to exercise challenge for cause against identified biased juror after court denied peremptory challenge); *State v. Rieger*, 270 Neb. 904, 916, 708 N.W.2d 630 (Neb. 2006) (failure to include proper documentation in support of objection after making timely objection and litigating speedy trial issue); *Heckelsmiller v. State*, 687 N.W.2d 454, 458-59 (N.D. 2004) (counsel ineffective for failing to make offer of proof or bill of exception for two defense witnesses who were excluded from testifying at trial).

Therefore, should this Court seek to apply waiver or procedural default to this claim, then Mr. Ochoa would alternatively show that such waiver resulted from deficient attorney performance which prejudiced the outcome of the proceedings.

        v.      An evidentiary hearing is necessary to present facts for this court to make a reasonable determination of the merits of this claim or of any procedural defenses to claims of waiver/procedural default.

Resolution of this claim is heavily fact-dependent and necessarily involves investigation of facts not before the state court at the time of its ruling on the admissibility of Dr. Coons's testimony. In fact, resolution will depend in part upon Dr. Coons's production of the specific matters which were required of him in the subpoena duces tecum issued, but ignored, at trial. For this reason a live evidentiary hearing is required in order to fully and fairly develop the evidence relevant to this claim. *See Walker v. Johnson*, 312 U.S. 275, 286-87 (1941); *Jordan v. Estelle*, 594 F.2d 144 (5th Cir. 1979), *Scott v. Estelle*, 567 F.2d 632, 633 (5th Cir. 1978). In the case of complex and contested matters, a live hearing, including the right to confrontation and cross-examination is the best method of determining the facts.

        b.      Ineffective Assistance of Appellate Counsel:

Should this Court conclude that the merits of the preceding ground have been procedurally defaulted or otherwise waived as a result of Mr. Ochoa's failure, through appellate counsel, to raise the claim on direct appeal, then Mr. Ochoa would show, both as cause and prejudice, and as an independent claim that Mr. Ochoa received ineffective assistance of counsel on appeal.

In support of this claim for relief, Mr. Ochoa incorporates the factual recitation from the preceding ground and refers to the factual recitation as if fully set out within this claim.  Mr. Ochoa was represented at trial by two trial counsel, Stephen Miller and Michael Byck.  The record reflects that the state trial court appointed appellate counsel, Lawrence Mitchell, prior to the start of trial, but Mitchell does not appear to have  been present in court until the last day of trial.  *38R. 1.*

As previously recited, Mr. Ochoa sought to exclude Dr. Coons's prospective rebuttal evidence through a Motion to Exclude and Memorandum in Opposition to the Testimony of Dr. Richard E. Coons, and which relied on both due process and state evidentiary grounds as a basis for exclusion.  *1C. 124-38.*

Appellate counsel filed a brief on direct appeal from Mr. Ochoa's conviction, but raised only five grounds.  Notably, appellate counsel did *not* challenge the state trial court's ruling on Mr. Ochoa's motion to exclude Dr. Coons's testimony.[11]

---

[11]     Appellant counsel raised the following challenges:

(1)     The District Court Erred in Overruling Appellant's Objection to the Admission of Hearsay Evidence and Thereby Deprived Appellant of His Sixth and Fourteenth Amendment Right to the Confrontation of The Witnesses Against Him.

(2)     The Evidence is Legally Insufficient to Prove Beyond a Reasonable Probability that Appellant Would commit Criminal Acts of Violence that Would Constitute a Continuing Threat to Society as the Jury Found in Affirmatively Answering Special Issue No. 1

(3)     The District Court Erred in Overruling Appellant's Objection to the

A defendant has the right to the effective assistance of counsel on appeal. *Penson v. Ohio*, 488 U.S. 75 (1988); *Evitts v. Lucey*, 469 U.S. 387 (1985), and the defendant may be denied that right if appellate counsel has failed to raise a meritorious claim and the omission of such a claim raises a reasonable probability that the results of the appeal would have been different. *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Smith v. Murray*, 477 U.S. 527, 535-536 (1986). *See also Jackson v. Leonardo*, 162 F.3d 81, 84-87 (2[d] Cir. 1998) (appellate ineffective for failing to raise straight-forward double jeopardy claim on appeal); *Roe v. Delo*, 160 F.3d 416, 418-20 (8th Cir. 1998) (appellate counsel ineffective for failing to raise erroneous jury instruction, which had been waived by trial counsel, under plain error review); *Mason v. Hanks*, 97 F.3d 887, 892-902 (7th Cir. 1996) (appellate counsel was ineffective for failing to raise claim relating to admission of hearsay evidence).

In light of Petitioner's Motion and Memorandum to exclude Dr. Coons's testimony, appellate counsel had the option of appealing the trial court's ruling both on a federal constitutional - due process basis, as well as a state evidentiary basis. Yet counsel did neither. Appellate counsel's failure to include, as an appellate issue, the trial court's admission of Dr. Coons's future dangerousness testimony is questionable for several reasons. First and foremost, trial counsel

---

Admission of Hearsay Evidence.

(4)     The District Court Erred in Overruling Appellant's Objection to the Admission of a Tape Recorded Statement Which Contained Inaudible Portions so that Appellant Could not Present the Remainder of the Tape in Violation of Tex.R.Evid. 106.

(5)     The District Court Committed Error in Overruling Appellant's Objection to the Admission of a Gruesome Photograph in Violation of Tex.R.Evid. 403.

*See Abel Revill Ochoa v. State of Texas*, AP - 74,663 (Appellant's Brief on Appeal) (filed April 1, 2004).

submitted a well-researched, thoroughly cited motion and memorandum of law.  Review of the memo within the appellate record indicates the memo is legally sound, and certainly not implausible on its face.  At a minimum, appellate counsel could have simply "cut and pasted" the contents of the motion into the appellate brief with minor revisions.  Second, raising the issue would not have been inconsistent with other issues raised on appeal by appellate counsel.  Nor, thirdly, was counsel facing an overly large brief; the maximum number of pages permitted on a direct appeal brief is 125 pages, Tex.R.App.Pro. 71.3;   Mr. Ochoa's appellate brief was 67 pages.

