**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS,
DALLAS DIVISION**

| | | |
|---|---|---|
| **ABEL REVILL OCHOA,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| | § | |
| **-v-** | § | **USDC No. 3:09-cv-02277-K** |
| | § | |
| | § | |
| | § | |
| **RICK THALER,** | § | |
| **Director, Texas Department of Criminal** | § | |
| **Justice, Correctional Institutions Division** | § | **CAPITAL CASE** |
| | § | |
| **Respondent.** | § | |

**PETITIONER'S RESPONSE TO RESPONDENT'S ANSWER**

COMES NOW, Petitioner, Abel Revill Ochoa, by and through the undersigned attorney of record, and files this Response to *Respondent's Answer with Brief in Support* and would show that there are genuine issues of material fact which deserve further consideration by this Court, and which make dismissal under Habeas Rule 4 or summary judgment in accordance with Federal Rule of Civil Procedure 56 inappropriate.

Respondent asserts that this Court should dismiss Mr. Ochoa's petition and that he is entitled to summary judgment on all of the claims presented. However, as will be demonstrated in this response, there are many unresolved procedural and factual issues that preclude dismissal or summary judgment at this stage. Mr. Ochoa's original petition, along with the evidence submitted in support, demonstrate that his claims are meritorious, and if all the facts asserted therein are believed and resolved in his favor, he would be entitled to relief. Additionally, Mr. Ochoa is entitled to further factual development through funding of a complete investigation in order to establish his

claims and other fact finding procedures such as discovery. Finally, in order to resolve Mr. Ochoa's

claims, the Court should conduct an evidentiary hearing.

## I. Restatement of Mr. Ochoa's Claims

1. Mr. Ochoa received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution when his trial attorneys failed to investigate and to present significant mitigation evidence at the punishment hearing.

2. Mr. Ochoa received ineffective assistance of counsel during the voir dire of his capital murder trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

3. Mr. Ochoa's trial counsel were rendered ineffective during the voir dire of his capital murder trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

4. Because Mr. Ochoa was deprived of the right to an adequate voir dire, his right to be tried by a fair and impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution was denied.

5. Mr. Ochoa received ineffective assistance of counsel on appeal because his appellate attorney failed to raise the voir dire issues on appeal.

6. Mr. Ochoa's right to confront and cross-examine witnesses as guaranteed by the Confrontation Clause of the Sixth Amendment was violated when the trial court allowed testimonial evidence before the jury.

7. Mr. Ochoa received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution when his trial counsel failed to make proper and timely objections to the State's use of testimonial statements contrary to the Confrontation Clause of the Sixth Amendment to the United States Constitution.

8. The trial court's exclusion of important rebuttal evidence denied Mr. Ochoa the right to present a fair defense contrary to the Sixth and Fourteenth Amendments to the United States Constitution.

9. Mr. Ochoa received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution when his trial counsel failed to make proper and timely objections to the trial court's ruling excluding important rebuttal evidence.

10.     Mr. Ochoa was deprived of his right to due process of law under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution by the State's presentation of unreliable psychiatric rebuttal testimony by Dr. Richard Coons.

11.     Mr. Ochoa was deprived of his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution because of his appellate counsel's failure to present the issue concerning the trial court's erroneous admission of Dr. Coons's unconstitutionally unreliable testimony on direct appeal.

12.     Because Mr. Ochoa was shackled during the punishment phase of his capital murder trial, his right to due process under the Fourteenth Amendment to the United States Constitution was denied.

13.     Mr. Ochoa received ineffective assistance of counsel during the punishment phase of his capital murder trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution when his trial counsel failed to object to the trial court's decision to place Mr. Ochoa in shackles.

14.     The evidence is legally insufficient to support the jury's answer to the first special issue finding that Mr. Ochoa would constitute a continuing threat to society.

15.     Mr. Ochoa was deprived of rights to due process and to a fair trial when the State destroyed material and exculpatory evidence.

16.     Mr. Ochoa received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution when his trial counsel failed to preserve evidence in the State's possession or make a timely objection or motion for such preservation.

17.     Mr. Ochoa received ineffective assistance of appellate counsel when his direct appeal counsel failed to raise the issue concerning the State's unconstitutional destruction of evidence on direct appeal.

18.     Mr. Ochoa's death sentence should be set aside because the Texas mitigation special issue given in his case failed to assign a burden of proof in violation of Applicant's rights to due process under the Fourteenth Amendment and to reliability of the death sentence and freedom from arbitrariness and capriciousness in capital sentencing as guaranteed by the Eighth Amendment.

19.     Mr. Ochoa's death sentence should be set aside because the Texas mitigation special issue given in his case failed to adequately define what is meant by mitigation or mitigating evidence and the terms used created a reasonable

possibility that the jury would construe mitigating evidence narrowly such that it would not give full consideration and effect to all of Applicant's mitigating evidence in violation of the Eighth Amendment to the United States Constitution.

20.     Mr. Ochoa received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution when his trial counsel failed to object properly and timely to the mitigation special issue and when his direct appeal counsel failed to raise these issues on direct appeal.

21.     Mr. Ochoa right as guaranteed by the Sixth Amendment of the United States Constitution to be tried by a jury selected from a jury panel representing a fair cross-section of the community was violated.

## II.  Standard Governing Motions for Summary Judgment

Respondent seeks dismissal of all of Mr. Ochoa's claims.  However, dismissal or summary judgment is not proper at this stage of the proceedings.

The Federal Rules of Civil Procedure are applicable to habeas practice to the extent that they are not inconsistent with the Rules Governing Habeas Cases.  *See Blackledge v. Allison*, 431 U.S. 63, 80-81 (1977); *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002).  *See also* Habeas Rule 11, Rules Governing Section 2254 Cases in the District Courts [hereinafter Habeas Rules].  "A summary judgment is only appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Myers v. Collins*, 8 F.3d 249, 252-53 (5th Cir. 1993); *see also* FED. R. CIV. P. 56(c).  *See generally Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue of  material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  An issue is "genuine" if it is real and substantial, as opposed to merely formal, pretended, or a sham. *Bazon ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 489 (5th Cir. 2001).  A fact is "material" if it "*might* affect the outcome of the suit under the governing law."  *Id*. (quoting *Anderson*, 477 U.S.

-4-

at 248).  In other words, if the non-movant sets forth specific facts in support of allegations relevant to the claim, a genuine issue of material fact is presented, and summary judgment is inappropriate. The moving party has the burden of initially showing the absence of a genuine issue concerning any material fact.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159 (1970); *Bazan*, 246 F.3d at 489. Additionally, in considering a motion for summary judgment, the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party.  *Eastman Kodak Co. v. Image Technical Servs.,* Inc, 504 U.S. 451, 456 (1992); *Anderson*, 477 U.S. at 255; *Huckabay v. Moore*, 142 F.3d 233, 238 (5th Cir. 1998).

Once the moving  party has met its initial burden, the burden shifts to the nonmoving party to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. at 322.  To discharge this burden, the nonmoving party cannot rely on its pleadings but instead must have evidence showing that there is a genuine issue for trial.  *Id*. at 324.  Additionally, the "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent entry of summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252.  To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]."  *Id.*

Even though, as the Fifth Circuit has concluded, a district court must consider the question of whether there are any material issues in light of the review standards superimposed on Rule 56 by the deferential review standards of 28 U.S.C. § 2254(d) and (e), *Smith v. Cockrell*, 311 F.3d at 668, AEDPA does not dictate summary judgment based upon the court's review of the state record merely because state court factual determinations are presumed correct under 28 U.S.C. § 2254(e)(1).  As the Supreme Court cautioned in *Miller-El v. Cockrell*, 537 U.S. 322 (2003), the deference contemplated by AEDPA

> does not by definition preclude relief. A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.

*Id*. at 340. Under *Miller-El*, AEDPA does not dispense with the concept or practice of independent federal review. *Id*. 537 U.S. at 340-41. Thus, this Court must exercise its independent evaluation of the state record and determine whether the state habeas court's fact-findings are actually reasonably supported by the evidence presented, and whether the state habeas court's application of federal precedent is objectively reasonable. *See* 28 U.S.C. § 2254(d)(1) & (2), (e)(1).

Finally, summary judgment is inappropriate at this stage of proceedings. According to the Supreme Court, "the plain language of Rule 56(c) mandates the entry of summary judgment, *after adequate time for discovery* and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. at 322 (1986) (emphasis added); *see also Morris v. Equifax Information Services, LLC*, 457 F.3d 460, 464-65 (5th Cir. 2006). In light of Respondent's answer, Mr. Zelaya intends to move for leave of court to conduct discovery in accordance with Habeas Rule 6, to expand the record in accordance with Habeas Rule 7, and for an evidentiary hearing in accordance with Habeas Rule 8. In addition, to the extent that the original petition in this case contains unexhausted claims, Mr. Zelaya will seek a stay and abey of the proceedings in order to return to state court to exhaust certain of those claims. As a result, summary judgment is premature.

### III.  Response to Respondent's Answer

**A.    The evidence presented at trial was insufficient to support the jury's verdict with respect to the future dangerousness special issue; thus, the imposition of a death sentence in this case was arbitrary and capricious.**

The evidence is legally insufficient to support the jury's answer to the first special issue finding that Mr. Ochoa would constitute a continuing threat to society.

1.      Introduction

Though it is true that Mr. Ochoa committed a terrible crime in killing five family members, the same can be said of any capital murder. Simply, there are no good capital murders. But Texas does not predicate eligibility for the death penalty on a finding that a defendant committed capital murder; instead, the State must also prove beyond a reasonable doubt that he would constitute a continuing threat to society. The future dangerousness inquiry requires a prediction concerning the probability a defendant will commit criminal acts of violence in the future. In conducting a sufficiency review of the jury's determination of future dangerousness, a reviewing court must consider all of the evidence, both aggravating and mitigating, that is relevant to the prediction. Of course, the evidence is viewed in the light most favorable to the verdict, and the jury may weigh the evidence, draw reasonable inferences, and resolve conflicts in the evidence. However, a jury's determination must be reasonable in light of all the evidence presented at trial.

In this case, it is undisputed that Mr. Ochoa was a cocaine addict. He immigrated to this country when he was 2 years old, and though the family was impoverished and moved frequently to find work, Mr. Ochoa was the first in his family to graduate from high school. After high school, Mr. Ochoa entered the work force, and he proved himself a good, dependable worker. Later, he met his future wife, and they were married shortly thereafter. When he was still in his 20's, Mr. Ochoa lived the American dream by becoming a homeowner. He was a good neighbor and freely helped others in the neighborhood, and people who lived there saw a happy family and a man who outwardly showed his affection for his family. Though his marriage was not without rough spots, the evidence reflected that he and his wife had moved beyond them. It cannot be doubted that

cocaine drove the result in this case and that without cocaine, Mr. Ochoa would likely have lived his life in a neighborhood, continuing to be a good neighbor, and with his family in their house, continuing to be a good husband and father.  Regardless of whether the jury reasonably rejected the defense evidence that Mr. Ochoa was in a cocaine-induced delirium and accepted the State's theory that he was angry, it cannot be doubted that the anger was inextricably linked to cocaine addiction. Removed from free society for the rest of his life, and ostensibly in an environment in which access to cocaine would be greatly restricted, Mr. Ochoa would pose virtually no threat to anyone.

      2.      Discussion

In order to render Mr. Ochoa eligible for the death penalty, the State was required to prove, beyond a reasonable doubt, that Mr. Ochoa would constitute a future danger.  *See Connor v. State*, 67 S.W.3d 192, 199 (Tex.Crim.App. 2001); *Ladd v. State*, 3 S.W.3d 547, 557 (Tex.Crim.App. 1999).  This required the State to prove that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."  TEX. CODE. CRIM. PROC. ANN. art. 37.071 § 2(b)(1).  The future dangerousness requirement serves primarily to effectuate the Eighth Amendment's mandate that only a narrow class of defendants qualify as eligible for the death penalty.  *See Smith v. State*, 779 S.W.2d 417, 419 (Tex.Crim.App. 1989).  *See generally Arave v. Creech*, 507 U.S. 463, 470-71 (1993); *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980).  Thus, to ensure that the death penalty is reserved for a narrow class of defendants found guilty of capital murder, as required by the Eighth Amendment, only those murders that are "so heinous or evince an 'aberration of character' so peculiarly 'dangerous'" may be considered probative on the future dangerousness question.  *Smith*, 779 S.W.2d at 419; *Roney v. State*, 632 S.W. 2d 598, 603 (Tex.Crim.App. 1982) ("To hold that the facts of this offense, standing alone, would support such a verdict, would mean that virtually every murder in the course of a robbery would

warrant the death penalty.  Such a construction would destroy the purpose of the punishment stage

… which is to provide a reasonable and controlled decision on whether the death penalty should be

imposed, and to guard against its capricious and arbitrary imposition.").  As the Court of Criminal

Appeals has noted, the requirement ensures that the death penalty is reserved for those "few

incorrigibles that pose such a great threat to society that they cannot be incarcerated without fear of

further violent outbursts toward others."  *Nobles v. State*, 843 S.W.2d 503, 510 (Tex.Crim.App.

1992).

Under *Jackson v. Virginia*, 443 U.S. 307 (1979), a reviewing court, particularly a federal

court in habeas, must consider all of the evidence in the light most favorable to the verdict to

determine whether any rational factfinder could reach the necessary findings and conclusions

underlying the verdict.  *Id*. at 319.  Though the evidence is considered in the light most favorable,

a reviewing court must also consider "all" the evidence relevant to the particular element of the

State's proof:

> Once a defendant has been found guilty of the crime charged, the factfinder's role
> as weigher of the evidence is preserved through a legal conclusion that upon judicial
> review *all of the evidence* is to be considered in the light most favorable to the
> prosecution.

*Id*. (emphasis in original).  *See Young v. State*, 283 S.W.3d 854, 861-62 (Tex.Crim.App. 2009)

(noting that reasonableness is gauged by considering "the combined and cumulative force of all the

evidence, both direct and circumstantial").  The Court held that this standard gives "full play" to the

factfinder's responsibility to fairly resolve conflicts in the evidence, to weigh the evidence, and to

draw reasonable inferences from basic facts to ultimate facts.  *Id*.  *See also id*. at 326 (requiring

reviewing court to defer to the jury's resolution of conflicting inferences).  At issue in *Jackson* was

whether the "no evidence" standard set forth in *Thompson v. Louisville*, 362 U.S. 199, 204-06

(1960), adequately ensured that a conviction rested on evidence sufficient to satisfy the beyond a reasonable doubt standard of proof required in *In re Winship*, 397 U.S. 1068 (1970). *Jackson*, 443 U.S. at 309, 313-14. The Court held that it did not:

> That the *Thompson* "no evidence" rule is simply inadequate to protect against missplications of the constitutional standard of reasonable doubt is readily apparent. "[A] mere modicum of evidence may satisfy a 'no evidence' standard . . . ." Any evidence that is relevant–that has any tendency to make the existence of an element of a crime more probable that it would be without the evidence . . . could be deemed a "mere modicum." But it could not seriously be argued that such a "modicum" of evidence could by itself rationally support a conviction beyond a reasonable doubt. The *Thompson* doctrine simply fails to supply a workable or even predictable standard for determining whether the due process command of *Winship* has been honored.

*Id*. at 320 (quoting *Jacobellis v. Ohio*, 378 U.S. 184, 202 (1964)) (citations omitted). Thus, under *Jackson*, it is clear that the proper standard of review does not merely ask if there is "some" evidence supporting the verdict. Instead, the focus is on whether the findings underlying the verdict are rational in light of the evidence at trial and the requisite standard of proof.

The Court of Criminal Appeals, in reviewing the sufficiency of the evidence to support the jury's affirmative finding to the future dangerousness special issue, "looks at the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have believed beyond a reasonable doubt that [the defendant] would probably commit future criminal acts of violence that would constitute a continuing threat to society." *Hayes v. State*, 85 S.W.3d 809, 813-14 (Tex.Crim.App. 2002). *See also Young v. State*, 283 S.W.3d at 863; *Connor v. State*, 67 S.W.3d at 199. The *Jackson* rational factfinder standard is applicable to a sufficiency review of evidence to support an aggravating factor making a person eligible for the death penalty. *Martinez v. Johnson*, 255 F.3d 229, 244-45 (5ᵗʰ Cir. 2001). *See generally Lewis v. Jeffers*, 497 U.S. 764, 781-83 (1990). Application of the standard not only ensures that basic due process rights are secured, it also

ensures that there is no violation of the Eighth Amendment's prohibition against the arbitrary and

capricious imposition of the death penalty:

> [*Jackson*] applies with equal force to federal habeas review of a state court's
> finding of aggravating circumstances.  Although aggravating circumstances are not
> "elements" of any offense, the standard of federal review for determining whether
> a state court has violated the Fourteenth Amendment's guarantee against wholly
> arbitrary deprivations of liberty is equally applicable in safeguarding the Eighth
> Amendment's bedrock guarantee against the arbitrary or capricious imposition of the
> death penalty.   Like findings of fact, state court findings of aggravating
> circumstances often require a sentencer to "resolve conflicts in testimony, to weigh
> the evidence, and to draw reasonable inferences from basic facts to ultimate facts."