Just a review of Dr. Coons's voir dire testimony would, at a minimum, have supported appellate counsel raising the issue.  Expert testimony must meet at least minimum standards of qualification of the expert, reliability of the testimony, and relevance of that testimony to the proceedings.  *Vela v. State*, 209 S.W.3d 128, 131 (Tex.Crim.App. 2006).  Under state evidentiary rules, which are modeled off of *Daubert* and federal authority, the proponent of expert testimony has the burden of establishing by clear and convincing evidence the qualifications of the expert and the reliability of the proposed testimony.  *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995); *Kelly v. State*, 824 S.W.2d 568, 573 (Tex.Crim.App. 1992).  A purported expert's *ipse dixit* of his expertise in and of itself is not  insufficient to establish render proposed testimony admissible.  *Wal-Mart Stores v. Merrell*, ___ S.W.3d ___, 09-0224, slip op. at 6 (Tex. 6-18-2010);   *Vela*, 209 S.W.3d at 134 (citing *Viterbo v. Dow Chemical Company*, 826 F.2d 420, 424 (5th Cir. 1987); *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 726 (Tex. 1998) (citing *General Electric Co. v. Joiner*, 522 U.S. 136 (1997)).  Evidence which is not based upon a sound scientific methodology should be excluded.  *Vela*, 209 S.W.3d at 133-34.

Appellate counsel, reviewing the voir dire of Dr. Coons's prospective testimony would have found ample evidentiary support on which to base a claim that the state trial court had erred in

admitting Dr. Coons's testimony without sufficient proof – clear and convincing proof – that Dr., Coons was presenting testimony based upon a sufficiently scientific methodology.  Dr. Coons disregarded, without explanation, Mr. Ochoa's subpoena duces tecum for the very items which would have independently supported his claim that his methodology in risk assessment  was sound. He identified no literature or studies which supported his risk assessment methodology, or of risk assessment in general.  He brought no information regarding the general rates of error for risk assessment for future dangerousness assessments, nor did he ever determine his own potential error rates for the individuals he had predicted to be future dangers.  He did not know precisely the number of individuals whom he had predicted would be future dangers.  Dr. Coons purported not to know whether there was any literature which supported or rejected his methodology.  When queried why he believed his methodology to be sound, Dr. Coons replied that it was "common knowledge within our area . . . very generally accepted . . . common sense things that we use" but provided no specifics.

Presented with Dr. Coons's general and vague responses to trial counsel's specific inquires regarding the accuracy and reliability of the methodology of risk assessment in capital murder cases, and the reliability of Dr. Coons's own methodology, appellate counsel would have had strong factual support to present a claim that the State had not demonstrated by clear and convincing evidence  the reliability of Dr. Coons's methodology, that he had done nothing to establish his own reliability in making accurate prognostications of future dangerousness.  Even though appellate counsel did not raise this claim, counsel did decide to raise a much weaker claim, specifically a challenge as unfairly prejudicial the trial court's admission of a single crime scene photograph.  *See Smith v. Robbins*, 528 U.S. at 288 (in determining appellate counsel ineffectiveness, court should review whether "ignored issues are clearly stronger than those presented.").

The record is silent regarding appellate counsel's decisions of which issues to raise and which to reject on the appeal of this case.  Accordingly, a full and fair resolution of the claim requires an evidentiary hearing in which Mr. Ochoa is provided the opportunity to question appellate counsel concerning his legal and factual review of the case.  *See United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999) (appellate counsel has an obligation to research relevant facts and law for appeal).

Prejudice from ineffective appellate counsel is measured under the prejudice standard from *Strickland v. Washington,* 466 U.S. 668 (1984).  *Smith*, 528 U.S. at 288-89; *United States v. Reinhart*, 357 F.3d 521, 525 n.10 (5th Cir. 2004); *Williamson*, 183 F.3d at 463.  To demonstrate prejudice, a petitioner must show that but for appellate counsel's deficient conduct, the outcome of the  appellate proceedings would have been different, *i.e.*, the petitioner would have been granted relief on appeal.  *Reinhart*, 357 F.3d at 530.  For the reasons explained in the preceding ground for review, as well as the discussion in this ground for review, upon a showing that appellate counsel was deficient, prejudice from his failure to raise a challenge to the admission of Dr. Coons's testimony, either on a constitutional or a statutory basis, was prejudicial.  While the full constitutional claim cannot be fully predicated upon the existing appellate record, the State's failure to meet the threshold standard of proving the reliability of Dr. Coons's prospective testimony is firmly established within the appellate record.  Dr. Coons's testimony during the voir dire was insufficient to demonstrate by clear and convincing evidence that his methodology in assessing future dangerousness; had counsel presented a ground for review upon this narrow issue, it is more likely than not that the Texas Court of Criminal Appeals would have been compelled to reverse Mr. Ochoa's sentence.

Accordingly, the state court record does establish prejudice on its face; an evidentiary hearing is required to demonstrate appellate counsel's deficient conduct, or in the alternative, cause for any procedural default.

### F.  Mr. Ochoa was Unconstitutionally Shackled During Trial

Because Mr. Ochoa was shackled during the punishment phase of his capital murder trial, his right to due process under the Fourteenth Amendment to the United States Constitution was denied.

Mr. Ochoa received ineffective assistance of counsel during the punishment phase of his capital murder trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution when his trial counsel failed to object to the trial court's decision to place Mr. Ochoa in shackles.

1.     Mr. Ochoa's Right to Due Process Was Violated When He Was Shackled During the Punishment Phase of His Capital Murder.

Forcing a criminal defendant to appear at trial in shackles creates a danger of extreme prejudice.  As the Supreme Court has noted, "[n]ot only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of the technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." *Illinois v. Allen*, 397 U.S. 337, 344 (1970).  The Fifth Circuit has echoed the court's concerns:

> [T]he appearance of a defendant in shackles and handcuffs before a jury in a capital case requires careful scrutiny.  Shackling carries the message that the state and the judge think the defendant is dangerous, even in the courtroom. . . . Apart from the risk of prejudice to the defendant, the indecorous appearance of a shackled defendant in an American trial demands close scrutiny of the practice.

*Marquez v. Collins*, 11 F.3d 1241, 1243-44 (5th Cir. 1994).