*Jeffers*, 497 U.S. at 782 (quoting *Jackson v. Virginia*, 443 U.S. at 319) (citations omitted).  Under

AEDPA, the limited question in a sufficiency review is whether the state court (namely the Texas

Court of Criminal Appeals on direct review) reached an objectively unreasonable determination that

the future dangerousness special issue was supported by sufficient evidence as dictated by clearly

established law in *Jackson v. Virginia*.  *Martinez*, 255 F.3d at 244-45 (applying unreasonable

application prong of 28 U.S.C. § 2254(d) to *Jackson v. Virginia* claim).

    The Court of Criminal Appeals first addressed the future dangerousness issue in *Jurek v.*

*State*, 522 S.W.2d 934, 936 n.1 (Tex.Crim.App. 1975).  The court confronted an attack on the

revamped death penalty statute that the Texas Legislature passed in the wake of *Furman v. Georgia*,

408 U.S. 238 (1972), in which the defendant claimed that the statute violated the cruel and unusual

punishment prohibition of the Eighth Amendment. *Id*. at 937.  Specifically, the defendant contended

that the special issues–which at the time required the jury to answer three questions relating to

deliberateness, future danger, and provocation (but only in the event the evidence raised this last

issue)–were "too vague to provide adequate guidance to the jury." *Id*. at 939-40.  The court also

addressed the concerns of the concurring and dissenting judges, who would have held that the statute

violated the Eighth Amendment because the term "probability" as used in the future dangerousness

special issue effectively mandated the imposition of a death sentence in every case. *Id*. at 943-46 (Odom, J., concurring in part and dissenting in part); *id*. at 946-49 (Roberts, J., dissenting).

The court upheld the statute, but to understand the import of the opinion and its ramifications for the manner in which the future dangerousness special issue should operate in order to avoid running afoul of the Eighth Amendment, it is important to consider the observations of the concurring and dissenting judges and how the court ultimately responded to these concerns. Judge Odom, who dissented from the majority's interpretation of the future danger special issue, noted that Article 37.071 prescribed "a very distinct and rigid method for determining whether the punishment shall be death or life imprisonment." *Jurek v. State*, 522 S.W.2d at 943 (Odom, J., dissenting). He asked, "Where is the 'discretion' referred to in the majority opinion?" *Id*. at 944. In answer to this question, Odom, after noting that the statute used the command "shall," rather than the permissive "may," observed: "These questions each require a factual determination by the jury. If the fact questions are answered in the affirmative, pronouncement of a sentence calling for the ultimate penalty is absolutely mandated by Art. 37.071. [It] inflexibly requires certain procedures to be followed, allowing no discretion in determining the punishment to be received by a defendant who is guilty of capital murder." *Id*. Because the jury was required to answer the special issues without regard to the resulting penalty, Odom believed the death penalty scheme was mandatory; otherwise, one would have to presume that the jurors would disregard their oaths in order to return a life sentence. *Id*.

Judge Odom then took issue with the court's resolution of the contention that the special issues were unconstitutionally vague through holding that the indefiniteness in the statute was necessary and allowed for measured jury discretion. *Jurek v. State*, 522 S.W.2d at 944-45. Odom criticized the court for ignoring the term "probability" and making no attempt to define it or to

discuss its meaning. "The essential indefiniteness of the word 'probability' is ignored." *Id*. at 945. Odom analyzed at length various possible meanings of the term "probability," including common-sense, technical, and legal meanings, and concluded that the term was irreparably vague and would "by its terms be answered in the affirmative for all men, no matter how saintly . . . ." *Id*. at 945-46. Essentially, Odom believed that the mandatory nature of the statute in conjunction with the inherent vagueness of the term "probability" necessarily led to a yes answer to the future dangerousness special issue in all circumstances. Judge Roberts, who also dissented, believed the same. *Id*. at 947-49 (Roberts, J., dissenting). Roberts believed that probability was a "chance however large or small–as measured and defined in mathematical or statistical terms." *Id*. at 948. As a result, the answer to the question would always be answered yes because there always existed a mathematical chance that all individuals, regardless of how saintly they were, would commit criminal acts of violence. *Id*.

The majority in *Jurek* disagreed with the contentions that the future danger special issue was unconstitutionally vague. The court held that the statute, as written, provided effective guidance to the jury, limited its discretion, and guarded against the arbitrary and standardless imposition of the death penalty. *Jurek v. State*, 522 S.W.2d at 938. First, the new statute narrowly defined capital murder to a small group of particularly brutal offenses, which, in the eyes of the court, ensured that the death penalty would be reserved for the most serious crimes and would be imposed for the same types of offenses under the same set of circumstances. *Id*. at 939. Second, the scheme provided for a separate sentencing procedure once a person was found guilty of capital murder, and the jury's discretion with respect to possible punishments was limited to life imprisonment or death. *Id*. In order to assess death, the jury had to answer two or three questions, which, according to the court, "channel[ed] the jury's consideration on punishment and effectively insure[d] against the arbitrary

-13-

and wanton imposition of the death penalty."  *Id*.  Finally, the statute provided for "swift and

mandatory appellate review."  *Id*.

With respect to the special issues, the court rejected the defendant's vagueness challenge.

*Jurek v. State*, 522 S.W.2d at 939-40.  The court noted that an exhaustive list of factors relevant to

whether a death sentence should be imposed was "too complex to be compressed within the limits

of a simple formula," but nevertheless, according to the court, there were "factors which are readily

apparent and viable factors for the jury's consideration."  *Id*. at 939.  In the court's view, the future

dangerousness of the defendant encompassed a number of such viable factors that the jury could

consider:

> In determining the likelihood that the defendant would be a continuing threat to
> society, the jury could consider whether the defendant had a significant criminal
> record.  It could consider the range and severity of his prior criminal conduct.  It
> could further look to the age of the defendant and whether or not at the time of the
> commission of the offense he was acting under duress or under the domination of
> another.  It could also consider whether the defendant was under an extreme form of
> mental or emotional pressure, something less, perhaps, than insanity, but more than
> the emotions of the average man, however inflamed, could withstand.

*Id*. at 939-40.  Given this interpretation of the future dangerousness special issue, the court

determined that the death penalty scheme was not mandatory, thus rejecting the positions of the

dissenting judges; instead, it vested the jury with a degree of measured discretion.  *Id*. at 940.  The

court concluded:

> To eliminate all discretion on the part of the jury would be to risk elimination of that
> valuable element which permits individualization based on consideration of all
> extenuating circumstances and would eliminate the element of mercy, one of the
> fundamental traditions of our system of criminal jurisprudence.  If discretion in
> assessment of punishment under a statute can be shown to be reasonable and
> controlled, rather than capricious and discriminatory, the test of *Furman* will be met.

*Id*. (footnote omitted).  Under this view of the future dangerousness special issue, a jury may

consider an array of circumstances, both aggravating and mitigating, in reaching an answer.

-14-

Importantly, the jury is not inevitably led to a yes answer in every case.  As an additional safeguard against the arbitrary and wanton imposition of the death penalty, the Court of Criminal Appeals played an integral role in reviewing the jury's answer to the special issue by taking into account the same array of factors and circumstances that informed the jury's decision.

It is apparent that Judges Odom and Roberts accused the court of conjuring by judicial fiat a discretionary capital sentencing system that both channeled jury discretion while allowing a degree of individualized sentencing, but the majority's understanding of the future dangerousness special issue was crucial to the early success of the statute, particularly in its first foray before the Supreme Court of the United States.  There the Court rejected the contention that the Texas death penalty statute was unconstitutional on its face.  *Jurek v. Texas*, 428 U.S. 262, 276 (1976).  The structure of the capital murder statute by including aggravating elements that elevated simple murder to capital murder served much the same purpose as the statutory aggravating elements used during the punishment phases in death penalty trials in Georgia and Florida.  *Id*. at 270.  Thus, the statute narrowed the categories of murders for which a death sentence could ever be imposed.  *Id*.  The Court also held that the death penalty scheme set forth in Article 37.071 was not mandatory but, instead, allowed individualized sentencing because, though it did not "explicitly speak of mitigating circumstances," it ostensibly allowed "consideration of particularized mitigating factors."  *Id*. at 271-72.  The Court relied upon the assurances of the Court of Criminal Appeals that a jury may consider both aggravating and mitigating circumstances in answering the future dangerousness special issue and that, therefore, it would not invariably lead to the imposition of a death sentence in every case.  *Id*. at 272-74.  The Court concluded, "It thus appears that, as in Georgia and Florida, the Texas capital-sentencing procedure guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can

impose a sentence of death." *Id*. at 273-74.  The Court rejected the contention that the predictive focus of the special issue rendered it vague and arbitrary; instead, the special issue functioned in much the same way that other predictive devices in criminal law, such as how to set bail, imposing punishment, and determining whether and when to allow parole, worked, but what was essential from an Eighth Amendment standpoint is that the jury have all relevant information about the defendant before making the predictive determination.  *Id*. at 275-76.  "What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine.  Texas law clearly assures that all such evidence will be adduced."  *Id*. at 276. Finally, meaningful appellate review was essential to the Court's holding:  "By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law." *Id*.

The import of *Jurek* is that the future dangerousness special issue is to be applied expansively so that the jury's consideration will encompass a broad array of circumstances related both to the offense and to the defendant.  Only in this way can the special issue avoid the essential shortcoming of its language, as identified by the dissenting judges on the Court of Criminal Appeals, and permit both yes and no answers depending on "all" of the circumstances.  It follows, then, that there must exist situations in which the answer must be no even in view of the fact that someone has committed one of the "most serious crimes," which by definition are "particularly brutal."  *Jurek v. State*, 522 S.W.2d at 939.  Therefore, the crime viewed alone cannot always be sufficient to support a yes answer.  In other words, though the facts of a particular crime and the circumstances surrounding it can support a yes vote, it does not follow that a capital crime alone in all cases will invariably provide such support.  *See, e.g.*, *Valle v. State*, 109 S.W.3d 500, 503 (Tex.Crim.App.

2003) (holding that prior holdings finding that the facts of a particular crime supported an affirmative answer "did not imply that the circumstances of an offense *will always support* a finding of future dangerousness" (emphasis added)).  Additionally, evidence that shows the defendant would not pose a continuing risk to society must be considered, and in certain situations, this type of evidence may mandate a no answer.  If these assumptions about the future dangerousness special issue did not exist, then a jury would be free to impose a death sentence in an arbitrary and capricious manner in violation of the Eighth Amendment and there would be no meaningful check through the appellate review of the jury's decision.

This is the underlying framework that the Court of Criminal Appeals adopted and that the Supreme Court of the United States approved in *Jurek*.  Its functioning in practice informs the constitutionality of the Texas death penalty.  After *Jurek*, the Court of Criminal Appeals hued close to this understanding, and in a number of cases, it held that there was insufficient evidence to support a jury's affirmative answer to the future dangerousness special issue.  In *Keeton v. State*, the court listed eight non-exclusive factors, based largely on the relevant considerations discussed in *Jurek*, that a jury may consider in determining whether a defendant poses a continuing threat of violence to society, and these same factors give content to the nature and scope of appellate review:

1.    The circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties;

2.    the calculated nature of the defendant's acts;

3.    the forethought and deliberateness exhibited by the crime's execution;

4.    the existence of a prior criminal record, and the severity of the prior crimes;

5.      the defendant's age and personal circumstances at the time of the offense;

6.      whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;

7.      psychiatric evidence; and

8.      character evidence.

724 S.W.2d 58, 61 (Tex.Crim.App. 1987).  The existence or absence of any particular factor is not necessarily determinative. *Dinkins v. State*, 894 S.W.2d 330, 358 (Tex.Crim.App. 1995).  However, the evidence as a whole must support a rational determination that the defendant "would commit criminal acts of violence in the future which would constitute a *continuing* threat to society." *Keeton*, 724 S.W.2d at 64 (emphasis in original).

Importantly, when reviewing a jury's affirmative answer to the future dangerousness special issue, a reviewing court must consider all of the evidence, rather than narrow slices of only that evidence that most clearly supports the jury's answer, in making its determination. *See Ellason v. State*, 815 S.W.2d 656, 660 (Tex.Crim.App. 1991).  The court held that its sufficiency review of the special issues, though viewed in the light most favorable to the jury verdict, must also accommodate the court's Eighth Amendment roll to "make certain that the death sentence is not 'wantonly or freakishly' imposed, and that the purposes of Art. 37.071(b), V.A.C.C.P., are accomplished." *Id.* (citing *Horne v. State*, 607 S.W.2d 556, 558-59 (Tex.Crim.App. 1980) (op. by Clinton, J.), which recognized court's responsibility in assuring the even-handed application of the ultimate punishment). *See also Keeton v. State*, 724 S.W.2d at 64.  Thus, as in other cases in which the court has held that the evidence at trial was insufficient to support an affirmative finding of future dangerousness, the court looked at all the evidence, both aggravating and mitigating, from both stages of the trial.  The court believed that it was required to review sufficiency challenges to the

future dangerous special issue in this broad manner in order to discharge its proper role to give meaningful appellate review of death sentences as required by the Eighth Amendment.

It is a truism that all murders, particularly capital murders, are brutal, senseless, and unnecessary. *See Roney v. State*, 632 S.W.2d 598, 603 (Tex.Crim.App. 1982).  However, under Texas law, the mere fact that someone has committed a capital murder as it is defined in Section 19.03 of the Texas Penal Code does not trigger automatic eligibility of the death penalty.  *See Dinkins v. State*, 894 S.W.2d 330, 358 (Tex.Crim.App. 1995).  Instead, the future dangerousness special issue requires further narrowing, and with respect to that issue, the circumstances surrounding the commission of the offense, "if severe enough," may be sufficient to support an affirmative finding.  *See Huffman v. State*, 746 S.W.2d 212, 223 (Tex.Crim.App. 1988); *Beltran v. State*, 728 S.W.2d 382, 388 (Tex.Crim.App. 1987).  Thus, whether a person is eligible for the death penalty in Texas depends on a broader contextual inquiry beyond the determination that a person is guilty of capital murder.

The Court of Criminal Appeals has applied this principle numerous times and has found that the facts of the crime in particular cases were insufficient to support a death sentence.  In *Keeton*, a robbery-murder case in which the defendant shot a store clerk at close range before robbing the store, the court held there was "no evidence showing that appellant would commit criminal acts of violence in the future which would constitute a *continuing* threat to society . . . ," notwithstanding the fact that the murder was "senseless, unnecessary, and cold blooded."  *Keeton v. State*, 724 S.W.2d at 63-64 (emphasis in original).  Similarly, in *Burns v. State*, the court found that, though defendant's participation in a robbery murder was "senseless," it was not "so shocking or heinous as to evince a particularly 'dangerous aberration of character.'"  761 S.W.2d 353, 355-56 (Tex.Crim.App. 1988).  *See also Marras v. State*, 741 S.W.2d 395, 408 (Tex.Crim.App. 1987)

-19-

(holding evidence insufficient in case where defendant who, though armed, ran from unarmed woman and ultimately surrendered to authorities without firing shots); *Roney v. State*, 632 S.W.2d. at 603 (holding that a shooting murder in the course of a robbery does not, standing alone, support an affirmative finding of future dangerousness).  The spontaneousness of the crime and the lack of deliberation or forethought in planning a murder are relevant considerations to whether a defendant will be a future danger.  For instance in *Garcia v. State*, a robbery-murder case, the court found that evidence of future dangerousness was insufficient because the robbery had not been long-planned and it was not a case where "an armed individual drives around searching for an ideal situation for a robbery, intending to use violence if necessary."  626 S.W.2d 46, 51-52 (Tex.Crim.App. 1982). *See also Huffman v. State*, 746 S.W.2d at 225 (although defendant committed a "senseless murder" during a robbery, because there was no evidence of forethought or deliberateness and because defendant was intoxicated and emotionally devastated at the time of the murder, the evidence was insufficient to support a finding of future dangerousness); *Beltran v. State*, 728 S.W.2d at 390 (although defendant was armed when he entered the store he intended to rob, because there was no showing that the robbery was long in the planning or that violence was intended, the facts of the crime were insufficient to support a finding of future dangerousness).  In *Warren v. State*, the court found that there was no evidence of "calculation" where defendant entered the deceased's home unarmed for the purpose of burglarizing it, found a gun in the home, and shot the deceased after the deceased pulled a gun on him.  562 S.W.2d 474, 476-67 (Tex.Crim.App. 1978).