As a result, the Supreme Court has long held that shackling may be used only "as a last resort" to control a dangerous and disruptive criminal defendant during trial. *Illinois v. Allen*, 397 U.S. at 344.  The Fifth Circuit disavows shackling except upon a finding that the restraint was

"necessary." *Marquez*, 11 F.3d at 1244.  Specifically, "a defendant must not be shackled before his jury unless the restraint is necessary to protect the safety of the trial participants or the sanctity of the trial itself." *Id.*  The Fifth Circuit has held that due process affords a defendant the right to an articulation of the trial judge's reasons for concluding that restraint is necessary and the opportunity to contest that reasoning.  *Id.*

These safeguards apply even during the punishment phase of capital trials.  The Fifth Circuit has acknowledged that "[w]hen the complained of restraint comes only in the sentencing phase of a capital charge, a jury has just convicted [the defendant] of a violent crime—so the risk of prejudice is lessened from the risk of such events during the guilt phase." *Id.*  Because the capital sentencing jury's determination rests largely on a determination of the defendant's future dangerousness, however, the risk of prejudice "is not eliminated.  Restraint at trial may carry a message that a defendant continues to be dangerous." *Id.  See also Elledge v. Dugger*, 823 F.2d 1439, 1450 (11th Cir. 1987) ("a jury might view the shackles as first hand evidence of future dangerousness and uncontrollable behavior which if unmanageable in the courtroom may also be unmanageable in prison, leaving death as a proper decision").[12]

Texas state cases mirror this reasoning.  The Texas Court of Criminal Appeals (CCA) has directed that "all efforts should be maintained to prevent the jury from seeing the defendant in shackles, except where there has been a showing of exceptional circumstances or a manifest need for such restraint." *Long v. State*, 823 S.W.2d 259, 282 (Tex. Crim. App. 1991) (citing *Clark v. State*, 717 S.W.2d 910, 919 (Tex. Crim. App. 1986)).  *See also Gray v. State*, 268 S.W. 941, 950 (Tex. Crim. App. 1925) ("We desire to make it perfectly plain that we regard a trial with the prisoner

---

[12]      A portion of the *Elledge* opinion that did not address shackling was subsequently withdrawn by *Elledge v. Dugger*, 833 F.2d 250 (11th Cir. 1987).

in irons as obnoxious to the spirit of our laws, and all ideas of justice, and it is only when the record brings the case clearly within one of the rare exceptions that we would consent for a conviction to stand. Before a judge should permit a case to proceed under such circumstances he should be very sure of his ground.").

Because of the severity of the prejudice involved, the CCA further requires that "the record must clearly and affirmatively reflect the trial judge's reasons" for ordering the restraints.  *Long*, 823 S.W.2d at 282.  The nature of the charged offense alone cannot justify shackling a defendant before the jury.  *Id*.  The facts of *Long* are instructive.  In that case, the court ordered Long shackled during his capital murder trial, despite noting that Long had been well-behaved during pre-trial proceedings, citing only "general concerns regarding security because appellant was charged with capital murder."  *Id*. at 283.  The CCA held that the trial judge abused its discretion in shackling Long, finding that there was no "evidence in the record of violence or threatened violence by appellant *during this* trial."  *Id*. (emphasis in original).

Tena Francis observed that Mr. Ochoa was shackled with leg irons when he testified during the punishment phase of his trial.  *Affidavit of Tena Frances (dated August 18, 2010)*, p. 12.  Mr. Ochoa passed by the jury box on his way to the stand, and the jury was seated when Mr. Ochoa was called to testify.  *38R. 3, 5*.  Francis notes that it was obvious that Mr. Ochoa was shackled because he walked to the witness stand with a shuffling gait.  *Affidavit of Tena Francis (dated August 18, 2010)*, p. 12.

This restraint violated Mr. Ochoa's constitutional rights to a fair trial.  The reporter's record is totally devoid of any indication that Mr. Ochoa was disruptive, posed any danger to himself or others during his trial, or posed a flight risk.  Moreover, the trial judge failed to offer any

justification for her decision to shackle Mr. Ochoa. Because Mr. Ochoa was unnecessarily shackled, his constitutional rights were violated.

As detailed above, the Supreme Court and the Fifth Circuit have long held that a defendant's constitutional right to due process is violated when he is forced to appear at trial in shackles, in the absence of a showing that the restraint was necessary. *Illinois v. Allen*, 397 U.S.at 344 (shackling may be used only "as a last resort" to control a dangerous and disruptive criminal defendant during trial); *Marquez*, 11 F.3d at 1244 ("a defendant must not be shackled before his jury unless the restraint is necessary to protect the safety of the trial participants or the sanctity of the trial itself"). These limitations apply during both the guilt-innocence and the punishment phases of capital murder trials. *Id.*

Mr. Ochoa was shackled during the punishment phase of his trial. Because he was wearing leg irons that caused him to shuffle when he took the witness stand in the presence of the jury, there is no question that the jurors were aware of his restraint. There is no evidence in the record that Mr. Ochoa behaved in a manner that would have warranted this inherently prejudice restraint, *See id.* at 1243 ("Shackling carries the message that the state and the judge think the defendant is dangerous, even in the courtroom."), nor did the trial court at any point justify its decision to restrain Mr. Ochoa. Mr. Ochoa's constitutional rights were violated by this unjustified, severely prejudicial restraint.

2.     Trial Counsel's Failure to Object to the Shackling of Mr. Ochoa Was Objectively Unreasonable and Prejudiced Him.

At no point did counsel object to the fact that Mr. Ochoa was restrained or request a hearing on the trial court's decision to have him shackled. This failure contravened prevailing professional norms and was objectively unreasonable. *See, e.g.*, *Smith v. Black*, 904 F.2d 950, 980 (5th Cir. 1990)

144

("failure to object properly or to preserve fundamental errors at trial may constitute ineffective assistance of counsel"); ABA GUIDELINES IN DEATH PENALTY CASES, Commentary to Guideline 10.8 ("One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review.") (internal citations omitted).   Moreover, based on both the federal and state cases cited above, competent counsel should have been well aware that shackling is a prejudicial practice that must be closely scrutinized and requires justification on the record.

There can be no question that Mr. Ochoa was prejudiced by counsel's deficiency in this regard.   Mr. Ochoa's rights were violated simply by virtue of being forced to sit through the punishment phase of his capital trial in leg irons.   The prejudicial effect of Mr. Ochoa's shackling was compounded, however, by the fact that the jury witnessed him shuffling to the witness stand in his leg irons.   This not only highlighted for the jury that Mr. Ochoa was restrained, giving the court's imprimatur to the State's argument that he was dangerous, *see Marquez*, 11 F.3d at 1243, but did so immediately before the defense asked the jury to credit Mr. Ochoa's testimony.   *Contra Long v. State*, 823 S.W.2d 259, 283 (Tex.Crim.App. 1991) (finding that, though trial judge abused his discretion in shackling defendant during trial, defendant was not prejudiced because "[t]he trial judge took measures to prevent the exposure of the jury to the shackles, and in fact, during trial, the jury was excused each time appellant took the witness stand and was excused therefrom").