A defendant's criminal history is relevant to the future dangerousness inquiry; however, the fact that a defendant has prior criminal convictions or a history of minor violent incidences or episodes is not dispositive, and depending on the overall circumstances of the case, this evidence, even when considered along with the fact that the defendant is guilty of capital murder, may be

insufficient to support an affirmative finding of future dangerousness. In *Huffman*, the defendant led police on a wild car chase, and then he was very abusive and combative with the arresting officers both when he was arrested and later at the hospital where the police had taken him for treatment of injuries sustained as a result of a car crash. *Huffman v. State*, 746 S.W.2d at 214-15. A jailer testified that more than a day after the arrest, the defendant became violent and charged out of his cell and began fighting and swinging his arms. *Id.* at 215-16. The State also presented evidence that the defendant had assaulted his girlfriend on a couple of occasions after he had been drinking. *Id.* at 216, 224. Finally, the defendant had a prior burglary conviction, and his probation was revoked based upon another burglary charge. *Id.* at 215, 224. The court reviewed all of the evidence, both aggravating and mitigating, and concluded that it was insufficient to support the future dangerousness finding. *Id.* at 225. "We find that in viewing the evidence as a whole from both stages of the bifurcated trial, . . . there is insufficient evidence to support the affirmative finding by the jury to the second special issue under Article 37.071(b)(2)." *Id.* The court explained that the defendant's violence after his arrest was largely attributable to intoxication and the fact that he was emotionally distraught over his girlfriend. *Id.* Furthermore, the "prior criminal record of the appellant reflected no criminal acts of violence." *Id. Huffman* is important because the existence of prior violent acts does not necessarily equate to evidence that is sufficient to support future dangerousness; instead, this evidence must be viewed within the entire context of the case. Within this framework, the fact that a defendant's prior offenses do not involve violence is a factor to be considered in determining future dangerousness. *Beltran v. State*, 728 S.W.2d 382, 390 (Tex.Crim.App. 1987) (although defendant had a multiple convictions for drunk driving, because these offenses were not criminal acts of violence, they did not support a finding of future dangerousness); *Keeton v. State*, 724 S.W.2d at 60-61, 64 (rejecting implicitly State's argument that

prior conviction for marijuana and being uncooperative during probation supported future dangerousness finding); *Wallace v. State*, 618 S.W.2d 67, 68-9 (Tex.Crim.App. 1981) (where the only evidence of future dangerousness offered was defendant's confession that he had unsuccessfully attempted to commit a robbery a few weeks before the murder, the court found such evidence to be insufficient to support a finding of future dangerousness); *Warren v. State*, 562 S.W.2d 474, * (Tex.Crim.App. 1978) (evidence of a prior felony theft conviction was insufficient to sustain a finding of future dangerousness). There must be a logical nexus between the prior criminal history and the prediction of future violence.

*Ellason* is another case in which the court reviewed all of the evidence, both aggravating and mitigating, in holding that there was insufficient evidence to support the jury's affirmative finding of future dangerousness. *Ellason v. State*, 815 S.W.2d at 662. The defendant lived next door to the 74 year old victim and had never displayed any animosity toward her. *Id*. at 659. However, at the time he committed the crime, the defendant was addicted to amphetamine and had not slept for ten days. *Id*. He had also committed a number of non-violent burglaries in the month prior to the crime, ostensibly to support his habit. *Id*. at 659-60. The defendant broke into his neighbor's house to obtain money for drugs, but when she awoke and recognized him, he struck her and started to flee. *Id*. at 659. On his way through the kitchen, he noticed a knife and in that moment decided to kill her. *Id*. Notwithstanding the fact that this was a "horrible and senseless crime," the court held that the "circumstances fall short of showing that it was the work of a cold-blooded and calculated killer." *Id*. at 663. The court rejected the State's argument that other evidence demonstrated that the defendant was predisposed to violence. *Id*. In addition to evidence of the burglaries, the State presented evidence that a jailer thought the defendant's reputation for peacefulness while in jail was bad (though the jailer did not elaborate with any specific instances of bad conduct) and that the

defendant had twice physically assaulted his father-in-law. *Id*. at 660. The court held that the defendant's few violent outbursts towards his father-in-law, when viewed within the overall context of the family dynamic, which included the fact that the father-in-law imposed an extreme living arrangement on the defendant, were "not particularly probative of whether the defendant would commit criminal acts of violence that would constitute a continuing threat to society." *Id*. at 663. Importantly, the court considered the mitigating aspects of the defendant's case, which included his drug addiction, a life-changing injury during youth that precipitated his drug addiction, and his youth. When the evidence was viewed in its entirely, the court held that the jury unreasonably concluded that the defendant would constitute a continuing threat to society.

*Smith v. State*, 779 S.W.2d 417 (Tex.Crim.App. 1989), involved a brutal crime in which the defendant raped his victim and then stabbed her fourteen times. *Id*. at 419. The court found the evidence of the crime alone was not sufficient to show the defendant would be a continuing threat to society. *Id*. at 419-20. The court relied in part on evidence presented by the State's expert that this kind of "over-killing" is common where sex-related crimes are at issue and, as such, the offense "was not shocking or otherwise extraordinary even with respect to the multiple stabbing." *Id*. Importantly, the court held that the future dangerousness special issue plays an integral role in the Texas death penalty scheme to narrow the class of individuals eligible for death: "To hold the offense itself in this cause was sufficient to prove future dangerousness would threaten to undermine the function of Article 37.071 . . . to further narrow the class of death-eligible offenders to less than all those who have been found guilty of an offense as defined under § 19.03." *Id*. at 420. Thus, under the Texas death penalty scheme, no category of capital murder under Section 19.03 on its own terms can sufficiently narrow the class of offenders eligible for the death penalty; instead, the jury

must consider additional evidence within the context of the future dangerousness inquiry, which, of course, may include particular circumstances surrounding the commission of the crime.

In *Smith*, the State urged that other evidence that showed that the defendant was over-sexed and "hot-blooded," but the court rejected this contention because "such evidence has no logical bearing on propensity to commit violent crime." *Id*. The court also rejected the State's contention that other evidence suggested that the defendant had been looking for someone to rape because this evidence was largely speculative, at best, and even assuming that the evidence supported a rational inference that the defendant planned a rape, whatever forethought may have gone into that crime, there was no other evidence that he contemplated murder beforehand. *Id*. at 420-21. After discussing the defendant's uncontested mitigating evidence, which included evidence that he was potentially mentally retarded and was described by those who knew him as mild-mannered and gentle, the court concluded that the evidence as a whole was not "adequate to persuade a rational jury of a 'probability' appellant would commit future acts of violence." *Id*. at 421.

In *Berry v. State*, 233 S.W.3d 847 (Tex.Crim.App. 2007), the court applied the foundational principles set out in *Jurek* and, after reviewing all the evidence, found it insufficient to support the jury's affirmative response to the future dangerousness special issue. *Id*. at 863. In 1998, Beaumont residents, who were looking for tin cans in a dumpster, discovered the body of a new-born baby whose arms and mouth had been secured with duct tape and who was wrapped in a trash bag. *Id*. at 851. Five years later, another Jefferson county resident discovered a baby abandoned by the side of a road–the child was naked and covered in fire ants. *Id*. at 861. Authorities took the baby to the hospital, and then she was transferred to CPS care. *Id*. During the investigation that followed, the police linked the second child's abandonment with the unsolved murder of the first child. *Id*. at 851. The defendant explained that she hid her pregnancies. *Id*. at 852. She gave birth to the first child,

who she called Malachi, but the child died soon thereafter. *Id*. The defendant became scared and secured the child's arms and mouth with duct tape and then placed him in a dumpster. *Id*. She denied that she killed the infant, but forensic evidence presented by the State supported the possibility that the child was alive when the defendant taped his mouth shut and placed him in a plastic trash bag and that he had died of asphyxiation. *Id*. at 852-53. The defense presented experts who opined that the death could have been from natural causes or from homicide. *Id*. During punishment, the State presented a fuller account of the defendant's abandonment of the second child, Paris. *Id*. at 861. Initially, she blamed a boyfriend, but when confronted with the fact that he had an alibi, she confessed that she had abandoned the child. *Id*. According to the police, she was mostly concerned with what her family would think of her. *Id*. She evidently expressed no remorse for her abandonment of the child. *Id*.

The defense presented family members and experts during the punishment phase. *Berry v. State*, 233 S.W.3d at 861-62. The defendant's mother, as well as a cousin and an aunt, described her as shy and respectful. *Id*. at 861. She was also a good mother to her other three children, Jasmine, Keerstan, and Joskin, who all had the same father. *Id*. A developmental psychologist testified that the defendant was depressed, which could have affected her judgment and decision-making process. *Id*. She was afraid of disappointing her mother and grandmother, and the psychologist believed she was under extreme pressure, which was exacerbated by a sociocultural background that did not promote reaching out to family for support. *Id*. A forensic psychologist, Edward Gripon, testified that the defendant had been depressed for a long period. *Id*. at 862. Though she denied killing Malachi, she expressed remorse for what had happened to him. *Id*. He concluded that "there was a low risk of future dangerousness because the incidents involving

Malachi and Paris were unique and that there was only a remote possibility that appellant would become pregnant in prison." *Id*.

The court considered all of these circumstances in determining that the evidence was insufficient to support the jury's finding. "We hold that the state did not meet its burden of proving beyond a reasonable doubt that there is a probability that appellant, if allowed to live, would commit criminal acts of violence in the future so as to constitute a continuing threat, whether in or out of prison." *Berry v. State*, 233 S.W.3d at 863. In making this decision, the court considered all of the circumstances presented in the case, both at guilt-innocence and at punishment. *Id*. at 863-64. Though she had murdered one child and abandoned another (without means of survival), the court noted that there was other evidence that the defendant acted out of character, that she was loving and caring to her other three children, and that she had suffered from long-term depression. *Id*. She had no criminal history, and there was no other evidence that indicated she was violent. *Id*. The court also thought it was relevant that both offenses stemmed from pregnancies, and the chance of her becoming pregnant again before becoming parole eligible in 40 years if given a life sentence was extremely low. *Id*. at 864. "The evidence indicates that appellant has been dangerous only toward those of her own children whose existence she wanted to hide from her favored mate, that there is a very low probability that, if sentenced to life in prison, she will have any more children, and that therefore it is unlikely that she would be a danger in the future." *Id*. The State failed to prove that "any other stimulus led to a violent or dangerous act in any other context." *Id*.

The court recognized that the "society" relevant to the future dangerousness inquiry "includes both prison and the 'free world,' and the jury must consider dangerousness in that context." *Berry v. State*, 233 S.W.3d at 863 (citing *Muniz v. State*, 851 S.W.2d 238, 250 (Tex.Crim.App. 1993)). The defense, during closing arguments, pointed out that there was a very

-26-

low risk that the defendant would become pregnant again, though it was remotely possible, during the minimum 40 years of incarceration if the jury sentenced her to life.  *Id*. at 862.  The State, however, argued that the jury should disregard the fact that the defendant, if given a life sentence, would be incarcerated and would have little chance to become pregnant again, much less to have any access whatsoever to any future-born children, and to consider only whether she would be dangerous in free society.  *Id*. at 862-63.  Specifically, the State argued, "'[W]hen you're asking yourself that question, you have to assume whether she's a future danger sitting there as she sits today, if she was out among us, among other children, is she a future danger.'"  *Id*.  The court held that the State misdirected the jury's attention when it "told the jury that the *only* society it should consider was the free world."  *Id*. at 863 (emphasis added).  Thus, under the holding in *Berry*, the actual circumstances that the defendant will face if sentenced to life in prison is a relevant factor for the jury to consider and the "both in prison and in the free world" construct of society may not arbitrarily be limited solely to hypothetical "free society" situations.  *Id*.  Specifically, the court held that the State's "final argument exacerbated the heavy emotional impact of the offense by inviting the jury to use an improper standard in its consideration of future dangerousness."  *Id*. at 864.

In *Estrada v. State*, 313 S.W.3d 274 (Tex.Crim.App. 2010), the court found the evidence sufficient to support the jury's finding on future dangerousness, and in doing so, the court rejected an argument not unlike the State's in *Berry* (which had focused jury's attention only on "free world" society) in which the defendant urged the court to consider only the fact that he would be incarcerated if sentenced to life and would have no access to his "preferred" victims–in this case, teenage girls.[1]  *Id*. at 280-81.  "We do not read *Berry* as adopting appellant's interpretation of the

---

[1]        The court indicated that it understood the defendant to argue that *Berry* required the reviewing court first to consider whether a defendant would be dangerous in prison and then second

future-dangerousness special issue." *Id*. at 281.  The court held, instead, that the special issue asked whether a defendant would constitute a continuing threat to society "whether in or out of prison" without regard to how long the defendant would actually spend in prison.  *Id*.  The court believed this interpretation, not only supported by prior case law, was part of the "commonsense" or "core" understanding of the special issue, which a jury could easily contemplate without further instructional definitions.  *Id*. at 281-82.  The legislature's use of the word "would" supported this interpretation of the special issue because, according to the court, it required the jury to look past the fact that the defendant would be incarcerated for life and inquire what the defendant's potential for dangerousness would be regardless of where he was.[2]  The court then distinguished this case

_____

to consider whether he would be dangerous if ever released on parole.  *Id*.  The defendant in *Estrada* was subject to the new life without possibility of parole provision; thus, ostensibly the court would never reach the second inquiry unless the State could prove that the defendant would escape or be released from prison through other means.  *Id*.  *See also id*. at 283-84.  The court rejected this argument.

[2]      Had the court ceased its analysis at this point, *Estrada* would appear to undercut the reasoning in *Berry*.  But the court in *Berry* plainly rejected an interpretation of the special issue that *only* included hypothetical scenarios, such as idealized situations in which the defendant would most likely be violent, without tempering such views with the actual facts and circumstances of the case, particularly the probable length of incarceration, lack of access to victims, and the practical opportunity to be violent.  The dissent in *Berry* believed the fact that a hypothetical situation existed in which the defendant could exhibit similar violence as she had in the past, without any regard to the practicality that such a situation ever would arise, was sufficient to sustain the jury's affirmative answer:

> At the very least, a rational jury could have found that appellant would be dangerous to her unwanted babies.  A rational jury could even have found that appellant **would**, in fact, be very dangerous to that segment of society.  This should, as a matter of appellate review, be dispositive of appellant's sufficiency challenge to the jury's finding on the future-dangerousness special issue.

*Berry v. State*, 233 S.W.3d at 864-65 (Hervey, J., dissenting).  The dissent believed that the extremely low probability that the defendant would ever be in contact with a potential victim (defined as her unwanted babies) and have the opportunity to harm such a victim was "not dispositive of appellant's sufficiency claim."  *Id*. at 868 n.3.  The dissent continued:

from the situation in *Berry*. *Id*. at 283. The court pointed out that the defendant in *Berry* was only dangerous to a select group of victims–namely, her unwanted babies. *Id*. Furthermore, the defendant would not likely have any more pregnancies during the 40 years she would be in prison before becoming parole eligible. *Id*. In *Estrada*, however, the evidence supported "a finding that appellant is dangerous to a broader range of potential victims than only his unborn children."[3] *Id*. Thus, the court rejected the contention that *Berry* altered the legal landscape with respect to future dangerousness; instead, it found that all of the facts and circumstances of each case must be considered. *Id*. at 284.

Finally, the defendant contended that he posed as low a threat of future danger as the defendants in cases in which the court had found insufficient evidence, such as in *Ellason*, *Smith*, *Huffman*, *Keeton*, and *Roney*, discussed above. *Estrada v. State*, 313 S.W.3d at 284. The court rejected this argument by referring to the fundamental principles set out in *Jurek*: "In reviewing a jury's affirmative answer to the future-dangerousness special issue, this Court has stated that each case must be resolved on its own facts." *Id*. The court specifically referenced *Dinkins v. State*, 894

---

The future dangerousness special issue, therefore, does not exempt from the death penalty those defendants who are dangerous only to a segment of society that they probably will not encounter in prison or are not likely to encounter again if they are paroled forty or so years later.

*Id*. at 869. The majority in *Berry* rejected this narrow understanding of the future dangerousness special issue. Though the defendant's probable conduct if left to his own devices in free society would be relevant to the future dangerousness question, it is not the sole focus of the issue, and consistent with the holding in *Berry*, a jury's determination that a defendant would pose a continuing threat to society based only on what the defendant would hypothetically do, without any consideration of whether such a situation could ever arise, can be unreasonable and insufficient to support a verdict of death.

[3]     There was also evidence that a life-without-parole defendant would have little incentive (through the availability of parole) to behave in prison, which the court believed supported the jury's answer. *Id*.