Moreover, the cases cited above leave no doubt that the shackling of a criminal defendant is an inherently prejudicial practice.   *See, e.g.*, *Illinois v. Allen*, 397 U.S. at 344; *Marquez*, 11 F.3d at 1243-44; *Chanthakoummane v. State*, 2010 Tex.Crim.App. Unpub. LEXIS 249, *26 (Tex.Crim.App. 2010) (referring to shackling as "inherently prejudicial").   It has only been condoned when the prejudice to the defendant is outweighed by the need to protect trial participants

145

from a dangerous defendant or to ensure that the defendant does not disrupt the trial through flight or otherwise.  In the absence of even a shred of evidence that any of these rationales applied to Mr. Ochoa, the prejudice inherent in the practice cannot be justified.

### G.  Legal Insufficiency of the Evidence to Support Future Danger

> The evidence is legally insufficient to support the jury's answer to the first special issue finding that Mr. Ochoa would constitute a continuing threat to society.

Mr. Ochoa's direct appeal attorney challenged the legal sufficiency of the evidence to support the jury's "yes" answer to the first special issue related to future dangerousness.  *See Appellant's Brief*, pp. 44-51.  The relevant portions of the direct appeal brief are incorporated as part of this petition as if fully set forth.  When reviewing a legal sufficiency challenge, a court must view the evidence in the light most favorable to the verdict and ask whether a reasonable factfinder could find beyond a reasonable doubt that the defendant would constitute a continuing threat to society.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  This threshold of proof is required by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  As set forth in his appellate brief, Mr. Ochoa's behavior in committing these crimes was the product of drug addiction and brain damage.  Mr. Ochoa poses no risk to society absent drug addiction, a condition that would be most likely removed once within the prison walls.  Furthermore, Mr. Ochoa's history as a hard working man, who supported his family, and had no prior criminal history, particularly violent history, demonstrate that this crime was an aberration.   The jury was irrational in concluding otherwise.  Mr. Ochoa is entitled to relief.

### H.  Unconstitutional Destruction of Mitigating Evidence

> Mr. Ochoa was deprived of rights to due process and to a fair trial when the State destroyed material and exculpatory evidence.

Mr. Ochoa received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution when his trial counsel failed to preserve evidence in the State's possession or make a timely objection or motion for such preservation

Mr. Ochoa received ineffective assistance of appellate counsel when his direct appeal counsel failed to raise the issue concerning the State's unconstitutional destruction of evidence on direct appeal.

1.      The Legal Standard Governing the State's Destruction of Exculpatory Evidence.

The Due Process Clause of the United States Constitution secures fundamental fairness in criminal trials. Embodied within this concept is the guarantee that the defendant will be given a meaningful opportunity to present a complete defense. *California v. Trombetta*, 467 U.S. 479, 485 (1984). Under certain circumstances, the State must provide the defendant with access to evidence within its possession. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). Implicit within the rule that the State must turn over favorable and material evidence is the corollary rule that the due process clause imposes a duty on the State not to destroy certain evidence. *Trombetta*, 467 U.S. at 486.[13] Because of the difficulty inherent in trying to determine what destroyed evidence would have shown, such destruction of evidence cases differ from the typical *Brady* inquiry: "Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." *Id*.

A petitioner claiming a due process violation when the State destroys evidence must establish a number of factors. First, the petitioner must show that the officer or governmental agent who destroyed the evidence was acting in bad faith. *See Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988); *California v. Trombetta*, 467 U.S. at 488-89. In *Youngblood*, the Supreme Court explained its reasoning for this requirement:

_____

[13]      It has long been held that evidence related to punishment is within the purview of *Brady* and its progeny. *Brady*, 373 U.S. at 87.

147

> We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

*Youngblood*, 488 U.S. at 58. Second, the petitioner show that the exculpatory value of the evidence was apparent to the officer before it was destroyed. *Trombetta*, 467 U.S. at 489; *Youngblood*, 488 U.S. at 56. Finally, the petitioner must show that there were no alternative means to prove what the destroyed evidence could have shown. *Trombetta*, 467 U.S. at 488-89.

2.      Mr. Ochoa Was Deprived of His Due Process Rights by the State's Destruction of Drug Paraphernalia Seized During Mr. Ochoa's Arrest.

Subsequent to his arrest, Mr. Ochoa was searched by members of the Dallas Police Department (DPD). During this search, officers seized what was identified as a crack pipe, a loose piece of steel wool, and a small plastic bag of the type often used to hold drugs. *32R. 7-8*. The arresting officer, Jason Cox, took possession of this evidence. *32R. 9*. That night, Officer Cox informed the detectives assigned to Mr. Ochoa's case that he recovered these items during his search of Mr. Ochoa. *Id.* Rather than instructing Officer Cox to preserve this evidence, Detective Carollo[14] told Officer Cox to do whatever he wanted to do with the items. *Id.* at 10 (testifying that Detective Carollo told him, "[D]o what you want with it."). Officer Cox subsequently placed the evidence in the property room. *Id.* Specifically, he placed the evidence in the "found property" section. *Id.* at 17-18. That decision was fateful, as unclaimed property in that section is destroyed after

---

[14]      Detective Carollo and Detective Lusty were the two investigators assigned to Mr. Ochoa's case. Detective Carollo died the weekend before the guilt-innocence phase of Mr. Ochoa's trial began. *31R. 3*.

148

approximately 60 days.  *Id.* at 29.  In accordance with DPD policy, the evidence recovered from Mr.

Ochoa was destroyed a little more than 60 days without any type of forensic testing.  *Id.* at 24.

On February 17, 2003, trial counsel filed a Motion to Preserve Evidence, which specifically

requested the "preservation of all physical evidence[,] . . . . including evidence collected at the crime

scene and any actual physical evidence found."  *1C. 62-66*.  In addition, the motion requested that

"none of the evidence seized in this investigation be destroyed, modified or altered without an order

from this Court, after notice to the State and to the defense of its intent to do so."  *Id.*  The motion

was granted by the trial court on April 7, 2003.  *Id.* at 66.  On April 4, 2003, the defense filed a

Motion for Scientific Analyses of Small Plastic Baggie and Alleged Crack Pipe Obtained from

Defendant Abel R. Ochoa.  *Id.* at 84-88.  This motion sought forensic analysis of the pipe and plastic

bag "for the purpose of determining the components, including adulterants and dilutants [*sic*] that

were a part of the crack cocaine the Defendant smoked immediately prior to the alleged offenses."