S.W.2d 330 (Tex.Crim.App. 1995), in support of this proposition. In *Dinkins*, the court considered the fact that the defendant's murder of two people was wanton and callous and evinced a disregard for human life. *Id*. at 359-60. Furthermore, the evidence supported an inference that the defendant planned to murder at least one of his victims. *Id*. at 360. The court included the defendant's unrebutted mitigating evidence of his good and peaceful character as part of its analysis, but the court concluded that the evidence supported the jury's affirmative finding. *Id*. at 361. "In weighing the factors enunciated in *Keeton*, we find the evidence supports the jury's affirmative finding to the second punishment issue." *Id*. By implication, then, the *Estrada* court acknowledged that a sufficiency review must take into account all of the evidence. The court ultimately viewed all the facts and circumstances in determining that there was sufficient evidence to support the jury verdict:

> In this case, we decide that the evidence of appellant's unremorseful, premeditated, brutal murders of Sanchez and their unborn child by stabbing Sanchez thirteen times, of his pattern of using his position of trust as a youth pastor to take sexual advantage of underage girls in his youth group, of his threat to "ruin" another former member of the youth group when she threatened to expose appellant, and of the opportunities for a life-sentenced-without-parole appellant to commit violence in prison are sufficient to support the jury's affirmative answer to the future-dangerousness special issue.

*Id*. at 284-85. Importantly, the *Estrada* court did not rely upon a hypothetical composite of what the defendant might be like if allowed back into free society.

In *Coble v. State*, 330 S.W.3d 253 (Tex.Crim.App. 2010), the court found the evidence sufficient to support future dangerousness, notwithstanding the fact that the defendant, who was re-sentenced to death after a federal court set aside his initial death sentence, exhibited non-dangerous behavior during the 18 years he had been on death row. *Id*. at 265-66. Thus, the entire argument in *Coble* centered around whether certain mitigating evidence–18 years of good prison behavior–could overcome evidence of the murder of three family members and of other criminal

and otherwise violent behavior, particularly against women, committed before being sent to death row:

> Appellant does not suggest that the evidence of his gruesome triple murder and his life-long history of violence toward women and young girls is–viewed in a vacuum–insufficient to support the jury's finding. Clearly it is sufficient. Instead, he argues that, like Saul on the road to Damascus, he has experienced a character conversion while spending the last eighteen years in prison with a spotless disciplinary record.

*Id*. The court characterized the defendant's argument, "at first blush," as a compelling one. *Id*. at 266.

Though the court agreed that the defendant had "adapted very well to prison life," this fact, according to the court, "by itself, does not resolve the special issue." *Id*. at 267. The court then discussed the theoretical underpinnings of the special issue. Even though the legislature did not assign a particular level of risk or probability of future violence, the special issue nevertheless "ensures that no defendant, regardless of how heinous his capital crime, will be sentenced to death unless the jury finds that he poses a *real threat* to society." *Id*. at 268 (emphasis added). According to the court, the special issue in this sense "is essentially a normative one," which "focuses on the character for violence of the particular individual . . . ." *Id*. at 267-68. As in *Estrada*, the court noted that the quantity and quality of institutional restraints was not the sole focus of the issue because the decision requires the jury to consider whether the defendant would pose a continuing threat whether in or out of prison. *Id*. at 268-69. However, also as in *Estrada*, the court stopped well short of declaring that the issue was solely focused on a defendant's character and that institutional restraints and the ability to adapt to the structured prison environment had no place in the decision:

> Thus, juries appropriately focus upon the defendant's individual character for violence and the probability that he would commit acts of violence in whatever

> society he found himself.  Obviously, the likelihood that a defendant does not or will
> not pose a heightened risk of violence in the structured prison community is a
> relevant, indeed important, criterion, but it is not the exclusive focus of the "future
> dangerousness" issue.

*Id*. at 269 (footnote omitted).  Clearly, evidence of the realities of prison and the defendant's ability

to adapt positively to prison life are relevant to future dangerousness.

In holding that there was sufficient evidence of future dangerousness in this case, the court

acknowledged that the defendant had an "impressive history of nonviolence in prison," but the court

cast the issue confronting it as "whether he is the same person" now as the person who exhibited an

explosive character for violence in the past.  *Id*. at 269-70.  It is obvious that the court considered

the mitigating evidence of the impressive changes that the defendant made during 18 years on death

row as part of its sufficiency analysis, but it ultimately held that there was sufficient evidence upon

which a jury could rationally reject the defendant's contention that he was a changed person:

> It was the jury's duty to assess appellant's present character for future
> dangerousness, and there was ample evidence to support its finding, beyond a
> reasonable doubt, that appellant had not experienced a conversion on the road to
> Damascus; rather, he had the same character for violence at age 60 that he did at ages
> 15, 19, and 40, despite his spotless prison record.

*Id*. at 270.  Importantly, the court did not slice off the important, undisputed mitigating facts as part

of its analysis; instead, it considered these facts in addition to the aggravating facts in the case to

determine whether the jury's ultimate decision was reasonable.

*Estrada* and *Coble* make clear that the future dangerousness inquiry focuses on a defendant's

character for violence and asks the jury to consider whether the defendant would pose a risk of

future violence whether in or out of prison.  However, these cases did not declare that this is the sole

focus of the special issue; nor did the cases disturb the fundamental framework set out by the court

in *Jurek* and later cases.  Instead, a defendant's character for violence is simply another factor that

-32-

the jury may consider in answering the special issue. Essentially, the future dangerousness special issue requires the jury to make a prediction about the defendant's level of continuing threat, and this prediction is based upon data, particularly evidence that may fit within the broad *Keeton* factors. *See Jurek v. Texas*, 428 U.S. at 274-76. This includes both aggravating and mitigating evidence.

In contrast to *Jurek* and cases applying sufficiency review in fidelity to its principles, the Court of Criminal Appeals, in *McGinn v. State*, 961 S.W.2d 161 (Tex.Crim.App. 1998), indicated that it will not consider mitigating evidence as part of its sufficiency review of the future dangerousness special issue. *Id*. at 169. At issue in *McGinn* was whether a defendant is entitled to "factual" sufficiency review of the jury's finding of future danger. *Id*. at 166-69. Under such a review, the court would examine all the evidence in a neutral light (rather than in the light most favorable) and then determine whether the jury's verdict was clearly wrong or unjust. *Id*. at 166-67. Ostensibly, then, a court would have to determine whether the verdict was against the great weight and preponderance of the countervailing (mitigating) evidence. *Id*. The court recognized the possibility that evidence supporting an affirmative answer to the special issue may be so lacking that a jury could not make a rational prediction based upon it; however, the court in addressing the reasons factual sufficiency review was not possible potentially undercut the ability of the court to consider mitigating evidence as part of a *Jackson v. Virginia* review. The root problem with the court's analysis is its refusal to accord any particular evidence mitigating value as part of its sufficiency review:

> Moreover a juror is not required to accord any particular circumstance mitigating relevance to the special issues. For this reason, a *Jackson* review of the mitigation special issue is impossible. Whether a particular piece of evidence is mitigating in the context of that issue is a normative judgment that is not amenable to appellate review.

> Similar concerns apply to an attempt to conduct a [factual sufficiency] review of a finding of probability of future dangerousness. While the future dangerousness issue is not wholly normative in nature, the issue is highly subjective because it calls for a prediction of future events rather than an assessment of events that have already occurred. Such predictions are necessarily value-laden, and whether a particular circumstance tends to increase or reduce the likelihood of future violence is a question whose answer will vary widely from one individual to the next, depending at least in part upon the individual's values and experiences.

*Id*. at 169 (citations omitted). According to the court, a *Jackson* review was "feasible" because it viewed the evidence in the light most favorable to the verdict and asked only "whether circumstances are present that a rational person somewhere could find prove a probability of future dangerousness." *Id*. Though the court did not indicate whether the "circumstances" relevant to the *Jackson* standard included mitigating evidence, the overall tenor of the court's opinion in rejecting a factual sufficiency review suggests the court does not consider such evidence because "there is no evidence that must be considered to have mitigating value." *Id*.

Two judges in *McGinn* recharacterized the *Keeton* factors as essentially encompassing a factual sufficiency review. *McGinn v. State*, 961 S.W.2d at 171 (Mansfield, J., joined by Womack, J., concurring). "For some time, we have effectively conducted a factual sufficiency review in capital cases where an appellant has averred the evidence was insufficient to support a jury finding that he will be a future danger . . . ." *Id*. In this manner, the concurring judges could justify considering mitigating evidence as part of a sufficiency analysis, which apparently would otherwise be prohibited under a *Jackson* standard. The problem with this analysis is it ignores the fact that the court, in the prior cases in which it considered mitigating evidence as part of its review, reformed death sentences to life because the State was prohibited by double jeopardy from seeking the death penalty on retrial. *Wallace v. State*, 618 S.W.2d at 76 (citing *Bullington v. Missouri*, 461 U.S. 430 (1981)); *see also Brasfield v. State*, 600 S.W.2d at 298 (citing *Burks v. United States*, 437 U.S. 1

(1978), and *Greene v. Massey*, 437 U.S. 19 (1978)).  In other words, the court understood that when it reversed a case for insufficient evidence, it was doing so under the *Jackson* standard and the relief and reformation to a life sentence, was required.  Had the court been applying a factual sufficiency review, remand for a new sentencing hearing would have been the appropriate remedy.

Two other judges in *McGinn* dissented, and from their opinions it is apparent that they viewed *Jackson* review narrowly and focused only on aggravating circumstances.  *McGinn v. State*, 961 S.W.2d at 175 n.2 (Baird, J., dissenting); *id*. at 176-77 (Overstreet, J., dissenting).  According to these judges, factual sufficiency review was required in order to provide the meaningful appellate review required by the Eighth Amendment.  Judge Overstreet made this clear by his view of the limited nature of *Jackson* review:  "However, a true application of the *Jackson v. Virginia* legal sufficiency standard of review would result in each and every future dangerousness finding being upheld–the facts of any capital murder, when viewed in the requisite *Jackson v. Virginia* light most favorable to the prosecution and verdict, would be sufficient." *Id*. at 176 (Overstreet, J., dissenting).  He expounded on this point:

> A true *Jackson v. Virginia* analysis of viewing the evidence in the light most favorable to the verdict *would disregard any and all potentially mitigating aspects of evidence* because such would be viewing in a light *contrary* to the verdict.  The weighing of evidence via the *Keeton* factors to decide whether the jury's finding on the future dangerousness issue is "rational' is much more akin to a factual rather than legal sufficiency review."

*Id*. at 176-77 (emphasis in original).  Judge Baird apparently agreed with this view of a legal sufficiency analysis and added that a *Jackson v. Virginia* review could not provide meaningful appellate review, principally because it would constitute a rule of automatic affirmance of every jury finding of future dangerousness.  *Id*. at 175 & n.2 (Baird, J., dissenting).  As a result, these judges believed that factual sufficiency review, which in their view was the only review that could take

mitigating evidence into account, was necessary and constitutionally required.  Judge McCormick, who joined the majority opinion, took issue with the views expressed by the dissent and argued that "Texas' capital sentencing scheme does provide for 'meaningful appellate review' of death sentences" because "Texas applies the *Jackson v. Virginia* 'rationality' standard of reviewing the sufficiency of the evidence to support the jury's answer to the 'future dangerousness' special issue." *Id*. at 171 (McCormick, PJ., concurring).

The implication of the various opinions in *McGinn* is that the court will carve out any consideration of mitigating evidence when conducting a *Jackson v. Virginia* review.  Thus, the court will only consider aggravating circumstances in isolation to determine whether a jury could rationally make this finding.  As the majority in *McGinn* noted, the court steadfastly refuses to measure the sufficiency of the evidence to support the mitigation special issue.  *McGinn v. State*, 961 S.W.2d at 169.  This is based on the court's view that the mitigation special issue is a normative judgment.  *Matchett v. State*, 941 S.W.2d 922, 936 (Tex.Crim.App. 1996); *Morris v. State*, 940 S.W.2d 610, 614 (Tex.Crim.App. 1997); *McFarland v. State*, 928 S.W.2d 482, 497-98 (Tex.Crim.App. 1996), *abrogated on other grounds by Mosley v. State*, 983 S.W.2d 249 (Tex.Crim.App. 1998).  "Under Article 37.071 § 2(f), the jury determines whether any evidence has mitigating effect and, if so, how much.  We have said that these two decisions are normative and therefore are not reviewable by this Court."  *Eldridge v. State*, 940 S.W.2d 646, 652 (Tex.Crim.App. 1997) (citing *Lawton v. State*, 913 S.W.2d 542, 557 (Tex.Crim.App. 1995)).  As a result, a jury in a death penalty case has unfettered discretion to determine whether sufficient mitigating circumstances exist that warrant a life sentence.  If the court also limits its review of the future dangerousness special issue to exclude mitigating circumstances and only considers evidence in the narrowest terms, rather than considering all of the facts and circumstances relevant to the

reasonableness of a future dangerousness prediction, then the problems identified by the dissents in *Jurek* will arise–namely, the end result of the review will always be an affirmance of the jury's finding. This, in turn, would render the jury's discretion with respect to future dangerousness unreviewable and, as a practical matter, every bit as unfettered as it is with the mitigation special issue. Of course, such a result would undermine in the court's original understanding of future dangerousness in *Jurek*.

An important insight that the dissents observed in *McGinn* is that a narrow *Jackson v. Virginia* review that only took into account aggravating circumstances would violate the Eighth Amendment's requirement of meaningful appellate review. The Fifth Circuit has held that a defendant is entitled to meaningful appellate review, and at the very least this means sufficiency review under *Jackson v. Virginia*. *Martinez v. Johnson*, 255 F.3d 241 n.17 (5th Cir. 2001). "The district court concluded that the Eighth and Fourteenth Amendments impose a constitutional floor on the sufficiency of evidence required to sustain the jury's verdict on the special issue of future dangerousness and that the CCA was required to review that determination. We agree." *Id*. In so holding, the court noted that the Supreme Court upheld the Texas death penalty statute in *Jurek* "in part because of the meaningful appellate review provided by the CCA." *Id*. (citing *Jurek v. Texas*, 428 U.S. at 276). Undoubtedly, a defendant under a sentence of death is entitled to meaningful appellate review. *See Parker v. Dugger*, 498 U.S. 308, 321 (1991) ("We have emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally); *Godfrey v. Georgia*, 446 U.S. at 428.

However, the solution to the problem identified by the *McGinn* dissent is not a requirement that factual sufficiency review be mandated for future dangerousness; instead, a proper application of the *Jackson v. Virginia* standard is required. This must take into account the type of inquiry

required by the future dangerousness special issue. The court in *McGinn* noted the difference between a finding of historical fact, such as intent, identity, or whether the defendant committed a particular act, which are "either right or wrong at the time of trial," and a finding of future dangerousness, which is essentially a prediction of events to come. *McGinn v. State*, 961 S.W.2d at 168. The rationality of a prediction must be based upon all of the facts and circumstances relevant to whether a particular person will be a continuing threat to society, and this may include aggravating facts, such as the circumstances of the crime, prior criminal history, and other acts of violence, as well as mitigating circumstances, such as the defendant's particular circumstances and his state of mind at the time the crime was committed and the absence of evidence that the defendant had ever exhibited violent tendencies in the past. The ultimate question is whether the jury's prediction, in light of all the evidence, was reasonable.

Also, it is apparent that since *McGinn*, the Court of Criminal Appeals has reconsidered the nature of factual sufficiency review. In *Brooks v. State*, 323 S.W.3d 893 (Tex.Crim.App. 2010), the court jettisoned the factual sufficiency review standard that it adopted in *Clewis v. State*, 922 S.W.2d 126 (Tex.Crim.App. 1996), reasoning that there was "no meaningful distinction between the *Jackson v. Virginia* legal sufficiency standard and the *Clewis* factual sufficiency standard" and because "these two standards have become indistinguishable." *Brooks*, 323 S.W.3d at 902. Though deference to the jury is preserved by reviewing evidence in the light most favorable to the verdict under the *Jackson* standard, it nevertheless requires the reviewing court to consider "all" the evidence in the record to determine whether the jury could reasonably make the finding at issue. *Id*. at 906-07; *see also id*. at 916-17 (Cochran, J., concurring). "It bears emphasizing that a rigorous and proper application of the *Jackson v. Virginia* legal sufficiency standard is as exacting a standard as any factual sufficiency standard . . . ." *Id*. at 906. Thus, the *Jackson* standard is not one that asks

merely whether there is "some" evidence to support the verdict; instead, it seeks to determine whether the jury finding is reasonable under the beyond a reasonable doubt standard. Because it is not a no-evidence standard, a court must consider all the evidence or risk skewing the results. *See Johnson v. State*, 23 S.W.3d 1, 14-15 (Tex.Crim.App. 2000) (McCormick, PJ., dissenting). *See also In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002) (noting that under a *Jackson v. Virginia* standard "[d]isregarding undisputed facts that do not support the finding could skew the analysis . . .").