*Id.*  In also averred that "[t]his request is made for the purpose of presentation of evidence and

scientific data under Special Issue No. 2 that would mitigate against the sentence of death or would

otherwise relate to the moral blameworthiness of this Defendant, should he be found guilty of capital

murder."  *Id.*

During a pretrial hearing on April 7, 2003, the State informed the Court that this evidence

had been destroyed and was therefore unavailable for the forensic analysis sought by the defense.

*31R. 6*.  Trial counsel requested that the court dismiss the indictment or prohibit the State from

seeking the death penalty.  The court took the motion under advisement.  *Id.*  On April 14, 2003, the

defense filed a Motion to Dismiss Indictment for Failure to Preserve Exculpatory Evidence.  *Id.* at

25-30.  The motion noted that the "only evidence in the case which would be subject to analysis to

determine what substance or substances were contained in the crack cocaine smoked by the

Defendant was the baggie and the pipe.  If that analysis were to reveal that there were substances in the crack cocaine of which the Defendant was not aware at the time of ingestion, and that substance or substances rendered his conduct involuntary, then the Defendant would not be guilty of the offense charged." *Id.*  After a pretrial hearing, the motion was denied.  *32R. 36.*

The State's destruction of this evidence was in bad faith.  There is no question that the detectives assigned to Mr. Ochoa's case were aware of the existence of this evidence and that their failure to instruct Officer Cox to preserve it resulted in its destruction.  At the examining trial held nine days after the offense, Detective Dan Lusty acknowledged that he was aware that DPD officers had recovered the pipe and the plastic bag during Mr. Ochoa's arrest.  *See Examining Trial Transcript*, p. 17.  Detective Lusty also testified that, during his interrogation, Mr. Ochoa admitted to smoking crack just before the shootings.  *Id.* at 8.  Despite this information, Detective Lusty and other members of the DPD took no steps to analyze or even preserve this crucial evidence.  *Id.* at 17 (testifying at the examining trial that the bag was "placed in the property room.  But at this time it has not been marked to be analyzed.").  Indeed, when specifically asked by Officer Cox what should be done with this evidence, Detective Carollo told him, "[D]o what you want with it."  *32R. 10.*  Taking Detective Carollo at his word, Officer Cox could just as easily have thrown this evidence in the trash.  Such callous indifference to the preservation of evidence alone is sufficient to show bad faith.  In this case, however, that indifference is even more egregious, as Officer Cox testified that he had never before received such instructions regarding evidence in a felony case.  *Id.* The fact that Detective Carollo's instructions to Officer Cox were out of the ordinary is sufficient to show that the destruction of this evidence was in bad faith.

This showing of bad faith is further bolstered by the fact that the exculpatory value of the evidence should have been apparent to DPD officers before it was destroyed.  As noted above, Mr.

Ochoa informed Detective Lusty that he smoked crack just before the offense took place.  As early as the night of the offense, then, officers were aware that this evidence could be tested to determine if it contained drug residue and could thereby corroborate a portion of Mr. Ochoa's statement. Police officers, who–by virtue of their employment–are familiar with the drug trade, would have been well aware that drugs such as crack cocaine are often mixed with adulterants that can alter the typical effect of the drug on the user.  It should have been obvious to Detective Lusty, at least, that forensic analysis could determine whether such adulterants were present in the evidence Officer Cox recovered, causing an atypical reaction in Mr. Ochoa.  Thus, the exculpatory value of the evidence should have been evident, and officers should have taken steps to preserve it.

Finally, the destruction of this evidence wholly deprived Mr. Ochoa of the opportunity to prove that the drugs he used just prior to shooting five people contained such adulterants or were unusually concentrated.  Mr. Ochoa had no alternate materials that could be tested.  The State's destruction of these items, therefore, prevented Mr. Ochoa from presenting to the jury evidence of the precise substance he consumed.  Such evidence was crucial in Mr. Ochoa's case, given that his mitigation evidence centered on a theory of drug-induced delirium.  The State's actions deprived Mr. Ochoa of the opportunity to present evidence affirmatively supporting this theory.  In addition, Mr. Ochoa was deprived of the ability to rebut the testimony of Dr. Richard Coons, who testified that Mr. Ochoa could not have experienced drug-induced delirium because he ingested only a small amount of cocaine.  *38R. 224.*

> 3.      Counsel's Ineffective Assistance Was Objectively Unreasonable and Prejudiced Mr. Ochoa.

Though the State's failure to preserve this crucial evidence constituted a deprivation of Mr. Ochoa's constitutional rights, trial counsel also rendered deficient performance by failing to take

affirmative steps to ensure that these items were preserved and analyzed.  As noted above, trial counsel filed three motions related to the preservation and analysis of this evidence.  The first motion, seeking to preserve all physical in the case, was not filed, however, until April 4, 2003–fully eight months after the offense and Mr. Ochoa's arrest.  By that time, the evidence had long since been destroyed.  *See 32R. 24.*

As Sergeant Judy Katz testified at the pretrial hearing on the destruction of these items, had trial counsel issued a subpoena for the evidence or sought a court order barring its destruction, it would have been preserved.  *Id.* at 29.  As early as the examining trial, counsel were aware that these items had not been marked by the DPD for analysis.  *Examining Trial Transcript*, p. 17.  In her affidavit, trial mitigation specialist Tena Francis notes that trial counsel failed to ask for preservation of the evidence at the examining trial because "[h]e assumed [DPD] would preserve the pipe as evidence."  *Affidavit of Tena Francis (dated August 18, 2010)*, p. 8.  In his affidavit provided to the State, Miller reiterated as much.  "I did not move to preserve the evidence sooner for the simple reason that I never would have dreamed that the police department would destroy evidence in a capital murder case.  It has been my experience that such evidence is usually not destroyed."  *SHR. 263.*

Presuming that critical defense evidence will be preserved by the State, without taking accompanying steps to ensure the accuracy of that presumption, is objectively unreasonable and falls below prevailing professional standards of care.  *See, e.g.*, ABA DEATH PENALTY GUIDELINES Commentary to Guideline 10.7 (directing competent counsel to "make a prompt request to the relevant government agencies for any physical evidence" and to "conduct appropriate analyses" of such evidence).