The court's recognition that legal sufficiency review under *Jackson*, when applied properly, is indistinguishable from factual sufficiency review under *Clewis*, is as much a recognition of how *Jackson* should operate as it is a repudiation of an unworkable appellate construct. It clearly demonstrates that the manner in which the court reviewed claims concerning the sufficiency of evidence of future dangerousness in the wake of *Jurek* was in fact a legal sufficiency standard and not a makeshift *Clewis* factual sufficiency standard, and it accommodates the concerns of the dissents in *McGinn* that only by reviewing all of the evidence, including mitigating evidence, could the court provide meaningful appellate review. In other words, a legal sufficiency review that is virtually indistinguishable from a factual sufficiency review would not "disregard any and all potential mitigating aspects of evidence" as Judge Overstreet feared, and considering this evidence as relevant to the reasonableness of the jury's verdict would not be equivalent to consideration of evidence "contrary to" the verdict. *McGinn v. State*, 961 S.W.2d at 176-77 (Overstreet, J., dissenting). Rather, it represents a "true" application of the *Jackson v. Virginia* standard.

Mr. Ochoa pressed a *Jackson v. Virginia* sufficiency claim concerning his lack of future dangerousness in his direct appeal. *Appellant's Brief*, pp. 44-48.[4] As part of this issue, he pointed

---

[4]      In this response, the official trial transcript of the trial shall be referred to as "R." preceded by the volume number and followed by the page number. The state habeas record shall


out that the Eighth Amendment heightened reliability requirements are relevant to the sufficiency review of an aggravating factor in a death penalty case. *Id*. at 45-46. Mr. Ochoa urged the court to consider all of the circumstances in his case in determining whether there was sufficient evidence upon which a jury could rationally predict that he would constitute a continuing threat to society. The Court of Criminal Appeals rejected Mr. Ochoa's claim on the merits. The court's factual recitation focused primarily on the facts of the crime and Mr. Ochoa's confession. *Opinion of the Court of Criminal Appeals*, pp. 2-8. The court briefly described some of the mitigating evidence relevant to the issue:

> Appellant presented other evidence that he had no criminal record and that, before his crack cocaine addiction, he was considered by many to be a responsible, law-abiding citizen. Family, friends and co-workers of appellant testified that they were shocked when they heard that appellant had murdered his family because they did not believe that appellant was capable of committing such an act.

*Id*. at 8. The court then discussed Mr. Ochoa's experts' testimony, particularly concerning brain damage as a result of cocaine use and cocaine-induced delirium, and the State's rebuttal expert's testimony that the crime was the result of anger rather than cocaine-induced delirium. *Id*. at 8-12. The court held that there was sufficient evidence in the record to support the jury's future dangerousness finding. "We find that a rational jury could find beyond a reasonable doubt that there is a probability that 'a man capable of slaughtering five members of his immediate family' would commit criminal acts of violence that would constitute a continuing threat to society." *Id*. at 12. Thus, the court's primary focus in finding sufficient evidence was on the crime itself. The court also found that there was evidence in the record of a "pattern of abuse and threats directed by appellant against his wife." *Id*. at 13. Finally, the court found that Mr. Ochoa's expert testified that he would

be referred to as "SHR." followed by the page number. All other documents shall be referred to by title followed by the page number.

expect bad things to happen if Mr. Ochoa obtained cocaine in prison.  There is no indication that any other evidence, other than these three reasons for finding sufficiency, factored into the court's decision.  Respondent asserts that this decision was a reasonable application of *Jackson v. Virginia*. *Respondent Thaler's Answer with Brief in Support*, pp. 97-99.

It is true that Mr. Ochoa committed a terrible crime, and the facts and circumstances surrounding the commission of five murders, when "viewed in a vacuum," might support a conclusion that Mr. Ochoa would pose a continuing threat to society.  *Coble v. State*, 330 S.W.3d at 265-66; *Dinkins v. State*, 894 S.W.2d 330, 358 (Tex.Crim.App. 1995).  However, as in *Coble*, the question is not whether the crime itself is sufficient; instead, it is whether a reasonable jury could conclude on the basis of the State's aggravating evidence, which includes the crime itself, that Mr. Ochoa would constitute a continuing threat to society given the mitigation evidence before the jury. *Coble*, 330 S.W.3d at 265-66 (noting that circumstances of offense and evidence of prior violent acts were clearly sufficient to support future dangerousness determination if viewed "in a vacuum;" however, the court addressed claim that 18 years of spotless good behavior in prison overcame this evidence and demonstrated non-dangerousness).  *See also Martinez v. State*, 924 S.W.2d 693, 701 (Tex.Crim.App. 1996) (Baird, J., dissenting) ("While the absence of certain aggravating factors might not render the evidence insufficient to support an affirmative answer to the 'future dangerousness' punishment issue, the overwhelming presence of mitigating evidence may.").  The Court of Criminal Appeals failed to consider the evidence that demonstrated that he was not a dangerous person as part of its review.  At best, it only paid it lip service in its factual recitation, and the court failed to even mention it, much less take it into account, in its legal analysis.  As a result, the court lopped off the major punishment theme presented at trial and did not inquire whether Mr. Ochoa would pose a danger in light of it.

Mr. Ochoa immigrated to the United States when he was two years old.[5]  His father had come to this country to find work, and shortly afterwards he sent for his wife and two sons.  Life was hard for the family, and they lived in impoverished conditions.  Mr. Ochoa's father worked hard when he could find work, but there were periods in which he was unemployed, and the family moved frequently to seek better job opportunities.  Mr. Ochoa's father became an alcoholic, and he physically abused his wife and sons.  After an automobile wreck, Mr. Ochoa's father quit drinking, but he continued the physical abuse for several years afterwards.  Notwithstanding these adversities, Mr. Ochoa went to school (though he missed a year during one of the family's frequent moves), and he was the first in his family to graduate from high school.  While he was still in school, he entered the workforce as a busboy at a Luby's restaurant, and upon graduation, he started working for International Mill Service (IMS), which later became Heckett.  He worked there for 10 years, and he received promotions and pay raises, which reflected his ability to take on responsibility at work. Co-workers testified that he was a good, dependable worker.  He did not fight with anyone, and he did not talk inappropriately; instead, he was happy and cheerful around his co-workers.  To them, he seemed like just a normal guy.

A few months after starting his career at IMS, Mr. Ochoa met Cecilia.  They lived together for a while until they could afford their own place, and in 1993, he proposed to her.  They were married in a civil ceremony.  A year later, their first daughter, Crystal, was born.  Both Mr. Ochoa and Cecilia worked, and in 1996, they bought their first house.  Mr. Ochoa was 23 years old, and he believed he had entered the American dream by becoming a home-owner.  Mr. Ochoa's father

---

[5]  A complete recitation of the facts is set forth in Mr. Ochoa's original Petition for Writ of Habeas Corpus by a Person in State Custody, pp. 4-46.  Rather than restate them in this reply, Mr. Ochoa incorporates them by reference.

and two brothers believed that Mr. Ochoa was proud to be a father and that he loved his wife and family.  Neighbors described Mr. Ochoa as a good, kind man who outwardly exhibited pride in his home and family.  He demonstrated that he was willing to help a neighbor in need, particularly when he helped remove a fallen tree from an elderly lady's yard.

Mr. Ochoa's marriage was not without strife.  He and Cecilia would argue intensely at times, but they always made up.  Cecilia and her family deceived Mr. Ochoa about the fact that she had a son prior to meeting Mr. Ochoa.  When Cecilia's mother told Mr. Ochoa, he was hurt and moved out.  During the separation, he said things that he regretted.  However, he reunited with his wife, and he had another child with her.  Again, outwardly, they appeared to be a happy family.  Bessie McClendon, a neighbor who lived across the street from the Ochoas and who Cecilia confided in, believed that Cecilia and Mr. Ochoa loved one another.  Mr. Ochoa's family and neighbors were not aware of any instances in which Mr. Ochoa was violent toward anyone.  In fact, the only evidence that Mr. Ochoa engaged in violence was he slapped Cecilia a couple of times when they argued, he had grabbed her by the arm once when she tried to walk away from a family discussion, and he made a comment on a tape concerning whether he should shoot Cecilia.  The latter statement was made during Mr. Ochoa's separation from Cecilia and she was exploring divorce proceedings and had threatened to prevent Mr. Ochoa from seeing his daughter.  All of these incidents occurred years before the murders in this case.  In the intervening years, Mr. Ochoa proved himself to be a good, hard-working family man as described by his family, neighbors, and co-workers.

Mr. Ochoa became addicted to cocaine, and the course of the addiction put him on a downward spiral that ultimately resulted in the murders.  Mr. Ochoa had lost the ability to control his addiction, and when his family intervened, he willingly admitted himself in a religious-based treatment program.  However, this program did not provide meaningful counseling and drug

addiction treatment and, instead, consisted of a regime of fund raising, church attendance, and fasting.  Mr. Ochoa presented evidence that he suffered from brain damage because of his cocaine use (which rendered areas of his brain dead), that he could not control his addiction, and that he was in a cocaine-induced delirium at the time of the murders.  The State countered this evidence with psychiatric testimony that Mr. Ochoa was not in a cocaine-induced delirium but was instead frustrated and angry about his "situation."  Regardless of whether the jury could reasonably resolve this conflicting evidence in favor of the State, the fact remains that cocaine addiction drove the result in this case.  Without cocaine, Mr. Ochoa would be the good, hard-working man that the jury heard about.  Importantly, the jury could not reasonably reject the following facets of the evidence at trial: (1) Mr. Ochoa had mild brain damage, (2) he had no ability to control his addiction by himself, (3) he received inadequate and ineffective treatment for his addiction, and (4) cocaine addiction was a root cause of the murders.  The jury also heard evidence that Mr. Ochoa financed his drug addiction, not through criminal activity, but by extending his credit until it ran out.  Furthermore, he continued to work out of a sense of duty to provide for his family until the addiction overwhelmed him.

Cocaine is the only explanation for this crime that makes sense.  Cecilia had restricted Mr. Ochoa's access to money and transportation.  When she confronted him about his drug use, he willingly handed over the ATM card, and he knew that she changed the PIN so he could not use it. At the time of the murders, he had tried to quit cocaine cold-turkey for ten days.  He asked Cecilia to relent so he could buy a small amount in order to take the edge off his cravings.  After walking into the house, Cecilia confronted him because he did not say hello to her sisters, who had come for a visit.  Nothing in these circumstances can explain how Mr. Ochoa became provoked to such a degree that he would kill his entire family.  Nothing in his past indicates that he could lose his temper to this degree.  Though Mr. Ochoa was human and had exhibited anger in the past, nothing

about his past indicates that he possessed the type of rage and anger that could result in a mass murder. Thus, contrary to the State's position, anger and frustration alone are inadequate to explain this result. If Mr. Ochoa's motive was to obtain money in order to purchase more cocaine, he could have taken far less drastic measures than murder. Furthermore, murdering five people did nothing to perpetuate a goal to obtain more cocaine. It is frankly an irrational response. Mr. Ochoa's brothers and his neighbors who knew him were all shocked to learn that Mr. Ochoa had committed this crime. They believed it was completely out of character and that the only explanation was that there was something wrong with him. When all the evidence in this case is considered, it is clear that Mr. Ochoa's actions were an aberration and did not represent the culmination of a trend of lifelong aggressiveness and violence. Mr. Ochoa is not one of the "few incorrigibles that pose such a great threat to society that [he] cannot be incarcerated without fear of further violent outbursts toward others," *Nobles v. State*, 843 S.W.2d at 510, and there is nothing about his past that reasonably supports a conclusion that he would be a "real threat" to society, notwithstanding the atrocity of his crime. *Coble v. State*, 330 S.W.3d at 268. Based on the complete picture presented at trial, infliction of the ultimate punishment on Mr. Ochoa would be arbitrary and capricious. The state court's contrary decision failed to provide meaningful appellate review, as required by the Due Process Clause and the Eighth Amendment, it was an unreasonable application of clearly established law set out in *Jackson v. Virginia*, and arguably was contrary to the standard set out in *Jackson* because the court employed an analysis that skewed the results. Mr. Ochoa is entitled to relief.

**B.      Mr. Ochoa's Confrontation Clause claim is properly before the Court because, though ostensibly defaulted by trial counsel's failure to raise a contemporaneous objection, Mr. Ochoa has shown cause and prejudice for the default.**

Mr. Ochoa's right to confront and cross-examine witnesses as guaranteed by the Confrontation Clause of the Sixth Amendment was

violated when the trial court allowed testimonial evidence before the jury.

Mr. Ochoa received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution when his trial counsel failed to make proper and timely objections to the State's use of testimonial statements contrary to the Confrontation Clause of the Sixth Amendment to the United States Constitution.

### 1.    Introduction

Respondent contends that the issue of the erroneous admission of Cecilia Ochoa's hearsay statements of threats against her is procedurally defaulted on the ground that trial counsel failed to comply with the State's contemporaneous objection rule, and therefore waived the claim. *Respondent Thaler's Answer with Brief in Support*, pp. 65-68. Though it is true that trial counsel failed to make a contemporaneous objection on Confrontation Clause grounds, Respondent overlooks the fact that Mr. Ochoa asserted an ineffective assistance of counsel claim in State court complaining about trial counsels' default of this claim.

### 2.    Discussion

It is axiomatic that a habeas petitioner must show cause and prejudice as a result of the violation of federal law in order to excuse the procedural default. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Cause may be based on ineffective assistance of counsel provided that ineffectiveness constitutes an independent constitutional violation. *Id.* at 752 (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)); *Martinez v. Johnson*, 255 F.3d 229, 241 (5th Cir. 2001). "Prejudice" is that harm resulting from the underlying violation of his constitutional right. *Coleman*, 501 U.S. at 752; *Moore v. Quarterman*, 533 F.3d 338, 341 (5th Cir. 2008) (holding that "'prejudice' a defendant must demonstrate that errors 'worked to his actual and substantial disadvantage,' amounting to errors of constitutional dimensions").

There is both "cause" and "prejudice" in the present case resulting from trial counsel's failure to make a timely and specific objection to the State's admission of Cecilia Ochoa's statements to her sister, Alma Alvizo, regarding a tape-recorded conversation between Mr. Ochoa and his wife some five years before the murders and about statements Cecilia allegedly made to Alma concerning a threat made by Petitioner. *35R. 62-64, 89-90; State's Exhibit 142.* The trial court overruled trial counsel's *hearsay* objection and permitted Alviso to testify. *35R. 90.* She then related to the jury that Cecilia told her approximately three weeks before the murder that during an argument, Mr. Ochoa had put a gun to her head. Cecilia also told Alviso that if anything ever happened to her, Mr. Ochoa would be the one who did it. *Id.*

State habeas counsel raised a claim in state post-conviction proceedings that Mr. Ochoa had received ineffective assistance of counsel as a result of trial counsel's failure to preserve an objection based upon the Confrontation Clause.[6] *SHR. 36-39.* Citing relevant precedent holding trial counsel has an obligation to adequately preserve trial errors for appeal, *see Flores v. Demskie*, 215 F.3d 293 (2ᵈ Cir. 2000); *Davis v. Secretary for the Dept. of Corrections*, 341 F.3d 1310 (11th Cir. 2003), Mr. Ochoa contended trial counsel erred by relying solely upon a hearsay objection and that it would have been readily apparent to prepared counsel that Cecilia's hearsay statements were also subject to Confrontation Clause objections. *SHR. 38-39.* The state habeas court addressed the

---

[6] Petitioner's claim alleged:

GROUND FOR RELIEF NO. 4

Applicant was denied effective assistance of counsel in violation of the 6th and 14th Amendments to the United States Constitution by trial counsels' failure to assert Applicant's Right to the Confrontation of the Witnesses against him.

claim's merits, concluding trial counsel had not been ineffective for failing to object under the Confrontation Clause. *SHR. 368-82.*

Though Respondent is plainly incorrect on the ground that this issue is procedurally defaulted, Mr. Ochoa briefly discusses the facts demonstrating cause and prejudice. "Cause" in the present case is established by trial counsel having failed to raise a cogent Confrontation Clause-based objection to Cecilia's out-of-court testimony made to her sister. Even though Mr. Ochoa cited *Crawford* for the proposition that Cecilia's statements were "testimonial" in nature and hence excludable, the objectionable basis of her statements would have been apparent to counsel even under the more permissive standard set out in *Ohio v. Roberts*, 448 U.S. 56 (1980). Even though *Crawford* overruled *Roberts* on the ground that testimonial hearsay is subject to exclusion regardless of its indicia of reliability under a state hearsay exception and of whether it possessed particularized guarantees of trustworthiness, trial counsel, need not, as the state habeas court suggested, foreseen *Crawford* to have recognized that Cecilia's statements to her sister about a past event, after the event was over, and made for the purpose of providing proof, would be unreliable even under a hearsay exception. *SHR. 370.*

Furthermore, *Crawford* was applicable to cases on direct appeal at the time of its decision in 2004. *See Griffith v. Kentucky*, 479 U.S. 314, 328 (1987). Mr. Ochoa's case was decided in January 2005. *See Ochoa v. State*, AP 74,663 (Jan. 26, 2005). Had trial counsel lodged a general Confrontation Clause objection, he might well have won under the old *Roberts*' standard–but he clearly would have prevailed on his objection under *Crawford*. Trial counsel need not have foreseen *Crawford* to have recognized the necessity of a constitutional-based objection.