There can be no question that Mr. Ochoa was prejudiced by counsel's ineffectiveness. As noted above, this evidence was crucial to the defense mitigation case and could also have been relevant to the guilt-innocence portion of his trial. Deprived of this evidence, Mr. Ochoa's mitigation evidence was inadequate, and he was unable to rebut Dr. Coons testimony effectively.

4.      Mr. Ochoa's direct appeal counsel was ineffective.

Trial counsel ostensibly complained about the destruction of this evidence through their motions to dismiss the indictment or to prevent the State from seeking the death penalty. The court denied the objections. In the event that trial counsel preserved the issue for appeal, and it had not been forfeited through counsel's lack of diligence in seeking the evidence sooner, then counsel on direct appeal was ineffective for failing to press the issue on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Smith v. Murray*, 477 U.S. 527, 535-536 (1986). Mr. Ochoa was prejudiced by this failure as well.

5.      Conclusion

As detailed above, unique exculpatory evidence destroyed in bad faith by state actors aware of the nature of the evidence constitutes a due process violation. *See Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988); *California v. Trombetta*, 467 U.S. at 488-89. For the reasons set above, the destruction of the crack pipe, steel wool, and plastic bag recovered by Officer Cox during Mr. Ochoa's arrest meets this standard. The State's actions therefore deprived Mr. Ochoa of his rights under the Due Process Clause of the Fourteenth Amendment.

I.  Issues Related to the Mitigation Special Issue.

Mr. Ochoa's death sentence should be set aside because the Texas mitigation special issue given in his case failed to assign a burden of proof in violation of Applicant's rights to due process under the Fourteenth Amendment and to reliability of the death sentence and freedom from arbitrariness and capriciousness in capital sentencing as guaranteed by the Eighth Amendment..

Mr. Ochoa's death sentence should be set aside because the Texas mitigation special issue given in his case failed to adequately define what is meant by mitigation or mitigating evidence and the terms used created a reasonable possibility that the jury would construe mitigating evidence narrowly such that it would not give full consideration and effect to all of Applicant's mitigating evidence in violation of the Eighth Amendment to the United States Constitution.

Mr. Ochoa received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution when his trial counsel failed to object properly and timely to the mitigation special issue and when his direct appeal counsel failed to raise these issues on direct appeal.

1.      Background

The punishment charge in this case instructed the jury with respect to mitigation evidence

as follows:

> In deliberating on your answer to Special Issue No. 2, you are instructed as follows:
>
> ***
>
> The members of the jury need not agree on what particular evidence supports an affirative answer to Special Issue No. 2.
>
> In arriving at your answer, *you shall consider mitigating evidence to be evidence that a jury might regard as reducing the defendant's moral blameworthiness.*

*1C. 376.* (emphasis added).  The relevant special issues provided as follows:

## SPECIAL ISSUE NO. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Abel Ochoa, would commit criminal acts of violence that would constitute a continuing threat to society?

***

## SPECIAL ISSUE NO. 2

Do you find, talking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating

circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

*1C. 379-80.* The jury answered "Yes" and "No," and Mr. Ochoa was sentenced to death accordingly. *Id.*

2.      Discussion

The charge only assigned a burden of proof with respect to the first special issue, and consistent with the legislative provisions in Article 37.071 and the Texas Court of Criminal Appeals's holdings interpreting that provision, the charge did not assign a burden of proof to the mitigation special issue. *See Eldridge v. State*, 940 S.W.2d 646, 654 (Tex.Crim.App. 1996); *McFarland v. State*, 928 S.W.2d 482, 498-99 (Tex.Crim.App. 1996).

Like the future dangerousness special issue, the State should bear the burden of proof with respect to the mitigation special issue to establish it beyond a reasonable doubt.  Because of the heightened reliability requirement in capital sentencing, only the reasonable doubt standard can adequately impress upon the jury the significance and solemnity of their decision between life and death.  "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confidence our society thinks he [or she] should have in the correctness of the factual conclusions for a particular type of adjudication.'" *Addington v. Texas*, 441 U.S. 418, 423 (1979) (quoting *In re Winship*, 397 U.S. 358, 370 (1970) (Harlan, J., concurring)).  The beyond a reasonable doubt standard is "indispensable" to due process, because "it impresses on the trier of fact the necessity of reaching a subjective state of certitude of the facts in issue." *In re Winship*, 397 at 364 (internal quotation marks and citation omitted).  As Justice Harlan wrote in *Winship*:

In this context, I view the requirement of proof beyond a reasonable doubt in a criminal case as bottomed on a fundamental value determination of our society that

155

it is far worse to convict an innocent man than to let a guilty man go free.  It is only because of the nearly complete and long-standing acceptance of the reasonable-doubt standard by the States in criminal trials that the Court has not before today had to hold explicitly that due process, as an expression of fundamental procedural fairness, requires a more stringent standard for criminal trials than for ordinary civil litigation.

*Id*. at 372 (Harlan, J., concurring) (footnote omitted).

The level of certitude that the beyond a reasonable doubt standard impresses upon juries is no less applicable in the context of capital sentencing.  In *Ring v. Arizona*, the Court wrote, "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact–no matter how the State labels it–must be found by a jury beyond a reasonable doubt."  536 U.S. 584 (2002) (citing and relying upon *Apprendi v. New Jersey*, 530 U.S. 466, 482-83 (2000)).  Under the capital sentencing framework in Texas by which Mr. Ochoa was sentenced to death, both a "yes" answer to the mitigation special issue as well as a "non" answer based on jury disagreement concerning it results in a life sentence.  Thus, life is the default sentence, and the only possible answer that may result in the imposition of death is a "no" answer.  In this sense, the fact at issue–the lack of sufficient mitigation evidence–increases the punishment from life in prison to death.  Under *Ring*, such a fact must be found by a jury beyond a reasonable doubt.

Furthermore, though the mitigation special issue does require the jury to make a value judgment, this fact does not distinguish it from the future dangerousness special issue as given in this case.  The jury received an instruction concerning mitigation as it applied to the jury's framework in answering the future dangerousness special issue, which would have required a similar value judgment in reaching an answer, and yet the jury was likewise instructed that it had to find that Mr. Ochoa would pose a future danger beyond a reasonable doubt before answering that issue "yes."