Prejudice is equally plain. Had counsel lodged a constitutionally based objection at trial, he would have subjected the error to harm review to a more favorable "harmless error" standard under

*Chapman v. California*, 386 U.S. 18 (1967), as opposed to the test for harm/prejudice under *Strickland,* a "much more onerous test." *United States v. Lott*, 310 F.3d 1231, 1252 (10th Cir. 2002). Appellant, on direct appeal, would have had little difficulty prevailing under the harmless error standard, which places the burden on the State. *Nelson v. Quarterman*, 472 F.3d 287, 333 (5th Cir. 2006).

Trial counsel rendered deficient conduct by failing to pose a relevant and compelling constitutional-based objection, and that failure prejudiced Mr. Ochoa. The state habeas court's analysis of this claim is objectively unreasonable in light of established precedent and should be rejected.

Respondent also contends that there was no error in admitting Cecilia's out-of-court statements because the Confrontation Clause is inapplicable to the sentencing phase of a capital trial. *Respondent Thaler's Answer with Brief in Support*, pp. 68-69. Respondent relies upon *United States v. Fields*, 483 F.3d 313 (5th Cir. 2007), in support of this proposition. Regardless of *Fields*, the Supreme Court has held that the Sixth Amendment right to a jury applies to the sentencing phase of a capital trial. *Ring v. Arizona*, 536 U.S. 584, 609 (2002). Similarly, the Eighth Amendment imposes heightened procedural requirements in the context of capital sentencing process in order to ensure the reliability and fairness of the result. *See, e.g.*, *Gardner v. Florida*, 430 U.S. 349, 362 (1977) (due process of law is violated where death sentence is based in a part on information that defendant has no opportunity to explain or deny); *Simmons v. South Carolina*, 512 U.S.154, 171 (1994) (due process is violated by excluding information from jury on length of a life sentence without parole where State argues future dangerousness); *Johnson v. Mississippi*, 486 U.S. 578 (1988) (death sentence based on subsequently vacated out-of-state felony conviction violated 8th Amendment); *Beck v. Alabama*, 447 U.S. 625 (1980) (due process requires submission of lesser-

-49-

included offense instruction where supported by evidence in order to give jury alternative basis for conviction).  This line of cases is premised, in part, upon the right not to have a jury assess a death sentence based upon incorrect or inaccurate information concerning the defendant.

The Supreme Court has recognized the central importance of the right to confront and cross-examine witnesses as the means of ensuring the reliability of the evidence before the fact-finder. *Maryland v. Craig*, 497 U.S. 836, 845 (1990); *California v. Green*, 399 U.S. 149, 158 (1970).  In *Crawford*, the Court held that the Confrontation Clause precludes the admission of testimonial hearsay in a subsequent trial.  *Crawford v. Washington*, 541 U.S. at 59.  The Court did not specifically define "testimonial hearsay" but explained that such statements included statements which were made in anticipation of trial, and thus, served the function of trial testimony.  *Id*. at 51-52.  In subsequent decisions the Court has further defined the contours of such statements underscoring the point that statements made in anticipation of a trial are inadmissible as substitutes for live testimony subject to cross-examination.  *See Davis v. Washington*, 547 U.S. 813, 821-22 (2006).  *Crawford* thus expressly overruled prior precedent in *Ohio v. Roberts*, 448 U.S. 56 (1980), which imposed an amorphous standard for determining the reliability of hearsay statements.  Nonetheless, for evidence which is not testimonial hearsay, *Roberts* posed at the time of  Mr. Ochoa's trial a pressing basis for a Confrontation Clause objection to non-testimonial hearsay which was not sufficiently reliable in the absence of confrontation and cross-examination.  *Id*. at 66.  Statements made in anticipation of civil or criminal litigation are not deemed sufficiently reliable to avoid exclusion by the Confrontation Clause.  *See, e.g., Lilly v. Virginia*, 527 U.S. 116 (1999) (holding self-inculpatory statements which included incriminating references to co-defendant lacked indicia of reliability because possible purpose was to shift blame for offense); *Palmer v. Hoffman*, 318 U.S. 800 (1943) (holding that an accident reports prepared by a railroad did not carry the indicia

of reliability of a routine business record because it was prepared at least partially in anticipation of litigation); *Lust v. Sealy, Inc.*, 383 F.3d 580 (7th Cir. 2004) (finding memorandum of conversation with fired employee was unreliable as a business record because it was created with anticipated litigation in mind); *United States v. Stone*, 604 F.2d 922, 925-26 (5th Cir. 1979) (holding that an affidavit prepared by an official of the United States Treasury Department was unreliable because it was prepared in anticipation of litigation); *Sneed v. State*, 955 S.W.2d 451 (Tex.App.–Houston [14th Dist.] 1997) (upholding exclusion of defendant's medical records where court determine the statements were made with an eye toward litigation, and therefore were not sufficiently reliable).

While the Supreme Court has not specifically held at this point that the Confrontation Clause applies to capital sentencing, a reading of the Sixth Amendment in light of continuing precedent as it relates to capital sentencing compels this conclusion.  Writing a dissenting opinion in *United States v. Fields*, 483 F.3d 313 (5th Cir. 2007), to the panel's conclusion that the Confrontation Clause is inapplicable to the sentencing phase of a federal capital trial, Judge Benavides forcefully contended that the confluence of Eighth and Sixth Amendment jurisprudence compels the application of *Crawford* to capital sentencing proceedings. *Id.* at 361-81 (Benevides, J., dissenting). In articulating several arguments why the Confrontation Clause, Benevides observed that the *Apprendi v. New Jersey*, 530 U.S. 466 (2000), line of cases have eroded the traditional distinctions between capital trial and sentencing proceedings, particularly because the factors which must be found to impose a sentence of death are conceptually the same as the elements that a jury must consider in assessing guilt.  *Id.* at 364-67.  At least in the capital context, the trial proceeding for guilt are little different from a proceeding at sentencing.  *Id.* at 371-72. "[W]hen a jury cannot practically hand down a death sentence without finding certain facts, testimony regarding those facts must be tested through confrontation." *Id.* at 368.  Examining the text of the Sixth Amendment,

Benevides observed that the Sixth Amendment's application to "criminal proceedings" extends to sentencing. *Id.* at 369-70. Insofar as the right to counsel extends to sentencing, Benevides noted that the interdependence of adversarial rights under the Sixth Amendment also compelled the a conclusion that the right to counsel at capital sentencing, entails the right to have counsel confront and cross-examine the witnesses at sentencing. *Id.* at 369-70, 373-74. Finally, Benavides pointed out that the Eight Amendment's imposition of heightened standards of reliability in capital sentencing proceedings, by necessity included the opportunity for cross-examination, given cross-examination's unique function in subjecting evidence to scrutiny, thereby permitting the jury a meaningful opportunity to evaluate the truth and accuracy of the evidence. *Id.* at 373-74.

A sizeable number of diverse federal and state courts–including Texas–have similarly recognized that because of the heightened requirements of procedural accuracy in capital sentencing proceedings, and the significance of the right to confrontation and cross-examination, *Crawford* is applicable to capital sentencing proceedings. *See United States v. Brown*, 441 F.3d 1330, 1361 n. 12 (11th Cir. 2006) (citing *Proffitt v. Wainwright*, 685 F.2d 1227, 1254-55 (11th Cir. 1982)) ("We have held that *Crawford* does not apply in the context of non-capital sentencing. However, death is different, and we have held . . . that the constitutional right to cross-examine witnesses applies to capital sentencing hearings."); *United States v. Sablan*, 555 F. Supp. 2d 1205, 1221 (D. Colo. 2007); *United States v. Mills*, 446 F. Supp. 2d 1115, 1135 (C.D. Cal. 2006) ("*Crawford v. Washington*'s protections apply to any proof of any aggravating factor during the penalty phase of a capital proceeding under the FDPA."); *Russeau v. State*, 171 S.W.3d 871, 880 (Tex.Crim.App. 2005) (reversing a death sentence under *Crawford* because the trial court admitted testimonial hearsay at the punishment phase); *State v. Bell*, 603 S.E.2d 93, 115-16 (N.C. 2004) (applying *Crawford* to hold that the introduction of testimonial hearsay at the sentencing phase of a capital trial violated the

Confrontation Clause); *Rodriguez v. State*, 753 So. 2d 29, 43-44 (Fla. 2000) (holding that "the Sixth Amendment right of confrontation applies to all three phases of the capital trial" and that "the admission of . . . hearsay statements of co-defendants in the penalty phase violated the Confrontation Clause"). *See also United States v. Fell*, 2:01-CR-12-01, slip. op. at 15 (D. Vt. 2005). It is significant that the Texas Court of Criminal Appeals, through rejecting Mr. Ochoa's claim on appeal as a result of procedural default by trial counsel, unhesitatingly accepted the premise that *Crawford* extends the Confrontation Clause to Texas capital sentencing proceedings. *Russeau*, 171 S.W.3d at 880-81.

While the issue in this case is slightly more nuanced than when a witness gives a formal statement to the police as the result her report of a crime, Cecilia's statements on the audio tape, as well as her statements to Alviso plainly fall within *Crawford*'s definition of "testimonial." Cecilia's statements were testimonial because they were made with the expectation that they might be subsequently used against Mr. Ochoa, either in potential divorce proceeding, or with the police.

Mr. Ochoa is entitled to relief on this claim as set out in his original petition. Respondent's arguments for why this Court should not reach the claim are unavailing.

    **C.**    **Mr. Ochoa meets the requirements for a stay and abey under *Rhines v. Weber*, in order to return to state court in order to exhaust the unexhausted claims presented as part of this federal habeas proceeding.**

Mr. Ochoa received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution when his trial attorneys failed to investigate and to present significant mitigation evidence at the punishment hearing.

Mr. Ochoa received ineffective assistance of counsel during the voir dire of his capital murder trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

Mr. Ochoa's trial counsel were rendered ineffective during the voir dire of his capital murder trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

Because Mr. Ochoa was deprived of the right to an adequate voir dire, his right to be tried by a fair and impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution was denied.

Mr. Ochoa received ineffective assistance of counsel on appeal because his appellate attorney failed to raise the voir dire issues on appeal.

The trial court's exclusion of important rebuttal evidence denied Mr. Ochoa the right to present a fair defense contrary to the Sixth and Fourteenth Amendments to the United States Constitution.

Mr. Ochoa received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution when his trial counsel failed to make proper and timely objections to the trial court's ruling excluding important rebuttal evidence.

Mr. Ochoa was deprived of his right to due process of law under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution by the State's presentation of unreliable psychiatric rebuttal testimony by Dr. Richard Coons.

Mr. Ochoa was deprived of his right to the effective assistance of counsel under the Sixth and Fourteenth Amendments to the United States Constitution because of his appellate counsel's failure to

present the issue concerning the trial court's erroneous admission of Dr. Coons's unconstitutionally unreliable testimony on direct appeal.

Because Mr. Ochoa was shackled during the punishment phase of his capital murder trial, his right to due process under the Fourteenth Amendment to the United States Constitution was denied.

Mr. Ochoa received ineffective assistance of counsel during the punishment phase of his capital murder trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution when his trial counsel failed to object to the trial court's decision to place Mr. Ochoa in shackles.

1.     Introduction.

Respondent asserts that the majority of Mr. Ochoa's remaining claims (set forth above) are unexhausted because they were never presented in direct appeal or in state habeas to the Court of Criminal Appeals. *Respondent Thaler's Answer with Brief in Support*, pp. 24-28.[7] Respondent is correct.

However, Respondent's argument that each of these claims should now be dismissed as procedurally defaulted misses the mark. Mr. Ochoa is not seeking to excuse procedurally defaulted claims. Rather, at this point in time, his claims are not procedurally defaulted precisely because they are unexhausted, and it is not "entirely clear" that the state court would apply an adequate and independent procedural bar to his claims. *Wilder v. Cockrell*, 274 F.3d 255, 262-63 (5th Cir. 2001). Under these circumstances, a procedural default analysis is inappropriate until the state court has first had an opportunity to consider and dispose of the claims. It is for that reason that Mr. Ochoa seeks a stay and abatement in these proceedings so that he may return to state court and exhaust his claims. It is thus irrelevant, at this stage, that Mr. Ochoa has not sought to satisfy the cause and

---

[7] Respondent sets forth his general discussion of exhaustion along with his contentions about procedural default in these pages. However, Respondent prefaces his discussion of each of these issues with an assertion that they are unexhausted.

prejudice standard or to demonstrate that this court's failure to consider his claims would result in a fundamental miscarriage of justice.

        2.     Discussion

      Exhaustion and procedural default, though their enforcement is often intertwined, are not co-extensive.  Exhaustion ensures that state courts are provided with an opportunity to correct federal constitutional errors marring state convictions before the claims are presented to federal courts.  *See Rose v. Lundy*, 455 U.S. 509, 518 (1982).  In accord with this principle, Congress has prohibited federal courts from granting habeas relief when the petitioner "has the right under the law of the State to raise, by any available procedure, the question presented."  28 U.S.C. § 2254(c).  Before passage of the Anti-Terrorism and Effective Death Penalty Act (AEDPA), federal courts were required to dismiss habeas petitions that contained unexhausted claims.  *Lundy*, 455 U.S. at 518.  Petitioners faced with the dismissal of their petitions routinely returned to state court to exhaust their claims before returning to federal court.  AEDPA, however, "dramatically altered the landscape for federal habeas corpus petitions," and imposed a one-year statute of limitations for the filing of federal habeas petitions.  *Rhines v. Weber*, 544 U.S. 269, 274 (2005); 28 U.S.C. § 2244(d).  Because the pendency of a federal petition does not toll the statute of limitations, *see Duncan v. Walker*, 533 U.S. 167, 181 (2001), the total exhaustion requirement threatened to foreclose review altogether for petitioners who arrived in federal court with unexhausted claims.  To avoid this dilemma, the Supreme Court unanimously adopted a stay-and-abeyance procedure in *Rhines v. Weber*.  The Court held that district courts should stay federal proceedings (1) when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court; and (2) the claims presented are not "plainly meritless."  544 U.S. at 277.  The Fifth Circuit has held that the Supreme Court did not intend the phrase "good cause" in *Rhines* in the "technical sense,"

but "rather intended the district court [to] find 'good cause' in the equitable sense." *Ruiz v. Quarterman*, 504 F.3d 523, 529 n.17 (5th Cir. 2007).

The procedural default doctrine's underpinnings are similar to those of the exhaustion doctrine: it is grounded in respect for the state's interest in requiring petitioners to adhere to its procedural requirements for raising constitutional violations. *See Coleman v. Thompson*, 501 U.S. 722, 732 (1991). Procedural default generally occurs in one of two circumstances. First, when a claim has been exhausted in the state courts, the claim may nevertheless be procedurally defaulted if the state court denied relief by expressly relying on a state procedural rule that is both independent of the federal claim and adequate to support the decision. *Id*. at 729. Second, a petitioner's claim may be procedurally defaulted when the claim is unexhausted and "the court to which he would be required to return [to exhaust the federal claim] . . . would now find the claim procedurally barred." *Id*. at 735 n.1; *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). However, unless it is "entirely clear" that the state court would apply an independent and adequate procedural bar to petitioner's claim, "the State should be allowed to make the procedural, *vel non*, determination." *Wilder v. Cockrell*, 274 F.3d 255, 262 (5th Cir. 2001). When a federal claim has been procedurally defaulted, the federal court may nevertheless review the claim if (1) the petitioner shows cause for the default and prejudice as a result of the underlying federal violation; or (2) the petitioner demonstrates that failure to consider the federal claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

To begin, it is not "entirely clear" that Mr. Ochoa's claims will be dismissed in reliance on an independent and adequate state ground in light of recent evolutions of the Court of Criminal Appeals' treatment of the state procedural bar to successive petitions. Accordingly, it is premature to find that his claims are procedurally defaulted. Prior to 2007, Mr. Ochoa would likely have been

-57-

unable to return to the state court for review of his claims because of Texas's bar on successive petitions set forth in Section 5 of Article 11.071 of the Texas Code of Criminal Procedure.  The state law in question reads:

> (a)  If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:
>
> (1)  the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;
>
> (2)  by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found applicant guilty beyond a reasonable doubt; or
>
> (3)  by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the state's favor one or more of the special issues that were submitted to the jury in the applicant's trial under Article 37.071, 37.0711, or 37.072.

TEX. CRIM. P. CODE ANN. art. 11.071, §5(a).