156

Finally, the lack of a standard of proof and an assignment of the burden with respect to the mitigation special issue raises the problem of unfettered and open-ended jury discretion with respect to capital sentencing. *See Furman v. Georgia*, 408 U.S. 238 (1972). As such, a jury may require the State to prove that the mitigation special issue should be answered no beyond a reasonable doubt just as easily as it might require the defendant to prove beyond all possible doubt that mitigating circumstances exist. The latter scenario, though entirely possible under the current framework, would offend most sensibilities and notions of fair play and would likely be found unconstitutional. The level of capriciousness and arbitrariness possible under the current system violates the Eighth Amendment.

In addition to the lack of a burden of proof with respect to the mitigation special issue, the charge given in Mr. Ochoa's case, as authorized by Article 37.071, defined mitigating evidence, as used in the charge, as "evidence that a juror might regard as reducing the defendant's moral blameworthiness." *1C.* . This instruction impermissibly limited the jury's consideration of Mr. Ochoa's mitigation evidence and effectively instructed them to disregard important classes of mitigating evidence when considering the mitigation special issue. As a result, the charge created a reasonable likelihood that the jury would understand the instructions such that they could not give full consideration and full effect to all of Mr. Ochoa's mitigating evidence.

Simply put, mitigating evidence is any evidence that a sentencer could reasonably find warrants a sentence of less than death. *See Tenard v. Dretke*, 542 U.S. 274, 284-85 (2004); *Nelson v. Quarterman*, 472 F.3d 287, 301 (5th Cir. 2006). It is evidence concerning the defendant's background and character and the circumstances of the offense, but it is not limited to evidence that reduces the defendant's moral blameworthiness for the crime at hand alone. It is clear that the Supreme Court has never so limited the scope of mitigating evidence. If mitigating evidence is

relevant under this low threshold for relevancy, the constitution requires that a capital sentencing jury must be able to give full consideration and full effect to it. *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 127 U.S. 1654, 1664, 1672 (2007); *Brewer v. Quarterman*, 550 U.S. 286; 127 U.S. 1706, 1713 (2007); *Nelson*, 472 F.3d at 300-03. A defendant is entitled to sentencing relief if there is a reasonable likelihood that the charge precluded the jury from giving full consideration and full effect to all of the defendant's mitigating evidence. *Nelson*, 472 F.3d at 303.

By limiting mitigating evidence to only evidence that reduced Mr. Ochoa's moral blameworthiness, the charge effectively instructed the jury to find a nexus between the mitigating evidence and his culpability for committing the crime. Such a nexus has been rejected. *See Tennard v. Dretke*, 542 U.S. at 285-86; *Nelson v. Quarterman*, 472 F.3d at 313 (discussing past erroneous Fifth Circuit cases). Or at the very least, the charge linked the two unrelated concepts together. As such, the jury reasonably could have understood the charge to require it to disregard evidence that had nothing to do with Mr. Ochoa's underlying culpability for committing the crime or any evidence that tangentially bore such relevance. Mr. Ochoa presented important mitigating evidence–such as poverty, his good qualities as a neighbor and family man, his exemplary work history, and his father's abusive nature and alcoholism–that the jury may not have been able to give full consideration and full effect to in assessing whether he live or die.

There is an additional reason the mitigation special issue is flawed in this case. Because mitigation was not defined for the jury, other than in terms of moral blameworthiness, jurors could have refused to consider some or all of Mr. Ochoa's mitigating evidence. In other words, the jury was not instructed that it was not limited in the type or manner of mitigation evidence that it could consider, and conversely it was not instructed that it could not refuse to consider any particular mitigating evidence.

The right to present mitigation evidence during a capital trial is firmly secured by the Eighth Amendment.  In *Jurek v. Texas*, the Court held:  "[A] sentencing scheme that allowed the jury to consider only aggravating circumstances would almost certainly fall short of providing the individualized sentencing determination that we today held in *Woodson v. North Carolina*, 428 U.S. 280, 303-305 [(1976)], to be required by the Eighth and Fourteenth Amendments. . . .  A jury must be allowed to consider on the basis of *all relevant evidence* not only why a death sentence should be imposed, but also why it should not be imposed."  428 U.S. 262, 270-71 (1976) (emphasis added).  Thus, the Court concluded that "a capital-sentencing system must allow the sentencing authority to consider mitigating circumstances."  *Id*.  In *Locket v. Ohio*, 438 U.S. 586 (1978), the Supreme Court addressed the requirement that a jury be able to consider mitigating evidence that animated its decisions in the series of cases that included *Jurek*.  A plurality of the Court held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."  *Id*. at 604 (emphasis in original).  Also, the Court held that an "individualized decision is essential in capital cases."  *Id*. at 605.  Though *Lockett* was a plurality opinion, the Court later adopted its essential holdings that individualized sentencing is required in death penalty cases and that the sentencer may not be precluded from considering any aspect of the defendant's character and record and the circumstances of the offense that may support a sentence less than death.  *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982).  Importantly, in *Eddings*, the Court made it clear that the introduction of mitigating evidence is not enough if the sentencer *refuses to consider* such evidence as a matter of law.  *Id*. at 113-14.  Thus, the Court contemplated that the sentencer would actually consider and give effect to this evidence.  *Id*. at 114-15 & n.10 (holding

159

that even though state law allowed a defendant to present mitigating evidence, *Lockett* required the

"sentencer to listen").   *See also Hitchcock v. Dugger*, 481 U.S. 393, 398-99 (1987) (holding that

requirement that sentencer not consider nonstatutory, but otherwise relevant mitigating evidence

rendered death sentence invalid).   In *Skipper v. South Carolina*, 476 U.S. 1 (1986), the Court held

that the rules in *Lockett* and *Eddings* "are now well established . . . ."   *Id.* at 4.

In this case, there are important indications that the jury did refuse to consider the major

mitigating thrust of Mr. Ochoa's punishment defense.   In particular, there is a reasonable likelihood

that the jury understood mitigation as referred to in the charge in such a way that it could refuse to

consider Mr. Ochoa's addiction to cocaine and consequent brain damage.   Under these

circumstances, an additional charge or instruction was required to instruct the jury that it must at

least consider Mr. Ochoa's evidence as a mitigating factor that could warrant a sentence of less than

death.   The unacceptable risk posed in this case is evidenced most particularly in the State's closing

argument at punishment.   On three occasions, the State's argued:

> Let's talk a little bit about drug use.   What do you think about drug use?   You know, some jurors will tell us – some jurors have told us in the past that drug use is mitigating, they wouldn't have done it but for the drugs.   Other people have told us, wait a second, it's not only illegal, it's a character flaw, illegal to use, but then they go out and commit violent offenses, that's aggravating.   *Each of you assured Mr. Blackman and myself, committed to us that you said drug use would be aggravating. So that leaves—if you still believe that way, which we took you to believe...*

*39 R. 40-41* (emphasis added).