However, significant changes in the operation of this statute have cropped up in a number of cases from the Court of Criminal Appeals in recent years.  On January 10, 2007, the Court of Criminal Appeals–for the first time since the adoption of Section 5–pointed out the existence of potential equitable exceptions to the state procedural bar.  In *Ex parte Granados*, No. WR-51,135-01 (Tex.Crim.App., Jan. 10, 2007) (Slip Ops.),[8] the Court of Criminal Appeals was presented with a request to vacate its previous judgment or to allow rehearing of Granados's initial application and permit him to raise new claims because of the appointment of incompetent counsel during his initial

---

[8]      True and correct copies of the unpublished opinions in *Granados* are attached to this motion as Exhibit "A."

habeas proceeding. Although the court denied Mr. Granados's requests, it did so while inferring that grounds existed for relief to have been granted if his new counsel, that is federal habeas counsel, had presented the court with any meritorious claims. The court concluded by stating, "Applicant has failed to persuade us that we should reconsider our previous denial of relief on his writ application, or that he is entitled to any other relief." *Id*. at 5. Judge Johnson, joined by Judges Meyers and Price, elaborated more fully on the possibility of equitable exceptions to the Section 5 bar. After mentioning the possibility that a single record-based claim not cognizable on habeas may not even be considered a "writ application," Johnson concluded that relief was not warranted on the pleadings before the court. *Granados*, slip op. at 1-2 (Johnson, J., concurring). "Regardless, the justice system must still perform its constitutional and statutory duties to provide full and fair opportunity to have relevant issues addressed and resolved. While to do less may not result in an injustice to a particular applicant, it has the potential to erode confidence in the justice system itself. Still, the pleadings before us do not provide a basis for granting relief." *Id*. at 2.

On the same day, that is, January 10, 2007, the court in *Ex parte Hood*, 211 S.W.3d 767 (Tex.Crim.App. 2007), ruled that there are judicially created exceptions to the plain language of Section 5. In *Hood*, the court was faced with a subsequent application raising a *Penry/Tennard* claim where that same claim had been previously rejected. Rejecting prior precedent, the court held that when a claim has been presented and the legal basis of that claim is subsequently overruled, then the legal basis "can become newly available" for purposes of Section 5(a)(1). *Id*. at 776. Though the court in *Hood* rejected the petitioner's claim, the court subsequently reversed its course and held that the petitioner's *Penry* claim was cognizable under Article 11.071 and granted relief. *See Ex parte Hood*, 304 S.W.3d 397, 406-09 (Tex.Crim.App. 2010).

In *Ex parte Moreno*, an evenly divided court, faced with a subsequent application, initially ruled that it would take no action. *Ex parte Moreno*, No. WR-25,897-03 (Tex.Crim.App., May 9, 2007) (Slip Ops.) (not designated for publication).[9]  Evidently, the court could not decide whether recent Supreme Court cases granting *Penry* relief provided a new legal basis under *Hood*, with four members of the court castigating the other four members for not recognizing that *Hood* provided an avenue for reconsideration of the claim.  *See Ex parte Moreno*, slip op. at 1-2 (Womack, J., issuing statement concerning non-action of court); *Ex parte Moreno*, slip op. at 1-2 (Price, J., issuing statement concerning non-action of court).  But upon the suggestion of the petitioner in the successor writ, the court took the unprecedented step of reopening the original habeas case, almost seven years after it was originally denied, and granted relief on the *Penry* claim as originally filed.  *Ex part Moreno*, 245 S.W.3d. 419, 427-31 (Tex.Crim.App. 2008)  Again, the ultimate result in *Moreno* strongly suggests that the court is amenable to equitable exceptions to the Section 5 bar.

In *Ex parte Blue*, 230 S.W.3d 151 (Tex.Crim.App. 2007), the court addressed a successor writ application that raised an *Atkins* claim.  *Id*. at 153-54.  At issue was whether Section 5(a)(3), the state's actual innocence of the death penalty provision, operated to allow a successor *Atkins* claim.  *Id*. at 154.  In the process of analyzing this claim, the court determined that an *Atkins* claim could pass through the Section 5(a)(3) gateway, but in doing so, the court held that underlying merits of the claim must be addressed in determining whether to allow the exemption.  *Id*. at 161-62.  The court held:

> We hold that a state habeas applicant alleging mental retardation for the first time in a subsequent writ application will be allowed to proceed to the merits of his application under the terms of Section 5(a)(3)—at least so long as he alleges and

---

[9]       True and correct copies of the unpublished opinions in *Moreno* are attached to this motion as Exhibit "B."

presents, as part of his subsequent pleading, evidence of a sufficiently clear and convincing character that we could ultimately conclude, to that level of confidence, that no rational factfinder would fail to find he is in fact mentally retarded.

*Id*. at 162. In a footnote, the court noted that this same procedure may be available to a petitioner alleging a *Wiggins*-type claim. *Id*. at 160 n.42.

Though the plain language of Section 5 references the mitigation special issue as part of the "innocent of the death penalty" provision, which would necessarily focus on jury discretion in sentencing a person to death rather than eligibility as would be the case with an *Atkins* claim, the Fifth Circuit in *Rocha II* and *Balentine II*[10] ostensibly has refused to recognize that the Court of Criminal Appeals has interpreted Section 5(a)(3) in this manner or that such an interpretation could happen in subsequent cases. *Rocha v. Thaler*, 626 F.3d 815, 828-29 (5th Cir. 2010); *Balentine v. Thaler*, 626 F.3d 842, 856 (5th Cir. 2010). *Balentine* and *Rocha* addressed district court denials under Federal Rule of Civil Procedure 60(b); thus, they were focused on the meaning of the state court's denial of a successor writ, rather than the prediction under *Rhines* of whether the state court would apply a procedural bar in a particular case. However, because this interpretation remains an open question, though supporting denial of a Rule 60(b) motion when the state court order is silent concerning the reasons for denying a successor writ application as in *Rocha* and *Balentine*, a habeas claimant should not be barred from going back to the Court of Criminal Appeals with a unexhausted but otherwise meritorious claims and arguing that Section 5(a)(3) provides an avenue for relief.

In *Ex parte Campbell*, 226 S.W.3d 418 (Tex.Crim.App. 2007), the court expressly noted for the first time, that the state procedural bar under Section 5(a)(1) (which is premised on factual or

---

[10] The opinions in *Rocha* and *Balentine* discussed in this reply are opinions on rehearing. The original opinions are not cited. However, the cases shall be referenced as *Rocha II* and *Balentine II*, respectively.

legal unavailability) inherently required the court to determine whether an application "establish[ed] a federal constitutional violation sufficiently serious as to likely require relief from his conviction or sentence." *Id*. at 422.  In so doing, the court demonstrated that Section 5(a)(1) potentially was not an adequate and independent ground, and that, even in non-*Atkins* and non-*Penry* cases, the court's analysis of its state procedural bar may entail a determination of whether there is a meritorious federal constitutional violation.  In *Balentine*, the Fifth Circuit addressed the two-part inquiry required under Section 5(a)(1) in light of *Campbell*.  *Balentine II*, 626 F.3d at 853-54.  The first part of the inquiry asks whether there is a factual or legal basis that was unavailable as to all previous state habeas applications.  *Id*.  The second inquiry asks if the facts as pleaded would constitute a constitutional violation that would likely require relief from either the conviction or sentence.  *Id*.  The first inquiry is a state law question and would pose an adequate and independent state law ground.  *Id*. at 854-55.  The second inquiry is a federal law question, and if the state court reached this part of the test, it necessarily addresses the merits of the federal claim.  *Id*.  However, under *Balentine II* and *Rocha II*, there must be a fair indication in the record before the court that the state court reached the merits of the federal claim.  *Id*.; *Rocha II*, 626 F.3d at 834-39.

Balentine II* and *Rocha II* addressed how a federal court must interpret an order denying successor review under Section 5.  Though these cases limited *Ruiz*, which also was a Rule 60(b) case, they did not limit *Ruiz*'s recognition of equitable exceptions to Section 5.  Therefore, the cases are of limited import in a request to stay and abey federal proceedings in order to allow a petitioner to go back to state court and seek relief, even equitable relief, under Section 5.  In fact, these cases strongly imply that a Rule 60(b) motion is predicated on an earlier request to stay and abey.

As noted above, the Supreme Court has held that district courts should stay federal proceedings (1) when the district court determines there was good cause for the petitioner's failure

to exhaust his claims in state court; and (2) the claims presented are not "plainly meritless." *Rhines v. Weber*, 544 U.S. at 277.  Mr. Ochoa meets both prongs of this test.  To begin, Mr. Ochoa meets the equitable standard under *Rhines* as contemplated by *Ruiz v. Quarterman*, 504 F.3d at 529 n.17.  As will be demonstrated, like the petitioner in *Ruiz*, Mr. Ochoa's unexhausted claims were not raised in his state habeas petition because of the severe deficiencies in his appointed state habeas counsel's representation.   Each of the claims raised in Mr. Ochoa's federal petition could have been discovered and briefed by state habeas counsel, had counsel diligently carried out his obligation to raise all meritorious claims.  *See* State Bar of Texas Guidelines and Standards for Texas Capital Counsel, Guideline 12.2(7)(b) ("Habeas corpus counsel should consider every legal claim potentially available, and thoroughly investigate the basis for each potential claim before deciding not to include it in the first state application for writ of habeas corpus.").   These deficiencies constitute good cause for Mr. Ochoa's failure to raise his unexhausted claims in his state habeas petition.

State habeas counsel, Wayne Huff was appointed by the state habeas court, the 194th District Court of Dallas County, Texas, to represent Mr. Ochoa in challenging his conviction and sentence in accordance with Article 11.071 of the Texas Code of Criminal Procedure.  He filed the state post-conviction writ application on February 11, 2005.  *SHR. 2.*

The writ application prepared by Huff consists of 53 pages and 9 claims for relief.  *SHR. 2-55.*  Of these, 17  pages consist of procedural matters and a factual recitation of the trial testimony.  *SHR. 3-20.*  Examination of  the issues raised in the state writ petition demonstrate that three are record-based appellate issues,[11] two are boiler-plate ineffective assistance of counsel issues based

---

[11]    The first three claims for relief related to record-based claims, specifically:

upon a facial review of the trial record,[12] one issue is a multifarious ineffective assistance of appellate counsel claim,[13] and one claim argues only that the cumulative effect of the errors was

---

GROUND FOR RELIEF NO. 1

> Applicant was denied due process of law pursuant to the 14th Amendment to the United States Constitution by the State's destruction of mitigating evidence before it could be subjected to forensic testing by Applicant.

GROUND FOR RELIEF NO. 2

> The Texas Death Penalty Scheme Violates the Fifth, Sixth and Due Process Clause of the Fourteenth Amendments to the United States Constitution Because the Punishment Special Issue Related to Mitigation Fails to Require the State to Prove the Absence of Sufficient Mitigating Circumstances Beyond a Reasonable Doubt

GROUND FOR RELIEF NO. 3

> Texas' Future Dangerousness Aggravating Factor Violates the Constitutional Rule Announced in Ring V. Arizona, 536 U.S. 584 (2002), in That Tex. Code Crim. P. 37.071 §(b)(1) Effectively Requires the Prosecution to Prove by a Mere Preponderance of the Evidence, Rather than by Proof Beyond a Reasonable Doubt, That a Capital Defendant Poses a Continuing Threat to Society.

*SHR. 22-35.*

[12]  Petitioner's fourth and fifth claims for relief provide:

GROUND FOR RELIEF NO. 4

> Applicant was denied effective assistance of counsel in violation of the 6th and 14th Amendments to the United States Constitution by trial counsels' failure to assert Applicant's Right to the Confrontation of the Witnesses against him.

GROUND FOR RELIEF NO. 5

> Applicant was denied effective assistance of counsel in violation oft he 6th and 14th Amendments to the United States Constitution by trial counsels' failure to properly preserve and analyze mitigating evidence.

*SHR. 36-41.*

[13]  Petitioner's seventh ground for relief alleges:

GROUND FOR RELIEF NO. 7

prejudicial under the Due Process clause.[14]  *SHR. 22-51.*  This left two non-record claims, one

---

Applicant was denied effective assistance of appellate counsel in violation of the 6th and 14th Amendments to the United States Constitution by the failure of appellate counsel to raise meritorious issues in Applicant's brief to the Court of Criminal Appeals.

The claim then raises the following legal grounds which were not raised by appellate counsel:

1.   Applicant was denied due process of law pursuant to the 14th Amendment to the United States Constitution by the state's destruction of mitigating evidence before it could be subjected to forensic testing by applicant.

2.   The Texas death penalty scheme violates the fifth, sixth and due process clause of the 14th amendment to the United States Constitution because the punishment special issue related to mitigation fails to require the state to prove the absence of sufficient mitigating circumstances beyond a reasonable doubt.

3.   Texas' future dangerousness aggravating factor violates the constitutional rule announced in Ring v. Arizona, 536 U.S. 584 (2002), in that Tex. Code Crim. P. 37.071 §(b)(1) effectively requires the prosecution to prove by a mere preponderance of the evidence, rather than by proof beyond a reasonable doubt, that a capital, defendant poses a continuing threat to society.

4.   Applicant was denied effective assistance of counsel in violation of the 6th and 14th Amendments to the United States Constitution by trial counsels' failure to assert applicant's right to the confrontation of the witnesses against him.

5.   Applicant was denied effective assistance of counsel in violation of the 6th and 14th amendments to the United States Constitution by trial counsels' failure to properly preserve and analyze mitigating evidence.

6.   Dallas County's venire selection process violates applicant's rights to an impartial jury consisting of a representative cross-section of the community under the sixth and fourteenth amendments to the United States Constitution.

*SHR. 43-45.*  Huff addressed all five claims in a little more than one page of his writ application, citing only general case law applicable to claims of ineffective assistance of counsel, but not specifically addressing the legal and  merits of each of the five claims.  *Id.*  Insofar as the claims relate to facial errors on the record, Huff in challenging the effectiveness of appellate counsel for failing to raise claims of ineffective assistance against trial counsel, did not address the general appellate presumption against raising claims of ineffective assistance of counsel on direct appeal because of an undeveloped record.  *See Massaro v. United States*, 538 U. S. 500, 504-05 (2003);  *United States v. Gordon,* 346 F.3d 135, 136-37 (5th Cir. 2003); *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex.Crim.App. 2005).

[14]   GROUND FOR RELIEF NO. 10 (misnumbered) provides:

The cumulative effect of the above-enumerated constitutional violations denied Applicant due process of law in violation of the Fifth and Fourteenth Amendments of the United States

alleging ineffective assistance of trial counsel for failing to adequately prepare Mr. Ochoa to face cross-examination (claim number 6),[15] and a claim under *Taylor v. Louisiana*, 419 U.S. 523 (1975), relating to the systematic exclusion of Hispanics, and individuals under the age of 34 from Dallas Country jury pools (claim number eight).[16]

The writ application contains only three affidavits. One is by Mr. Ochoa consisting to a two page handwritten statement that generically discusses his limited meetings with, and preparation for trial by trial counsel. *SHR. 67-68.* Two other affidavits are by Donna Roach, and Lori Bodino, concerning general jury selection procedures in Dallas County, Texas. *SHR. 141-44.*

In light of Huff's original writ application, Mr. Ochoa filed two *pro se* supplements to the writ. *SHR. 158-78.* Like a sizeable portion of Huff's writ application, the *pro se* supplement contained record-based issues, and the second supplement was ultimately dismissed by the Court of Criminal Appeals for "abuse of the writ."

The Texas Legislature's enactment of Article 11.071 of the Texas Code of Criminal Procedure creates the statutory right to the counsel following a conviction for capital murder and sentence of death. *See* TEX. CODE CRIM. P. art. 11.071, § 2(a). Article 11.071 charges post-conviction counsel with conducting both a "factual and legal" investigation. *Id.* at § 3(a) ("On

---

Constitution, even if no separate infraction by itself rose to that magnitude

*SHR. 51-52.*

[15] The entirety of this claim, both factual recitation and legal analysis comprises eight sentences. *SHR. 42.* And while the claim makes reference to Petitioner's affidavit, it provides no specific examples or details from Petitioner's testimony in support of the claim.

[16] Trial counsel did not raise this objection at trial. And while challenging the effectiveness of appellate counsel for failing to raise this claim on direct appeal, Huff did not address the issue of waiver/procedural default stemming from trial counsel's conduct nor argue that ineffective assistance of counsel provided cause and prejudice for any waiver. *SHR. 45-51.*

-66-

appointment, counsel shall investigate expeditiously . . . the factual and legal grounds for the filing

of an application for a writ of habeas corpus."). Implicit in this charge is that the factual and legal

investigation must be comprehensive and thorough. The need to conduct a thorough investigation

is understandable in light of the purpose of Article 11.071 to provide only one, but at least one, "full

and fair" opportunity to litigate issues relating to the constitutionality of a habeas petitioner's

conviction and death sentence. *Ex parte Kerr*, 64 S.W.3d 414, 419 (Tex.Crim.App. 2002). The

penalty for failing to discover and raise an available claim for relief in the first writ application is

dire; Section 5 creates a high barrier over which a petitioner must pass in order to present and have

considered challenges to his sentence that were not raised in the initial writ application. TEX. CODE

CRIM. P. art. 11.071, § 5. In light of this, state post-conviction writ counsel must be cognizant that

the failure to uncover and raise any potentially meritorious ground likely constitutes a procedural

default for consideration of the claim, both in state court and in federal court.