> [T]here has to be something about the defendant's past, the nature of the offense itself, that would lead you as a jury, as an individual juror, to believe that he should get a life sentence rather than a death sentence.   He should get a life sentence rather than a death sentence.   *Well, you've already told us that dope use is aggravating.*

*Id.* at 46 (emphasis added).

> What can be mitigating?   *You've already told us that dope is an aggravating circumstance.   I'm going to hold you to your commitments and ask that you answer*

> *Special Issue Number 1 yes because he will be a future danger, based on what we've proved and based on what their own expert said.*

*Id.* at 52-53(emphasis added).  If the State is correct in these assertions, then Mr. Ochoa's factfinder refused to consider important mitigating evidence in violation of the Eighth Amendment, similar to the judge in *Eddings*.  The charge should have reminded the jury that it had a duty to at least consider all of Mr. Ochoa's mitigating evidence as indicating that a sentence of less than death was warranted.  For these reasons, Mr. Ochoa is entitled to sentencing relief.

 3. Ineffective Assistance of Counsel

 Mr. Ochoa's trial counsel made objections to the jury charge; however, they did not object to the burden of proof or the definition of mitigating evidence.  To the extent that these objections were insufficient to preserve the issues for review, counsel were deficient, and Mr. Ochoa was prejudiced.

J. Unconstitutional Impanelment of the Venire

 Mr. Ochoa right as guaranteed by the Sixth Amendment of the United States Constitution to be tried by a jury selected from a jury panel representing a fair cross-section of the community was violated.

 Mr. Ochoa was deprived of his Sixth Amendment right to be tried by a jury selected from a jury panel representing a fair cross-section of the community.  *Duren v. Missouri*, 439 U.S. 357, 363-64 (1979).  To make out a *prima facie* showing of a fair cross-section violation, Mr. Ochoa must make the following showing:

> (1) that the group alleged to be excluded is a "distinctive" group in the community [cognizable group prong]; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community [underrepresentation prong]; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process [systematic exclusion prong].

161

*Id.* at 364. Once a *prima facie* violation is shown, the government is required to justify its practices to prove "that a significant state interest [is] manifestly and primarily advanced by those aspects of the jury-selection process . . . that result in the disproportionate exclusion of a distinctive group." *Id.* at 367-68.

Mr. Ochoa satisfies the three-pronged *Duren* test because Dallas County's jury selection system results in the systematic exclusion of Hispanic jurors. Hispanics have long been recognized as a cognizable group for purposes of fair cross-section litigation. *See, e.g.*, *Hernandez v. Texas*, 347 U.S. 475 (1954); *Castenda v. Partida*, 430 U.S. 482 (1977); *Garcia v. State*, 919 S.W.2d 370, 392 (Tex. Crim. App. 1996). For the reasons set forth in Mr. Ochoa's state petition for a writ of *habeas corpus*, which are incorporated herein, Mr. Ochoa also satisfies the second and third prongs of the *Duren* test.

The importance of empanelling a jury selected from a fair cross-section of the community is magnified in capital cases, such as Mr. Ochoa's. This is true not only because the stakes are at their highest in a capital case, but also because of the unique role jurors play in such cases. These jurors are not simply rendering a factual judgment on guilt or innocence, but "an ethical judgment expressing the conscience of the community." Jeffrey Abramson, *Death is Different: Jurisprudence and the Role of the Capital Jury*, 2 Ohio St. J. Crim. L. 117, 119 (2004) (citing *Spaziano v. Florida*, 468 U.S. 447, 469 (1984) (Stevens, J., concurring in part and dissenting in part)). As Justice Marshall eloquently noted, "when any large and identifiable segment of the community is excluded . . . the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable." *Peters v. Kiff*, 407 U.S. 493, 503 (1972). Mr. Ochoa is entitled to relief on this claim.

## IX.  Prayer for Relief

WHEREFORE, PREMISES CONSIDERED, Petitioner, Abel Revill Ochoa, prays that this

Court:

A.    Order Respondent to provide this court with the record of all state court proceedings;

B.    Issue a writ of habeas corpus to have him brought before it, to the end that he may

be discharged from his unconstitutional confinement and restraint and/or relieved of

his unconstitutional sentence of death;

C.    Grant an evidentiary hearing so that he may present evidence in support of these

claims; and

D.    Grant such other relief as law and justice require.

Respectfully submitted,

ALEXANDER L. CALHOUN
Attorney at Law
Texas Bar No. 00787187
4301 W. William Cannon Dr.  Ste. B-150
        # 260
Austin, Texas 78749
(512) 420-8850 (telephone)
(512) 233-5946 (facsimile)
(512) 731-731-3159 (cell)
alcalhoun@earthlink.net

By:  /s/ Alexander L. Calhoun
        Alexander L. Calhoun
        Member of the Bar of this Court

PAUL E. MANSUR
Attorney at Law
Texas Bar No. 00796078
P.O. Box 1300
Denver City, Texas 79323
(806) 592-2797 (telephone)
(806) 592-9136 (facsimile)
pmansur@midtech.net

By:  /s/ Paul E. Mansur
      Paul E. Mansur
      Member of the Bar of this Court

      Attorneys for Petitioner,
      Abel Revill Ochoa

## Verification

Under penalty of perjury, I hereby declare that all the factual allegations made herein are true and accurate except for those allegations made upon information and belief.

Dated: August 19, 2010                 /s/ Paul E. Mansur
                                             Paul E. Mansur

## *Certificate of Service*

I certify that on August 19, 2010, I served, by email, a true and correct copy of this Petition for Writ of Habeas Corpus by a Person in State Custody upon opposing counsel at the following address:

Greg Abbott
attn: Stephen Hoffman
Texas Attorney General
Postconviction Litigation Division
P.O. Box 12548
Austin, Texas 78711-2548

                                            /s/ Paul E. Mansur
                                            Paul E. Mansur