    In providing for the appointment of counsel, the statute expressly mandates that counsel be

"competent" to provide representation in state post-conviction writ practice. TEX. CODE CRIM. P.

art. 11.071, § 2(c). The statute does not define "competence" however. In addressing this question,

the Texas Court of Criminal Appeals has defined competence not as "effective" in the sense

described in *Strickland v. Washington*, 466 U.S. 668 (1984), but instead as whether counsel

possesses the necessary "qualifications, experience, and abilities at the time" of appointment. *See*

*Ex parte Graves*, 70 S.W.3d 103, 114-15 (Tex.Crim.App. 2002). As may be seen, however, from

an evaluation of Huff's writ application in this case, the quality of his writ investigation in light of

clearly established standards of post-conviction practice, and his history of conducting deficient

investigations in other capital habeas proceedings, it is questionable whether Huff understood or

possessed the necessary qualifications and experience to represent Mr. Ochoa. As a result, Huff was

not "competent" and this lack of competence has imposed dire consequences upon Mr. Ochoa's development and exhaustion of meritorious claims.

Post-conviction writ representation is founded on investigation, and this investigation, unlike that of appellate counsel, must venture beyond the safety and comfort of the appellate record.  An extra-record investigation is necessary precisely because the purpose of an post-conviction writ under  Article 11.071, as distinct from a brief on direct appeal, is to investigate and develop constitutional-based issues that were not evident from the face of the record, and therefore could not have been raised on appeal.  This is not a new concept, and it would have been understood by competent practitioners in the field of post-conviction litigation for at least the past decade.  It is a firmly established and regularly enforced rule of state court procedure that issues that are evident on the face of the record and that could have been raised by appellate counsel on state direct appeal are procedurally defaulted for post-conviction.  *Ex parte Gardner*, 959 S.W.2d 189, 191 (Tex.Crim.App. 1996 (op. on rehearing); *see also Ex parte Ramos*, 977 S.W.2d 616, 617 (Tex.Crim.App. 1998).  The Fifth Circuit recognizes this rule as an adequate and independent ground to preclude federal review of issues not properly raised and exhausted in state court proceedings.  *See Busby v. Dretke*, 359 F.3d 708, 719 (5th Cir. 2004).

 Certainly, the quality and competence of state post-conviction counsel may be evident from a review of the final product submitted in state post-conviction litigation.  Of the nine issues raised, three are plainly not cognizable on post-conviction, two more are record-based claims of ineffective assistance, one is a claim of ineffective assistance of appellate counsel, raising five sub-claims, none of which are supported by legal analysis or factual development, one is a reiteration of cumulative prejudice, and one non-record based claim may be procedurally defaulted for failure to argue "cause and prejudice" from trial counsel's failure to object at the time of trial.  But aside from the writ

application itself (the "end product" of Huff's representation as an *ipso facto* evaluation of Huff's competence), Mr. Ochoa would show that an review of investigation of the case, and whether it is consistent with well-established standards of post-conviction practice, is a more telling determination of whether he was actually competent to represent Mr. Ochoa. Review of Huff's billing records reflects a disturbing lack of significant factual investigation.[17] His billing records are devoid of specific detail, but they reflect only 12.5 hours of non-record investigation on the writ,[18] out of a total of 254.3 hours billed. His total expenses for non-copying related items is listed as "Mileage 1150x 22 p/m" and totaled $253.00. But far more troubling, Huff's records, as well as the state court habeas record, reflect that Huff requested no independent funding from the court for fact investigators, no funding for a mitigation specialist, and it is apparent that he did not seek the assistance of any expert witnesses to assist in the investigation and evaluation of the potential claims.

These brief records raise troubling questions about the extent to which Huff even minimally complied with prevailing standards of post-conviction practice. The American Bar Association, through a comprehensive evaluation of nationwide standards of capital practice has set out general standards for capital trial, appeal, and post-conviction practice in its Guidelines for the Appointment

---

[17]   Huff's complete billing records for his work performed, obtained through a Texas Open Records Act request to Dallas County are attached to this motion as Exhibit "C," and referred to as if fully incorporated herein.

[18]   Huff's itemization provides no insight into the nature of his investigation. He records the investigation as: "Interviews with witnesses, attorneys, etc." *See* Exhibit "C." The records indicate that Huff billed 18.5 hours for "Travel to Livingston, and interviews with client." *Id.* Huff has his offices in Boerne, Texas. According to the web cite, "Mapsonus.com", the quickest route to Livingston, Texas, from Boerne is approximately 4.8 hours. If Huff made only two round trips to visit and interview Petitioner, then his travel time alone would have been 19.2 hours, leaving a deficit of 0.7 hours for interviews. Mr. Ochoa's point is not to quibble over tenths of an hour, but to show that with travel time, Huff's interaction with Mr. Ochoa, which represented the only other avenue of investigation, must have been very short.

and Performance of Defense Counsel in Death Penalty Representation.  *See Wiggins v. Smith*, 539 U.S. 510, 546-47 (2003) (citing the ABA Guidelines as an authoritative source concerning prevailing standards of capital representation); *Strickland v. Washington*, 466 U.S. 668, 688 (1984). *See also*, *Bobby v. Van Hook*, 130 S. Ct. 13, 16-17 (2009) ("Restatements of professional standards, we have recognized, can be useful as "guides" to what reasonableness entails . . . to the extent they describe the professional norms prevailing when the representation took place.").  The ABA Guidelines were published in 2003.  So Huff's representation in this case occurred after the publication of the Guidelines.  Standards of competent practice as reflected in the Guidelines did not suddenly appear with their publication; instead, the Guidelines merely published the established and prevailing practices for capital practitioners that had developed for years.  Thus, competent capital post-conviction practitioners, which are those possessing experience and training to render post-conviction writ investigation, even if not aware of the Guidelines themselves, would plainly have been aware of the substantive measures advanced by the Guidelines as those required for competent post-conviction representation.

Reference to the Guidelines provides strong insight into how Huff's representation in the instant case fell far short of those practices undertaken by competent counsel.  Notably, the Commentary to Guideline 10.7 explains that counsel is obliged to undertake a comprehensive investigation of all phases of trial.  *See* GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY REPRESENTATION, Guideline 10.7, commentary (reprinted in 31 HOFSTRA. L. REV. 913, 1021-26 (2003)) [hereinafter ABA DEATH PENALTY GUIDELINES]. Counsel in both trial and post-conviction phases are charged with a duty to conduct a widespread investigation of both the guilt and punishment phases of trial.  With reference to sentencing, counsel is charged with investigating a defendant's medical history, family and social history, educational

and training history, employment history, and prior juvenile and correctional history. *Id*. at 1021-22. As stated, the duty to conduct a comprehensive investigation is not limited to trial counsel. The Guidelines explain that post-conviction counsel has an obligation to conduct a thorough and *independent* investigation of the case. He may not presume that trial counsel conducted a sufficient investigation. *See id*., Guideline 10.15.1., Commentary ("Because an appreciable portion of the task of post-conviction counsel is to change the overall picture of the case . . . collateral counsel cannot rely on the previously compiled record but must conduct a thorough, independent investigation in accordance with Guideline 10.7. (Subsection E(4))".). The Guidelines plainly set forth post-conviction counsel's obligation to "re-investigate" the case, including aspects of a petitioner's background:

> Reinvestigating the client means assembling a more-thorough biography of the client than was known at the time of trial, not only to discover mitigation that was not presented previously, but also to identify mental-health claims which potentially reach beyond sentencing issues to fundamental questions of competency and mental-state defenses.

*Id*. at 1086. Moreover, the Guidelines admonish post-conviction counsel to raise *all* potentially meritorious issues, precisely because "any meritorious issue not contained in the initial application will be waived or procedurally defaulted in subsequent litigation, or barred by strict rules governing subsequent applications." *Id*., Guideline 10.15.1, Commentary.

Measured under these standards, Huff's post-conviction representation in Mr. Ochoa's case is woefully lacking. Though the Guidelines, consistent with the established standards of practice, plainly instruct post-conviction counsel to conduct a thorough re-investigation of both phases of trial, Huff's own billing records, indicating that he spent only 12.5 hours on the non-record based investigation of the case, demonstrate a minuscule amount of time discharging this duty. Even including the time Huff itemized for interviewing Petitioner (which apparently including travel time)

of 18.5 hours, Huff's billing records reflect that he spent a mere 31 hours, out of a total 254.3 hours, approximately one-eighth of his time on matters constituting the heart of post-conviction practice.

Similarly troubling is the appearance that Huff's minimal investigation was neither supplemented nor benefitted by the assistance of trained investigators or experts.   The Guidelines advocate a "team approach" to capital litigation, based on the recognition of the complexity of issues confronting counsel, and the massive investments of time and resources. *See* ABA DEATH PENALTY GUIDELINES, Guideline 4.1(A)(1)-(2) & Commentary; *id.* at Guideline 10.4(C)(2)(a)-(c) & commentary.   The Guidelines recommend the assistance of both fact investigators and mitigation specialists, and caution that the need for experts is common given the myriad issues which may arise in a capital investigation.   *See id.*, Guidelines 4.1 commentary.   Counsel, even one diligently conducting his own investigation, often lacks the time and expertise to gather or understand all the relevant facts of a case.   This is why investigators and experts are part of standard practice, because given the complexity of capital representation, even diligent counsel cannot do it alone.   Again, because post-conviction counsel is charged with the complete re-investigation of the case, counsel must obtain sufficient resources in order to discharge this duty.   *See id.* at Guideline 10.15.1 & commentary.   Ultimately, what Huff's billing records reflect, however, is that he not only handled the case alone, which itself was inconsistent with standards practiced by competent counsel, but  that he handled the case with almost no independent investigation.   This is not "competent" counsel, one who has the training and experience to engage in capital post-conviction investigation consistent with prevailing standards.

While Huff's work on the instant case could be regarded as an idiosyncratic failure by an otherwise competent post-conviction attorney, this is not the sole incident in which Huff's state post-conviction representation has come under scrutiny or criticism.   In case of Rolando Ruiz, a death

sentenced inmate from Bexar County, Texas, which preceded the instant case, Huff similarly filed

a boiler-plate state post-conviction writ application, and like the present case, Huff completely failed

to investigate–and failed to present–a potentially meritorious claim under *Wiggins v. Smith*, 539 U.S.

510 (2003).  Although ultimately denying relief on the unexhausted *Wiggins* claim, the United States

District Court for the Western District of Texas in San Antonio excoriated Huff's post-conviction

representation–representation which mirrors, as well as  predates, his representation in the present

case:

> . . . Quite frankly, the quality of representation petitioner received during his state
> habeas corpus proceedings was appallingly inept.  Petitioner's state habeas counsel
> made no apparent effort to investigate and present a host of potentially meritorious
> and readily available claims for state habeas relief.  Furthermore, petitioner's state
> habeas counsel made virtually no effort to present the state habeas court with any
> evidence supporting the vast majority of the claims for state habeas relief which said
> counsel did present to the state habeas court . . .  Petitioner's state habeas counsel did
> little more than (1) assert a set of boilerplate, frivolous, claims which had repeatedly
> been rejected by both the state and federal courts and (2) fail to support even those
> claims with any substantial evidence.  Insofar as petitioner contends his state habeas
> court merely "went through the motions" and "mailed in" a frivolous state habeas
> corpus application which said counsel failed to support with evidence, those
> complaints have merit.

*Ruiz v. Dretke,*  SA-03-CA-303-OG, <u>Order Denying Certificate of Appealabilty</u> , at 4-5 (W.D. Tex.,

Oct. 13, 2005).

As reflected through Mr. Ochoa's own writ application, as well as Huff's billing records,

Huff's performance in this case is strikingly similar and as lethally inept.  Huff presented largely a

boilerplate writ application with little factual support and scant legal analysis of the claims raised

within the writ.  Of those record based claims which are not precluded under state procedural default

rules, Huff has raised claims that were culled from a simple review of the appellate record, as

opposed to an independent investigation of the non-record evidence, and largely failed to provide

factual support for those claims.  Huff challenged the representation of appellate counsel through

the identification of five different alleged errors–many of which, as in *Ruiz*, have been continuously rejected by the state and federal courts, and of the three claims that appear to not be based exclusively on the appellate record, Huff did not address the issue of procedural default in one, nor provided factual and legal analysis relating to trial counsel's inadequate preparation of Petitioner to testify.   And, as in *Ruiz*, Huff failed to undertake a necessary investigation, which failed to uncover and to present in the state habeas court a compelling *Wiggins* claim.[19]   As in *Ruiz*, these failures by state writ counsel to comply with recognized standards of writ practice bode ill for Mr. Ochoa unless he is able to satisfactorily exhaust any aspects of the claims.

Based on the fact that Mr. Ochoa's court-appointed state habeas attorney failed to investigate this case and, as a result, filed what can best be described as a record-based writ, Mr. Ochoa, as did the applicant in *Ruiz*, has compelling grounds to seek equitable relief from the Section 5 bar to successor writ applications from the Court of Criminal Appeals.   Thus, Mr. Ochoa has met the first prong of the *Rhines* test.

Mr. Ochoa likewise meets the second prong of the *Rhines* test because his claims are not plainly meritless.   *Rhines* does not set forth a test for determining when a claim is "plainly" meritless.   Mr. Ochoa respectfully suggests that the appropriate benchmark is the same used for determining whether the Respondent must answer Mr. Ochoa's petition:   whether it appears from

---

[19]   Even with what can be characterized as an initial investigation, current counsel in this federal writ proceeding were able to uncover serious deficiencies in trial counsel's investigation and preparation for trial.   Particularly, it is indisputable that counsel failed to begin any meaningful investigation until shortly before *voir dire* began, and this lack of investigation impacted the trial from jury selection to closing argument in punishment.   A simple phone call to Tena Francis, the mitigation specialist retained (though very late) by trial counsel revealed tremendous concerns with trial counsels' performance and raised the sort of red flags that should prompt additional investigation.   And additional investigation with Mr. Ochoa's family only confirmed that trial counsel failed to investigate this case properly.   It is apparent that Huff did not take even these basic steps.

the face of the petition that Mr. Ochoa may be entitled to relief.  Respondent was clearly required
to respond to Mr. Ochoa's petition, and in fact did so.  As detailed in his original petition for a writ
of habeas corpus, many, if not all, of Mr. Ochoa's claims will likely entitle him to relief once they
have been exhausted.   Moreover, as set out above, the recent recognition of equitable exceptions
to Texas' procedural bar to successive petitions means that returning to state court is no longer an
exercise in futility.  Finally, Mr. Ochoa is not engaging in dilatory tactics in seeking this stay.  Once
he was appointed competent counsel in these proceedings, Mr. Ochoa raised his unexhausted claims.
He is simply seeking an opportunity to permit state court consideration of these claims, which entitle
him to relief.

## VI.  Prayer for Relief

WHEREFORE, PREMISES CONSIDERED, Petitioner, Abel Revill Ochoa, prays that this

Court:

1.      Deny Respondent's motion for summary judgment in all things;

2.      Grant Mr. Ochoa's request to stay and abey the proceedings to allow him to return
        to state court and exhaust those meritorious claims that are unexhausted.

3.      Authorize under Habeas Rule 6 fact-finding mechanisms such as discovery to
        resolve factual disputes and, under Habeas Rule 8, hold an evidentiary hearing on the
        merits of Mr. Ochoa's claims, and, if necessary, on procedural issues, where Mr.
        Ochoa may present evidence in support of his claims and allegations;

4.      Grant Mr. Ochoa's Petition for Writ of Habeas Corpus.

5.      Grant such other relief as law and justice require.

<div style="margin-left:40%">

Respectfully submitted,

ALEXANDER L. CALHOUN
Attorney at Law
Texas Bar No. 00787187
4301 W. William Cannon Dr.  Ste. B-150
    # 260
Austin, Texas 78749
(512) 420-8850 (telephone)
(512) 233-5946 (facsimile)
(512) 731-731-3159 (cell)
alcalhoun@earthlink.net

By: /s/ Alexander L. Calhoun_____
        Alexander L. Calhoun
        Member of the Bar of this Court

</div>

PAUL E. MANSUR
Attorney at Law
Texas Bar No. 00796078
P.O. Box 1300
Denver City, Texas 79323
(806) 592-2797 (telephone)
(806) 592-9136 (facsimile)
pmansur@midtech.net

By:  /s/ Paul E. Mansur
       Paul E. Mansur
       Member of the Bar of this Court

       Attorney for Petitioner

### *Certificate of Service*

     I certify that on March 28, 2011, I served, by ECF, a true and correct copy of this Response upon opposing counsel at the following address:

Greg Abbott
attn: Stephen M. Hoffman
Texas Attorney General
Postconviction Litigation Division
P.O. Box 12548
Austin, Texas 78711-2548

       /s/ Paul E. Mansur
       Paul E. Mansur